## <u>ORAL ARGUMENT NOT YET SCHEDULED</u>

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Nos. 13-1112 and 10-1371 (and consolidated case No. 10-1378)

---

SIERRA CLUB, *et al*.,
Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
Respondents.

---

NATURAL RESOURCES DEFENSE COUNCIL,
Petitioner,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al*.,
Respondents.

---

Petition for Review of Final Administrative Action of the
United States Environmental Protection Agency

---

### PROOF BRIEF FOR PETITIONERS

James S. Pew
Seth L. Johnson
Earthjustice
1625 Massachusetts Ave., NW
Suite 702
Washington, DC 20036-2212
(202) 667-4500
jpew@earthjustice.org
sjohnson@earthjustice.org

*Counsel for Petitioners in Nos. 10-1378 and 13-1112*

John Walke
Meleah Geertsma
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington, DC 20005
(202) 289-6868
jwalke@nrdc.org
mgeertsma@nrdc.org

Avinash Kar
Natural Resources Defense Council
111 Sutter St., 20th Floor
San Francisco, CA 94104
(415) 875-6100
akar@nrdc.org

**Dated: June 5, 2013**

*Counsel for Petitioner in No. 10-1371*

**ORAL ARGUMENT NOT YET SCHEDULED**

## UNITED STATES COURT OF APPEALS FOR
## THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, | ) |
| *Petitioner*, | ) |
| v. | ) |
| | ) Case No. 10-1371 |
| | ) (and consolidated case No. 10-1378) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | ) |
| *Respondents*. | ) |

### PETITIONERS' CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Cir. R. 28(a)(1)(A), Petitioners hereby certify as follows:

**(A) Parties and Amici**

**(i) Parties, Intervenors, and Amici Who Appeared in the District Court**

This case is a petition for review of final agency action, not an appeal from the ruling of a district court.

**(ii) Parties to This Case**

Petitioners:

Petitioner is case No. 10-1371 is the Natural Resources Defense Council.

Petitioners in case No. 10-1378 are Sierra Club, Desert Citizens Against Pollution, Downwinders At Risk, Huron Environmental Activist League, Friends of Hudson, and Montanans Against Toxic Burning.

Respondents:

The respondents are the United States Environmental Protection Agency and Robert Perciasepe,[1] Acting Administrator (collectively, "EPA").

Intervenors:

CEMEX, Inc., Eagle Materials, Inc., Holcim (US) Inc., LaFarge Building Materials, Inc., LaFarge Midwest Inc., LaFarge North America, Inc., Lehigh Cement Company, Portland Cement Association, Riverside Cement Company, TXI Operations, LP, and Utility Solid Waste Activities Group are intervenors for respondents.  Ash Grove Cement Company is movant-intervenor for respondents.

**(iii) *Amici* in This Case**

SSM Coalition is *amicus curiae* for petitioners.

**(iv) Circuit Rule 26.1 Disclosures for Petitioners**

See disclosure form below.

**(B) Rulings Under Review**

Petitioners seek review of final action taken by EPA at 75 Fed. Reg. 54,970 (Sept. 9, 2010) and titled "National Emission Standards for Hazardous Air Pollutants From the Portland Cement Manufacturing Industry and Standards of Performance for Portland Cement Plants."

---

[1] Bob Perciasepe is automatically substituted for Lisa Perez Jackson, who resigned. Fed. R. App. P. 43(c)(2).

**(C) Related Cases**

Petitioners are unaware of any other currently pending challenges in this Court to portions or the whole of the same rule.

The following challenges to EPA's action setting national emission standards for hazardous air pollutants from the Portland cement manufacturing industry, which EPA took at 78 Fed. Reg. 10,006 (Feb. 12, 2013), are related and are pending in this Court:

- Sierra Club, Cape Fear River Watch, Citizens' Environmental Coalition, Desert Citizens Against Pollution, Downwinders at Risk, Friends of Hudson, Huron Environmental Activist League, Montanans Against Toxic Burning, and PenderWatch and Conservancy, Apr. 5, 2013, No. 13-1112

On May 1, 2013, the petitioners in this case and in case No. 13-1112 filed a motion to govern, seeking consolidation with these cases.

3

DATED:      June 5, 2013

Respectfully submitted,

/s/James S. Pew                          /s/John Walke (with permission)
James S. Pew                             John Walke
Seth L. Johnson                          Meleah Geertsma
Earthjustice                             Natural Resources Defense Council
1625 Massachusetts Ave., NW              1152 15th St. NW
Suite 702                                Suite 300
Washington, D.C. 20036-2212              Washington, DC 20005
(202) 667-4500                           (202) 289-6868
jpew@earthjustice.org                    jwalke@nrdc.org
sjohnson@earthjustice.org                mgeertsma@nrdc.org

*Counsel for Petitioners in No. 10-1378*     Avinash Kar
                                         Natural Resources Defense Council
                                         111 Sutter St., 20th Floor
                                         San Francisco, CA 94104
                                         (415) 875-6100
                                         akar@nrdc.org

                                         *Counsel for Petitioner in No. 10-1371*

**ORAL ARGUMENT NOT YET SCHEDULED**

## UNITED STATES COURT OF APPEALS FOR
## THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| SIERRA CLUB, *et al.*, <br> *Petitioners*, <br><br> v. <br><br> U.S. ENVIRONMENTAL <br> PROTECTION AGENCY, *et al.*, <br> *Respondents*. | Case No. 13-1112 |

## PETITIONERS' CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Cir. R. 28(a)(1), Petitioners hereby certify as follows:

**(A) Parties and Amici**

**(i) Parties, Intervenors, and Amici Who Appeared in the District Court**

This case is a petition for review of final agency action, not an appeal from the ruling of a district court.

**(ii) Parties to This Case**

Petitioners:

The petitioners in this case are Sierra Club, Cape Fear River Watch, Citizens' Environmental Coalition, Desert Citizens Against Pollution, Downwinders at Risk, Friends of Hudson, Huron Environmental Activist League, Montanans Against Toxic Burning, and PenderWatch and Conservancy.

Respondents:

The respondents are the United States Environmental Protection Agency and Robert Perciasepe, Acting Administrator (collectively, "EPA").

Intervenors:

Portland Cement Association and Holcim (US) Inc. are intervenors for respondents.

**(iii) *Amici* in This Case**

As yet, there are no *amici curiae*.

**(iv) Circuit Rule 26.1 Disclosures for Petitioners**

See disclosure form filed previously.

**(B) Rulings Under Review**

Petitioners seek review of final action taken by EPA at 78 Fed. Reg. 10,006 (Feb. 12, 2013) and titled "National Emission Standards for Hazardous Air Pollutants for the Portland Cement Manufacturing Industry and Standards of Performance for Portland Cement Plants."

**(C) Related Cases**

*NACWA v. EPA*, Case No. 11-1131 (oral argument held May 3, 2013) appears to be related within the meaning of Circuit Rule 28(a)(1)(C), because Sierra Club is a petitioner in both cases and because this case and that case challenge EPA's interpretation of closely similar "beyond-the-floor" language in, respectively, Clean Air Act § 112(d)(2), 42 U.S.C. § 7412(d)(2), and § 129(a)(2),

2

42 U.S.C. § 7429(a)(2). However, the Court may not reach this issue in *NACWA*.
*See Northeast Maryland Waste Disposal Authority v. EPA*, 358 F.3d 936, 955
(D.C. Cir. 2004).

The following challenges to EPA's action setting national emission
standards for hazardous air pollutants from the Portland cement manufacturing
industry, which EPA took at 75 Fed. Reg. 54,970 (Sept. 9, 2010), are related and
are pending in this Court:

- Natural Resources Defense Council, Nov. 8, 2010, No. 10-1371

- Sierra Club, Desert Citizens Against Pollution, Downwinders At Risk,
  Friends of Hudson, Huron Environmental Activist League, and Montanans
  Against Toxic Burning, Nov. 8, 2010, No. 10-1378

Case Nos. 10-1371 and 10-1378 are consolidated and being held in abeyance. On
May 1, 2013, the petitioners in those cases filed a motion to govern, seeking
consolidation with this case.

DATED:      June 5, 2013

Respectfully submitted,

/s/James S. Pew
James S. Pew
Seth L. Johnson
Earthjustice
1625 Massachusetts Ave., NW
Suite 702
Washington, D.C. 20036-2212
(202) 667-4500
jpew@earthjustice.org
sjohnson@earthjustice.org

*Counsel for Petitioners*

ORAL ARGUMENT NOT YET SCHEDULED

## IN THE UNITED STATES COURT OF APPEALS FOR
## THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL, | ) |
| *Petitioner*, | ) |
| v. | ) No. 10-1371 |
| | ) (and consolidated case |
| | ) No. 13-1378) |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | ) |
| *Respondents*. | ) |

## RULE 26.1 DISCLOSURE STATEMENT

### Desert Citizens Against Pollution

<u>Non-Governmental Corporate Party to this Action</u>: Desert Citizens Against Pollution.

<u>Parent Corporations</u>: None

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None

<u>Party's General Nature and Purpose</u>: Desert Citizens Against Pollution is a corporation organized and existing under the laws of the State of California to protect the communities of the desert from pollution and its threat to human health and the environment

### Downwinders at Risk

<u>Non-Governmental Corporate Party to this Action</u>:  Downwinders at Risk.

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: Downwinders at Risk, a nonprofit corporation organized and existing under the laws of the State of Texas, is a diverse grassroots citizens group dedicated to reducing toxic industrial air pollution in North Texas and to continued education and advocacy concerning cement plant pollution.

### Friends of Hudson

<u>Non-Governmental Corporate Party to this Action</u>: Friends of Hudson.

<u>Parent Corporations</u>: None

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None

<u>Party's General Nature and Purpose</u>: Friends of Hudson, a nonprofit corporation organized and existing under the laws of the State of New York, has members in communities throughout Columbia County, the mid-Hudson Valley, and neighboring states. Friends of Hudson is dedicated to ensuring a healthy, sustainable, and fulfilling quality of life for the region's economically and culturally diverse population by safeguarding public health, air and water quality, natural habitats and species, protecting agricultural, cultural, historic, natural, and scenic resources, and encouraging a vibrant, balanced, and sustainable local economy.

### Huron Environmental Activist League

Non-Governmental Corporate Party to this Action: Huron Environmental Activist League.

Parent Corporations: None

Publicly Held Company that Owns 10% or More of Party's Stock: None

Party's General Nature and Purpose: Huron Environmental Activist League, certified and existing as a non-profit educational corporation under the laws of the State of Michigan, was formed by residents of Alpena County to educate and protect residents of Alpena County (and other counties as dictated by the Board of Directors) from human and environmental contaminants and their impact on the environment and public health and safety; to work with environmental organizations, regulatory agencies, corporations, and lawmakers in seeking solutions and alternatives to human and environmental contamination; and to monitor the activities of companies that generate human and environmental contaminants in Alpena, Michigan (and elsewhere as dictated by the Board of Directors), as well as the regulatory agencies that oversee such companies.

## Montanans Against Toxic Burning

Non-Governmental Corporate Party to this Action: Montanans Against Toxic Burning.

Parent Corporations: None

Publicly Held Company that Owns 10% or More of Party's Stock: None

Party's General Nature and Purpose: Montanans Against Toxic Burning, a corporation registered and existing under the laws of the State of Montana, is a nonprofit, grassroots citizens' advocacy group of health professionals, small business owners, farmers, ranchers, builders, and other concerned citizens focused on air quality issues in Montana. Their goal is to educate the public about the human health and environmental risks of toxic waste incineration. They oppose the burning of hazardous, toxic, and solid wastes in industrial facilities not specifically designed for that purpose. They support the responsible disposal of wastes, including true recycling and other alternatives, and the reduction of hazardous air pollutants through the use of best available control technology.

## Natural Resources Defense Council

Non-Governmental Corporate Party to this Action: Natural Resources Defense Council.

Parent Corporations: None

Publicly Held Company that Owns 10% or More of Party's Stock: None

Party's General Nature and Purpose: Natural Resources Defense Council, a corporation organized and existing under the laws of the State of New York, is a national nonprofit organization dedicated to improving the quality of the human environment and protecting the nation's endangered natural resources.

**Sierra Club**

<u>Non-Governmental Corporate Party to this Action</u>: Sierra Club.

<u>Parent Corporations</u>: None

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None

<u>Party's General Nature and Purpose</u>: Sierra Club, a corporation organized and existing under the laws of the State of California, is a national nonprofit organization dedicated to the protection and enjoyment of the environment.

DATED:      June 5, 2013

Respectfully submitted,

<u>/s/James S. Pew</u>                          <u>/s/John Walke (with permission)</u>
James S. Pew                            John Walke
Seth L. Johnson                         Meleah Geertsma
Earthjustice                            Natural Resources Defense Council
1625 Massachusetts Ave., NW             1152 15th St. NW
Suite 702                               Suite 300
Washington, D.C. 20036-2212             Washington, DC 20005
(202) 667-4500                          (202) 289-6868
jpew@earthjustice.org                   jwalke@nrdc.org
sjohnson@earthjustice.org               mgeertsma@nrdc.org

*Counsel for Petitioners in No. 10-1378*    Avinash Kar
                                        Natural Resources Defense Council
                                        111 Sutter St., 20th Floor
                                        San Francisco, CA 94104
                                        (415) 875-6100
                                        akar@nrdc.org

                                        *Counsel for Petitioner in No. 10-1371*

ORAL ARGUMENT NOT YET SCHEDULED

## IN THE UNITED STATES COURT OF APPEALS FOR
## THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| SIERRA CLUB, *et al.*, | ) | |
| *Petitioners*, | ) | |
| v. | ) | No. 13-1112 |
| | ) | |
| UNITED STATES ENVIRONMENTAL | ) | |
| PROTECTION AGENCY, *et al.*, | ) | |
| *Respondents*. | ) | |

## RULE 26.1 DISCLOSURE STATEMENT

### Cape Fear River Watch

<u>Non-Governmental Corporate Party to this Action</u>: Cape Fear River Watch.

<u>Parent Corporations</u>: None

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None

<u>Party's General Nature and Purpose</u>: Cape Fear River Watch ("CFRW") is a not-for-profit corporation organized and existing under the laws of North Carolina. Its mission is to protect and improve the water quality of the lower Cape Fear River basin through education, advocacy and action. CFRW provides programs and activities for its members including clean-ups on local water bodies and advocates on environmental issues affecting the Cape Fear River Basin such as environmentally sustainable development, hog lagoon regulations, coal ash regulations, wetland preservation and restoration, vegetative wetland retention, oyster reseeding, and recycling.

## Citizens' Environmental Coalition

<u>Non-Governmental Corporate Party to this Action</u>: Citizens' Environmental Coalition.

<u>Parent Corporations</u>: None

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None

<u>Party's General Nature and Purpose</u>: Citizens' Environmental Coalition, a nonprofit corporation organized and existing under the laws of the State of New York, is a grassroots organization that works with citizens throughout the State of New York to create safe and healthy communities by reducing exposure to toxic chemicals.

## Desert Citizens Against Pollution

<u>Non-Governmental Corporate Party to this Action</u>: Desert Citizens Against Pollution.

<u>Parent Corporations</u>: None

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None

<u>Party's General Nature and Purpose</u>: Desert Citizens Against Pollution is a corporation organized and existing under the laws of the State of California to protect the communities of the desert from pollution and its threat to human health and the environment

**Downwinders at Risk**

<u>Non-Governmental Corporate Party to this Action</u>:  Downwinders at Risk.

<u>Parent Corporations</u>: None.

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None.

<u>Party's General Nature and Purpose</u>: Downwinders at Risk, a nonprofit corporation organized and existing under the laws of the State of Texas, is a diverse grassroots citizens group dedicated to reducing toxic industrial air pollution in North Texas and to continued education and advocacy concerning cement plant pollution.

**Friends of Hudson**

<u>Non-Governmental Corporate Party to this Action</u>: Friends of Hudson.

<u>Parent Corporations</u>: None

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None

<u>Party's General Nature and Purpose</u>: Friends of Hudson, a nonprofit corporation organized and existing under the laws of the State of New York, has members in communities throughout Columbia County, the mid-Hudson Valley, and neighboring states. Friends of Hudson is dedicated to ensuring a healthy, sustainable, and fulfilling quality of life for the region's economically and culturally diverse population by safeguarding public health, air and water quality, natural habitats and species, protecting agricultural, cultural, historic, natural, and

scenic resources, and encouraging a vibrant, balanced, and sustainable local economy.

## Huron Environmental Activist League

<u>Non-Governmental Corporate Party to this Action</u>: Huron Environmental Activist League.

<u>Parent Corporations</u>: None

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None

<u>Party's General Nature and Purpose</u>: Huron Environmental Activist League, certified and existing as a non-profit educational corporation under the laws of the State of Michigan, was formed by residents of Alpena County to educate and protect residents of Alpena County (and other counties as dictated by the Board of Directors) from human and environmental contaminants and their impact on the environment and public health and safety; to work with environmental organizations, regulatory agencies, corporations, and lawmakers in seeking solutions and alternatives to human and environmental contamination; and to monitor the activities of companies that generate human and environmental contaminants in Alpena, Michigan (and elsewhere as dictated by the Board of Directors), as well as the regulatory agencies that oversee such companies.

**Montanans Against Toxic Burning**

<u>Non-Governmental Corporate Party to this Action</u>: Montanans Against Toxic Burning.

<u>Parent Corporations</u>: None

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None

<u>Party's General Nature and Purpose</u>: Montanans Against Toxic Burning, a corporation registered and existing under the laws of the State of Montana, is a nonprofit, grassroots citizens' advocacy group of health professionals, small business owners, farmers, ranchers, builders, and other concerned citizens focused on air quality issues in Montana. Their goal is to educate the public about the human health and environmental risks of toxic waste incineration. They oppose the burning of hazardous, toxic, and solid wastes in industrial facilities not specifically designed for that purpose. They support the responsible disposal of wastes, including true recycling and other alternatives, and the reduction of hazardous air pollutants through the use of best available control technology.

**PenderWatch and Conservancy**

<u>Non-Governmental Corporate Party to this Action</u>: PenderWatch and Conservancy.

<u>Parent Corporations</u>: None

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None

5

<u>Party's General Nature and Purpose</u>: PenderWatch and Conservancy is a not-for-profit corporation organized and existing under the laws of North Carolina. PenderWatch's mission is to preserve and maintain the natural environment of Pender County by promoting environmentally sound policies and programs. The organization serves this mission by, among other things: (i) actively working with local officials on land use, zoning, and other regulatory issues; (ii) addressing issues related to utilities, pollution, stormwater runoff, and waste disposal; (iii) promoting conservation of wetlands, forests, and wildlife; (iv) taking action on water quality issues affecting the coast; and (v) educating the public about environmental issues affecting Pender County at schools, fairs, and civic and community organization meetings.

## Sierra Club

<u>Non-Governmental Corporate Party to this Action</u>: Sierra Club.

<u>Parent Corporations</u>: None

<u>Publicly Held Company that Owns 10% or More of Party's Stock</u>: None

<u>Party's General Nature and Purpose</u>: Sierra Club, a corporation organized and existing under the laws of the State of California, is a national nonprofit organization dedicated to the protection and enjoyment of the environment.

DATED: June 5, 2013

Respectfully submitted,

/s/James S. Pew
James S. Pew
Seth L. Johnson
Earthjustice
1625 Massachusetts Ave., NW
Suite 702
Washington, DC 20036-2212
(202) 667-4500
jpew@earthjustice.org
sjohnson@earthjustice.org

*Counsel for Petitioners*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

GLOSSARY OF ACRONYMS AND ABBREVIATIONS ................. ix

PRELIMINARY STATEMENT ...................................................... 1

JURISDICTIONAL STATEMENT .................................................. 1

STATUTES AND REGULATIONS ................................................. 2

STATEMENT OF ISSUES................................................................ 2

STATEMENT OF FACTS ............................................................... 4

    I. FACTUAL BACKGROUND. ................................................. 4

    II. STATUTORY BACKGROUND ............................................ 6

    III. HISTORY OF THE CEMENT PLANTS LITIGATION AND RULES. ...... 9

        A. The 2010 Rule: A Decade to Respond to This Court's Remand. ........... 9

        B. The *PCA* Decision. ................................................. 11

        C. EPA's Post-Litigation "Settlement" with PCA. .................................. 12

        D. The Weakened and Delayed Standards, and Confirmation of the Affirmative Defense. ......................................... 13

SUMMARY OF ARGUMENT ........................................................ 17

STANDING.................................................................................... 20

STANDARD OF REVIEW .............................................................. 26

ARGUMENT .................................................................................. 27

    I. EPA'S DECISION TO WEAKEN THE PARTICULATE MATTER STANDARD VIOLATES CLEAN AIR ACT §112(d)(7). ........................... 27

    II. EPA'S REFUSAL TO SET PM STANDARDS THAT REQUIRE THE MAXIMUM ACHIEVABLE DEGREE OF REDUCTION IS UNLAWFUL AND ARBITRARY................................................................. 32

    III. EPA'S DELAY OF THE COMPLIANCE DATE VIOLATES CLEAN AIR ACT §112(i)(3)(A)................................................. 37

        A. The Delayed Compliance Date Is Not "As Expeditious[] As Practicable."................................................. 37

B.  EPA Cannot Circumvent §112(i)(3)(A) by Voluntarily Weakening Its Emission Standards ................................................................................ 41

1.  EPA Cannot Extend the Compliance Date for Any of the Emission Standards ........................................................................................... 41

2.  Even If EPA Could Extend the Compliance Date for Its PM Standard, It Lacks Authority to Extend the Compliance Dates for the Other Emission Standards ................................................................................. 46

IV.  EPA'S AFFIRMATIVE DEFENSE FOR MALFUNCTIONS IS UNLAWFUL AND ARBITRARY ................................................................. 47

A.  The Affirmative Defense Is Unlawful ................................................ 48

1.  The Affirmative Defense Exceeds EPA's Authority ........................ 48

2.  The Affirmative Defense Contravenes §§112(d) and 302(k), and Circumvents This Court's Ruling in *Sierra Club-SSM* ........................ 56

B.  Even If the Act Is Ambiguous, EPA's Interpretation Is Unlawful and the Affirmative Defense Is Arbitrary ................................................ 57

1.  The Affirmative Defense Is Not Entitled to *Chevron* Deference ...... 57

2.  EPA's Affirmative Defense Is Unlawful Under *Chevron* Step Two And Arbitrary ..................................................................................... 58

CONCLUSION AND RELIEF REQUESTED ................................................... 61

CERTIFICATE REGARDING WORD LIMITATION ...................................... 63

STATUTES AND REGULATIONS

DECLARATIONS

CERTIFICATE OF SERVICE

ii

# <u>TABLE OF AUTHORITIES</u>

CASES                                                                          PAGE(S)

*Adams Fruit Co. v. Barrett*,
    494 U.S. 638 (1990)..................................................................................57

*Am. Elec. Power Serv. Corp. v. FCC*,
    708 F.3d 183 (D.C. Cir. 2013) ...............................................................30

*Am. Petroleum Inst. v. EPA*,
    52 F.3d 1113 (D.C. Cir. 1995) ..........................................................53, 55

*Am. Textile Mfrs. Inst. v. Donovan*,
    452 U.S. 490 (1981).............................................................................35, 36

*Arthur Andersen LLP v. Carlisle*,
    556 U.S. 624 (2009)..................................................................................37

*Ashton v. Pierce*,
    716 F.2d 56, *amended in other part* 723 F.2d 70 (D.C. Cir. 1983) .............40, 41

*Ass'n of Battery Recyclers v. EPA*,
    2013 WL 2302713 (D.C. Cir. May 28, 2013)...................................20

*Barnhart v. Sigmon Coal Co.*,
    534 U.S. 438 (2002)..................................................................................29

*Business Roundtable v. SEC*,
    647 F.3d 1144 (D.C. Cir. 2011) .............................................................59

*Chevron U.S.A. Inc. v. NRDC*,
    467 U.S. 837 (1984).............................................................................26, 35

*City of Arlington v. FCC*,
    No. 11-1545, 2013 WL 2149789 (Super Ct. May 20, 2013).......................48, 57

*Clinton v. City of New York*,
    524 U.S. 417 (1998)..................................................................................25

*Cases upon which we chiefly rely are marked with an asterisk.*

iii

*Engine Mfrs. Ass'n v. EPA*,
   88 F.3d 1075 (D.C. Cir. 1996) .......................................................... 28

*Ethyl Corp. v. EPA*,
   51 F.3d 1053 (D.C. Cir. 1995) .................................................. 36, 55

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) .......................................................................... 30

*Financial Planning Ass'n v. SEC*,
   482 F.3d 481 (D.C. Cir. 2007) ........................................................ 28

*Friends of the Earth v. EPA*,
   446 F.3d 140 (D.C. Cir. 2006) ........................................................ 55

*Friends of the Earth v. Laidlaw Envtl. Servs. (TOC)*,
   528 U.S. 167 (2000) .......................................................................... 23

*Frontier Pipeline Co. v. FERC*,
   452 F.3d 774 (D.C. Cir. 2006) ........................................................ 59

*Halverson v. Slater*,
   129 F.3d 180 (D.C. Cir. 1997) ........................................................ 61

*Hamilton v. Lanning*,
   130 S.Ct. 2464 (2010) ...................................................................... 33

*HUD v. Rucker*,
   535 U.S. 125 (2002) .......................................................................... 50

*Husqvarna v. EPA*,
   254 F.3d 195 (D.C. Cir. 2001) .................................................. 36, 37

*International Alliance v. NLRB*,
   334 F.3d 27 (D.C. Cir. 2003) .................................................... 58, 59

*Kucana v. Holder*,
   558 U.S. 233 (2010) .......................................................................... 29

*Lamie v. U.S. Trustee*,
   540 U.S. 526 (2004) .......................................................................... 38

iv

*Massachusetts v. DOT*,
   93 F.3d 890 (D.C. Cir. 1996) ....................................................27, 61

*Miller v. Clinton*,
   687 F.3d 1332 (D.C. Cir. 2012) ...............................................26, 58

*Nat'l Cottonseed Products Ass'n v. Brock*,
   825 F.2d 482 (D.C. Cir. 1987) ........................................................36

*National Lime Ass'n v. EPA*,
   233 F.3d 625 (D.C. Cir. 2000) .................................................1, 6, 9

*Ne. Hosp. Corp. v. Sebelius*,
   657 F.3d 1 (D.C. Cir. 2011) ...........................................................37

*New Jersey v. EPA*,
   517 F.3d 574 (D.C. Cir. 2008) ......................................... 30, 31, 51, 52

*North Carolina v. EPA*,
   531 F.3d 896 (D.C. Cir. 2008) ...................................................28, 60

*NRDC v. EPA*,
   489 F.3d 1364 (D.C. Cir. 2007) ......................... 21, 30, 40, 42-43, 47

*Oljato Ch. of Navajo Tribe v. Train*,
   515 F.2d 654 (D.C. Cir. 1975) ........................................................31

*PCA v. EPA*,
   665 F.3d 177 (D.C. Cir. 2011) ........................................... 12, 45, 46

*Pennsylvania v. Del. Valley Citizens Council for Clean Air*,
   478 U.S. 546 (1986)..........................................................................8

*Pound v. Airosol Co., Inc.*,
   498 F.3d 1089 (10th Cir. 2007).................................................24, 49

*Pub. Citizen Health Research Grp. v. Dep't of Labor*,
   557 F.3d 165 (3rd Cir. 2009) .........................................................36

*Rettig v. Pension Benefit Guar. Corp.*
   744 F.2d 133 (D.C. Cir. 1984) .............................................58, 60, 61

*Rwy. Labor Executives' Ass'n v. Nat'l Mediation Bd.*,
   29 F.3d 655 (D.C. Cir. 1994) (en banc)............................................................55

*\*S. Coast Air Quality Mgmt. Dist. v. EPA*,
   489 F.3d 1245 (D.C. Cir. 2007) ................................................................43, 45

*Shays v. FEC*,
   414 F.3d 76 (D.C. Cir. 2005) ..............................................................24, 26, 55

*Sierra Club v. EPA*,
   129 F.3d 137 (D.C. Cir. 1997) ....................................................................20

*Sierra Club v. EPA*,
   294 F.3d 155 (D.C. Cir. 2002) ....................................................................52

*Sierra Club v. EPA*,
   325 F.3d 374 (D.C. Cir. 2003) ....................................................................36

*Sierra Club v. EPA*,
   479 F.3d 875 (D.C. Cir. 2007) ("*Sierra Club-Brick*") ................................7, 57

*\*Sierra Club v. EPA*,
   551 F.3d 1019 (D.C. Cir. 2008) ("*Sierra Club-SSM*")............. 11, 22, 52, 56, 60

*St. Bernard Citizens for Envtl. Quality v. Chalmette Refining*,
   500 F.Supp.2d 592 (E.D. La. 2007) ................................................................23

*Teva Pharma., USA v. Sebelius*,
   595 F.3d 1303 (D.C. Cir. 2010) ....................................................................25

*United States v. Anthony Dell'Aquilla, Enters.*,
   150 F.3d 329 (3d Cir. 1998).............................................................................49

*United States v. Atl. Research Corp.*,
   551 U.S. 128 (2007)..........................................................................................29

*United States v. Oliver*,
   394 Fed. Appx. 376 (9th Cir. 2010) ..............................................................49

*United Steelworkers of Am., ALF-CIO-CLC v. Marshall*,
   647 F.2d 1189 (D.C. Cir. 1980) ....................................................................34

*Vill. of Barrington, Ill. v. Surface Transp. Bd.*,
   636 F.3d 650 (D.C. Cir. 2011) ........................................................27

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001)...............................................................35, 43

*Wolf Run Mining Co. v. FMSHRC*,
   659 F.3d 1197 (D.C. Cir. 2011) ....................................................29

**STATUTES**

42 U.S.C. §7412 ................................................................................1

42 U.S.C. §7412(b) ...........................................................................6

42 U.S.C. §7412(c) ...........................................................................6

*42 U.S.C. §7412(d)(2) ...............................................................6, 33

42 U.S.C. §7412(d)(3) .................................................................6, 9

42 U.S.C. §7412(d)(6) ...............................................................7, 30

*42 U.S.C. §7412(d)(7) .....................................................2, 7, 27, 28

42 U.S.C. §7412(f)(2)(A).................................................................30

42 U.S.C. §7412(f)(2)(C).................................................................30

*42 U.S.C. §7412(i)(3)(A) ...................................... 3, 7, 10, 37,39, 42, 46

42 U.S.C. §7412(i)(3)(B) .............................................................8, 42

42 U.S.C. §7412(i)(4)-(8) ...............................................................42

42 U.S.C. §7413(c)(5)(C)-(D)..........................................................50

42 U.S.C. §7413(d) ..........................................................................49

42 U.S.C. §7413(d)(2)(B) ................................................................50

42 U.S.C. §7413(e) ............................................................................4

*42 U.S.C. §7413(e)(1)..........................................9, 24, 47, 49-51, 61

42 U.S.C. §7429(h)(1) ...................................................................29

42 U.S.C. §7429(h)(2) ...................................................................29

42 U.S.C. §7601(a) .......................................................................53

42 U.S.C. §7601(a)(1) ...........................................................1, 53, 57

42 U.S.C. §7602(k) .......................................................................54

*42 U.S.C. §7604(a) .........................................................8, 47, 48, 50

42 U.S.C. §7604(a)(1)(A) ...............................................................48

42 U.S.C. §7604(g) .......................................................................23

42 U.S.C. §7604(g)(2) .....................................................................9

42 U.S.C. §7607(b) .......................................................................31

42 U.S.C. §7607(b)(1) ...........................................................1, 2, 31

42 U.S.C. §7607(d)(1)(C) ...............................................................26

42 U.S.C. §7607(d)(3) ...................................................................45

42 U.S.C. §7607(d)(9) ...................................................................26

## CODE OF FEDERAL REGULATIONS

40 C.F.R. §63.2 ...........................................................................59

40 C.F.R. §63.1344(a) ...................................................................47

## FEDERAL REGISTER

63 Fed. Reg. 14,182 (Mar. 24, 1998) .............................................5, 6

75 Fed. Reg. 54,970 (Sept. 9, 2010) ("2010 Rule")...............1, 6, 9-11, 16, 41

76 Fed. Reg. 28,318 (May 17, 2011)...........................................12, 32

76 Fed. Reg. 2832 (Jan. 18, 2011)................................................10

77 Fed. Reg. 27,055 (May 8, 2012)................................................12

77 Fed. Reg. 42,368 (July 18, 2012) ........................................ 14, 15, 23-33, 52, 54

78 Fed. Reg. 10,006 (Feb. 12, 2013) ("2013 Rule")…………………………………

……………………………1-3, 6, 14-16, 27, 28, 30-36, 41-46, 51-54, 59-60

78 Fed. Reg. 3086 (Jan. 15, 2013)......................................................................4, 5

## OTHER AUTHORITIES

*Black's Law Dictionary* 1172 (6th ed. 1990).........................................................38

S. Rep. 101-228 (1989)................................................................................8, 49

Webster's Seventh New Collegiate Dictionary 7 (1971) .......................................33

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

Pursuant to Circuit Rule 28(a)(3), the following is a glossary of acronyms and abbreviations used in this brief:

| | |
|---|---|
| "CAA" | Clean Air Act |
| CISWI kilns | Cement kilns that burn waste |
| "EPA" | Respondents U.S. Environmental Protection Agency and Bob Perciasepe, Acting Administrator |
| HUD | Department of Housing and Urban Development |
| NRDC | Natural Resources Defense Council |
| NRDC Comments | Comment of NRDC, et al on May 2009 Proposed Rule on National Emission Standards for Hazardous Air Pollutants from the Portland Cement Manufacturing Industry |
| O'Hare Decl. | PCA Opp. to Mot. For Stay, Ex.2 (Declaration of Andrew T. O'Hare) |
| OSHA | Occupational Safety and Health Act |
| PCA | Portland Cement Association |
| PCA Memo | PCA, The Impact of a Change in the Cement NESHAP PM Limit on Compliance Strategies and Schedules |
| PM | Particulate matter |
| SIP | State implementation plan |
| THC | Total hydrocarbons |

## PRELIMINARY STATEMENT

The present case challenges amendments to EPA's limits on hazardous air pollutants from cement plants. 78 Fed. Reg. 10,006 (Feb. 12, 2013) ("2013 Rule"). These amendments weaken and delay compliance with a previous rule that EPA promulgated in response to this Court's decision in *National Lime Ass'n v. EPA*, 233 F.3d 625 (D.C. Cir. 2000). 75 Fed. Reg. 54,970 (Sept. 9, 2010) ("2010 Rule"). This case also challenges EPA's "affirmative defense" — promulgated without notice and comment in the 2010 Rule and retained on reconsideration in the 2013 Rule — that purports to limit federal courts' authority to impose civil penalties on cement companies that violate their emission standards during periods of malfunction.

## JURISDICTIONAL STATEMENT

**(A) Agency.** Respondents U.S. Environmental Protection Agency and Bob Perciasepe, Acting Administrator (collectively, "EPA" or "the agency") have jurisdiction to issue rules implementing EPA-administered provisions of the Clean Air Act ("the Act" or "CAA"). CAA §§112, 301(a)(1), 42 U.S.C. §§7412, 7601(a)(1).

**(B) Court of Appeals.** Pursuant to 42 U.S.C. §7607(b)(1), this Court has jurisdiction to review the final EPA actions, taken at 75 Fed. Reg. 54,970 (Sept. 9,

1

2010), JA\_\_\_\_, and 78 Fed. Reg. 10,006 (Feb. 12, 2013), JA\_\_\_\_, challenged in this proceeding.

**(C) Timeliness.** The petitions for review were timely filed within the 60-day window of CAA §307(b)(1), 42 U.S.C. §7607(b)(1), on Nov. 8, 2010 (Nos. 10-1371 and -1378), and Apr. 5, 2013 (No. 13-1112).

## STATUTES AND REGULATIONS

Pertinent statutes and regulations appear in an addendum to this brief.

## STATEMENT OF ISSUES

1.     Clean Air Act §112(d)(7) prohibits the agency from applying §112 emission standards to diminish or replace a more stringent standard previously issued under "section 7411 of this title, part C or D of this subchapter, or other authority of this chapter." 42 U.S.C. §7412(d)(7). "[T]his chapter" means the entire Clean Air Act. Does §112(d)(7) bar EPA from applying §112 standards to diminish or replace standards previously issued under §112? If so, did EPA violate §112(d)(7) by voluntarily weakening its previously issued particulate matter (PM) emission standard for existing cement kilns from 0.05 pounds per ton of clinker (lb/ton) to 0.07 lb/ton and its previously issued PM standard for new cement kilns from 0.01 lb/ton to 0.02 lb/ton?

2. Clean Air Act §112(d)(2) provides that §112(d) standards must require the "maximum" degree of reduction in emissions that, considering cost and certain other factors, is "achievable." *Id.* §7412(d)(2). Although EPA acknowledges that the stricter PM standards it set in the 2010 Rule are "achievable," it claims that they are not "cost-effective" and therefore "not 'achievable' within the meaning of section 112(d)(2)." 78 Fed. Reg. 10,020, JA____. Does EPA's refusal to set stronger PM standards contravene §112(d)(2)?

3. Clean Air Act §112(i)(3) provides that EPA must require compliance with "any" existing source emission standard "as expeditiously as practicable" but "in no event later than 3 years after the effective date of such standard." 42 U.S.C. §7412(i)(3)(A). Did EPA violate §112(i)(3)(A) by:

    a. extending the compliance date by two years (from 2013 to 2015) so that cement companies will have more time to deploy cheaper control strategies, even though it is "practicable" for companies to meet the original 2013 compliance date?

    b. using its voluntary weakening of the PM standards to extend the compliance date beyond 3 years?

    c. extending beyond 3 years the compliance dates for standards that have not changed since they were first promulgated in 2010?

3

4.      Clean Air Act §304 authorizes "any person" to bring an enforcement suit against a company that violates emission standards, and gives district courts exclusive jurisdiction to hear such cases and "to apply any appropriate civil penalties." *Id.* §7604(a). Clean Air Act §113(e) establishes the criteria that district courts must consider in determining what penalty (if any) to apply. *Id.* §7413(e). In the 2010 Rule, EPA created an affirmative defense to civil penalties that purports to preclude district courts from imposing civil penalties on cement companies that violate their emission limits during periods of equipment malfunction if certain agency-created conditions are met. Did EPA exceed its authority or act unlawfully and arbitrarily by purporting to limit district courts' statutory authority to apply civil penalties under §304 and §113(e) and citizens' ability to obtain penalties where a violation has occurred?

## STATEMENT OF FACTS

## I.      FACTUAL BACKGROUND.

The air pollutants cement plants emit are extremely dangerous. PM—and especially fine PM—cause death and cardiovascular harms, like heart attacks, that can require emergency room visits and hospitalization. 78 Fed. Reg. 3086, 3103/2-04/1 (Jan. 15, 2013) (adding that PM may cause developmental harms and lung cancer), JA____-__. It is dangerous for all, but particularly for children, seniors, and people with pre-existing heart or lung conditions. *Id.* 3104/1, JA____. There is

4

no known threshold below which PM is not dangerous. *E.g.*, *id.* 3140/1, JA____.

PM also likely harms vegetation and ecosystems, especially near cement plants. *Id.*

3203/2, JA____.

Mercury is notoriously hazardous. Children's exposure *in utero* can cause

neuro-developmental harms, and exposure outside the womb also harms brain

development. EPA-HQ-OAR-2002-0051-2898 ("NRDC Comments") 2-4,

JA____-__. Mercury can also harm adults neurologically and has been linked to

cardiovascular problems. *Id.* 4-5, JA____-__. It persists in watersheds,

accumulating in fish and other wildlife, and ultimately in humans. *Id.* 8, JA____.

Nearly every state—48 of the 50—has posted health advisories for mercury in fish,

affecting 35% of total U.S. lake acreage and about 25% of U.S. river miles. *Id.* 8-9,

JA____-__.

Also highly dangerous and persistent in the environment are cement plants'

emissions of non-mercury metals, such as arsenic, chromium, and lead, for which

EPA uses PM as a surrogate. These hazardous substances cause a range of harms

that include cancer, skin and lung irritation, neurological effects, cardiovascular

effects, and reproductive and developmental effects. 63 Fed. Reg. 14,182, 14,184/3

(Mar. 24, 1998), JA____. *See generally* NRDC Comments 21-25, JA____-__.

Total hydrocarbons ("THC") is EPA's surrogate for non-dioxin organic

hazardous air pollutants, which include acetaldehyde, benzene, formaldehyde, and

polycyclic organic matter. 63 Fed. Reg. 14,184/3, 14,187/3, JA____, ____. These

pollutants cause cancer, as well as neurological, blood, gastrointestinal,

developmental, and liver harms. *Id.* 14,184/3-85/1, JA____-__.

Hydrogen chloride ("HCl") "can cause damage to eyes, nose, throat, and the

upper respiratory tract as well as pulmonary edema, bronchitis, gastritis, and

dermatitis." 75 Fed. Reg. 54,985/3, JA____. "Exposure to HCl can lead to RADS,

a chemically- or irritant-induced type of asthma." 78 Fed. Reg. 10,028/3, JA____.

Children may be more vulnerable to HCl pollution than adults. *Id.*, JA____.


## II.    STATUTORY BACKGROUND.

In 1990 Congress amended the Clean Air Act to require highly protective

technology-based standards for all major sources of hazardous air pollutants. *See,*

*e.g.*, *National Lime*, 233 F.3d at 633-634. Section 112 of the Act listed 187

pollutants as hazardous, and required EPA to set standards requiring the

"maximum" degree of reduction that is "achievable" in all of these pollutants

considering cost and other factors. 42 U.S.C. §7412(b), (c), (d)(2). At a minimum,

standards for new sources must be no less stringent than the emission level actually

achieved by the best performing source in the category, and the agency's standards

for existing sources must reflect the average emission level achieved by the best-

performing 12% of the sources for which EPA has emissions information. *Id.*

§7412(d)(3); *see Sierra Club v. EPA*, 479 F.3d 875, 880-84 (D.C. Cir. 2007) ("*Sierra Club-Brick*").

Section 112 requires EPA to periodically review and revise the standards it promulgates under §112(d). Section 112(d)(6), in particular, requires EPA to "review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section no less often than every 8 years. 42 U.S.C. §7412(d)(6). Section 112(d)(7) then provides that no emission standard issued under §112 may be applied to weaken standards previously issued under either the Clean Air Act or state law. *Id.* §7412(d)(7).

Section 112(i)(3) governs the compliance dates for standards EPA issues under §112(d). Section 112(i)(3)(A) provides "the Administrator shall establish a compliance date or dates for each category or subcategory of existing sources, which shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard," subject to enumerated exceptions. *Id.* §7412(i)(3)(A). Of particular note, §112(i)(3)(B) provides a limited exception to §112(i)(3)(A): "The Administrator (or a State with a program approved under subchapter V of this chapter) may issue a permit that grants an extension permitting an existing source up to 1 additional year to comply with

7

standards under subsection (d) of this section if such additional period is necessary for the installation of controls." *Id.* §7412(i)(3)(B).

Section 304 gives citizens the right to file suit to enforce Clean Air Act emission standards, and gives federal district courts exclusive jurisdiction to hear such cases. *Id.* §7604(a). Congress enacted the citizen suit provision "specifically to encourage 'citizen participation in the enforcement of standards and regulations established under this Act,' and intended the section 'to afford citizens very broad opportunities to participate in the effort to prevent and abate air pollution.'" *Pennsylvania v. Del. Valley Citizens Council for Clean Air*, 478 U.S. 546, 560 (1986) (citations and alterations omitted).

In the Clean Air Act Amendments of 1990, Congress amended the Act to give district courts additional authority to impose civil penalties in citizen enforcement suits, 42 U.S.C. §7604(a), explaining that "[t]he assessment of civil penalties for violations of the Act is necessary for deterrence, restitution and retribution." S. Rep. No. 101-228, at 373 (1989), *as reprinted in* 1990 U.S.C.C.A.N. 3385, 3756.[1] In addition, §304(g) allows district courts to order that

---

[1] *See also, e.g.*, 136 Cong. Reg. S16,904/2 (Oct. 27, 1990) (Exhibit 1 to statement of Sen. Mitchell) ("Facilities subject to the requirements of the Act must know that compliance is the best and <u>least expensive</u> route for them to choose. Aggressive enforcement is key."), *reprinted in* 1 *A Legislative History of the Clean Air Act Amendments of 1990*, at 789 (1993) (emphasis added) [hereinafter *Legislative History*]; 136 Cong. Reg. H12,896/3 (Oct. 26, 1990) (statement of Rep. Collins)

continued on next page…

8

such penalties "be used in beneficial mitigation projects" to "enhance public health or the environment." 42 U.S.C. §7604(g)(2). Where a district court finds that a company has violated its emission standards, §113(e) spells out the criteria it shall consider in determining what penalties, if any, to apply. *Id.* §7413(e)(1).

## III.    HISTORY OF THE CEMENT PLANTS LITIGATION AND RULES.

## A.    The 2010 Rule: A Decade to Respond to This Court's Remand.

In *National Lime*, this Court ordered EPA to set statutorily required emission standards for cement plants' emissions of mercury, HCl, and THC (a surrogate for organic hazardous air pollutants such as benzene and formaldehyde). 233 F.3d at 633-34, 641. After delaying for ten years, EPA finally set these standards in the 2010 Rule. 75 Fed. Reg. 54,972/2-3, JA____. EPA also strengthened its standards for PM, a surrogate for non-mercury metals such as arsenic, chromium, and lead, after concluding its original standards did not satisfy the minimum stringency ("floor") requirements in §112(d)(3), 42 U.S.C. §7412(d)(3). 75 Fed. Reg. 54,987/2-3, JA____.

---

…continued from previous page
("If we are taking action for strong clean air legislation, then we must also ensure that the resulting legislation is fully enforceable. Clean citizen suit provisions are the key to that."), *reprinted in* 1 *Legislative History* 1308.

EPA stated that the new standards in the 2010 Rule would reduce cement plants' total mercury emissions by 16,600 pounds per year, a 92% reduction. EPA Fact Sheet 1-2, available at www.epa.gov/ttnatw01/pcem/pcempg.html, JA____-__. EPA further stated they would reduce cement plants' THC emissions by 10,600 tons/year (83%), their PM emissions by 11,500 tons/year (92%), and their HCl emissions by 5,800 tons/year (97%). *Id.* 2, JA____; *see also* EPA-HQ-OAR-2002-0051-3438 at 6 (giving same or similar figures), JA____. Although EPA did not calculate the health benefits of all these reductions, it found that the resulting reductions in cement plants' emissions of fine PM alone (particles less than 2.5 microns in diameter) would prevent between 960 and 2,500 premature deaths every year, along with 17,000 cases of aggravated asthma, 1,500 heart attacks, 1,000 emergency room visits, and 130,000 lost days of work. 75 Fed. Reg. 55,026-27 tbl.13, JA____-__.

EPA stated that the emission reductions and the health benefits would begin in 2013, when existing cement plants began to comply with the new standards. EPA Fact Sheet 1-2, 4, JA____-__, ____. EPA gave existing plants three years to comply because "[t]his is the maximum period allowed by law."[2] 75 Fed. Reg. 54,993/2, JA____; *see* 42 U.S.C. §7412(i)(3)(A).

_____

[2] In early 2011, EPA made minor revisions by direct final rule to the language of the regulatory text establishing the September 9, 2013, compliance date. 76 Fed.

continued on next page…

In addition to establishing new emission standards, the 2010 Rule eliminated an unlawful exemption that allowed plants to avoid compliance with emission standards during period of startup, shutdown, and malfunction. 75 Fed. Reg. 54,991/2, JA____; *see Sierra Club v. EPA*, 551 F.3d 1019 (D.C. Cir. 2008) ("*Sierra Club-SSM*"). At the same time, however, EPA also added an "affirmative defense" that allows companies that violate emission standards during periods of malfunction to avoid paying any civil penalties if they meet certain agency-created conditions. 75 Fed. Reg. 54,993/1, JA____. Petitioners petitioned for review of the affirmative defense, and because EPA had not provided notice or comment opportunity, petitioned the agency for administrative reconsideration. Reconsideration Petitions, JA____, ____. EPA granted the reconsideration petitions, and this Court granted petitioners and EPA's joint motion to hold the petitions for review in abeyance while EPA reconsidered the affirmative defense. *See* Order of May 13, 2011, *in NRDC v. EPA*, No. 10-1371 (D.C. Cir.)

## B.    The *PCA* Decision.

Cement companies and their umbrella organization, the Portland Cement Association ("PCA"), also petitioned for review, seeking vacatur or a stay of the

---

…continued from previous page
Reg. 2832, 2837/1 (Jan. 18, 2011) (direct final rule) (revising 40 C.F.R. §63.1351(c) to have compliance date of Sept. 9, 2013), JA____.

2010 Rule. This Court remanded for EPA to provide reconsideration on a single narrow issue — whether the agency should include cement kilns that burn waste ("CISWI kilns") when it calculates the stringency of the emission standards. *PCA v. EPA*, 665 F.3d 177, 189 (D.C. Cir. 2011). The Court declined to vacate the 2010 Rule, however (*id.* 185), and expressly denied PCA's request to stay the 2010 Rule pending EPA's reconsideration process. *Id.* 189.[3] In deciding to deny a stay, the Court relied on EPA's representations that removing the CISWI kilns would only change the PM standard for existing sources from 0.04 lb/ton to 0.05 lb/ton, a "minimal" change that would leave compliance strategies "unaltered." 76 Fed. Reg. 28,318, 28,322/3 (May 17, 2011), JA____; *see also* EPA Supp. Br. 8, *in PCA*, No. 10-1359 (Aug. 24, 2011) (describing PM standards after removing CISWI kilns as "virtually identical"), JA____; *PCA*, 665 F.3d at 188 (describing EPA findings); 189 ("it is unlikely that significant changes will be made to the standards upon reconsideration").

## C.    EPA's Post-Litigation "Settlement" with PCA.

Shortly after *PCA* was decided, PCA and EPA entered into a private "settlement" of the already-decided *PCA* case. 77 Fed. Reg. 27,055, 27,056/2 (May

---

[3] The *PCA* decision did stay one part of the 2010 Rule, its work practice requirements for clinker storage piles. *Id.* 189. Those requirements are not at issue here.

8, 2012), JA____. PCA agreed not to seek rehearing of the decision if EPA

completed its reconsideration proceedings by December 2012 and "propose[d] to

extend the compliance date for existing sources until at least September 9, 2015,"

"[i]f supported by the administrative record" or at least to solicit comment "on

whether existing source compliance deadlines should be extended and make clear

that the final rule may include such an extension if justified." Joint Mot. Abeyance,

Exhibit (Settlement Agreement) *in PCA*, No. 10-1359 (Apr. 16, 2012), JA____.

Nothing in EPA's Federal Register notice or the proposed settlement indicated

what new information in the administrative record might support a compliance date

extension.

## D.   The Weakened and Delayed Standards, and Confirmation of the Affirmative Defense.

Before the announcement of the settlement, however, PCA had privately

urged EPA to weaken the PM standard and extend the compliance date. PCA Opp.

to Mot. For Stay, Ex.2 ("O'Hare Decl.") ¶¶10-12, JA____;PCA, *The Impact of a*

*Change in the Cement NESHAP PM Limit on Compliance Strategies and*

*Schedules* ("PCA Memo") 1-2 (EPA-HQ-OAR-2011-0817-0154, Apr. 9, 2012)

(posted in docket July 18, 2012), JA____-__. Specifically, PCA "suggested" that

EPA weaken the PM standard to "between 0.06 lb/ton and 0.08 lbs/ton." O'Hare

Decl. ¶¶11-12, JA____; PCA Memo 1-2, JA____-__. PCA further requested a

13

compliance date extension so that cement companies could implement different control strategies that the weakened PM standard would make available. PCA Memo 4, JA____.

EPA's response to the *PCA* remand did not result in weakening the PM standards to the extent PCA requested. As the agency had predicted, removing the CISWI kilns caused the PM floor for existing plants to increase only from 0.04 lb/ton to 0.05 lb/ton, *see supra* p.12, and had no effect on the PM floor for new plants. 77 Fed. Reg. 42,368, 42,372/3 (July 18, 2012), JA____. However, EPA voluntarily weakened the PM standards further. *Id.* 42,370, JA____.

Purporting to discover a technical problem with its method for calibrating continuous emissions monitoring systems (CEMS)—an issue neither the agency nor any commenter raised during the rulemaking process, the reconsideration processes, or the *PCA* litigation—EPA decided that plants would demonstrate compliance annually with a stack test, instead of continuously with CEMS. 77 Fed. Reg. 42,374/1-2 & n.8, JA____; 42,376/2, JA____. Citing that change, EPA further weakened the existing source standard from 0.05 lb/ton to 0.07 lb/ton – *i.e.*, to the level "between 0.06 and 0.08 lbs/ton" that PCA had "suggested." 78 Fed. Reg. 10,017/1, JA____; O'Hare Decl. at ¶12, JA____. EPA also weakened the new source standard from 0.01 lb/ton to 0.02 lb/ton. 77 Fed. Reg. 42,376/2, JA____.

EPA also granted PCA's request for a delay in the existing source

compliance date. *Id.* 42,386/1, JA_____. EPA did not claim that weakening the PM

standard made compliance by the original 2013 compliance date any less

practicable. Rather, tracking the argument advanced by PCA, EPA asserted that

weakening the PM standard to 0.07 lb/ton opened up different compliance

strategies and that cement companies would need more time if they wanted to use

them:

> The basic reason for the proposed compliance date was that the
> proposed change in the PM standard made possible different
> compliance alternatives for all of the stack emission standards, and
> that it could legitimately take two years from the original compliance
> date to implement those new compliance strategies.

78 Fed. Reg. 10,022/3, JA_____; *cf.* O'Hare Decl. ¶12, JA_____. EPA finalized the

proposed changes in the 2013 Rule. *See* 78 Fed. Reg. 10,008 tbl.1, 10,022,

JA_____,_____.

EPA states the 2013 Rule will allow cement plants to emit an additional 138

tons per year of PM but, otherwise, will provide roughly the same benefits in 2015

as the 2010 Rule would have provided starting in 2013.[4] 78 Fed. Reg. 10,026-27,

JA_____-__; 77 Fed. Reg. 42,392/2 ("The benefits … for the first year of full

compliance for the 2010 final rule are expected to be little changed for the first

---

[4] Although EPA only quantified the change from existing plants' emissions, for
new plants, it acknowledged that the change in the standard "may result in a small
increase in total nationwide emissions." 78 Fed. Reg. 10,026/2-3, JA_____.

year of full compliance for this action."), JA____; *see also* 78 Fed. Reg. 10,029/3

(not recalculating benefits), JA____. If that is true, the main effect of the 2013

Rule is to delay the benefits described in the 2010 Rule by two years, from 2013 to

2015. By EPA's own calculations, that delay alone will cause between 1,920 and

5,000 premature deaths (approximately 3-7 premature deaths per day), 3,000 non-

fatal heart attacks, 2,000 emergency room visits, 34,000 cases of aggravated

asthma, and 260,000 lost days of work. *See* 75 Fed. Reg. 55,026-27 tbl.13,

JA____-__.

The 2013 Rule also retains the "affirmative defense" promulgated in the

2010 Rule. EPA does not identify any statutory authority allowing it to create an

affirmative defense that restricts federal courts' ability to impose penalties and

citizens' right to have federal courts apply penalties consistent with the Clean Air

Act. Instead, EPA asserts the affirmative defense resolves a "tension" between the

Act's requirement for compliance with §112 standards at all times and the

agency's belief that some violations should not lead to civil penalties, 78 Fed. Reg.

10,014/1, JA____.

Because the compliance delay will irreparably harm Petitioners starting

September 9, 2013, they moved to stay that aspect of the 2013 rule pending

judicial review or, in the alternative, for expedited consideration of the case.

Petitioners also moved for a briefing schedule that would commence on June 5,

16

2013, give the other parties in the case the standard length of time to file responsive briefs, and provide final briefs to the Court by July 30, 2013. Because the Court had not ruled on these motions as of June 5, 2013, Petitioners lodged this brief with the Court on that date.

## SUMMARY OF ARGUMENT

At an approximate cost of between 3 and 7 lives lost every day, the 2013 Rule puts off long-overdue reductions in cement plants' emissions of mercury and other toxic metals, PM, toxic organic pollutants, and HCl. EPA's only stated reason for this latest delay is the agency's own, wholly voluntary, decision to weaken its PM standards far more than the *PCA* decision required.

Clean Air Act §112(d)(7) unambiguously precludes EPA from voluntarily weakening pre-existing §112 emission standards, and the agency's attempt to rewrite §112(d)(7) so that it precludes the agency only from weakening standards issued under other sections of the Clean Air Act is refuted by the statutory text. Further, even if EPA's action did not violate §112(d)(7), the weakened standards violate §112(d)(2) because they do not require the "maximum" degree of reduction in emissions that is "achievable." Contrary to EPA's claim, §112(d)(2) does not allow the agency to declare that a standard is unachievable just because the agency does not think it "cost-effective."

17

Even if EPA could weaken the PM standard, its 2-year extension of the compliance date (to 2015) violates Clean Air Act §112(i)(3)(A)'s mandate that EPA require compliance "as expeditiously as practicable." It is practicable for cement plants to comply by 2013, and EPA's decision to weaken its PM standard does not change that reality. EPA's argument for the extension—that it wants to give cement plants time to comply more cheaply with different compliance strategies made available by its weakened standards—is irrelevant and elevates EPA's policy preferences over Congress's plainly expressed intent.

EPA's extension also violates §112(i)(3)(A)'s 3-year outside limit on compliance by giving plants 5 years to comply. The Act provides several carefully tailored exceptions to the 3-year limit, but does not provide an exception for situations where EPA voluntarily weakens its standards. Further, this Court has already rejected the notion that EPA can circumvent statutory deadlines just by continually amending its standards. And even if EPA could extend the deadline for its PM standard, it lacks authority to extend the deadlines for the other standards at issue (for mercury, THC, and HCl), which have remained in effect, unchanged, since 2010.

EPA's affirmative defense purports to limit a statutory right of action that Congress granted to citizens and statutory jurisdiction that Congress conferred on federal courts. Specifically, it bars courts from applying penalties in enforcement

18

suits where certain agency-created conditions have been met. EPA lacks authority to create such limits: Clean Air Act §304(a) gives district courts exclusive jurisdiction to hear enforcement suits and "apply any appropriate civil penalties," and §113(e)(1) spells out the criteria courts <u>must</u> consider in deciding what penalties, if any, to impose. EPA's affirmative defense arrogates authority Congress gave the courts and makes the mandatory criteria in §113(e)(1) subordinate to different criteria the agency prefers.

EPA's rationale for the affirmative defense—that the agency wishes to resolve a "tension" between the Act's requirement for continuous compliance with §112 standards and its own belief that this requirement is too demanding—is a transparent attempt by EPA to elevate its policy views above the statute. Where Congress wished to limit penalties in enforcement cases or provide affirmative defenses, it did so explicitly in the text of the Act. Further, EPA's attempts to avoid §304 and §113 are without merit. The affirmative defense is relevant to the amount of the penalty imposed because it requires courts to impose no penalty at all in certain circumstances and, contrary to EPA's claim, zero is an amount. The Act's definition of "emission standard" makes clear that the affirmative defense is not part of the emission standard itself, rather than a provision relating to penalties. And EPA's general rulemaking authority under §301(a) lends no support to the

19

agency because it provides authority only to carry out EPA's functions, not to usurp the courts' functions.

## STANDING

Petitioners have members who live, work, and recreate in areas affected by cement plants' emissions. As a result of these plants' emissions, they are forced to breathe or otherwise ingest dangerous and toxic materials, like mercury, PM, lead, and organic hazardous pollutants, into their bodies. These exposures to toxic substances threaten Petitioners' members' health and diminish or curtail their enjoyment of their everyday activities, including walking, hiking, gardening, hunting, and fishing. *See* declarations; *Ass'n of Battery Recyclers v. EPA*, 2013 WL 2302713, *3 (D.C. Cir. May 28, 2013).

EPA has delayed the deadline by which existing cement plants, including those near Petitioners' members, must come into compliance with EPA's standards for toxic air pollutants from September 9, 2013, to September 9, 2015. This delay enables plants to continue emitting more of these pollutants than the Act allows, for a longer time, and thus prolongs and increases Petitioners' members' injury. Vacatur of EPA's revision to the compliance deadline will result in an earlier compliance deadline, which will redress the injuries caused by EPA's extension of the compliance deadline. *See, e.g.*, *Sierra Club v. EPA*, 129 F.3d 137, 139 (D.C.

Cir. 1997) (petitioner has standing to challenge one-year delay in air pollution controls that applies in areas where it has members).

Similarly, EPA's weakening of the PM standards for new and existing plants harms Petitioners' members, for the reasons given above. *See* declarations. If the PM standards were stricter, cement plants would have to reduce their emissions more, and these harms would be alleviated. *See, e.g.*, *NRDC v. EPA*, 489 F.3d 1364, 1370-71 (D.C. Cir. 2007).

Petitioners also have standing to challenge the affirmative defense EPA invented. Petitioners' members are routinely exposed to excess toxic emissions from nearby cement plants that occur during real or alleged malfunctions of plant equipment. For example, the Holcim Trident plant, located near Jennifer Swearingen, operated through an upset that lasted about 22 hours and caused multiple violations that Holcim attributed to "equipment malfunction." Swearingen Decl. ¶12; *id.* attachment (upset report); Carman Decl. ¶16 ("In Texas, in my experience, companies state on essentially all their reports of emission exceedance events that a malfunction, like a power failure or equipment failure, was the cause."). Excess emissions from cement plants harm Petitioners' members and their families by causing burning eyes and throats, increasing the hazard of cancer and other serious diseases, and diminishing their ability to enjoy ordinary activities like daily walks, running, and other recreational activities in their homes,

21

backyards, and communities. Because of these emissions, Petitioners' members refrain from activities they would otherwise enjoy or find their enjoyment of those activities diminished. *See* declarations.[5]

Industrial facilities, including cement plants, routinely claim violations resulted from malfunctions, and often invoke, under other regulations, other, similar affirmative defenses or exemptions from liability that substantially overlap with the affirmative defense. *See* declarations. Therefore, it is highly likely that cement plants will invoke the affirmative defense when they violate EPA's new emission standards in the future. *See id.* Indeed, PCA urged EPA to provide an affirmative defense. EPA-HQ-OAR-2011-0817-0505 at 3, 65, JA____, ____.

Petitioners have worked for years to protect their members against the harmful effects of excess emissions from cement plants. Petitioners will—consistent with their past work—file citizen enforcement suits under Clean Air Act §304 against cement companies that violate their emission standards.[6] *See id.*

---

[5] Petitioners Sierra Club and Friends of Hudson were among the parties who successfully petitioned for review of EPA's unlawful loophole that allowed cement companies and other sources of hazardous air pollutants to avoid compliance with §112 emission standards during periods of malfunction. *Sierra Club-SSM*, 551 F.3d at 1028 (vacating exemption). The affirmative defense effectively restores much of that loophole by allowing companies that violate emission standards during equipment malfunctions to avoid paying any penalty for their violations.

[6] Although Petitioners have brought citizen suits to enforce other Clean Air Act requirements in the past, the combination of an unlawful exemption from

continued on next page…

These suits will seek civil penalties both to deter future violations and to mitigate the harm that violations cause. *E.g.*, Schermbeck Decl. ¶¶9, 11; *See* 42 U.S.C. §7604(g). Petitioners and their members will also attempt to negotiate with cement plants to get them to agree to take steps to prevent future violations and mitigate past ones. *See, e.g.*, Carman Decl. ¶27.

The availability of civil penalties is vital to deterring future violations of environmental statutes. *See Friends of the Earth v. Laidlaw Envtl. Servs. (TOC)*, 528 U.S. 167, 186 (2000) ("To the extent that [civil penalties] encourage defendants to discontinue current violations and deter them from committing future ones, they afford redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct."); *id.* 208 (Scalia, J., dissenting). Under the scheme Congress established, a citizen plaintiff need only demonstrate that the defendant has violated the Act by exceeding its emission limits. *E.g.*, *St. Bernard Citizens for Envtl. Quality v. Chalmette Refining*, 500 F.Supp.2d 592, 609 (E.D. La. 2007). After that, Congress intended that a court

---

…continued from previous page

compliance with emission standards during malfunction, unlawfully weak standards, and the absence of meaningful monitoring requirements rendered air toxics standards for cement plants effectively unenforceable by citizens. *E.g.*, Schermbeck Decl. ¶7. In 2008, however, this Court vacated the malfunction exemption, and in 2010 EPA revised its cement plant regulations to provide stronger emission standards and meaningful monitoring requirements (some of which EPA diluted in the 2013 Rule).

determine what penalty (if any) to impose by taking into consideration the factors laid out in §113(e)(1) of the Act. 42 U.S.C. §7413(e)(1); *Pound v. Airosol Co., Inc.*, 498 F.3d 1089, 1095 n.3 (10th Cir. 2007).

Under EPA's affirmative defense, however, a district court cannot impose civil penalties—even when its consideration of the §113(e)(1) criteria supports doing so—if the agency's separate regulatory criteria in 40 C.F.R. §63.1344 are met. Thus the affirmative defense unlawfully limits Petitioners' right to have a district court impose civil penalties on a violator. The affirmative defense harms Petitioners and their members by restricting their statutory right to have penalties imposed on companies that violate their emission standards whenever a district court finds penalties appropriate under §113. *Cf. Shays v. FEC*, 414 F.3d 76, 87 (D.C. Cir. 2005) (holding that parties "suffer legal harm under Article III" "when regulations illegally structure" how they seek to protect their interests).

In addition, the affirmative defense will harm Petitioners by causing them to refrain from bringing enforcement suits they would otherwise bring and, as a result, unlawfully restricting their work on their core organizational missions of protecting their members from toxic pollution. Litigating similar issues in a past citizen suit enforcement case contributed significantly to generating over $100,000 in expert fees and nearly 5000 hours of attorney time, and the plaintiffs in that case probably would have expended another million dollars in fees and costs had the

expense of the suit not forced them to settle to avoid further litigation costs. Hecker Decl. ¶¶8, 10-11, 13-14. The strong likelihood of incurring such additional costs has forced and will force Petitioners to refrain from bringing some suits even where significant violations of emission standards are involved. *See* declarations.

Further, the additional legal proceedings and cost that the affirmative defense imposes on Petitioners' statutory right to protect their members' concrete interest in protection from excess toxic pollution are themselves an injury that independently confers standing. *See* declarations; *Teva Pharma., USA v. Sebelius*, 595 F.3d 1303, 1314 (D.C. Cir. 2010). In addition, the affirmative defense impermissibly deprives Petitioners of a congressionally granted bargaining chip they otherwise would use in enforcement suits and in pre-suit negotiations. *See* declarations; *Clinton v. City of New York*, 524 U.S. 417, 432-33 & n.22 (1998).

Also, because the affirmative defense undermines the likelihood that civil penalties will actually be imposed on a violator, it weakens their deterrent value. As a result, their emissions will be higher than they otherwise would be, harming Petitioners' members. *See* declarations.

Finally, the affirmative defense also injures Petitioners and their members procedurally. Petitioners have standing to challenge the affirmative defense's fundamental alteration of the structure under which they defend their concrete

interests by mitigating excess toxic emissions and deterring future violations. *See Shays*, 414 F.3d at 91-92.

Because EPA's rule created the affirmative defense, which causes these injuries, its vacatur will redress Petitioners' injuries. *See* declarations; *e.g.*, *Shays*, 414 F.3d at 95.

## STANDARD OF REVIEW

At issue is whether EPA's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. §7607(d)(9); *see also id.* §7607(d)(1)(C). For matters of statutory interpretation, if EPA has not been charged with administering a provision of the statute, the Court "must decide for [itself] the best reading," deferring under *Skidmore* to the agency's views only to the extent of "their power to persuade." *Miller v. Clinton*, 687 F.3d 1332, 1342 & n.11 (D.C. Cir. 2012) (internal quotation marks omitted).

When EPA administers a statutory provision, *Chevron* governs: "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984). Thus, if the intent of Congress is clear, the agency's interpretation is accorded no deference. *Id.* 842-43. If the statute is ambiguous, at *Chevron* step two, a reviewing court defers to the agency's interpretation of the statute only if (among other things) "the agency has

26

offered a reasoned explanation for why it chose that interpretation," *Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011), and the interpretation does not "diverge[] from any realistic meaning of the statute," *Massachusetts v. DOT*, 93 F.3d 890, 893 (D.C. Cir. 1996).

## ARGUMENT

I.  **EPA'S DECISION TO WEAKEN THE PARTICULATE MATTER STANDARD VIOLATES CLEAN AIR ACT §112(d)(7).**

In the 2013 Rule, EPA weakened the PM standards for existing kilns from 0.05 to 0.07 lb/ton and the PM standard for new kilns from 0.01 to 0.02 lb/ton. 78 Fed. Reg. 10,017/1, 10,026/2, JA____, ____. These changes had nothing to do with the *PCA* decision or EPA's reconsideration process. Rather, they reflect a purely <u>voluntary</u> decision by EPA to go beyond what the *PCA* decision required and weaken the 2010 standards further. By voluntarily weakening the PM standards in the 2010 Rule, EPA violated Clean Air Act §112(d)(7), which provides:

> No emission standard or other requirement promulgated under this section shall be interpreted, construed or applied to diminish or replace the requirements of a more stringent emission limitation or other applicable requirement established pursuant to section 7411 of this title, part C or D of this subchapter, or other authority of this chapter or a standard issued under State authority.

42 U.S.C. §7412(d)(7).

EPA argues that §112(d)(7) does not preclude the agency from weakening

27

§112 standards, but merely "indicates that a section 112(d) standard does not supplant more stringent standards issued under some authority other than section 112(d)." 78 Fed. Reg. 10,017/3 (emphasis added), JA____. That argument is refuted by §112(d)(7)'s text, which provides that EPA may not weaken standards established under specific Clean Air Act authorities and then adds, without limitation, "or other authority of this chapter." 42 U.S.C. §7412(d)(7). Because "this chapter" means the entire Clean Air Act, the literal meaning of §112(d)(7) is that EPA may not use §112 standards to weaken standards issued under the Clean Air Act provisions that §112(d)(7) lists or under §112. *See North Carolina v. EPA*, 531 F.3d 896, 910 (D.C. Cir. 2008) ("EPA must give effect to both provisions in … statute" "written in the disjunctive"). EPA neither addresses this literal meaning, nor even attempts to overcome it with the requisite showing "that, as a matter of historical fact, Congress did not mean what it appears to have said, or that, as a matter of logic and statutory structure, it almost surely could not have meant it," *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1088-89 (D.C. Cir. 1996). *See* 78 Fed. Reg. 10,017/2-3, JA____.

EPA's claim that §112(d)(7) does not prevent it from weakening §112 standards is further refuted by the context of the key phrase "or other authority of this chapter." "[T]he word 'other' connotes 'existing besides, or distinct from, that already mentioned or implied.'" *Financial Planning Ass'n v. SEC*, 482 F.3d 481,

28

489 (D.C. Cir. 2007) (citation omitted). Because "other authority of this chapter" is the final element of a list referring to authorities within the Clean Air Act, the structure of the provision demonstrates that "other authorities of this chapter" means "authorities of this chapter distinct from those already mentioned." *See United States v. Atl. Research Corp.*, 551 U.S. 128, 134-36 (2007) (using structure of statute to determine that "phrase 'any other person' therefore means any person other than those three [listed]"); *Wolf Run Mining Co. v. FMSHRC*, 659 F.3d 1197, 1203 (D.C. Cir. 2011) (using structure of statute to determine what "'[o]ther' plainly refers to").

Moreover, Congress knows how to preclude standards promulgated under a specific section from replacing only those promulgated under <u>other</u> sections of the Act. It did so, for example, in §129(h)(2), which provides "[n]othing in this section shall diminish the authority of the Administrator or a State to establish any other requirements… under any <u>other</u> authority of law." 42 U.S.C. §7429(h)(2) (emphasis added); *see also id.* §7429(h)(1) (§129 standards do not override stricter standards promulgated under state authority). Congress's decision to sweep more broadly in §112(d)(7) must be given effect. *See, e.g.*, *Kucana v. Holder*, 558 U.S. 233, 248-49 (2010); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452-54 (2002).

That §112(d)(7) means what it says is further confirmed by §112(d)(7)'s broader context. Congress rewrote §112 in 1990 to channel EPA's efforts on and

curb EPA's discretion over regulating air toxics. *See, e.g.*, *New Jersey v. EPA*, 517 F.3d 574, 578 (D.C. Cir. 2008) ("Congress restricted the opportunities for EPA and others to intervene in the regulation of HAP sources."); *NRDC*, 489 F.3d at 1368 ("EPA no longer had discretion to set … whatever standards EPA deemed adequate."). And Congress made plain in §112(d)(6), the provision immediately proceeding §112(d)(7), that it intended EPA to revise its §112 standards every eight years. 42 U.S.C. §7412(d)(6); *see also id.* §7412(f)(2)(A), (C) (also requiring EPA to periodically establish health-protective standards). Congress did not intend the revision processes it required in §112(d)(6) and §112(f)(2) process to become vehicles for making air toxics standards weaker, and it is logical that it intended §112(d)(7) to prevent that result as well as preventing EPA from weakening standards previously issued under other Clean Air Act provisions. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must … interpret the statute 'as a symmetrical and coherent regulatory scheme.'"); *Am. Elec. Power Serv. Corp. v. FCC*, 708 F.3d 183, 187 (D.C. Cir. 2013) ("This proximity suggests an entirely intentional character in [paragraph's] use of the broader term.").

EPA suggests that its policy concern about correcting a standard that was "outright technically infeasible," should trump §112(d)(7)'s plain meaning. 78 Fed. Reg. 10,024/3 & n.17, JA____. But assuming that EPA accidentally set such a

standard, there are at least three ways in which it could be "corrected," and none of them requires the rewriting of §112(d)(7) urged by EPA. First, EPA can grant reconsideration under §307(d)(7)(B), which is precisely what EPA did in its own example. 78 Fed. Reg. 10,024 n.17 (citing 76 Fed. Reg. 28,325), JA____. Second, parties who believe a standard is infeasible can petition for review. 42 U.S.C. §7607(b). Third, even if an emission standard that is "outright technically infeasible" somehow escapes the attention of both EPA and all affected parties throughout the rulemaking process and until after the period for reconsideration and judicial review have passed, parties can still petition EPA to change the rule under §307(b)(1) and the *Oljato* process. *See id.* §7607(b)(1) (allowing petitions for review based on grounds arising after the 60th day); *Oljato Ch. of Navajo Tribe v. Train*, 515 F.2d 654, 666-667 (D.C. Cir. 1975). EPA's apparent disbelief that Congress did not also allow the agency to just weaken §112 standards at will does not trump §112(d)(7)'s plain meaning, especially when Congress provided other ways of "rectifying mistaken actions." *New Jersey*, 517 F.3d at 583 ("EPA's disbelief that it would be prevented from correcting its own listing 'errors' except through section 112(c)(9)'s delisting process or court-sanctioned vacatur cannot overcome the plain text enacted by Congress.").

Finally, although EPA wrongly insists that §112(d)(7) leaves it free to voluntarily weaken §112(d) standards, the agency also claims that its 0.07 lb/ton

31

standard merely "expresses" the 0.05 lb/ton standard that responded to *PCA* as "a

not-to-exceed value." 78 Fed. Reg. 10,017/1 & n.5, JA____. Whatever EPA meant

by that claim, the "higher" 0.07 lb/ton standard, *id.* n.5, JA____, is less stringent

than the 0.05 lb/ton standard. Under the 0.05 lb/ton standard, a plant's average

emissions over any 30-day period would have to remain at or below 0.05 lb/ton,

while the 0.07 lb/ton standard allows plants to emit up to 0.07 lb/ton over any 30-

day period (and, indeed, at all times). Moreover, EPA itself described the change

from 0.04 lb/ton to 0.05 lb/ton that it made in response to the *PCA* remand as an

insignificant one that would leave cement companies' compliance strategies

"unaltered," 76 Fed. Reg. 28,322/3, JA____, but stated that the change from 0.05

to 0.07 lb/ton would open up new compliance measures. 77 Fed. Reg. 42,386/1,

JA____; 78 Fed. Reg. 10,022/3, JA____. PCA made the same point. O'Hare Decl.

¶¶11-12, JA____ ("if EPA were to change the PM limit from 0.04 to 0.06-0.08

lbs/ton clinker, as PCA had suggested, cement plants would have, at a minimum,

one alternative control option…"); PCA Memo 1-2, JA____-__.

## II.   EPA'S REFUSAL TO SET PM STANDARDS THAT REQUIRE THE MAXIMUM ACHIEVABLE DEGREE OF REDUCTION WAS UNLAWFUL AND ARBITRARY.

Even if §112(d)(7) did not prevent EPA from voluntarily weakening §112

standards, Clean Air Act §112(d)(2) provides that EPA's standards must require

the "maximum degree of reduction in emissions of the hazardous air pollutants

32

subject to this section (including a prohibition on such emissions, where achievable) that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is <u>achievable</u>…." 42 U.S.C. §7412(d)(2) (emphasis added). Because the original PM standards in the 2010 Rule are "achievable," the weaker standards in the 2013 Rule violate §112(d)(2).

EPA agrees that the 0.04 lb/ton PM standard in the 2010 standard is "achievable," 77 Fed. Reg. 42,386/1, JA____, but argues it is "not 'achievable' within the meaning of section 112(d)(2)," 78 Fed. Reg. 10,020/3, JA____. EPA argues that §112(d)(2) leaves it free to base decisions on "cost effectiveness" and refuses to set the final PM standard at the same level as in the 2010 Rule because it does not view that a 0.04 lb/ton standard would be cost-effective. *Id.* 10,021/1 & n.11, JA____.

Statutory terms must be presumed to have their ordinary everyday meaning, and the ordinary meaning of "achievable" is "capable of being achieved." Webster's Seventh New Collegiate Dictionary 7 (1971). Thus, §112(d)(2) requires the maximum degree of reduction that, considering cost and the other listed factors, is capable of being achieved. *See Hamilton v. Lanning*, 130 S.Ct. 2464, 2471 (2010) ("'When terms used in a statute are undefined, we give them their ordinary meaning.'").

33

By directing EPA to consider cost and the other statutory factors <u>in determining the "maximum" degree of reduction that is capable of being achieved</u>, Congress made clear <u>how</u> it wanted EPA to consider these factors. It wanted these factors to limit the standards only to the extent they would <u>prevent</u> sources from achieving a standard—*i.e.*, make the standard <u>un</u>achievable. Cost, for example, can make a standard unachievable if the standard is too expensive for industry to achieve. *See United Steelworkers of Am., ALF-CIO-CLC v. Marshall*, 647 F.2d 1189, 1272 (D.C. Cir. 1980) (standard is economically feasible if it "will not threaten the existence or competitive structure of an industry"). Cost-effectiveness, however, has nothing to do with whether a standard is too expensive to be achieved. Rather, it is a measure EPA uses to decide whether a standard is <u>appropriately</u> expensive. Indeed, EPA acknowledges that "cost-effectiveness" and "economic achievability" are different concepts by insisting it can base §112(d)(2) decisions on "cost effectiveness" and is not "limit[ed]" by the statute "to considerations of economic achievability." 78 Fed. Reg. 10,021/1 n.11, JA____.

Section 112(d)(2) does not direct EPA to set standards at a level it thinks appropriate or cost-effective. Rather, it unambiguously requires the "maximum" degree of reduction that is "achievable"—capable of being achieved—by the industry in question. EPA's contention that it can refuse to set standards under §112(d)(2) if it does not think them "cost-effective" therefore contravenes

34

Congress's plainly expressed intent. *See Chevron*, 467 U.S. at 842-43. Indeed, because achievability and cost-effectiveness are completely different concepts, permitting EPA to require only the degree of reduction it deems "cost-effective" eviscerates §112(d)(2)'s "maximum … achievable" requirement. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 485 (2001) ("The EPA may not construe the statute in a way that completely nullifies textually applicable provisions meant to limit its discretion.").

Recognizing this point in a closely analogous case, the Supreme Court refused to import cost-benefit analysis into language in the Occupational Safety and Health Act ("OSHA") that requires "the standard which most adequately assures, <u>to the extent feasible</u>, on the basis of the best available evidence, that no employee will suffer material impairment of health." *Am. Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 508 (1981) (quoting 29 U.S.C. §655(b)(5) (emphasis in original)). The *Donovan* Court found that "feasible" means "'capable of being done, executed or effected," *id.* 508-509 (quoting Webster's Third New International Dictionary of the English Language 831 (1976)). Therefore, it held, although OSHA's "to the extent feasible" language allows the agency to consider cost or any other factor that made a standard "unachievable," *id.* 509,

> <u>impos[ing] an additional and overriding requirement of cost-benefit analysis on the issuance of … standards would eviscerate the "to the extent feasible" requirement</u>. Standards would inevitably be set at the level indicated by cost-benefit analysis, and not at the level specified

> by [the statute].… We decline to render Congress' decision to include
> a feasibility requirement nugatory, thereby offending the well-settled
> rule that all parts of a statute, if possible, are to be given effect.

*Id.* 513 (emphasis added); *accord id.* 509 ("Any standard based on a balancing of

costs and benefits by the Secretary that strikes a different balance than that struck

by Congress would be inconsistent with the command set forth in [the OSHA]."). 

*See Pub. Citizen Health Research Grp. v. Dep't of Labor*, 557 F.3d 165, 177 (3rd

Cir. 2009) (citing *Donovan*, holds "the Supreme Court has conclusively ruled that

economic feasibility does not involve a cost-benefit analysis"); *Nat'l Cottonseed*

*Products Ass'n v. Brock*, 825 F.2d 482, 485 n.1 (D.C. Cir. 1987) (same); *Ethyl*

*Corp. v. EPA*, 51 F.3d 1053, 1064 (D.C. Cir. 1995) ("The Administrator plainly

oversteps her authority when she considers other factors" not listed in the statute.).

　　　EPA seeks to rely on dicta in *Sierra Club v. EPA*, 325 F.3d 374, 378 (D.C.

Cir. 2003), and *Husqvarna v. EPA*, 254 F.3d 195, 200 (D.C. Cir. 2001), which

addressed standards under other sections of the Act. *See* 78 Fed. Reg. 10,021/1

n.11, JA____. But in *Sierra Club*, the Court expressly stated that the petitioners

"present no occasion for us to attempt any final analysis of the statutory meaning"

and "there is no real issue before us on the degree to which the statute constrains

consideration of cost." 325 F.3d at 378. In *Husqvarna*, far from challenging EPA's

reliance on cost-effectiveness, the petitioner argued that EPA should have

considered <u>another</u> measure of cost-effectiveness, so-called "incremental cost-

effectiveness." 254 F.3d at 200. Thus, in neither case did the Court face the question presented here: whether §112(d)(2)'s command to consider cost in determining the "maximum" degree of reduction that is "achievable" allows EPA to set standards at a level it deems cost-effective rather than the level reflecting the maximum degree of reduction that is capable of being achieved. To the extent those cases contain statements on that question, they are dicta. *E.g.*, *Ne. Hosp. Corp. v. Sebelius*, 657 F.3d 1, 12 n.7 (D.C. Cir. 2011) (refusing to follow cases because "meaning of [a] phrase" in statute "was not directly at issue in any of the cases," and their "interpretations of [phrase] … were therefore dicta"); *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631-32 (2009) (rejecting as dicta statements made in cases on questions not "presented for decision").

## III.  EPA'S DELAY OF THE COMPLIANCE DATE VIOLATES CLEAN AIR ACT §112(i)(3)(A).

The sole basis for EPA's two-year delay of the compliance date for existing cement plants is its voluntary weakening of the PM standard from 0.05 lb/ton to 0.07 lb/ton. *See supra* pp.13-15. Although that unlawful voluntary weakening alone renders EPA's compliance date extension unlawful, the extension independently contravenes §112(i)(3)(A), 42 U.S.C. §7412(i)(3)(A).

### A.  The Delayed Compliance Date Is Not "As Expeditious[] As Practicable."

Clean Air Act §112(i)(3)(A) provides "the Administrator shall establish a

37

compliance date or dates for each category or subcategory of existing sources,

which shall provide for compliance as expeditiously as practicable, but in no event

later than 3 years after the effective date of such standard." *Id.* §7412(i)(3)(A). The

ordinary meaning of "practicable" is "that which may be done, practiced, or

accomplished; that which is performable, feasible, possible." *Black's Law

Dictionary* 1172 (6th ed. 1990). By mandating compliance "as expeditiously as

practicable," Congress made plain that EPA must require sources to comply as

soon as they can comply.

    EPA's extension of the existing source compliance date from September

2013 to September 2015 violates §112(i)(3)(A) because the new compliance date is

not "as expeditious[] as practicable." Although EPA weakened the PM standard in

the 2013 Rule, cement companies do not need more time to meet weaker standards.

The same control strategies cement companies were planning to use before (to

meet the 2010 Rule) will also enable them to meet the weaker standards in the

2013 Rule by the original September 9, 2013, compliance date. EPA does not

contend otherwise. Because it is "practicable" for cement companies to comply by

September 9, 2013, §112(i)(3)(A) unambiguously requires compliance by that

date. 42 U.S.C. §7412(i)(3)(A). *See Lamie v. U.S. Trustee*, 540 U.S. 526, 534

(2004) ("when the statute's language is plain, the sole function of the courts—at

least where the disposition required by the text is not absurd—is to enforce it

according to its terms") (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)).

EPA argues that it should be allowed to extend the compliance date so that cement companies can take advantage of "new compliance measures" that the agency made available by weakening the PM standard. 78 Fed. Reg. 10,023/1, JA____. EPA states "it could legitimately take two years from the original compliance date to implement these new compliance strategies." *Id.* 10,022/3 (emphasis added), JA____. Conversely, the agency argues, requiring compliance by 2013 would force plants to "adopt more expensive controls than are needed to comply" with the weakened standards. EPA Opp. To Mot. For Stay at 13 (emphasis added).

EPA's arguments are not about practicability at all, but rather a belief that EPA should be able to delay compliance so that companies can comply more cheaply. Such policy arguments are irrelevant in the face of §112(i)(3)(A)'s unambiguous requirement that EPA "establish a compliance date … which shall provide for compliance as expeditiously as practicable." 42 U.S.C. §7412(i)(3)(A). EPA does not dispute that "practicable" has its ordinary meaning in §112(i)(3)(A)—"that which may be done, practiced, or accomplished"—and it does not identify any exception within §112(i)(3)(A) that allows EPA to defer compliance so that companies can install cheaper controls. By requiring cement

39

companies to comply when they can do so most cheaply—and not "as expeditiously as practicable"—EPA illegally elevates its own policy goals over §112(i)(3)(A)'s plain meaning. *E.g.*, *NRDC*, 489 F.3d at 1373-74 (text enacted by Congress trumps EPA's policy concerns).

That §112(i)(3)(A)'s "as expeditiously as practicable" language does not allow EPA to substitute cheap compliance for speedy compliance is further demonstrated by *Ashton v. Pierce*, 716 F.2d 56, *amended in other part* 723 F.2d 70 (D.C. Cir. 1983). There, this Court rejected an attempt by the Department of Housing and Urban Development ("HUD") to override a statutory mandate for "appropriate measures to eliminate <u>as far as practicable</u> immediate hazards due to the presence of paint which may contain lead and to which children may be exposed" in the Lead-Based Paint Poisoning Prevention Act. *Id.* 58 (quoting 42 U.S.C. §4822 (1976)) (emphasis added). Rather than requiring the elimination of immediate hazards "<u>as far as</u> practicable," HUD implemented measures it viewed as "<u>most</u> practicable" when judged "on a cost-benefit basis." *Id.* 63 (emphasis added). This Court was "singularly unpersuaded" by HUD's attempt to inject its cost-benefit priorities into the statute:

> In plain language Congress commanded that if it is "practicable" to eliminate an immediate hazard, that hazard <u>must</u> be eliminated. The statute admits of no exceptions to the required elimination procedures on the basis of the <u>degree</u> of practicability.

40

*Id.* 64 (emphasis in original). In equally plain language, Clean Air Act §112(i)(3)(A) commands EPA to require compliance with emission standards for hazardous air pollutants "as expeditiously as practicable," and it provides no exception allowing EPA to accept less expeditious compliance where the agency thinks that more time will allow companies to install cheaper control technologies.

## B.    EPA Cannot Circumvent §112(i)(3)(A) by Voluntarily Weakening Its Emission Standards.

### 1.    EPA Cannot Extend the Compliance Date for Any of the Emission Standards.

EPA also violates §112(i)(3)(A)'s 3-year outside limit on compliance dates. The September 9, 2013, compliance date in the 2010 Rule already provided three years, "the maximum period allowed by law." 75 Fed. Reg. 54,993/2, JA____. The challenged 2013 Rule unlawfully extends that compliance date by two years, to September 9, 2015.[7]

EPA argues that it is free to reset compliance dates whenever it revises

---

[7] EPA repeatedly characterizes its revision of the compliance date as an "extension." *E.g.*, 78 Fed. Reg. 10,012/2 (referring to "Compliance Date Extension for Existing Sources"); 10,024/1 ("We believe a compliance extension is appropriate…."); 10,027/3 (referring to "the compliance date extension"), JA____, ____, ____; EPA-HQ-OAR-2011-0817-0846 at 1-2, 11, 16 (discussing "One-Year Compliance Deadline Extension" and "Two-Year Compliance Deadline Extension," referring to "additional time" (emphasis added), arguing about EPA's authority to "extend compliance dates," and referring to "the two-year compliance date extension"), JA____-__, ____, ____.

emission standards, 78 Fed. Reg. 10,024/2-3, JA____, but the text and structure of §112(i)(3)(A) refute that claim. Section 112(i)(3)(A) requires compliance "no later than 3 years after the effective date of such standard," subject to specifically named and narrowly tailored exceptions, which the remainder of §112(i) provides. 42 U.S.C. §7412(i)(3)(A). For example, state permitting agencies or EPA may provide an additional year to plants that need it "for the installation of controls." *Id.* §7412(i)(3)(B); *see also id.* §7412(i)(4)-(8). Read together, §112(i)'s 3-year limit and specific exceptions make clear that Congress did not intend to allow other exceptions. *NRDC*, 489 F.3d at 1374. EPA's argument that it can reset the 3-year clock at will just by weakening its emission standards impermissibly writes a new agency-created exception into §112(i)(3)(A).

If EPA could extend compliance dates just by voluntarily weakening emissions standards before their compliance dates, it could put off compliance with any §112 standard indefinitely. Assuming *arguendo* that such gamesmanship does not contravene the "as expeditiously as practicable" requirement in §112(i)(3)(A), *but see supra* pp.37-41, it creates a loophole in the Act that defeats Congress's intent in enacting both §112(i)(3)(A)'s 3-year outside limit on compliance dates for hazardous air pollutant standards and in creating specific and limited exceptions to that limit. The Supreme Court has categorically rejected EPA interpretations that nullify objective limits on its authority, and this Court has specifically rejected as

42

"absurd" the notion that EPA can defeat and effectively nullify deadlines just by continually amending its standards.[8] *S. Coast Air Quality Mgmt. Dist. v. EPA*, 489 F.3d 1245, 1248 (D.C. Cir. 2007) (on reh'g) (refusing to read such a "glaring loophole" into the Act); *see Whitman*, 531 U.S. at 485 ("EPA may not construe the statute in a way that completely nullifies textually applicable provisions meant to limit its discretion.").

EPA wrongly seeks to rely on the holding in *NRDC*, 489 F.3d at 1373, that the agency cannot use amendments to regulatory requirements <u>other than</u> emission standards to justify compliance date extensions. 78 Fed. Reg. 10,024/2, JA____. EPA finds in that holding an implication that "EPA may reset the compliance date when the EPA amends the actual standard." *Id.*, JA____. The only issue before the *NRDC* Court, however, was whether EPA can delay compliance deadlines by changing parts of a regulation other than the emission standards. The Court had no occasion to address whether EPA can delay compliance dates by voluntarily weakening emission standards before their compliance date arrives, and it did not even "impl[y]" that <u>all</u> amendments to the standards—even weakening amendments that EPA issues on a wholly voluntary basis—suffice. Nor, as

---

[8] There, EPA <u>strengthened</u> the relevant standards. *S. Coast*, 489 F.3d at 1248. It would make even less sense to allow EPA to nullify deadlines by <u>weakening</u> standards.

discussed above, would EPA's interpretation of *NRDC* be consistent with Congress's intent in requiring EPA to establish and enforce compliance deadlines.

EPA claims it "makes sense" for EPA to be able to reset compliance dates when it changes standards because "it takes time to adopt the revised controls." 78 Fed. Reg. 10,024/2, JA____; *see also id.* 10,024/3 (claiming bar on delaying compliance date would "force sources to install one technology and rip it out in short order to install another"), JA____. That might be true where EPA strengthens standards, but weakening standards does not require companies to adopt new controls. Indeed, because any technology cement plants would install to meet the stronger PM standard in the 2010 Rule will also allow them to meet the weakened PM standard in the 2013 Rule, it would not need to be replaced.

EPA also seeks support from the *PCA* Court's decision to stay the standards for clinker storage piles. 78 Fed. Reg. 10,024/3, JA____. The agency claims its extension of the compliance date for the emission standards at issue here is "effectively" the same thing as that court-ordered stay, *id.* n.16, JA____, and purports to find in *PCA* a "principle" that EPA may extend compliance dates whenever it revises standards in a way that "negates the compliance strategy of the initial rule," *id.* n.15, JA____.

Those arguments lack merit. First, nothing about EPA's revisions in the 2013 Rule "negate[d] the compliance strategy of the" 2010 Rule: whatever strategy

44

plants selected to comply with the 2010 Rule will achieve compliance with the 2013 Rule. Second, the *PCA* Court stayed the clinker storage pile standards because EPA "conceded" that it had failed to provide sufficient notice and because those standards "could likely change substantially" in the reconsideration process. 665 F.3d at 189; *see* 42 U.S.C. §7607(d)(3) (requiring "notice" of proposed rule); §7607(d)(5) (requiring opportunity for comment); §7607(d)(7)(B) (requiring reconsideration proceedings where it is impracticable to raise an objection during the public comment period). Conversely, where the *PCA* Court found (based on EPA's submissions) that the court-ordered reconsideration process was "unlikely" to result in significant changes, it declined to stay the emission standards.[9] 665 F.3d at 189. *PCA* did not hold or even suggest that EPA may revise compliance dates just by voluntarily weakening emission standards; it had no occasion to address this issue. EPA's reading of *PCA* goes far beyond the Court's actual holding, and would bring that decision into direct conflict with *South Coast* by creating an even more "glaring loophole" than the one the Court rejected there. 489 F.3d at 1248.

---

[9] The only change to the PM standard that the *PCA* Court was not told about was the (illegal) jump from 0.05 lb/ton to 0.07 lb/ton that EPA introduced on its own. *See supra* p.12-15.

## 2.    Even If EPA Could Extend the Compliance Date for Its PM Standard, It Lacks Authority to Extend the Compliance Dates for the Other Emission Standards.

Even if voluntarily weakening the PM standard allowed EPA to extend the compliance date for that standard, it would not allow EPA to extend the compliance dates for the mercury, THC, and HCl standards. Section 112(i)(3)(A) provides that "[a]fter the effective date of <u>any</u> emission standard," EPA "shall establish a compliance date or dates for each category or subcategory of existing sources, which shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the effective date of <u>such</u> standard." 42 U.S.C. §7412(i)(3)(A) (emphasis added). EPA did not revise the emission standards for mercury, THC, or HCl in any way after they became effective in 2010, and they have remained in effect continuously since that date. *See PCA*, 665 F.3d at 189 (declining to stay emission standards). Therefore, under §112(i)(3)(A), the compliance dates for these standards must be no later than September 9, 2013, where EPA originally established them.

EPA argues that the control strategies for different pollutants "are interrelated so that the standards for PM, organics, mercury, and HCl are all implicated" by its decision to weaken the PM standard. 78 Fed. Reg. 10,023/3, JA____. That argument does not even speak to the statutory language, which unambiguously requires compliance with an emission standard no later than the

46

effective date of "such" standard. Because the mercury, THC, and HCl standards have not changed, EPA's extension of the compliance dates for these standards is unlawful regardless of whether EPA believes it would be better policy to allow cement plants to delay compliance with these standards so that they can implement cheaper overall compliance strategies. *NRDC*, 489 F.3d at 1373-74.

## IV.  EPA'S AFFIRMATIVE DEFENSE FOR MALFUNCTIONS IS UNLAWFUL AND ARBITRARY.

By purporting to limit federal courts' authority to impose penalties and citizens' right to obtain penalties in Clean Air Act enforcement suits, EPA's affirmative defense exceeds the agency's authority and violates Clean Air Act §304(a), which gives district courts exclusive jurisdiction "to apply any appropriate civil penalties." 42 U.S.C. §7604(a). Importantly, EPA's criteria for the affirmative defense are significantly different than those Congress mandated to govern district courts' assessment of penalties in Clean Air Act §113(e)(1), §7413(e)(1). For example, §113(e)(1) requires courts to consider "the economic benefit of noncompliance, and the seriousness of the violation," *id.*, criteria that are not addressed by EPA's affirmative defense. Compare *Id.*, with 40 C.F.R. §63.1344(a). Thus, a court that considers the criteria set forth in §113(e)(1) and concludes that penalties are appropriate would nonetheless be barred from imposing penalties if

47

EPA's alternative criteria in the affirmative defense are met. EPA's affirmative defense would rewrite the Act, and is unlawful and arbitrary.

## A.    The Affirmative Defense Is Unlawful.

### 1. The Affirmative Defense Exceeds EPA's Authority.

EPA lacks authority to abrogate citizens' rights to fully enforce the Clean Air Act or limit federal courts' exercise of their statutory jurisdiction. Congress granted "any person" the right to bring Clean Air Act enforcement cases, and gave "[t]he district courts" exclusive jurisdiction to hear those cases and "apply any appropriate civil penalties." 42 U.S.C. §7604(a), (a)(1)(A). EPA has no authority to limit the courts' statutory authority: "the Judiciary, not any executive agency, determines 'the scope—<u>including the available remedies</u>—'of judicial power vested by' statutes establishing private rights of action." *City of Arlington v. FCC*, No. 11-1545, 2013 WL 2149789, at *8 n.3 (Super Ct. May 20, 2013) (emphasis added; quoting *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650 (1990)).

Section 113 confirms that EPA lacks authority to determine when federal courts may apply penalties in citizen enforcement actions by spelling out precisely the factors district courts must consider:

> In determining the amount of any penalty to be assessed under this section or section 7604 of this title, the Administrator or the court, as appropriate, shall take into consideration (in addition to such other factors as justice may require) the size of the business, the economic impact of the penalty on the business, the violator's full compliance

48

> history and good faith efforts to comply, the duration of the violation
> as established by any credible evidence (including evidence other than
> the test method), payment by the violator of penalties previously
> assessed for the same violation, the economic benefit of the
> noncompliance, and the seriousness of the violation.

42 U.S.C. §7413(e)(1).[10] The only limit this language imposes on district courts'

authority to impose penalties on violators of the Act is to set forth criteria that

district courts <u>must</u> consider, *e.g.*, *United States v. Anthony Dell'Aquila, Enters.*,

150 F.3d 329, 339 (3d Cir. 1998),[11] leaving individual courts to decide on a case-

by-case basis how to weigh these criteria in determining what penalty, if any, is

appropriate.

Also, Congress carefully considered the limits it <u>did</u> want to place on district

courts' authority to apply penalties. Section 113(e)(1) provides, "The court shall

not assess penalties for noncompliance with <u>administrative subpoenas</u> under

section 7607(a) of this title or actions under section 7414 of this title, where the

violator had sufficient cause to violate or fail or refuse to comply with such

subpoena or action." 42 U.S.C. §7413(e)(1) (emphasis added). In addition,

---

[10] The reference to "the Administrator" relates to EPA's authority to assess administrative penalties against violators under §113. *See* 42 U.S.C. §7413(d). EPA must consider the same factors as district courts do when EPA determines administrative penalties under §113. *Id.* §7413(e)(1); *see also* S. Rep. 101-228, at 364, *as reprinted in* 1990 U.S.C.C.A.N. 3747. Administrative penalties are not at issue here.

[11] *Accord Pound*, 498 F.3d at 1097-98; *United States v. Oliver*, 394 Fed. Appx. 376, 377 (9th Cir. 2010) (mem.).

§113(c)(5)(C) provides a specific "affirmative defense" to prosecutions in a narrow category of criminal enforcement cases, and §113(c)(5)(D) preserves existing affirmative defenses available in other criminal cases. *Id.* §7413(c)(5)(C)-(D). Section 113(e)'s silence on affirmative defenses against civil penalties in cases of malfunction is thus quite telling. Congress was well aware that it also could have precluded district courts from imposing penalties for violating emission standards where a violator had "sufficient cause" or some other arguably mitigating factors were present. Congress chose not to do so, and its decision must be respected. *See, e.g.*, *HUD v. Rucker*, 535 U.S. 125, 132 (2002).

Moreover, the Act grants EPA minimal discretion to adjust only administrative penalties, allowing EPA to "compromise, modify, or remit, with or without conditions, any administrative penalty which may be imposed under [§113(d)]." 42 U.S.C. §7413(d)(2)(B) (emphasis added). There is no similar grant of authority to EPA to limit civil penalties that a court may impose. *See Id.* §§7413(e)(1), 7604(a). The explicit reference to EPA's authority to modify penalties in one provision and its absence in other, related provisions must be understood as an intentional decision by Congress that EPA may not contravene. *See, e.g.*, *Rucker*, 535 U.S. at 132.

EPA's affirmative defense directly overrides §§304(a) and 113(e) by providing that penalties "may be assessed" only if the violator "fail[s] to meet [its]

50

burden of proving all of the requirements in the affirmative defense." 78 Fed. Reg.

10,039/1 (codified at 40 C.F.R. §63.1344), JA____. Thus, it bars the imposition of

penalties if the requirements of 40 C.F.R. §63.1344 are met, regardless of whether

a district court concludes that penalties are appropriate based on the criteria in

§113(e). For example, a court that concludes penalties are appropriate based in part

on "the economic benefits of the noncompliance," and "the seriousness of the

violation"—as §113(e) plainly authorizes district courts to do, 42 U.S.C.

§7413(e)(1)—is nonetheless barred from imposing penalties on a violator that

satisfies EPA's separate requirements for the affirmative defense. The affirmative

defense thus unlawfully "substitute[s] EPA's desires for the plain text" of the

Clean Air Act. *New Jersey*, 517 F.3d at 582.

Moreover, EPA's stated rationale for the affirmative defense is divorced

from the text of the Act. EPA identifies neither textual support for the affirmative

defense nor any ambiguous language that might be stretched to accommodate it.

Instead, EPA claims that the affirmative defense "resolves an underlying tension"

between the Act's requirement for continuous compliance with emission standards

at all times and the agency's own policy views. 78 Fed. Reg. 10,014/1, JA____.

Specifically, although EPA acknowledges that the Act requires compliance at all

times, it professes concern that "despite the most diligent of efforts, emission limits

may be exceeded under circumstances beyond the control of the source." *Id.*,

51

JA\_\_\_\_. EPA then claims the affirmative defense "appropriately balances these competing concerns."[12] *Id.*, JA\_\_\_\_.

The Clean Air Act reflects the "balance[]" that Congress chose. Under §304(a), district courts (not EPA) have authority to "apply any appropriate penalties," and under §113(e)(1), district courts must consider the criteria Congress (not EPA) selected when they determine "any" penalties to assess. *See supra* p.8-9 (summarizing history of citizen enforcement and civil penalty provisions). EPA's atextual policy argument is not an attempt to interpret the Act, but to rewrite it by precluding federal courts from applying penalties where Congress unambiguously authorized them to do so. *E.g.*, *New Jersey*, 517 F.3d at 582; *Sierra Club v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002) ("it is of no moment that the extension may be, as the Agency claims, 'a reasonable accommodation of [certain provisions]'; it is not the accommodation the Congress made.").

EPA's attempt to rely on its general rulemaking authority under §301(a)(1), 78 Fed. Reg. 10,014/1, JA\_\_\_\_, is misplaced. Section 301(a)(1) only allows the

---

[12] In its proposal, EPA relies on case law that it itself that acknowledges has been "undermine[d]" by "intervening case law such as *Sierra Club v. EPA*, 551 F.3d 1019 (D.C. Cir. 2008)] and the CAA 1977 amendments" 77 Fed. Reg. 42,379/1-3, JA\_\_\_\_; *see also* 78 Fed. Reg. 10,013/3 (invoking proposed rule's discussion as support for affirmative defense), JA\_\_\_\_. It is irrational for EPA to say, on the one hand, that the cases it relies on have been "undermine[d]," but, on the other hand, that they give EPA a reasonable basis to claim authority to follow them.

Administrator to promulgate "such regulations as are necessary to carry out <u>his</u> [*sic*] <u>functions</u> under this chapter." 42 U.S.C. §7601(a)(1) (emphasis added). It does not allow the Administrator to regulate how <u>district courts</u> carry out <u>their functions</u>, which include "apply[ing] any appropriate civil penalties" in enforcement cases. *Id.* §7604(a); *see supra* p.48. Nor does §301(a)(1)  authorize EPA to override the more specific statutory provisions in §§113(e)(1) and 304(a). This Court has already held that "EPA cannot rely on its general authority to make rules necessary to carry out its functions when a specific statutory directive defines the relevant functions of EPA in a particular area" and "cannot use the general rulemaking authority under section 7601(a)(1) as justification for adding new factors to a list of statutorily specified ones." *Am. Petroleum Inst. v. EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995).

Straining to avoid the force of §§304(a) and 113(e), EPA argues that the affirmative defense is somehow "part of the emission standard" that EPA and citizens can enforce, and defines "two categories of violation." 77 Fed. Reg. 42,379/3, JA____. That claim has no grounding in logic or the Act. Civil penalties are a remedy for a violation, not somehow part of a violation. Further, the Act defines "emission standard" to mean "a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the

53

operation or maintenance of a source to assure continuous emission reduction, and any design, equipment, work practice or operational standard promulgated under this chapter." 42 U.S.C. §7602(k). Nothing in this definition even speaks to penalties, nor does any other Clean Air Act provision allow EPA to curtail the remedies Congress authorized district courts to apply.

EPA also argues that the affirmative defense does not conflict with §§113(e) and 304 because it "is not relevant to the amount of any penalty to be assessed." 77 Fed. Reg. 42,379/2, JA____. Yet, if a violator took advantage of the affirmative defense, the amount of civil penalties to be assessed would be zero. Zero is an amount. *See* Sesame Street, *Zero Is Delicious*, www.sesamestreet.org/play#media/video_b103907c-155f-11dd-a62f-919b98326687 (the "number of the day" defines amount of cookies Cookie Monster will get to eat, but because it is zero, Cookie Monster gets to eat no cookies: "no cookies is zero cookies").

Finally, EPA seeks to rely on a Fifth Circuit case that upheld EPA's authority to partially approve an affirmative defense provision in a state implementation plan ("SIP"). 78 Fed. Reg. 10,013/3-14/1 (citing *Luminant Generation Co. v. EPA*, 699 F.3d 427 (5th Cir. 2012) (superseded by 2013 WL 1195649 (5th Cir. Mar. 25, 2013))).

54

This Court should not follow the Fifth Circuit's decision. First, *Luminant* does not even address §304(a)'s grant of exclusive jurisdiction to district courts to hear enforcement cases and apply any civil penalties. Second, the Fifth Circuit's conclusion that §113(e)(1) is "ambiguous" conflicts with binding D.C. Circuit case law. The Fifth Circuit held that §113 was ambiguous because it "does not discuss whether a state may include in its SIP the availability of an affirmative defense against civil penalties for unplanned [startup, shutdown, or malfunction] activity," and thus deferred to EPA. 2013 WL 1195649, at *7-9. That analysis assumes that so long as the Act does not <u>explicitly</u> say whether EPA has authority, the Act is ambiguous. But such analysis is squarely foreclosed in this Circuit:

> To suggest … that *Chevron* step two is implicated any time a statute does not expressly <u>negate</u> the existence of a claimed administrative power (*i.e.* when the statute is not written in "thou shalt not" terms), is both flatly unfaithful to the principles of administrative law …, and refuted by precedent.

*Rwy. Labor Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 671 (D.C. Cir. 1994) (en banc) (emphasis in original); *accord, e.g.*, *Shays*, 414 F.3d at 108; *Am. Petroleum Inst.*, 52 F.3d at 1120; *Ethyl Corp.*, 51 F.3d at 1060; *see also Friends of the Earth v. EPA*, 446 F.3d 140, 146 (D.C. Cir. 2006) (refusing EPA request that Court follow Second Circuit in rejecting plain meaning of Clean Water Act because D.C. Circuit's case law on statutory interpretation differs from Second Circuit's).

55

**2.     The Affirmative Defense Contravenes §§112(d) and 302(k), and Circumvents This Court's Ruling in *Sierra Club-SSM*.**

*Sierra Club-SSM* holds that because §112(d) and §302(k) of the Act unambiguously require that §112-compliant standards apply to hazardous-air-pollutant-emitting facilities at all times, exempting facilities from compliance with such standards during malfunction periods is unlawful. 551 F.3d at 1028. The Court emphasized that EPA cannot satisfy the Act by substituting some other requirement of the agency's own invention and that only §112-compliant standards will suffice. *Id.*

Just as §112 must be read together with §302(k), *id.* 1027, it also must be read together with §304 and §113(e), which make clear that §112 standards must be enforceable by citizens in suits for civil penalties and that courts' authority to impose penalties in citizen suits is limited only by their obligation to consider the penalty criteria in §113(e)(1). By promulgating the affirmative defense, EPA converts the §112 standards in its cement plants rule into standards for which no penalties are available in enforcement suits if certain agency-created conditions are met. Although *Sierra Club-SSM* holds EPA cannot exempt sources from compliance with emission standards during malfunctions just because they are in compliance with the agency-created "general duty" requirement, *id.* 1027, the affirmative defense exempts sources from penalties for non-compliance so long as they meet other agency-created requirements. Thus, it effectively revives much of

56

the unlawful compliance exemption and reflects the same unlawful notion that

EPA can allow sources to comply with the agency's own preferred requirements

instead of those enacted by Congress. This Court should not countenance agency

attempts to hollow out or circumvent its decisions—especially statutory

interpretation decisions—with which the agency does not agree. *See Sierra Club-*

*Brick*, 479 F.3d at 884 ("[EPA] must obey the Clean Air Act as written by

Congress and interpreted by this court.").

**B.    Even If the Act Is Ambiguous, EPA's Interpretation Is Unlawful and the Affirmative Defense Is Arbitrary.**

**1.    The Affirmative Defense Is Not Entitled to *Chevron* Deference.**

As discussed above, EPA's authority under §301(a)(1) to administer the

Clean Air Act is limited to issuing regulations to carry out EPA's statutory

function, not the judiciary's. 42 U.S.C. §7601(a)(1); *see supra* p.52-53. Thus, even

if the Act were ambiguous with respect to EPA's authority to concoct an

affirmative defense to penalties, the affirmative defense, which purports to govern

actions by federal courts, does not warrant *Chevron* deference. *See Adams Fruit*,

494 U.S. at 649 (holding that Labor Secretary's "view of the scope of" statutory

provision merits no deference "because Congress has expressly established the

Judiciary and not the Department of Labor as the adjudicator of private rights of

action arising under the statute"); *see also, e.g.*, *City of Arlington*, 2013 WL

57

2149789, at *8 n.3 (describing holding of *Adams Fruit*). Because Petitioners'
interpretation of the Act is more consistent with congressional intent, the Court
should reject EPA's. *See, e.g.*, *Miller*, 687 F.3d at 1342 & n.11 (describing
standard of review when *Chevron* does not apply).

## 2.    EPA's Affirmative Defense Is Unlawful Under *Chevron* Step Two and Arbitrary.

Even if the Act were ambiguous and the affirmative defense were entitled to
*Chevron* deference, EPA does not articulate a rational statutory interpretation to
which the Court can defer. Further, as described above, EPA relies on case law that
the agency acknowledges to be at odds with the plain meaning of Clean Air Act
§§112 and 302 as interpreted by this Court in *Sierra Club-SSM*, and provides no
rational explanation for doing so. *Supra* p.52 n.12 (*citing* 78 Fed. Reg. 10,013/3,
JA____).EPA also relies the illogical belief that zero is not an amount, *supra* p.54,
and the irrational claim that the affirmative defense is somehow part of the
emission standards EPA set – a claim that is contradicted by EPA's invocation of
its general rulemaking authority as the basis for the affirmative defense, *supra*
p.53-54. These flaws render EPA's statutory interpretation unlawful and its action
arbitrary. *See Rettig v. Pension Benefit Guar. Corp.* 744 F.2d 133, 151 (D.C. Cir.
1984) (interpretation fails under *Chevron* step two where agency failed "to
consider matter in a detailed and reasoned fashion"); *International Alliance v.*

58

*NLRB*, 334 F.3d 27, 34-35 (D.C. Cir. 2003) (rejecting "internally inconsisten[t]" interpretation under *Chevron* step two); *Frontier Pipeline Co. v. FERC*, 452 F.3d 774, 781 (D.C. Cir. 2006) (agency acted arbitrarily by failing to reconcile its decision applying a given statutory provision with precedent construing that provision); *Business Roundtable v. SEC*, 647 F.3d 1144, 1153-54 (D.C. Cir. 2011) (agency reasoning is arbitrary where it is "internally inconsistent").

EPA's rationale for the affirmative defense is also internally inconsistent. EPA says that the "criteria" in the affirmative defense "are designed to ensure that steps are taken … to prevent future malfunctions." 78 Fed. Reg. 10,013/3, JA____. Yet EPA also says that the affirmative defense can operate "only" when the emissions event "meets the narrow definition of malfunction in 40 CFR 63.2," which requires that the event be "<u>not</u> reasonably preventable." *Id.*, JA____; 40 C.F.R. §63.2 (emphasis added). When there are steps that can be taken to prevent a malfunction, the malfunction is reasonably preventable, and thus not a "malfunction" at all under EPA's own definition of the term. Encouraging the prevention of future "preventable malfunctions" scarcely provides a rational basis for the affirmative defense when EPA does not even believe such things exist. *See Int'l Alliance*, 334 F.3d at 34-35; *Business Roundtable*, 647 F.3d at 1153-54.

In reality, the agency seeks to rest the affirmative defense on its policy argument that because equipment can fail and such failures can cause facilities to

exceed their emission standards, an affirmative defense to penalties is appropriate. *See, e.g.*, 78 Fed. Reg. 10,014/1, JA____. But to pass muster under *Chevron* step two, EPA must provide more than policy arguments: the agency must articulate its statutory interpretation and explain how that interpretation comports with the language of the Act. *See Rettig*, 744 F.2d at 151. A policy argument can never suffice where a statutory interpretation is required, and the policy argument EPA proffers here—the same one this Court rejected as irrelevant in *Sierra Club-SSM*, 551 F.3d at 1027-28—fails to reconcile EPA's affirmative defense with the Act.

Moreover, as explained above, Congress intended that the Act be fully enforced, and viewed citizen groups' seeking and winning civil penalties against violators as integral to achieving that goal. *See supra* pp.8-9 & n.1. EPA's failure to consider or explain the conflict between its affirmative defense and Congress's objectives in enacting §§113(e)(1) and 304(a) in 1990 renders its decision arbitrary and thus unlawful. *See, e.g.*, *North Carolina*, 531 F.3d at 919 (agency may not "substitute new goals in place of statutory objectives without explaining how doing so comports with the statute" (quotation marks omitted and alterations removed)).

Finally, the notion that EPA can deprive federal courts of authority expressly granted by statute—in this case, by prohibiting them from imposing penalties in accordance with Clean Air Act §113(e) when certain agency-created conditions are met—is not even "arguably consistent with the statutory scheme in a substantive

60

sense." *Rettig*, 744 F.2d at 151. Even if §§113(e) or 304(a) were ambiguous, it is fundamental that EPA lacks authority to place limits on discretion that Congress has given the courts. This is especially true here, where the limitation EPA created drains meaning from §113(e)'s mandate that district courts "shall take into consideration" criteria such as the seriousness of the violation and the economic benefit of the violation, 42 U.S.C. §7413(e)(1), by making those statutory criteria subordinate to different criteria established by the agency. *See Massachusetts v. DOT*, 93 F.3d at 893 ("Because the range of permissible interpretations of a statute is limited by the extent of its ambiguity, an agency cannot exploit some minor unclarity to put forth a reading that diverges from any realistic meaning of the statute."); *Halverson v. Slater*, 129 F.3d 180, 185 (D.C. Cir. 1997) (rejecting, under *Chevron* step two, agency interpretation that deprived statutory provision of effect).

## CONCLUSION AND RELIEF REQUESTED

For the reasons given above, Petitioners request that this Court vacate the 2013 Rule, except for its establishment of standards for clinker storage piles, and the affirmative defense promulgated in the 2010 Rule and codified at 40 C.F.R. §63.1344.

DATED: June 5, 2013

Respectfully Submitted,

/s/James S. Pew
James S. Pew
Seth L. Johnson
Earthjustice
1625 Massachusetts Ave., NW
Suite 702
Washington, DC 20036-2212
(202) 667-4500
jpew@earthjustice.org
sjohnson@earthjustice.org

*Counsel for Petitioners in Nos. 10-1378 and 13-1112*

/s/John Walke (with permission)
John Walke
Meleah Geertsma
Natural Resources Defense Council
1152 15th St. NW, Suite 300
Washington, DC 20005
(202) 289-6868
jwalke@nrdc.org
mgeertsma@nrdc.org

Avinash Kar
Natural Resources Defense Council
111 Sutter St., 20th Floor
San Francisco, CA 94104
(415) 875-6100
akar@nrdc.org

*Counsel for Petitioner in No. 10-1371*

## CERTIFICATE REGARDING WORD LIMITATION

Counsel hereby certifies that, in accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), the foregoing Proof Brief of Petitioners contains 13,950 words, as counted by counsel's word processing system, and thus complies with the applicable word limit established by the Court.

DATED: June 5, 2013

/s/ James S. Pew
James S. Pew

# STATUTES AND REGULATIONS

# TABLE OF CONTENTS

**STATUTES**                                                                    **Page**

42 U.S.C. §7412, Clean Air Act §112………………...…………… ADD1

42 U.S.C. §7413, Clean Air Act §113…..………………….………… ADD54

42 U.S.C. §7429, Clean Air Act §129…....…………….………….. ADD63

42 U.S.C. §7601, Clean Air Act §301…....…………….………….. ADD70

42 U.S.C. §7602, Clean Air Act §302…....…………….………….. ADD73

42 U.S.C. §7604, Clean Air Act §304…....…………….………….. ADD77

42 U.S.C. §7607, Clean Air Act §307…....…………….…………... ADD81

**REGULATIONS**

40 C.F.R. §63.2………………………………...…….………………... ADD88

United States Code Annotated
    Title 42. The Public Health and Welfare
        Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
        Subchapter I. Programs and Activities
        Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7412

§ 7412. Hazardous air pollutants

Effective: August 5, 1999
Currentness

**(a) Definitions**

For purposes of this section, except subsection (r) of this section--

**(1) Major source**

The term "major source" means any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants. The Administrator may establish a lesser quantity, or in the case of radionuclides different criteria, for a major source than that specified in the previous sentence, on the basis of the potency of the air pollutant, persistence, potential for bioaccumulation, other characteristics of the air pollutant, or other relevant factors.

**(2) Area source**

The term "area source" means any stationary source of hazardous air pollutants that is not a major source. For purposes of this section, the term "area source" shall not include motor vehicles or nonroad vehicles subject to regulation under subchapter II of this chapter.

**(3) Stationary source**

The term "stationary source" shall have the same meaning as such term has under section 7411(a) of this title.

**(4) New source**

The term "new source" means a stationary source the construction or reconstruction of which is commenced after the Administrator first proposes regulations under this section establishing an emission standard applicable to such source.

**(5) Modification**

The term "modification" means any physical change in, or change in the method of operation of, a major source which increases the actual emissions of any hazardous air pollutant emitted by such source by more than a de minimis amount or which results in the emission of any hazardous air pollutant not previously emitted by more than a de minimis amount.

**(6) Hazardous air pollutant**

The term "hazardous air pollutant" means any air pollutant listed pursuant to subsection (b) of this section.

**(7) Adverse environmental effect**

The term "adverse environmental effect" means any significant and widespread adverse effect, which may reasonably be anticipated, to wildlife, aquatic life, or other natural resources, including adverse impacts on populations of endangered or threatened species or significant degradation of environmental quality over broad areas.

**(8) Electric utility steam generating unit**

The term "electric utility steam generating unit" means any fossil fuel fired combustion unit of more than 25 megawatts that serves a generator that produces electricity for sale. A unit that cogenerates steam and electricity and supplies more than one-third of its potential electric output capacity and more than 25 megawatts electrical output to any utility power distribution system for sale shall be considered an electric utility steam generating unit.

**(9) Owner or operator**

The term "owner or operator" means any person who owns, leases, operates, controls, or supervises a stationary source.

**(10) Existing source**

The term "existing source" means any stationary source other than a new source.

**(11) Carcinogenic effect**

Unless revised, the term "carcinogenic effect" shall have the meaning provided by the Administrator under Guidelines for Carcinogenic Risk Assessment as of the date of enactment. Any revisions in the existing Guidelines shall be subject to notice and opportunity for comment.

**(b) List of pollutants**

**(1) Initial list**

The Congress establishes for purposes of this section a list of hazardous air pollutants as follows:

| CAS number | Chemical name |
| --- | --- |
| 75070 | Acetaldehyde |
| 60355 | Acetamide |
| 75058 | Acetonitrile |
| 98862 | Acetophenone |
| 53963 | 2-Acetylaminofluorene |
| 107028 | Acrolein |
| 79061 | Acrylamide |
| 79107 | Acrylic acid |
| 107131 | Acrylonitrile |

| | |
|---|---|
| 107051 | Allyl chloride |
| 92671 | 4-Aminobiphenyl |
| 62533 | Aniline |
| 90040 | o-Anisidine |
| 1332214 | Asbestos |
| 71432 | Benzene (including benzene from gasoline) |
| 92875 | Benzidine |
| 98077 | Benzotrichloride |
| 100447 | Benzyl chloride |
| 92524 | Biphenyl |
| 117817 | Bis(2-ethylhexyl)phthalate (DEHP) |
| 542881 | Bis(chloromethyl)ether |
| 75252 | Bromoform |
| 106990 | 1,3-Butadiene |
| 156627 | Calcium cyanamide |
| 105602 | Caprolactam |
| 133062 | Captan |
| 63252 | Carbaryl |
| 75150 | Carbon disulfide |
| 56235 | Carbon tetrachloride |
| 463581 | Carbonyl sulfide |
| 120809 | Catechol |
| 133904 | Chloramben |
| 57749 | Chlordane |
| 7782505 | Chlorine |
| 79118 | Chloroacetic acid |
| 532274 | 2-Chloroacetophenone |
| 108907 | Chlorobenzene |
| 510156 | Chlorobenzilate |

ADD3

| | |
|---|---|
| 67663 | Chloroform |
| 107302 | Chloromethyl methyl ether |
| 126998 | Chloroprene |
| 1319773 | Cresols/Cresylic acid (isomers and mixture) |
| 95487 | o-Cresol |
| 108394 | m-Cresol |
| 106445 | p-Cresol |
| 98828 | Cumene |
| 94757 | 2,4-D, salts and esters |
| 3547044 | DDE |
| 334883 | Diazomethane |
| 132649 | Dibenzofurans |
| 96128 | 1,2-Dibromo-3-chloropropane |
| 84742 | Dibutylphthalate |
| 106467 | 1,4-Dichlorobenzene(p) |
| 91941 | 3,3-Dichlorobenzidene |
| 111444 | Dichloroethyl ether (Bis(2-chloroethyl)ether) |
| 542756 | 1,3-Dichloropropene |
| 62737 | Dichlorvos |
| 111422 | Diethanolamine |
| 121697 | N,N-Diethyl aniline (N,N-Dimethylaniline) |
| 64675 | Diethyl sulfate |
| 119904 | 3,3-Dimethoxybenzidine |
| 60117 | Dimethyl aminoazobenzene |
| 119937 | 3,3#-Dimethyl benzidine |
| 79447 | Dimethyl carbamoyl chloride |
| 68122 | Dimethyl formamide |
| 57147 | 1,1-Dimethyl hydrazine |
| 131113 | Dimethyl phthalate |

| | |
|---|---|
| 77781 | Dimethyl sulfate |
| 534521 | 4,6-Dinitro-o-cresol, and salts |
| 51285 | 2,4-Dinitrophenol |
| 121142 | 2,4-Dinitrotoluene |
| 123911 | 1,4-Dioxane (1,4-Diethyleneoxide) |
| 122667 | 1,2-Diphenylhydrazine |
| 106898 | Epichlorohydrin (1-Chloro-2,3-epoxypropane) |
| 106887 | 1,2-Epoxybutane |
| 140885 | Ethyl acrylate |
| 100414 | Ethyl benzene |
| 51796 | Ethyl carbamate (Urethane) |
| 75003 | Ethyl chloride (Chloroethane) |
| 106934 | Ethylene dibromide (Dibromoethane) |
| 107062 | Ethylene dichloride (1,2-Dichloroethane) |
| 107211 | Ethylene glycol |
| 151564 | Ethylene imine (Aziridine) |
| 75218 | Ethylene oxide |
| 96457 | Ethylene thiourea |
| 75343 | Ethylidene dichloride (1,1-Dichloroethane) |
| 50000 | Formaldehyde |
| 76448 | Heptachlor |
| 118741 | Hexachlorobenzene |
| 87683 | Hexachlorobutadiene |
| 77474 | Hexachlorocyclopentadiene |
| 67721 | Hexachloroethane |
| 822060 | Hexamethylene-1,6-diisocyanate |
| 680319 | Hexamethylphosphoramide |
| 110543 | Hexane |
| 302012 | Hydrazine |

| | |
|---|---|
| 7647010 | Hydrochloric acid |
| 7664393 | Hydrogen fluoride (Hydrofluoric acid) |
| 123319 | Hydroquinone |
| 78591 | Isophorone |
| 58899 | Lindane (all isomers) |
| 108316 | Maleic anhydride |
| 67561 | Methanol |
| 72435 | Methoxychlor |
| 74839 | Methyl bromide (Bromomethane) |
| 74873 | Methyl chloride (Chloromethane) |
| 71556 | Methyl chloroform (1,1,1-Trichloroethane) |
| 78933 | Methyl ethyl ketone (2-Butanone) |
| 60344 | Methyl hydrazine |
| 74884 | Methyl iodide (Iodomethane) |
| 108101 | Methyl isobutyl ketone (Hexone) |
| 624839 | Methyl isocyanate |
| 80626 | Methyl methacrylate |
| 1634044 | Methyl tert butyl ether |
| 101144 | 4,4-Methylene bis(2-chloroaniline) |
| 75092 | Methylene chloride (Dichloromethane) |
| 101688 | Methylene diphenyl diisocyanate (MDI) |
| 101779 | 4,4#-Methylenedianiline |
| 91203 | Naphthalene |
| 98953 | Nitrobenzene |
| 92933 | 4-Nitrobiphenyl |
| 100027 | 4-Nitrophenol |
| 79469 | 2-Nitropropane |
| 684935 | N-Nitroso-N-methylurea |
| 62759 | N-Nitrosodimethylamine |

| | |
|---|---|
| 59892 | N-Nitrosomorpholine |
| 56382 | Parathion |
| 82688 | Pentachloronitrobenzene (Quintobenzene) |
| 87865 | Pentachlorophenol |
| 108952 | Phenol |
| 106503 | p-Phenylenediamine |
| 75445 | Phosgene |
| 7803512 | Phosphine |
| 7723140 | Phosphorus |
| 85449 | Phthalic anhydride |
| 1336363 | Polychlorinated biphenyls (Aroclors) |
| 1120714 | 1,3-Propane sultone |
| 57578 | beta-Propiolactone |
| 123386 | Propionaldehyde |
| 114261 | Propoxur (Baygon) |
| 78875 | Propylene dichloride (1,2-Dichloropropane) |
| 75569 | Propylene oxide |
| 75558 | 1,2-Propylenimine (2-Methyl aziridine) |
| 91225 | Quinoline |
| 106514 | Quinone |
| 100425 | Styrene |
| 96093 | Styrene oxide |
| 1746016 | 2,3,7,8-Tetrachlorodibenzo-p-dioxin |
| 79345 | 1,1,2,2-Tetrachloroethane |
| 127184 | Tetrachloroethylene (Perchloroethylene) |
| 7550450 | Titanium tetrachloride |
| 108883 | Toluene |
| 95807 | 2,4-Toluene diamine |
| 584849 | 2,4-Toluene diisocyanate |

ADD7

| 95534 | o-Toluidine |
| 8001352 | Toxaphene (chlorinated camphene) |
| 120821 | 1,2,4-Trichlorobenzene |
| 79005 | 1,1,2-Trichloroethane |
| 79016 | Trichloroethylene |
| 95954 | 2,4,5-Trichlorophenol |
| 88062 | 2,4,6-Trichlorophenol |
| 121448 | Triethylamine |
| 1582098 | Trifluralin |
| 540841 | 2,2,4-Trimethylpentane |
| 108054 | Vinyl acetate |
| 593602 | Vinyl bromide |
| 75014 | Vinyl chloride |
| 75354 | Vinylidene chloride (1,1-Dichloroethylene) |
| 1330207 | Xylenes (isomers and mixture) |
| 95476 | o-Xylenes |
| 108383 | m-Xylenes |
| 106423 | p-Xylenes |
| 0 | Antimony Compounds |
| 0 | Arsenic Compounds (inorganic including arsine) |
| 0 | Beryllium Compounds |
| 0 | Cadmium Compounds |
| 0 | Chromium Compounds |
| 0 | Cobalt Compounds |
| 0 | Coke Oven Emissions |
| 0 | Cyanide Compounds [1] |
| 0 | Glycol ethers [2] |
| 0 | Lead Compounds |

    0   Manganese Compounds

    0   Mercury Compounds

    0   Fine mineral fibers [3]

    0   Nickel Compounds

    0   Polycylic Organic Matter [4]

    0   Radionuclides (including radon) [5]

    0   Selenium Compounds

NOTE: For all listings above which contain the word "compounds" and for glycol ethers, the following applies: Unless otherwise specified, these listings are defined as including any unique chemical substance that contains the named chemical (i.e., antimony, arsenic, etc.) as part of that chemical's infrastructure.

[1] $X\#CN$ where $X = H\#$ or any other group where a formal dissociation may occur. For example KCN or $Ca(CN)_2$

[2] Includes mono- and di- ethers of ethylene glycol, diethylene glycol, and triethylene glycol $R\text{-}(OCH_2CH_2)_n\text{-}OR\#$ where

$n = 1, 2,$ or $3$

$R$ = alkyl or aryl groups

$R\#$ = R, H, or groups which, when removed, yield glycol ethers with the structure: $R\text{-}(OCH_2CH)_n\text{-}OH$. Polymers are excluded from the glycol category.

[3] Includes mineral fiber emissions from facilities manufacturing or processing glass, rock, or slag fibers (or other mineral derived fibers) of average diameter 1 micrometer or less.

[4] Includes organic compounds with more than one benzene ring, and which have a boiling point greater than or equal to 100°C.

[5] A type of atom which spontaneously undergoes radioactive decay.

### (2) Revision of the list

    The Administrator shall periodically review the list established by this subsection and publish the results thereof and, where appropriate, revise such list by rule, adding pollutants which present, or may present, through inhalation or other routes of exposure, a threat of adverse human health effects (including, but not limited to, substances which are known to be, or may reasonably be anticipated to be, carcinogenic, mutagenic, teratogenic, neurotoxic, which cause reproductive dysfunction, or which are acutely or chronically toxic) or adverse environmental effects whether through ambient concentrations, bioaccumulation, deposition, or otherwise, but not including releases subject to regulation under subsection (r) of this section as a result of emissions to the air. No air pollutant which is listed under section 7408(a) of this title may be added to the list under this section, except that the prohibition of this sentence shall not apply to any pollutant which independently meets the listing criteria of this paragraph and is a precursor to a pollutant which is listed under section 7408(a) of this title or to any pollutant which is in a class of pollutants listed under such section. No substance, practice, process or activity regulated under subchapter VI of this chapter shall be subject to regulation under this section solely due to its adverse effects on the environment.

**(3) Petitions to modify the list**

**(A)** Beginning at any time after 6 months after November 15, 1990, any person may petition the Administrator to modify the list of hazardous air pollutants under this subsection by adding or deleting a substance or, in case of listed pollutants without CAS numbers (other than coke oven emissions, mineral fibers, or polycyclic organic matter) removing certain unique substances. Within 18 months after receipt of a petition, the Administrator shall either grant or deny the petition by publishing a written explanation of the reasons for the Administrator's decision. Any such petition shall include a showing by the petitioner that there is adequate data on the health or environmental defects [1] of the pollutant or other evidence adequate to support the petition. The Administrator may not deny a petition solely on the basis of inadequate resources or time for review.

**(B)** The Administrator shall add a substance to the list upon a showing by the petitioner or on the Administrator's own determination that the substance is an air pollutant and that emissions, ambient concentrations, bioaccumulation or deposition of the substance are known to cause or may reasonably be anticipated to cause adverse effects to human health or adverse environmental effects.

**(C)** The Administrator shall delete a substance from the list upon a showing by the petitioner or on the Administrator's own determination that there is adequate data on the health and environmental effects of the substance to determine that emissions, ambient concentrations, bioaccumulation or deposition of the substance may not reasonably be anticipated to cause any adverse effects to the human health or adverse environmental effects.

**(D)** The Administrator shall delete one or more unique chemical substances that contain a listed hazardous air pollutant not having a CAS number (other than coke oven emissions, mineral fibers, or polycyclic organic matter) upon a showing by the petitioner or on the Administrator's own determination that such unique chemical substances that contain the named chemical of such listed hazardous air pollutant meet the deletion requirements of subparagraph (C). The Administrator must grant or deny a deletion petition prior to promulgating any emission standards pursuant to subsection (d) of this section applicable to any source category or subcategory of a listed hazardous air pollutant without a CAS number listed under subsection (b) of this section for which a deletion petition has been filed within 12 months of November 15, 1990.

**(4) Further information**

If the Administrator determines that information on the health or environmental effects of a substance is not sufficient to make a determination required by this subsection, the Administrator may use any authority available to the Administrator to acquire such information.

**(5) Test methods**

The Administrator may establish, by rule, test measures and other analytic procedures for monitoring and measuring emissions, ambient concentrations, deposition, and bioaccumulation of hazardous air pollutants.

**(6) Prevention of significant deterioration**

The provisions of part C of this subchapter (prevention of significant deterioration) shall not apply to pollutants listed under this section.

**(7) Lead**

The Administrator may not list elemental lead as a hazardous air pollutant under this subsection.

**(c) List of source categories**

**(1) In general**

Not later than 12 months after November 15, 1990, the Administrator shall publish, and shall from time to time, but no less often than every 8 years, revise, if appropriate, in response to public comment or new information, a list of all categories and subcategories of major sources and area sources (listed under paragraph (3)) of the air pollutants listed pursuant to subsection (b) of this section. To the extent practicable, the categories and subcategories listed under this subsection shall be consistent with the list of source categories established pursuant to section 7411 of this title and part C of this subchapter. Nothing in the preceding sentence limits the Administrator's authority to establish subcategories under this section, as appropriate.

**(2) Requirement for emissions standards**

For the categories and subcategories the Administrator lists, the Administrator shall establish emissions standards under subsection (d) of this section, according to the schedule in this subsection and subsection (e) of this section.

**(3) Area sources**

The Administrator shall list under this subsection each category or subcategory of area sources which the Administrator finds presents a threat of adverse effects to human health or the environment (by such sources individually or in the aggregate) warranting regulation under this section. The Administrator shall, not later than 5 years after November 15, 1990, and pursuant to subsection (k)(3)(B) of this section, list, based on actual or estimated aggregate emissions of a listed pollutant or pollutants, sufficient categories or subcategories of area sources to ensure that sources representing 90 percent of the area source emissions of the 30 hazardous air pollutants that present the greatest threat to public health in the largest number of urban areas are subject to regulation under this section. Such regulations shall be promulgated not later than 10 years after November 15, 1990.

**(4) Previously regulated categories**

The Administrator may, in the Administrator's discretion, list any category or subcategory of sources previously regulated under this section as in effect before November 15, 1990.

**(5) Additional categories**

In addition to those categories and subcategories of sources listed for regulation pursuant to paragraphs (1) and (3), the Administrator may at any time list additional categories and subcategories of sources of hazardous air pollutants according to the same criteria for listing applicable under such paragraphs. In the case of source categories and subcategories listed after publication of the initial list required under paragraph (1) or (3), emission standards under subsection (d) of this section for the category or subcategory shall be promulgated within 10 years after November 15, 1990, or within 2 years after the date on which such category or subcategory is listed, whichever is later.

**(6) Specific pollutants**

With respect to alkylated lead compounds, polycyclic organic matter, hexachlorobenzene, mercury, polychlorinated biphenyls, 2,3,7,8-tetrachlorodibenzofurans and 2,3,7,8-tetrachlorodibenzo-p-dioxin, the Administrator shall, not later than 5 years after November 15, 1990, list categories and subcategories of sources assuring that sources accounting for not less than 90 per centum of the aggregate emissions of each such pollutant are subject to standards under subsection (d)(2) or (d)(4) of this section. Such standards shall be promulgated not later than 10 years after November 15, 1990. This paragraph shall not be construed to require the Administrator to promulgate standards for such pollutants emitted by electric utility steam generating units.

**(7) Research facilities**

The Administrator shall establish a separate category covering research or laboratory facilities, as necessary to assure the equitable treatment of such facilities. For purposes of this section, "research or laboratory facility" means any stationary source whose primary purpose is to conduct research and development into new processes and products, where such source is operated under the close supervision of technically trained personnel and is not engaged in the manufacture of products for commercial sale in commerce, except in a de minimis manner.

**(8) Boat manufacturing**

When establishing emissions standards for styrene, the Administrator shall list boat manufacturing as a separate subcategory unless the Administrator finds that such listing would be inconsistent with the goals and requirements of this chapter.

**(9) Deletions from the list**

**(A)** Where the sole reason for the inclusion of a source category on the list required under this subsection is the emission of a unique chemical substance, the Administrator shall delete the source category from the list if it is appropriate because of action taken under either subparagraphs (C) or (D) of subsection (b)(3) of this section.

**(B)** The Administrator may delete any source category from the list under this subsection, on petition of any person or on the Administrator's own motion, whenever the Administrator makes the following determination or determinations, as applicable:

**(i)** In the case of hazardous air pollutants emitted by sources in the category that may result in cancer in humans, a determination that no source in the category (or group of sources in the case of area sources) emits such hazardous air pollutants in quantities which may cause a lifetime risk of cancer greater than one in one million to the individual in the population who is most exposed to emissions of such pollutants from the source (or group of sources in the case of area sources).

**(ii)** In the case of hazardous air pollutants that may result in adverse health effects in humans other than cancer or adverse environmental effects, a determination that emissions from no source in the category or subcategory concerned (or group of sources in the case of area sources) exceed a level which is adequate to protect public health with an ample margin of safety and no adverse environmental effect will result from emissions from any source (or from a group of sources in the case of area sources).

The Administrator shall grant or deny a petition under this paragraph within 1 year after the petition is filed.

**(d) Emission standards**

**(1) In general**

The Administrator shall promulgate regulations establishing emission standards for each category or subcategory of major sources and area sources of hazardous air pollutants listed for regulation pursuant to subsection (c) of this section in accordance with the schedules provided in subsections (c) and (e) of this section. The Administrator may distinguish among classes, types, and sizes of sources within a category or subcategory in establishing such standards except that, there shall be no delay in the compliance date for any standard applicable to any source under subsection (i) of this section as the result of the authority provided by this sentence.

**(2) Standards and methods**

Emissions standards promulgated under this subsection and applicable to new or existing sources of hazardous air pollutants shall require the maximum degree of reduction in emissions of the hazardous air pollutants subject to this section (including a prohibition on such emissions, where achievable) that the Administrator, taking into consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for new or existing sources in the category or subcategory to which such emission standard applies, through application of measures, processes, methods, systems or techniques including, but not limited to, measures which--

(A) reduce the volume of, or eliminate emissions of, such pollutants through process changes, substitution of materials or other modifications,

(B) enclose systems or processes to eliminate emissions,

(C) collect, capture or treat such pollutants when released from a process, stack, storage or fugitive emissions point,

(D) are design, equipment, work practice, or operational standards (including requirements for operator training or certification) as provided in subsection (h) of this section, or

(E) are a combination of the above.

None of the measures described in subparagraphs (A) through (D) shall, consistent with the provisions of section 7414(c) of this title, in any way compromise any United States patent or United States trademark right, or any confidential business information, or any trade secret or any other intellectual property right.

**(3) New and existing sources**

The maximum degree of reduction in emissions that is deemed achievable for new sources in a category or subcategory shall not be less stringent than the emission control that is achieved in practice by the best controlled similar source, as determined by the Administrator. Emission standards promulgated under this subsection for existing sources in a category or subcategory may be less stringent than standards for new sources in the same category or subcategory but shall not be less stringent, and may be more stringent than--

(A) the average emission limitation achieved by the best performing 12 percent of the existing sources (for which the Administrator has emissions information), excluding those sources that have, within 18 months before the emission standard is proposed or within 30 months before such standard is promulgated, whichever is later, first achieved a level of emission rate or emission reduction which complies, or would comply if the source is not subject to such standard, with the lowest achievable emission rate (as defined by section 7501 of this title) applicable to the source category and prevailing at the time, in the category or subcategory for categories and subcategories with 30 or more sources, or

(B) the average emission limitation achieved by the best performing 5 sources (for which the Administrator has or could reasonably obtain emissions information) in the category or subcategory for categories or subcategories with fewer than 30 sources.

**(4) Health threshold**

With respect to pollutants for which a health threshold has been established, the Administrator may consider such threshold level, with an ample margin of safety, when establishing emission standards under this subsection.

**(5) Alternative standard for area sources**

With respect only to categories and subcategories of area sources listed pursuant to subsection (c) of this section, the Administrator may, in lieu of the authorities provided in paragraph (2) and subsection (f) of this section, elect to promulgate standards or requirements applicable to sources in such categories or subcategories which provide for the use of generally available control technologies or management practices by such sources to reduce emissions of hazardous air pollutants.

**(6) Review and revision**

The Administrator shall review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section no less often than every 8 years.

**(7) Other requirements preserved**

No emission standard or other requirement promulgated under this section shall be interpreted, construed or applied to diminish or replace the requirements of a more stringent emission limitation or other applicable requirement established pursuant to section 7411 of this title, part C or D of this subchapter, or other authority of this chapter or a standard issued under State authority.

**(8) Coke ovens**

**(A)** Not later than December 31, 1992, the Administrator shall promulgate regulations establishing emission standards under paragraphs (2) and (3) of this subsection for coke oven batteries. In establishing such standards, the Administrator shall evaluate--

**(i)** the use of sodium silicate (or equivalent) luting compounds to prevent door leaks, and other operating practices and technologies for their effectiveness in reducing coke oven emissions, and their suitability for use on new and existing coke oven batteries, taking into account costs and reasonable commercial door warranties; and

**(ii)** as a basis for emission standards under this subsection for new coke oven batteries that begin construction after the date of proposal of such standards, the Jewell design Thompson non-recovery coke oven batteries and other non-recovery coke oven technologies, and other appropriate emission control and coke production technologies, as to their effectiveness in reducing coke oven emissions and their capability for production of steel quality coke.

Such regulations shall require at a minimum that coke oven batteries will not exceed 8 per centum leaking doors, 1 per centum leaking lids, 5 per centum leaking offtakes, and 16 seconds visible emissions per charge, with no exclusion for emissions during the period after the closing of self-sealing oven doors. Notwithstanding subsection (i) of this section, the compliance date for such emission standards for existing coke oven batteries shall be December 31, 1995.

**(B)** The Administrator shall promulgate work practice regulations under this subsection for coke oven batteries requiring, as appropriate--

ADD14

**(i)** the use of sodium silicate (or equivalent) luting compounds, if the Administrator determines that use of sodium silicate is an effective means of emissions control and is achievable, taking into account costs and reasonable commercial warranties for doors and related equipment; and

**(ii)** door and jam cleaning practices.

Notwithstanding subsection (i) of this section, the compliance date for such work practice regulations for coke oven batteries shall be not later than the date 3 years after November 15, 1990.

**(C)** For coke oven batteries electing to qualify for an extension of the compliance date for standards promulgated under subsection (f) of this section in accordance with subsection (i)(8) of this section, the emission standards under this subsection for coke oven batteries shall require that coke oven batteries not exceed 8 per centum leaking doors, 1 per centum leaking lids, 5 per centum leaking offtakes, and 16 seconds visible emissions per charge, with no exclusion for emissions during the period after the closing of self-sealing doors. Notwithstanding subsection (i) of this section, the compliance date for such emission standards for existing coke oven batteries seeking an extension shall be not later than the date 3 years after November 15, 1990.

**(9) Sources licensed by the Nuclear Regulatory Commission**

No standard for radionuclide emissions from any category or subcategory of facilities licensed by the Nuclear Regulatory Commission (or an Agreement State) is required to be promulgated under this section if the Administrator determines, by rule, and after consultation with the Nuclear Regulatory Commission, that the regulatory program established by the Nuclear Regulatory Commission pursuant to the Atomic Energy Act [42 U.S.C.A. § 2011 et seq.] for such category or subcategory provides an ample margin of safety to protect the public health. Nothing in this subsection shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce any standard or limitation respecting emissions of radionuclides which is more stringent than the standard or limitation in effect under section 7411 of this title or this section.

**(10) Effective date**

Emission standards or other regulations promulgated under this subsection shall be effective upon promulgation.

**(e) Schedule for standards and review**

**(1) In general**

The Administrator shall promulgate regulations establishing emission standards for categories and subcategories of sources initially listed for regulation pursuant to subsection (c)(1) of this section as expeditiously as practicable, assuring that--

**(A)** emission standards for not less than 40 categories and subcategories (not counting coke oven batteries) shall be promulgated not later than 2 years after November 15, 1990;

**(B)** emission standards for coke oven batteries shall be promulgated not later than December 31, 1992;

**(C)** emission standards for 25 per centum of the listed categories and subcategories shall be promulgated not later than 4 years after November 15, 1990;

**(D)** emission standards for an additional 25 per centum of the listed categories and subcategories shall be promulgated not later than 7 years after November 15, 1990; and

**(E)** emission standards for all categories and subcategories shall be promulgated not later than 10 years after November 15, 1990.

**(2) Priorities**

In determining priorities for promulgating standards under subsection (d) of this section, the Administrator shall consider--

**(A)** the known or anticipated adverse effects of such pollutants on public health and the environment;

**(B)** the quantity and location of emissions or reasonably anticipated emissions of hazardous air pollutants that each category or subcategory will emit; and

**(C)** the efficiency of grouping categories or subcategories according to the pollutants emitted, or the processes or technologies used.

**(3) Published schedule**

Not later than 24 months after November 15, 1990, and after opportunity for comment, the Administrator shall publish a schedule establishing a date for the promulgation of emission standards for each category and subcategory of sources listed pursuant to subsection (c)(1) and (3) of this section which shall be consistent with the requirements of paragraphs (1) and (2). The determination of priorities for the promulgation of standards pursuant to this paragraph is not a rulemaking and shall not be subject to judicial review, except that, failure to promulgate any standard pursuant to the schedule established by this paragraph shall be subject to review under section 7604 of this title.

**(4) Judicial review**

Notwithstanding section 7607 of this title, no action of the Administrator adding a pollutant to the list under subsection (b) of this section or listing a source category or subcategory under subsection (c) of this section shall be a final agency action subject to judicial review, except that any such action may be reviewed under such section 7607 of this title when the Administrator issues emission standards for such pollutant or category.

**(5) Publicly owned treatment works**

The Administrator shall promulgate standards pursuant to subsection (d) of this section applicable to publicly owned treatment works (as defined in title II of the Federal Water Pollution Control Act [33 U.S.C.A. § 1281 et seq.] ) not later than 5 years after November 15, 1990.

**(f) Standard to protect health and environment**

**(1) Report**

Not later than 6 years after November 15, 1990, the Administrator shall investigate and report, after consultation with the Surgeon General and after opportunity for public comment, to Congress on--

(A) methods of calculating the risk to public health remaining, or likely to remain, from sources subject to regulation under this section after the application of standards under subsection (d) of this section;

(B) the public health significance of such estimated remaining risk and the technologically and commercially available methods and costs of reducing such risks;

(C) the actual health effects with respect to persons living in the vicinity of sources, any available epidemiological or other health studies, risks presented by background concentrations of hazardous air pollutants, any uncertainties in risk assessment methodology or other health assessment technique, and any negative health or environmental consequences to the community of efforts to reduce such risks; and

(D) recommendations as to legislation regarding such remaining risk.

## (2) Emission standards

(A) If Congress does not act on any recommendation submitted under paragraph (1), the Administrator shall, within 8 years after promulgation of standards for each category or subcategory of sources pursuant to subsection (d) of this section, promulgate standards for such category or subcategory if promulgation of such standards is required in order to provide an ample margin of safety to protect public health in accordance with this section (as in effect before November 15, 1990) or to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect. Emission standards promulgated under this subsection shall provide an ample margin of safety to protect public health in accordance with this section (as in effect before November 15, 1990), unless the Administrator determines that a more stringent standard is necessary to prevent, taking into consideration costs, energy, safety, and other relevant factors, an adverse environmental effect. If standards promulgated pursuant to subsection (d) of this section and applicable to a category or subcategory of sources emitting a pollutant (or pollutants) classified as a known, probable or possible human carcinogen do not reduce lifetime excess cancer risks to the individual most exposed to emissions from a source in the category or subcategory to less than one in one million, the Administrator shall promulgate standards under this subsection for such source category.

(B) Nothing in subparagraph (A) or in any other provision of this section shall be construed as affecting, or applying to the Administrator's interpretation of this section, as in effect before November 15, 1990, and set forth in the Federal Register of September 14, 1989 (54 Federal Register 38044).

(C) The Administrator shall determine whether or not to promulgate such standards and, if the Administrator decides to promulgate such standards, shall promulgate the standards 8 years after promulgation of the standards under subsection (d) of this section for each source category or subcategory concerned. In the case of categories or subcategories for which standards under subsection (d) of this section are required to be promulgated within 2 years after November 15, 1990, the Administrator shall have 9 years after promulgation of the standards under subsection (d) of this section to make the determination under the preceding sentence and, if required, to promulgate the standards under this paragraph.

## (3) Effective date

Any emission standard established pursuant to this subsection shall become effective upon promulgation.

## (4) Prohibition

---

No air pollutant to which a standard under this subsection applies may be emitted from any stationary source in violation of such standard, except that in the case of an existing source--

(A) such standard shall not apply until 90 days after its effective date, and

(B) the Administrator may grant a waiver permitting such source a period of up to 2 years after the effective date of a standard to comply with the standard if the Administrator finds that such period is necessary for the installation of controls and that steps will be taken during the period of the waiver to assure that the health of persons will be protected from imminent endangerment.

**(5) Area sources**

The Administrator shall not be required to conduct any review under this subsection or promulgate emission limitations under this subsection for any category or subcategory of area sources that is listed pursuant to subsection (c)(3) of this section and for which an emission standard is promulgated pursuant to subsection (d)(5) of this section.

**(6) Unique chemical substances**

In establishing standards for the control of unique chemical substances of listed pollutants without CAS numbers under this subsection, the Administrator shall establish such standards with respect to the health and environmental effects of the substances actually emitted by sources and direct transformation byproducts of such emissions in the categories and subcategories.

**(g) Modifications**

**(1) Offsets**

(A) A physical change in, or change in the method of operation of, a major source which results in a greater than de minimis increase in actual emissions of a hazardous air pollutant shall not be considered a modification, if such increase in the quantity of actual emissions of any hazardous air pollutant from such source will be offset by an equal or greater decrease in the quantity of emissions of another hazardous air pollutant (or pollutants) from such source which is deemed more hazardous, pursuant to guidance issued by the Administrator under subparagraph (B). The owner or operator of such source shall submit a showing to the Administrator (or the State) that such increase has been offset under the preceding sentence.

(B) The Administrator shall, after notice and opportunity for comment and not later than 18 months after November 15, 1990, publish guidance with respect to implementation of this subsection. Such guidance shall include an identification, to the extent practicable, of the relative hazard to human health resulting from emissions to the ambient air of each of the pollutants listed under subsection (b) of this section sufficient to facilitate the offset showing authorized by subparagraph (A). Such guidance shall not authorize offsets between pollutants where the increased pollutant (or more than one pollutant in a stream of pollutants) causes adverse effects to human health for which no safety threshold for exposure can be determined unless there are corresponding decreases in such types of pollutant(s).

**(2) Construction, reconstruction and modifications**

(A) After the effective date of a permit program under subchapter V of this chapter in any State, no person may modify a major source of hazardous air pollutants in such State, unless the Administrator (or the State) determines that the maximum

achievable control technology emission limitation under this section for existing sources will be met. Such determination shall be made on a case-by-case basis where no applicable emissions limitations have been established by the Administrator.

**(B)** After the effective date of a permit program under subchapter V of this chapter in any State, no person may construct or reconstruct any major source of hazardous air pollutants, unless the Administrator (or the State) determines that the maximum achievable control technology emission limitation under this section for new sources will be met. Such determination shall be made on a case-by-case basis where no applicable emission limitations have been established by the Administrator.

**(3) Procedures for modifications**

The Administrator (or the State) shall establish reasonable procedures for assuring that the requirements applying to modifications under this section are reflected in the permit.

**(h) Work practice standards and other requirements**

**(1) In general**

For purposes of this section, if it is not feasible in the judgment of the Administrator to prescribe or enforce an emission standard for control of a hazardous air pollutant or pollutants, the Administrator may, in lieu thereof, promulgate a design, equipment, work practice, or operational standard, or combination thereof, which in the Administrator's judgment is consistent with the provisions of subsection (d) or (f) of this section. In the event the Administrator promulgates a design or equipment standard under this subsection, the Administrator shall include as part of such standard such requirements as will assure the proper operation and maintenance of any such element of design or equipment.

**(2) Definition**

For the purpose of this subsection, the phrase "not feasible to prescribe or enforce an emission standard" means any situation in which the Administrator determines that--

**(A)** a hazardous air pollutant or pollutants cannot be emitted through a conveyance designed and constructed to emit or capture such pollutant, or that any requirement for, or use of, such a conveyance would be inconsistent with any Federal, State or local law, or

**(B)** the application of measurement methodology to a particular class of sources is not practicable due to technological and economic limitations.

**(3) Alternative standard**

If after notice and opportunity for comment, the owner or operator of any source establishes to the satisfaction of the Administrator that an alternative means of emission limitation will achieve a reduction in emissions of any air pollutant at least equivalent to the reduction in emissions of such pollutant achieved under the requirements of paragraph (1), the Administrator shall permit the use of such alternative by the source for purposes of compliance with this section with respect to such pollutant.

**(4) Numerical standard required**

Any standard promulgated under paragraph (1) shall be promulgated in terms of an emission standard whenever it is feasible to promulgate and enforce a standard in such terms.

**(i) Schedule for compliance**

**(1) Preconstruction and operating requirements**

After the effective date of any emission standard, limitation, or regulation under subsection (d), (f) or (h) of this section, no person may construct any new major source or reconstruct any existing major source subject to such emission standard, regulation or limitation unless the Administrator (or a State with a permit program approved under subchapter V of this chapter) determines that such source, if properly constructed, reconstructed and operated, will comply with the standard, regulation or limitation.

**(2) Special rule**

Notwithstanding the requirements of paragraph (1), a new source which commences construction or reconstruction after a standard, limitation or regulation applicable to such source is proposed and before such standard, limitation or regulation is promulgated shall not be required to comply with such promulgated standard until the date 3 years after the date of promulgation if--

(A) the promulgated standard, limitation or regulation is more stringent than the standard, limitation or regulation proposed; and

(B) the source complies with the standard, limitation, or regulation as proposed during the 3-year period immediately after promulgation.

**(3) Compliance schedule for existing sources**

(A) After the effective date of any emissions standard, limitation or regulation promulgated under this section and applicable to a source, no person may operate such source in violation of such standard, limitation or regulation except, in the case of an existing source, the Administrator shall establish a compliance date or dates for each category or subcategory of existing sources, which shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard, except as provided in subparagraph (B) and paragraphs (4) through (8).

(B) The Administrator (or a State with a program approved under subchapter V of this chapter) may issue a permit that grants an extension permitting an existing source up to 1 additional year to comply with standards under subsection (d) of this section if such additional period is necessary for the installation of controls. An additional extension of up to 3 years may be added for mining waste operations, if the 4-year compliance time is insufficient to dry and cover mining waste in order to reduce emissions of any pollutant listed under subsection (b) of this section.

**(4) Presidential exemption**

The President may exempt any stationary source from compliance with any standard or limitation under this section for a period of not more than 2 years if the President determines that the technology to implement such standard is not available and that it is in the national security interests of the United States to do so. An exemption under this paragraph may be extended for 1 or more additional periods, each period not to exceed 2 years. The President shall report to Congress with respect to each exemption (or extension thereof) made under this paragraph.

**(5) Early reduction**

**(A)** The Administrator (or a State acting pursuant to a permit program approved under subchapter V of this chapter) shall issue a permit allowing an existing source, for which the owner or operator demonstrates that the source has achieved a reduction of 90 per centum or more in emissions of hazardous air pollutants (95 per centum in the case of hazardous air pollutants which are particulates) from the source, to meet an alternative emission limitation reflecting such reduction in lieu of an emission limitation promulgated under subsection (d) of this section for a period of 6 years from the compliance date for the otherwise applicable standard, provided that such reduction is achieved before the otherwise applicable standard under subsection (d) of this section is first proposed. Nothing in this paragraph shall preclude a State from requiring reductions in excess of those specified in this subparagraph as a condition of granting the extension authorized by the previous sentence.

**(B)** An existing source which achieves the reduction referred to in subparagraph (A) after the proposal of an applicable standard but before January 1, 1994, may qualify under subparagraph (A), if the source makes an enforceable commitment to achieve such reduction before the proposal of the standard. Such commitment shall be enforceable to the same extent as a regulation under this section.

**(C)** The reduction shall be determined with respect to verifiable and actual emissions in a base year not earlier than calendar year 1987, provided that, there is no evidence that emissions in the base year are artificially or substantially greater than emissions in other years prior to implementation of emissions reduction measures. The Administrator may allow a source to use a baseline year of 1985 or 1986 provided that the source can demonstrate to the satisfaction of the Administrator that emissions data for the source reflects verifiable data based on information for such source, received by the Administrator prior to November 15, 1990, pursuant to an information request issued under section 7414 of this title.

**(D)** For each source granted an alternative emission limitation under this paragraph there shall be established by a permit issued pursuant to subchapter V of this chapter an enforceable emission limitation for hazardous air pollutants reflecting the reduction which qualifies the source for an alternative emission limitation under this paragraph. An alternative emission limitation under this paragraph shall not be available with respect to standards or requirements promulgated pursuant to subsection (f) of this section and the Administrator shall, for the purpose of determining whether a standard under subsection (f) of this section is necessary, review emissions from sources granted an alternative emission limitation under this paragraph at the same time that other sources in the category or subcategory are reviewed.

**(E)** With respect to pollutants for which high risks of adverse public health effects may be associated with exposure to small quantities including, but not limited to, chlorinated dioxins and furans, the Administrator shall by regulation limit the use of offsetting reductions in emissions of other hazardous air pollutants from the source as counting toward the 90 per centum reduction in such high-risk pollutants qualifying for an alternative emissions limitation under this paragraph.

**(6) Other reductions**

Notwithstanding the requirements of this section, no existing source that has installed--

**(A)** best available control technology (as defined in section 7479(3) of this title), or

**(B)** technology required to meet a lowest achievable emission rate (as defined in section 7501 of this title),

prior to the promulgation of a standard under this section applicable to such source and the same pollutant (or stream of pollutants) controlled pursuant to an action described in subparagraph (A) or (B) shall be required to comply with such

ADD21

standard under this section until the date 5 years after the date on which such installation or reduction has been achieved, as determined by the Administrator. The Administrator may issue such rules and guidance as are necessary to implement this paragraph.

**(7) Extension for new sources**

A source for which construction or reconstruction is commenced after the date an emission standard applicable to such source is proposed pursuant to subsection (d) of this section but before the date an emission standard applicable to such source is proposed pursuant to subsection (f) of this section shall not be required to comply with the emission standard under subsection (f) of this section until the date 10 years after the date construction or reconstruction is commenced.

**(8) Coke ovens**

**(A)** Any coke oven battery that complies with the emission limitations established under subsection (d)(8)(C) of this section, subparagraph (B), and subparagraph (C), and complies with the provisions of subparagraph (E), shall not be required to achieve emission limitations promulgated under subsection (f) of this section until January 1, 2020.

**(B)(i)** Not later than December 31, 1992, the Administrator shall promulgate emission limitations for coke oven emissions from coke oven batteries. Notwithstanding paragraph (3) of this subsection, the compliance date for such emission limitations for existing coke oven batteries shall be January 1, 1998. Such emission limitations shall reflect the lowest achievable emission rate as defined in section 7501 of this title for a coke oven battery that is rebuilt or a replacement at a coke oven plant for an existing battery. Such emission limitations shall be no less stringent than--

**(I)** 3 per centum leaking doors (5 per centum leaking doors for six meter batteries);

**(II)** 1 per centum leaking lids;

**(III)** 4 per centum leaking offtakes; and

**(IV)** 16 seconds visible emissions per charge,

with an exclusion for emissions during the period after the closing of self-sealing oven doors (or the total mass emissions equivalent). The rulemaking in which such emission limitations are promulgated shall also establish an appropriate measurement methodology for determining compliance with such emission limitations, and shall establish such emission limitations in terms of an equivalent level of mass emissions reduction from a coke oven battery, unless the Administrator finds that such a mass emissions standard would not be practicable or enforceable. Such measurement methodology, to the extent it measures leaking doors, shall take into consideration alternative test methods that reflect the best technology and practices actually applied in the affected industries, and shall assure that the final test methods are consistent with the performance of such best technology and practices.

**(ii)** If the Administrator fails to promulgate such emission limitations under this subparagraph prior to the effective date of such emission limitations, the emission limitations applicable to coke oven batteries under this subparagraph shall be--

**(I)** 3 per centum leaking doors (5 per centum leaking doors for six meter batteries);

**(II)** 1 per centum leaking lids;

**(III)** 4 per centum leaking offtakes; and

**(IV)** 16 seconds visible emissions per charge,

or the total mass emissions equivalent (if the total mass emissions equivalent is determined to be practicable and enforceable), with no exclusion for emissions during the period after the closing of self-sealing oven doors.

**(C)** Not later than January 1, 2007, the Administrator shall review the emission limitations promulgated under subparagraph (B) and revise, as necessary, such emission limitations to reflect the lowest achievable emission rate as defined in section 7501 of this title at the time for a coke oven battery that is rebuilt or a replacement at a coke oven plant for an existing battery. Such emission limitations shall be no less stringent than the emission limitation promulgated under subparagraph (B). Notwithstanding paragraph (2) of this subsection, the compliance date for such emission limitations for existing coke oven batteries shall be January 1, 2010.

**(D)** At any time prior to January 1, 1998, the owner or operator of any coke oven battery may elect to comply with emission limitations promulgated under subsection (f) of this section by the date such emission limitations would otherwise apply to such coke oven battery, in lieu of the emission limitations and the compliance dates provided under subparagraphs (B) and (C) of this paragraph. Any such owner or operator shall be legally bound to comply with such emission limitations promulgated under subsection (f) of this section with respect to such coke oven battery as of January 1, 2003. If no such emission limitations have been promulgated for such coke oven battery, the Administrator shall promulgate such emission limitations in accordance with subsection (f) of this section for such coke oven battery.

**(E)** Coke oven batteries qualifying for an extension under subparagraph (A) shall make available not later than January 1, 2000, to the surrounding communities the results of any risk assessment performed by the Administrator to determine the appropriate level of any emission standard established by the Administrator pursuant to subsection (f) of this section.

**(F)** Notwithstanding the provisions of this section, reconstruction of any source of coke oven emissions qualifying for an extension under this paragraph shall not subject such source to emission limitations under subsection (f) of this section more stringent than those established under subparagraphs (B) and (C) until January 1, 2020. For the purposes of this subparagraph, the term "reconstruction" includes the replacement of existing coke oven battery capacity with new coke oven batteries of comparable or lower capacity and lower potential emissions.

**(j) Equivalent emission limitation by permit**

**(1) Effective date**

The requirements of this subsection shall apply in each State beginning on the effective date of a permit program established pursuant to subchapter V of this chapter in such State, but not prior to the date 42 months after November 15, 1990.

**(2) Failure to promulgate a standard**

In the event that the Administrator fails to promulgate a standard for a category or subcategory of major sources by the date established pursuant to subsection (e)(1) and (3) of this section, and beginning 18 months after such date (but not prior to the effective date of a permit program under subchapter V of this chapter), the owner or operator of any major source in such category or subcategory shall submit a permit application under paragraph (3) and such owner or operator shall also comply with paragraphs (5) and (6).

**(3) Applications**

By the date established by paragraph (2), the owner or operator of a major source subject to this subsection shall file an application for a permit. If the owner or operator of a source has submitted a timely and complete application for a permit required by this subsection, any failure to have a permit shall not be a violation of paragraph (2), unless the delay in final action is due to the failure of the applicant to timely submit information required or requested to process the application. The Administrator shall not later than 18 months after November 15, 1990, and after notice and opportunity for comment, establish requirements for applications under this subsection including a standard application form and criteria for determining in a timely manner the completeness of applications.

**(4) Review and approval**

Permit applications submitted under this subsection shall be reviewed and approved or disapproved according to the provisions of section 7661d of this title. In the event that the Administrator (or the State) disapproves a permit application submitted under this subsection or determines that the application is incomplete, the applicant shall have up to 6 months to revise the application to meet the objections of the Administrator (or the State).

**(5) Emission limitation**

The permit shall be issued pursuant to subchapter V of this chapter and shall contain emission limitations for the hazardous air pollutants subject to regulation under this section and emitted by the source that the Administrator (or the State) determines, on a case-by-case basis, to be equivalent to the limitation that would apply to such source if an emission standard had been promulgated in a timely manner under subsection (d) of this section. In the alternative, if the applicable criteria are met, the permit may contain an emissions limitation established according to the provisions of subsection (i)(5) of this section. For purposes of the preceding sentence, the reduction required by subsection (i)(5)(A) of this section shall be achieved by the date on which the relevant standard should have been promulgated under subsection (d) of this section. No such pollutant may be emitted in amounts exceeding an emission limitation contained in a permit immediately for new sources and, as expeditiously as practicable, but not later than the date 3 years after the permit is issued for existing sources or such other compliance date as would apply under subsection (i) of this section.

**(6) Applicability of subsequent standards**

If the Administrator promulgates an emission standard that is applicable to the major source prior to the date on which a permit application is approved, the emission limitation in the permit shall reflect the promulgated standard rather than the emission limitation determined pursuant to paragraph (5), provided that the source shall have the compliance period provided under subsection (i) of this section. If the Administrator promulgates a standard under subsection (d) of this section that would be applicable to the source in lieu of the emission limitation established by permit under this subsection after the date on which the permit has been issued, the Administrator (or the State) shall revise such permit upon the next renewal to reflect the standard promulgated by the Administrator providing such source a reasonable time to comply, but no longer than 8 years after such standard is promulgated or 8 years after the date on which the source is first required to comply with the emissions limitation established by paragraph (5), whichever is earlier.

**(k) Area source program**

**(1) Findings and purpose**

The Congress finds that emissions of hazardous air pollutants from area sources may individually, or in the aggregate, present significant risks to public health in urban areas. Considering the large number of persons exposed and the risks of carcinogenic and other adverse health effects from hazardous air pollutants, ambient concentrations characteristic of large urban areas should be reduced to levels substantially below those currently experienced. It is the purpose of this subsection to achieve a substantial reduction in emissions of hazardous air pollutants from area sources and an equivalent reduction in the public health risks associated with such sources including a reduction of not less than 75 per centum in the incidence of cancer attributable to emissions from such sources.

**(2) Research program**

The Administrator shall, after consultation with State and local air pollution control officials, conduct a program of research with respect to sources of hazardous air pollutants in urban areas and shall include within such program--

**(A)** ambient monitoring for a broad range of hazardous air pollutants (including, but not limited to, volatile organic compounds, metals, pesticides and products of incomplete combustion) in a representative number of urban locations;

**(B)** analysis to characterize the sources of such pollution with a focus on area sources and the contribution that such sources make to public health risks from hazardous air pollutants; and

**(C)** consideration of atmospheric transformation and other factors which can elevate public health risks from such pollutants.

Health effects considered under this program shall include, but not be limited to, carcinogenicity, mutagenicity, teratogenicity, neurotoxicity, reproductive dysfunction and other acute and chronic effects including the role of such pollutants as precursors of ozone or acid aerosol formation. The Administrator shall report the preliminary results of such research not later than 3 years after November 15, 1990.

**(3) National strategy**

**(A)** Considering information collected pursuant to the monitoring program authorized by paragraph (2), the Administrator shall, not later than 5 years after November 15, 1990, and after notice and opportunity for public comment, prepare and transmit to the Congress a comprehensive strategy to control emissions of hazardous air pollutants from area sources in urban areas.

**(B)** The strategy shall--

**(i)** identify not less than 30 hazardous air pollutants which, as the result of emissions from area sources, present the greatest threat to public health in the largest number of urban areas and that are or will be listed pursuant to subsection (b) of this section, and

**(ii)** identify the source categories or subcategories emitting such pollutants that are or will be listed pursuant to subsection (c) of this section. When identifying categories and subcategories of sources under this subparagraph, the Administrator

ADD25

shall assure that sources accounting for 90 per centum or more of the aggregate emissions of each of the 30 identified hazardous air pollutants are subject to standards pursuant to subsection (d) of this section.

**(C)** The strategy shall include a schedule of specific actions to substantially reduce the public health risks posed by the release of hazardous air pollutants from area sources that will be implemented by the Administrator under the authority of this or other laws (including, but not limited to, the Toxic Substances Control Act [15 U.S.C.A. § 2601 et seq.], the Federal Insecticide, Fungicide and Rodenticide Act [7 U.S.C.A. § 136 et seq.] and the Resource Conservation and Recovery Act [42 U.S.C.A. § 6901 et seq.] ) or by the States. The strategy shall achieve a reduction in the incidence of cancer attributable to exposure to hazardous air pollutants emitted by stationary sources of not less than 75 per centum, considering control of emissions of hazardous air pollutants from all stationary sources and resulting from measures implemented by the Administrator or by the States under this or other laws.

**(D)** The strategy may also identify research needs in monitoring, analytical methodology, modeling or pollution control techniques and recommendations for changes in law that would further the goals and objectives of this subsection.

**(E)** Nothing in this subsection shall be interpreted to preclude or delay implementation of actions with respect to area sources of hazardous air pollutants under consideration pursuant to this or any other law and that may be promulgated before the strategy is prepared.

**(F)** The Administrator shall implement the strategy as expeditiously as practicable assuring that all sources are in compliance with all requirements not later than 9 years after November 15, 1990.

**(G)** As part of such strategy the Administrator shall provide for ambient monitoring and emissions modeling in urban areas as appropriate to demonstrate that the goals and objectives of the strategy are being met.

**(4) Areawide activities**

In addition to the national urban air toxics strategy authorized by paragraph (3), the Administrator shall also encourage and support areawide strategies developed by State or local air pollution control agencies that are intended to reduce risks from emissions by area sources within a particular urban area. From the funds available for grants under this section, the Administrator shall set aside not less than 10 per centum to support areawide strategies addressing hazardous air pollutants emitted by area sources and shall award such funds on a demonstration basis to those States with innovative and effective strategies. At the request of State or local air pollution control officials, the Administrator shall prepare guidelines for control technologies or management practices which may be applicable to various categories or subcategories of area sources.

**(5) Report**

The Administrator shall report to the Congress at intervals not later than 8 and 12 years after November 15, 1990, on actions taken under this subsection and other parts of this chapter to reduce the risk to public health posed by the release of hazardous air pollutants from area sources. The reports shall also identify specific metropolitan areas that continue to experience high risks to public health as the result of emissions from area sources.

**(l) State programs**

**(1) In general**

Each State may develop and submit to the Administrator for approval a program for the implementation and enforcement (including a review of enforcement delegations previously granted) of emission standards and other requirements for air pollutants subject to this section or requirements for the prevention and mitigation of accidental releases pursuant to subsection (r) of this section. A program submitted by a State under this subsection may provide for partial or complete delegation of the Administrator's authorities and responsibilities to implement and enforce emissions standards and prevention requirements but shall not include authority to set standards less stringent than those promulgated by the Administrator under this chapter.

**(2) Guidance**

Not later than 12 months after November 15, 1990, the Administrator shall publish guidance that would be useful to the States in developing programs for submittal under this subsection. The guidance shall also provide for the registration of all facilities producing, processing, handling or storing any substance listed pursuant to subsection (r) of this section in amounts greater than the threshold quantity. The Administrator shall include as an element in such guidance an optional program begun in 1986 for the review of high-risk point sources of air pollutants including, but not limited to, hazardous air pollutants listed pursuant to subsection (b) of this section.

**(3) Technical assistance**

The Administrator shall establish and maintain an air toxics clearinghouse and center to provide technical information and assistance to State and local agencies and, on a cost recovery basis, to others on control technology, health and ecological risk assessment, risk analysis, ambient monitoring and modeling, and emissions measurement and monitoring. The Administrator shall use the authority of section 7403 of this title to examine methods for preventing, measuring, and controlling emissions and evaluating associated health and ecological risks. Where appropriate, such activity shall be conducted with not-for-profit organizations. The Administrator may conduct research on methods for preventing, measuring and controlling emissions and evaluating associated health and environment risks. All information collected under this paragraph shall be available to the public.

**(4) Grants**

Upon application of a State, the Administrator may make grants, subject to such terms and conditions as the Administrator deems appropriate, to such State for the purpose of assisting the State in developing and implementing a program for submittal and approval under this subsection. Programs assisted under this paragraph may include program elements addressing air pollutants or extremely hazardous substances other than those specifically subject to this section. Grants under this paragraph may include support for high-risk point source review as provided in paragraph (2) and support for the development and implementation of areawide area source programs pursuant to subsection (k) of this section.

**(5) Approval or disapproval**

Not later than 180 days after receiving a program submitted by a State, and after notice and opportunity for public comment, the Administrator shall either approve or disapprove such program. The Administrator shall disapprove any program submitted by a State, if the Administrator determines that--

**(A)** the authorities contained in the program are not adequate to assure compliance by all sources within the State with each applicable standard, regulation or requirement established by the Administrator under this section;

**(B)** adequate authority does not exist, or adequate resources are not available, to implement the program;

**(C)** the schedule for implementing the program and assuring compliance by affected sources is not sufficiently expeditious; or

**(D)** the program is otherwise not in compliance with the guidance issued by the Administrator under paragraph (2) or is not likely to satisfy, in whole or in part, the objectives of this chapter.

If the Administrator disapproves a State program, the Administrator shall notify the State of any revisions or modifications necessary to obtain approval. The State may revise and resubmit the proposed program for review and approval pursuant to the provisions of this subsection.

**(6) Withdrawal**

Whenever the Administrator determines, after public hearing, that a State is not administering and enforcing a program approved pursuant to this subsection in accordance with the guidance published pursuant to paragraph (2) or the requirements of paragraph (5), the Administrator shall so notify the State and, if action which will assure prompt compliance is not taken within 90 days, the Administrator shall withdraw approval of the program. The Administrator shall not withdraw approval of any program unless the State shall have been notified and the reasons for withdrawal shall have been stated in writing and made public.

**(7) Authority to enforce**

Nothing in this subsection shall prohibit the Administrator from enforcing any applicable emission standard or requirement under this section.

**(8) Local program**

The Administrator may, after notice and opportunity for public comment, approve a program developed and submitted by a local air pollution control agency (after consultation with the State) pursuant to this subsection and any such agency implementing an approved program may take any action authorized to be taken by a State under this section.

**(9) Permit authority**

Nothing in this subsection shall affect the authorities and obligations of the Administrator or the State under subchapter V of this chapter.

**(m) Atmospheric deposition to Great Lakes and coastal waters**

**(1) Deposition assessment**

The Administrator, in cooperation with the Under Secretary of Commerce for Oceans and Atmosphere, shall conduct a program to identify and assess the extent of atmospheric deposition of hazardous air pollutants (and in the discretion of the Administrator, other air pollutants) to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters. As part of such program, the Administrator shall--

**(A)** monitor the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters, including monitoring of the Great Lakes through the monitoring network established pursuant to paragraph (2) of this subsection and designing and deploying an atmospheric monitoring network for coastal waters pursuant to paragraph (4);

**(B)** investigate the sources and deposition rates of atmospheric deposition of air pollutants (and their atmospheric transformation precursors);

**(C)** conduct research to develop and improve monitoring methods and to determine the relative contribution of atmospheric pollutants to total pollution loadings to the Great Lakes, the Chesapeake Bay, Lake Champlain, and coastal waters;

**(D)** evaluate any adverse effects to public health or the environment caused by such deposition (including effects resulting from indirect exposure pathways) and assess the contribution of such deposition to violations of water quality standards established pursuant to the Federal Water Pollution Control Act [33 U.S.C.A. § 1251 et seq.] and drinking water standards established pursuant to the Safe Drinking Water Act [42 U.S.C.A. § 300f et seq.]; and

**(E)** sample for such pollutants in biota, fish, and wildlife of the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters and characterize the sources of such pollutants.

## (2) Great Lakes monitoring network

The Administrator shall oversee, in accordance with Annex 15 of the Great Lakes Water Quality Agreement, the establishment and operation of a Great Lakes atmospheric deposition network to monitor atmospheric deposition of hazardous air pollutants (and in the Administrator's discretion, other air pollutants) to the Great Lakes.

**(A)** As part of the network provided for in this paragraph, and not later than December 31, 1991, the Administrator shall establish in each of the 5 Great Lakes at least 1 facility capable of monitoring the atmospheric deposition of hazardous air pollutants in both dry and wet conditions.

**(B)** The Administrator shall use the data provided by the network to identify and track the movement of hazardous air pollutants through the Great Lakes, to determine the portion of water pollution loadings attributable to atmospheric deposition of such pollutants, and to support development of remedial action plans and other management plans as required by the Great Lakes Water Quality Agreement.

**(C)** The Administrator shall assure that the data collected by the Great Lakes atmospheric deposition monitoring network is in a format compatible with databases sponsored by the International Joint Commission, Canada, and the several States of the Great Lakes region.

## (3) Monitoring for the Chesapeake Bay and Lake Champlain

The Administrator shall establish at the Chesapeake Bay and Lake Champlain atmospheric deposition stations to monitor deposition of hazardous air pollutants (and in the Administrator's discretion, other air pollutants) within the Chesapeake Bay and Lake Champlain watersheds. The Administrator shall determine the role of air deposition in the pollutant loadings of the Chesapeake Bay and Lake Champlain, investigate the sources of air pollutants deposited in the watersheds, evaluate the health and environmental effects of such pollutant loadings, and shall sample such pollutants in biota, fish and wildlife within the watersheds, as necessary to characterize such effects.

## (4) Monitoring for coastal waters

The Administrator shall design and deploy atmospheric deposition monitoring networks for coastal waters and their watersheds and shall make any information collected through such networks available to the public. As part of this effort, the Administrator shall conduct research to develop and improve deposition monitoring methods, and to determine the relative contribution of atmospheric pollutants to pollutant loadings. For purposes of this subsection, "coastal waters" shall mean estuaries selected pursuant to section 320(a)(2)(A) of the Federal Water Pollution Control Act [33 U.S.C.A. § 1330(a)(2)(A) ] or listed pursuant to section 320(a)(2)(B) of such Act [33 U.S.C.A. § 1330(a)(2)(B) ] or estuarine research reserves designated pursuant to section 1461 of Title 16.

**(5) Report**

Within 3 years of November 15, 1990, and biennially thereafter, the Administrator, in cooperation with the Under Secretary of Commerce for Oceans and Atmosphere, shall submit to the Congress a report on the results of any monitoring, studies, and investigations conducted pursuant to this subsection. Such report shall include, at a minimum, an assessment of--

**(A)** the contribution of atmospheric deposition to pollution loadings in the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters;

**(B)** the environmental and public health effects of any pollution which is attributable to atmospheric deposition to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters;

**(C)** the source or sources of any pollution to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters which is attributable to atmospheric deposition;

**(D)** whether pollution loadings in the Great Lakes, the Chesapeake Bay, Lake Champlain or coastal waters cause or contribute to exceedances [2] of drinking water standards pursuant to the Safe Drinking Water Act [42 U.S.C.A. § 300f et seq.] or water quality standards pursuant to the Federal Water Pollution Control Act [33 U.S.C.A. § 1251 et seq.] or, with respect to the Great Lakes, exceedances [2] of the specific objectives of the Great Lakes Water Quality Agreement; and

**(E)** a description of any revisions of the requirements, standards, and limitations pursuant to this chapter and other applicable Federal laws as are necessary to assure protection of human health and the environment.

**(6) Additional regulation**

As part of the report to Congress, the Administrator shall determine whether the other provisions of this section are adequate to prevent serious adverse effects to public health and serious or widespread environmental effects, including such effects resulting from indirect exposure pathways, associated with atmospheric deposition to the Great Lakes, the Chesapeake Bay, Lake Champlain and coastal waters of hazardous air pollutants (and their atmospheric transformation products). The Administrator shall take into consideration the tendency of such pollutants to bioaccumulate. Within 5 years after November 15, 1990, the Administrator shall, based on such report and determination, promulgate, in accordance with this section, such further emission standards or control measures as may be necessary and appropriate to prevent such effects, including effects due to bioaccumulation and indirect exposure pathways. Any requirements promulgated pursuant to this paragraph with respect to coastal waters shall only apply to the coastal waters of the States which are subject to section 7627(a) of this title.

**(n) Other provisions**

**(1) Electric utility steam generating units**

**(A)** The Administrator shall perform a study of the hazards to public health reasonably anticipated to occur as a result of emissions by electric utility steam generating units of pollutants listed under subsection (b) of this section after imposition of the requirements of this chapter. The Administrator shall report the results of this study to the Congress within 3 years after November 15, 1990. The Administrator shall develop and describe in the Administrator's report to Congress alternative control strategies for emissions which may warrant regulation under this section. The Administrator shall regulate electric utility steam generating units under this section, if the Administrator finds such regulation is appropriate and necessary after considering the results of the study required by this subparagraph.

**(B)** The Administrator shall conduct, and transmit to the Congress not later than 4 years after November 15, 1990, a study of mercury emissions from electric utility steam generating units, municipal waste combustion units, and other sources, including area sources. Such study shall consider the rate and mass of such emissions, the health and environmental effects of such emissions, technologies which are available to control such emissions, and the costs of such technologies.

**(C)** The National Institute of Environmental Health Sciences shall conduct, and transmit to the Congress not later than 3 years after November 15, 1990, a study to determine the threshold level of mercury exposure below which adverse human health effects are not expected to occur. Such study shall include a threshold for mercury concentrations in the tissue of fish which may be consumed (including consumption by sensitive populations) without adverse effects to public health.

**(2) Coke oven production technology study**

**(A)** The Secretary of the Department of Energy and the Administrator shall jointly undertake a 6-year study to assess coke oven production emission control technologies and to assist in the development and commercialization of technically practicable and economically viable control technologies which have the potential to significantly reduce emissions of hazardous air pollutants from coke oven production facilities. In identifying control technologies, the Secretary and the Administrator shall consider the range of existing coke oven operations and battery design and the availability of sources of materials for such coke ovens as well as alternatives to existing coke oven production design.

**(B)** The Secretary and the Administrator are authorized to enter into agreements with persons who propose to develop, install and operate coke production emission control technologies which have the potential for significant emissions reductions of hazardous air pollutants provided that Federal funds shall not exceed 50 per centum of the cost of any project assisted pursuant to this paragraph.

**(C)** On completion of the study, the Secretary shall submit to Congress a report on the results of the study and shall make recommendations to the Administrator identifying practicable and economically viable control technologies for coke oven production facilities to reduce residual risks remaining after implementation of the standard under subsection (d) of this section.

**(D)** There are authorized to be appropriated $5,000,000 for each of the fiscal years 1992 through 1997 to carry out the program authorized by this paragraph.

**(3) Publicly owned treatment works**

The Administrator may conduct, in cooperation with the owners and operators of publicly owned treatment works, studies to characterize emissions of hazardous air pollutants emitted by such facilities, to identify industrial, commercial and residential discharges that contribute to such emissions and to demonstrate control measures for such emissions. When promulgating any standard under this section applicable to publicly owned treatment works, the Administrator may provide for control measures that include pretreatment of discharges causing emissions of hazardous air pollutants and process or product substitutions or limitations that may be effective in reducing such emissions. The Administrator may prescribe uniform sampling, modeling and risk assessment methods for use in implementing this subsection.

#### (4) Oil and gas wells; pipeline facilities

**(A)** Notwithstanding the provisions of subsection (a) of this section, emissions from any oil or gas exploration or production well (with its associated equipment) and emissions from any pipeline compressor or pump station shall not be aggregated with emissions from other similar units, whether or not such units are in a contiguous area or under common control, to determine whether such units or stations are major sources, and in the case of any oil or gas exploration or production well (with its associated equipment), such emissions shall not be aggregated for any purpose under this section.

**(B)** The Administrator shall not list oil and gas production wells (with its associated equipment) as an area source category under subsection (c) of this section, except that the Administrator may establish an area source category for oil and gas production wells located in any metropolitan statistical area or consolidated metropolitan statistical area with a population in excess of 1 million, if the Administrator determines that emissions of hazardous air pollutants from such wells present more than a negligible risk of adverse effects to public health.

#### (5) Hydrogen sulfide

The Administrator is directed to assess the hazards to public health and the environment resulting from the emission of hydrogen sulfide associated with the extraction of oil and natural gas resources. To the extent practicable, the assessment shall build upon and not duplicate work conducted for an assessment pursuant to section 8002(m) of the Solid Waste Disposal Act [42 U.S.C.A. § 6982(m) ] and shall reflect consultation with the States. The assessment shall include a review of existing State and industry control standards, techniques and enforcement. The Administrator shall report to the Congress within 24 months after November 15, 1990, with the findings of such assessment, together with any recommendations, and shall, as appropriate, develop and implement a control strategy for emissions of hydrogen sulfide to protect human health and the environment, based on the findings of such assessment, using authorities under this chapter including sections [3] 7411 of this title and this section.

#### (6) Hydrofluoric acid

Not later than 2 years after November 15, 1990, the Administrator shall, for those regions of the country which do not have comprehensive health and safety regulations with respect to hydrofluoric acid, complete a study of the potential hazards of hydrofluoric acid and the uses of hydrofluoric acid in industrial and commercial applications to public health and the environment considering a range of events including worst-case accidental releases and shall make recommendations to the Congress for the reduction of such hazards, if appropriate.

#### (7) RCRA facilities

In the case of any category or subcategory of sources the air emissions of which are regulated under subtitle C of the Solid Waste Disposal Act [42 U.S.C.A. § 6921 et seq.], the Administrator shall take into account any regulations of such emissions which are promulgated under such subtitle and shall, to the maximum extent practicable and consistent with the provisions of this section, ensure that the requirements of such subtitle and this section are consistent.

**(o) National Academy of Sciences study**

**(1) Request of the Academy**

Within 3 months of November 15, 1990, the Administrator shall enter into appropriate arrangements with the National Academy of Sciences to conduct a review of--

**(A)** risk assessment methodology used by the Environmental Protection Agency to determine the carcinogenic risk associated with exposure to hazardous air pollutants from source categories and subcategories subject to the requirements of this section; and

**(B)** improvements in such methodology.

**(2) Elements to be studied**

In conducting such review, the National Academy of Sciences should consider, but not be limited to, the following--

**(A)** the techniques used for estimating and describing the carcinogenic potency to humans of hazardous air pollutants; and

**(B)** the techniques used for estimating exposure to hazardous air pollutants (for hypothetical and actual maximally exposed individuals as well as other exposed individuals).

**(3) Other health effects of concern**

To the extent practicable, the Academy shall evaluate and report on the methodology for assessing the risk of adverse human health effects other than cancer for which safe thresholds of exposure may not exist, including, but not limited to, inheritable genetic mutations, birth defects, and reproductive dysfunctions.

**(4) Report**

A report on the results of such review shall be submitted to the Senate Committee on Environment and Public Works, the House Committee on Energy and Commerce, the Risk Assessment and Management Commission established by section 303 of the Clean Air Act Amendments of 1990 and the Administrator not later than 30 months after November 15, 1990.

**(5) Assistance**

The Administrator shall assist the Academy in gathering any information the Academy deems necessary to carry out this subsection. The Administrator may use any authority under this chapter to obtain information from any person, and to require any person to conduct tests, keep and produce records, and make reports respecting research or other activities conducted by such person as necessary to carry out this subsection.

**(6) Authorization**

Of the funds authorized to be appropriated to the Administrator by this chapter, such amounts as are required shall be available to carry out this subsection.

**(7) Guidelines for carcinogenic risk assessment**

The Administrator shall consider, but need not adopt, the recommendations contained in the report of the National Academy of Sciences prepared pursuant to this subsection and the views of the Science Advisory Board, with respect to such report. Prior to the promulgation of any standard under subsection (f) of this section, and after notice and opportunity for comment, the Administrator shall publish revised Guidelines for Carcinogenic Risk Assessment or a detailed explanation of the reasons that any recommendations contained in the report of the National Academy of Sciences will not be implemented. The publication of such revised Guidelines shall be a final Agency action for purposes of section 7607 of this title.

**(p) Mickey Leland National Urban Air Toxics Research Center**

**(1) Establishment**

The Administrator shall oversee the establishment of a National Urban Air Toxics Research Center, to be located at a university, a hospital, or other facility capable of undertaking and maintaining similar research capabilities in the areas of epidemiology, oncology, toxicology, pulmonary medicine, pathology, and biostatistics. The center shall be known as the Mickey Leland National Urban Air Toxics Research Center. The geographic site of the National Urban Air Toxics Research Center should be further directed to Harris County, Texas, in order to take full advantage of the well developed scientific community presence on-site at the Texas Medical Center as well as the extensive data previously compiled for the comprehensive monitoring system currently in place.

**(2) Board of Directors**

The National Urban Air Toxics Research Center shall be governed by a Board of Directors to be comprised of 9 members, the appointment of which shall be allocated pro rata among the Speaker of the House, the Majority Leader of the Senate and the President. The members of the Board of Directors shall be selected based on their respective academic and professional backgrounds and expertise in matters relating to public health, environmental pollution and industrial hygiene. The duties of the Board of Directors shall be to determine policy and research guidelines, submit views from center sponsors and the public and issue periodic reports of center findings and activities.

**(3) Scientific Advisory Panel**

The Board of Directors shall be advised by a Scientific Advisory Panel, the 13 members of which shall be appointed by the Board, and to include eminent members of the scientific and medical communities. The Panel membership may include scientists with relevant experience from the National Institute of Environmental Health Sciences, the Center for Disease Control, the Environmental Protection Agency, the National Cancer Institute, and others, and the Panel shall conduct peer review and evaluate research results. The Panel shall assist the Board in developing the research agenda, reviewing proposals and applications, and advise on the awarding of research grants.

**(4) Funding**

The center shall be established and funded with both Federal and private source funds.

**(q) Savings provision**

**(1) Standards previously promulgated**

Any standard under this section in effect before the date of enactment of the Clean Air Act Amendments of 1990 [November 15, 1990] shall remain in force and effect after such date unless modified as provided in this section before the date of enactment of such Amendments or under such Amendments. Except as provided in paragraph (4), any standard under this section which has been promulgated, but has not taken effect, before such date shall not be affected by such Amendments unless modified as provided in this section before such date or under such Amendments. Each such standard shall be reviewed and, if appropriate, revised, to comply with the requirements of subsection (d) of this section within 10 years after the date

of enactment of the Clean Air Act Amendments of 1990. If a timely petition for review of any such standard under section 7607 of this title is pending on such date of enactment, the standard shall be upheld if it complies with this section as in effect before that date. If any such standard is remanded to the Administrator, the Administrator may in the Administrator's discretion apply either the requirements of this section, or those of this section as in effect before the date of enactment of the Clean Air Act Amendments of 1990.

**(2) Special rule**

Notwithstanding paragraph (1), no standard shall be established under this section, as amended by the Clean Air Act Amendments of 1990, for radionuclide emissions from (A) elemental phosphorous plants, (B) grate calcination elemental phosphorous plants, (C) phosphogypsum stacks, or (D) any subcategory of the foregoing. This section, as in effect prior to the date of enactment of the Clean Air Act Amendments of 1990 [November 15, 1990], shall remain in effect for radionuclide emissions from such plants and stacks.

**(3) Other categories**

Notwithstanding paragraph (1), this section, as in effect prior to the date of enactment of the Clean Air Act Amendments of 1990 [November 15, 1990], shall remain in effect for radionuclide emissions from non-Department of Energy Federal facilities that are not licensed by the Nuclear Regulatory Commission, coal-fired utility and industrial boilers, underground uranium mines, surface uranium mines, and disposal of uranium mill tailings piles, unless the Administrator, in the Administrator's discretion, applies the requirements of this section as modified by the Clean Air Act Amendments of 1990 to such sources of radionuclides.

**(4) Medical facilities**

Notwithstanding paragraph (1), no standard promulgated under this section prior to November 15, 1990, with respect to medical research or treatment facilities shall take effect for two years following November 15, 1990, unless the Administrator makes a determination pursuant to a rulemaking under subsection (d)(9) of this section. If the Administrator determines that the regulatory program established by the Nuclear Regulatory Commission for such facilities does not provide an ample margin of safety to protect public health, the requirements of this section shall fully apply to such facilities. If the Administrator determines that such regulatory program does provide an ample margin of safety to protect the public health, the Administrator is not required to promulgate a standard under this section for such facilities, as provided in subsection (d)(9) of this section.

**(r) Prevention of accidental releases**

**(1) Purpose and general duty**

It shall be the objective of the regulations and programs authorized under this subsection to prevent the accidental release and to minimize the consequences of any such release of any substance listed pursuant to paragraph (3) or any other extremely hazardous substance. The owners and operators of stationary sources producing, processing, handling or storing such substances have a general duty in the same manner and to the same extent as section 654 of Title 29 to identify hazards which may result from such releases using appropriate hazard assessment techniques, to design and maintain a safe facility taking such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases which do occur. For purposes of this paragraph, the provisions of section 7604 of this title shall not be available to any person or otherwise be construed to be applicable to this paragraph. Nothing in this section shall be interpreted, construed, implied or applied to create any liability or basis for suit for compensation for bodily injury or any other injury or property damages to any person which may result from accidental releases of such substances.

**(2) Definitions**

(A) The term "accidental release" means an unanticipated emission of a regulated substance or other extremely hazardous substance into the ambient air from a stationary source.

(B) The term "regulated substance" means a substance listed under paragraph (3).

(C) The term "stationary source" means any buildings, structures, equipment, installations or substance emitting stationary activities (i) which belong to the same industrial group, (ii) which are located on one or more contiguous properties, (iii) which are under the control of the same person (or persons under common control), and (iv) from which an accidental release may occur.

(D) The term "retail facility" means a stationary source at which more than one-half of the income is obtained from direct sales to end users or at which more than one-half of the fuel sold, by volume, is sold through a cylinder exchange program.

**(3) List of substances**

The Administrator shall promulgate not later than 24 months after November 15, 1990, an initial list of 100 substances which, in the case of an accidental release, are known to cause or may reasonably be anticipated to cause death, injury, or serious adverse effects to human health or the environment. For purposes of promulgating such list, the Administrator shall use, but is not limited to, the list of extremely hazardous substances published under the Emergency Planning and Community Right-to-Know Act of 1986 [42 U.S.C.A. § 11001 et seq.], with such modifications as the Administrator deems appropriate. The initial list shall include chlorine, anhydrous ammonia, methyl chloride, ethylene oxide, vinyl chloride, methyl isocyanate, hydrogen cyanide, ammonia, hydrogen sulfide, toluene diisocyanate, phosgene, bromine, anhydrous hydrogen chloride, hydrogen fluoride, anhydrous sulfur dioxide, and sulfur trioxide. The initial list shall include at least 100 substances which pose the greatest risk of causing death, injury, or serious adverse effects to human health or the environment from accidental releases. Regulations establishing the list shall include an explanation of the basis for establishing the list. The list may be revised from time to time by the Administrator on the Administrator's own motion or by petition and shall be reviewed at least every 5 years. No air pollutant for which a national primary ambient air quality standard has been established shall be included on any such list. No substance, practice, process, or activity regulated under subchapter VI of this chapter shall be subject to regulations under this subsection. The Administrator shall establish procedures for the addition and deletion of substances from the list established under this paragraph consistent with those applicable to the list in subsection (b) of this section.

**(4) Factors to be considered**

In listing substances under paragraph (3), the Administrator--

(A) shall consider--

(i) the severity of any acute adverse health effects associated with accidental releases of the substance;

(ii) the likelihood of accidental releases of the substance; and

(iii) the potential magnitude of human exposure to accidental releases of the substance; and

**(B)** shall not list a flammable substance when used as a fuel or held for sale as a fuel at a retail facility under this subsection solely because of the explosive or flammable properties of the substance, unless a fire or explosion caused by the substance will result in acute adverse health effects from human exposure to the substance, including the unburned fuel or its combustion byproducts, other than those caused by the heat of the fire or impact of the explosion.

**(5) Threshold quantity**

At the time any substance is listed pursuant to paragraph (3), the Administrator shall establish by rule, a threshold quantity for the substance, taking into account the toxicity, reactivity, volatility, dispersibility, combustibility, or flammability of the substance and the amount of the substance which, as a result of an accidental release, is known to cause or may reasonably be anticipated to cause death, injury or serious adverse effects to human health for which the substance was listed. The Administrator is authorized to establish a greater threshold quantity for, or to exempt entirely, any substance that is a nutrient used in agriculture when held by a farmer.

**(6) Chemical Safety Board**

**(A)** There is hereby established an independent safety board to be known as the Chemical Safety and Hazard Investigation Board.

**(B)** The Board shall consist of 5 members, including a Chairperson, who shall be appointed by the President, by and with the advice and consent of the Senate. Members of the Board shall be appointed on the basis of technical qualification, professional standing, and demonstrated knowledge in the fields of accident reconstruction, safety engineering, human factors, toxicology, or air pollution regulation. The terms of office of members of the Board shall be 5 years. Any member of the Board, including the Chairperson, may be removed for inefficiency, neglect of duty, or malfeasance in office. The Chairperson shall be the Chief Executive Officer of the Board and shall exercise the executive and administrative functions of the Board.

**(C)** The Board shall--

**(i)** investigate (or cause to be investigated), determine and report to the public in writing the facts, conditions, and circumstances and the cause or probable cause of any accidental release resulting in a fatality, serious injury or substantial property damages;

**(ii)** issue periodic reports to the Congress, Federal, State and local agencies, including the Environmental Protection Agency and the Occupational Safety and Health Administration, concerned with the safety of chemical production, processing, handling and storage, and other interested persons recommending measures to reduce the likelihood or the consequences of accidental releases and proposing corrective steps to make chemical production, processing, handling and storage as safe and free from risk of injury as is possible and may include in such reports proposed rules or orders which should be issued by the Administrator under the authority of this section or the Secretary of Labor under the Occupational Safety and Health Act [29 U.S.C.A. § 651 et seq.] to prevent or minimize the consequences of any release of substances that may cause death, injury or other serious adverse effects on human health or substantial property damage as the result of an accidental release; and

**(iii)** establish by regulation requirements binding on persons for reporting accidental releases into the ambient air subject to the Board's investigatory jurisdiction. Reporting releases to the National Response Center, in lieu of the Board directly,

shall satisfy such regulations. The National Response Center shall promptly notify the Board of any releases which are within the Board's jurisdiction.

**(D)** The Board may utilize the expertise and experience of other agencies.

**(E)** The Board shall coordinate its activities with investigations and studies conducted by other agencies of the United States having a responsibility to protect public health and safety. The Board shall enter into a memorandum of understanding with the National Transportation Safety Board to assure coordination of functions and to limit duplication of activities which shall designate the National Transportation Safety Board as the lead agency for the investigation of releases which are transportation related. The Board shall not be authorized to investigate marine oil spills, which the National Transportation Safety Board is authorized to investigate. The Board shall enter into a memorandum of understanding with the Occupational Safety and Health Administration so as to limit duplication of activities. In no event shall the Board forego an investigation where an accidental release causes a fatality or serious injury among the general public, or had the potential to cause substantial property damage or a number of deaths or injuries among the general public.

**(F)** The Board is authorized to conduct research and studies with respect to the potential for accidental releases, whether or not an accidental release has occurred, where there is evidence which indicates the presence of a potential hazard or hazards. To the extent practicable, the Board shall conduct such studies in cooperation with other Federal agencies having emergency response authorities, State and local governmental agencies and associations and organizations from the industrial, commercial, and nonprofit sectors.

**(G)** No part of the conclusions, findings, or recommendations of the Board relating to any accidental release or the investigation thereof shall be admitted as evidence or used in any action or suit for damages arising out of any matter mentioned in such report.

**(H)** Not later than 18 months after November 15, 1990, the Board shall publish a report accompanied by recommendations to the Administrator on the use of hazard assessments in preventing the occurrence and minimizing the consequences of accidental releases of extremely hazardous substances. The recommendations shall include a list of extremely hazardous substances which are not regulated substances (including threshold quantities for such substances) and categories of stationary sources for which hazard assessments would be an appropriate measure to aid in the prevention of accidental releases and to minimize the consequences of those releases that do occur. The recommendations shall also include a description of the information and analysis which would be appropriate to include in any hazard assessment. The Board shall also make recommendations with respect to the role of risk management plans as required by paragraph (8)(B)[4] in preventing accidental releases. The Board may from time to time review and revise its recommendations under this subparagraph.

**(I)** Whenever the Board submits a recommendation with respect to accidental releases to the Administrator, the Administrator shall respond to such recommendation formally and in writing not later than 180 days after receipt thereof. The response to the Board's recommendation by the Administrator shall indicate whether the Administrator will--

**(i)** initiate a rulemaking or issue such orders as are necessary to implement the recommendation in full or in part, pursuant to any timetable contained in the recommendation;

**(ii)** decline to initiate a rulemaking or issue orders as recommended.

Any determination by the Administrator not to implement a recommendation of the Board or to implement a recommendation only in part, including any variation from the schedule contained in the recommendation, shall be accompanied by a statement from the Administrator setting forth the reasons for such determination.

**(J)** The Board may make recommendations with respect to accidental releases to the Secretary of Labor. Whenever the Board submits such recommendation, the Secretary shall respond to such recommendation formally and in writing not later than 180 days after receipt thereof. The response to the Board's recommendation by the Administrator shall indicate whether the Secretary will--

**(i)** initiate a rulemaking or issue such orders as are necessary to implement the recommendation in full or in part, pursuant to any timetable contained in the recommendation;

**(ii)** decline to initiate a rulemaking or issue orders as recommended.

Any determination by the Secretary not to implement a recommendation or to implement a recommendation only in part, including any variation from the schedule contained in the recommendation, shall be accompanied by a statement from the Secretary setting forth the reasons for such determination.

**(K)** Within 2 years after November 15, 1990, the Board shall issue a report to the Administrator of the Environmental Protection Agency and to the Administrator of the Occupational Safety and Health Administration recommending the adoption of regulations for the preparation of risk management plans and general requirements for the prevention of accidental releases of regulated substances into the ambient air (including recommendations for listing substances under paragraph (3)) and for the mitigation of the potential adverse effect on human health or the environment as a result of accidental releases which should be applicable to any stationary source handling any regulated substance in more than threshold amounts. The Board may include proposed rules or orders which should be issued by the Administrator under authority of this subsection or by the Secretary of Labor under the Occupational Safety and Health Act [29 U.S.C.A. § 651 et seq.]. Any such recommendations shall be specific and shall identify the regulated substance or class of regulated substances (or other substances) to which the recommendations apply. The Administrator shall consider such recommendations before promulgating regulations required by paragraph (7)(B).

**(L)** The Board, or upon authority of the Board, any member thereof, any administrative law judge employed by or assigned to the Board, or any officer or employee duly designated by the Board, may for the purpose of carrying out duties authorized by subparagraph (C)--

**(i)** hold such hearings, sit and act at such times and places, administer such oaths, and require by subpoena or otherwise attendance and testimony of such witnesses and the production of evidence and may require by order that any person engaged in the production, processing, handling, or storage of extremely hazardous substances submit written reports and responses to requests and questions within such time and in such form as the Board may require; and

**(ii)** upon presenting appropriate credentials and a written notice of inspection authority, enter any property where an accidental release causing a fatality, serious injury or substantial property damage has occurred and do all things therein necessary for a proper investigation pursuant to subparagraph (C) and inspect at reasonable times records, files, papers, processes, controls, and facilities and take such samples as are relevant to such investigation.

Whenever the Administrator or the Board conducts an inspection of a facility pursuant to this subsection, employees and their representatives shall have the same rights to participate in such inspections as provided in the Occupational Safety and Health Act [29 U.S.C.A. § 651 et seq.].

**(M)** In addition to that described in subparagraph (L), the Board may use any information gathering authority of the Administrator under this chapter, including the subpoena power provided in section 7607(a)(1) of this title.

**(N)** The Board is authorized to establish such procedural and administrative rules as are necessary to the exercise of its functions and duties. The Board is authorized without regard to section 6101 of Title 41 to enter into contracts, leases, cooperative agreements or other transactions as may be necessary in the conduct of the duties and functions of the Board with any other agency, institution, or person.

**(O)** After the effective date of any reporting requirement promulgated pursuant to subparagraph (C)(iii) it shall be unlawful for any person to fail to report any release of any extremely hazardous substance as required by such subparagraph. The Administrator is authorized to enforce any regulation or requirements established by the Board pursuant to subparagraph (C) (iii) using the authorities of sections 7413 and 7414 of this title. Any request for information from the owner or operator of a stationary source made by the Board or by the Administrator under this section shall be treated, for purposes of sections 7413, 7414, 7416, 7420, 7603, 7604 and 7607 of this title and any other enforcement provisions of this chapter, as a request made by the Administrator under section 7414 of this title and may be enforced by the Chairperson of the Board or by the Administrator as provided in such section.

**(P)** The Administrator shall provide to the Board such support and facilities as may be necessary for operation of the Board.

**(Q)** Consistent with subsection (G)[5] and section 7414(c) of this title any records, reports or information obtained by the Board shall be available to the Administrator, the Secretary of Labor, the Congress and the public, except that upon a showing satisfactory to the Board by any person that records, reports, or information, or particular part thereof (other than release or emissions data) to which the Board has access, if made public, is likely to cause substantial harm to the person's competitive position, the Board shall consider such record, report, or information or particular portion thereof confidential in accordance with section 1905 of Title 18, except that such record, report, or information may be disclosed to other officers, employees, and authorized representatives of the United States concerned with carrying out this chapter or when relevant under any proceeding under this chapter. This subparagraph does not constitute authority to withhold records, reports, or information from the Congress.

**(R)** Whenever the Board submits or transmits any budget estimate, budget request, supplemental budget request, or other budget information, legislative recommendation, prepared testimony for congressional hearings, recommendation or study to the President, the Secretary of Labor, the Administrator, or the Director of the Office of Management and Budget, it shall concurrently transmit a copy thereof to the Congress. No report of the Board shall be subject to review by the Administrator or any Federal agency or to judicial review in any court. No officer or agency of the United States shall have authority to require the Board to submit its budget requests or estimates, legislative recommendations, prepared testimony, comments, recommendations or reports to any officer or agency of the United States for approval or review prior to the submission of such recommendations, testimony, comments or reports to the Congress. In the performance of their functions as established by this chapter, the members, officers and employees of the Board shall not be responsible to or subject to supervision or direction, in carrying out any duties under this subsection, of any officer or employee or agent of the Environmental Protection Agency, the Department of Labor or any other agency of the United States except that the President may remove any member,

officer or employee of the Board for inefficiency, neglect of duty or malfeasance in office. Nothing in this section shall affect the application of Title 5 to officers or employees of the Board.

**(S)** The Board shall submit an annual report to the President and to the Congress which shall include, but not be limited to, information on accidental releases which have been investigated by or reported to the Board during the previous year, recommendations for legislative or administrative action which the Board has made, the actions which have been taken by the Administrator or the Secretary of Labor or the heads of other agencies to implement such recommendations, an identification of priorities for study and investigation in the succeeding year, progress in the development of risk-reduction technologies and the response to and implementation of significant research findings on chemical safety in the public and private sector.

## (7) Accident prevention

**(A)** In order to prevent accidental releases of regulated substances, the Administrator is authorized to promulgate release prevention, detection, and correction requirements which may include monitoring, record-keeping, reporting, training, vapor recovery, secondary containment, and other design, equipment, work practice, and operational requirements. Regulations promulgated under this paragraph may make distinctions between various types, classes, and kinds of facilities, devices and systems taking into consideration factors including, but not limited to, the size, location, process, process controls, quantity of substances handled, potency of substances, and response capabilities present at any stationary source. Regulations promulgated pursuant to this subparagraph shall have an effective date, as determined by the Administrator, assuring compliance as expeditiously as practicable.

**(B)(i)** Within 3 years after November 15, 1990, the Administrator shall promulgate reasonable regulations and appropriate guidance to provide, to the greatest extent practicable, for the prevention and detection of accidental releases of regulated substances and for response to such releases by the owners or operators of the sources of such releases. The Administrator shall utilize the expertise of the Secretaries of Transportation and Labor in promulgating such regulations. As appropriate, such regulations shall cover the use, operation, repair, replacement, and maintenance of equipment to monitor, detect, inspect, and control such releases, including training of persons in the use and maintenance of such equipment and in the conduct of periodic inspections. The regulations shall include procedures and measures for emergency response after an accidental release of a regulated substance in order to protect human health and the environment. The regulations shall cover storage, as well as operations. The regulations shall, as appropriate, recognize differences in size, operations, processes, class and categories of sources and the voluntary actions of such sources to prevent such releases and respond to such releases. The regulations shall be applicable to a stationary source 3 years after the date of promulgation, or 3 years after the date on which a regulated substance present at the source in more than threshold amounts is first listed under paragraph (3), whichever is later.

**(ii)** The regulations under this subparagraph shall require the owner or operator of stationary sources at which a regulated substance is present in more than a threshold quantity to prepare and implement a risk management plan to detect and prevent or minimize accidental releases of such substances from the stationary source, and to provide a prompt emergency response to any such releases in order to protect human health and the environment. Such plan shall provide for compliance with the requirements of this subsection and shall also include each of the following:

**(I)** a hazard assessment to assess the potential effects of an accidental release of any regulated substance. This assessment shall include an estimate of potential release quantities and a determination of downwind effects, including potential exposures to affected populations. Such assessment shall include a previous release history of the past 5 years, including the size, concentration, and duration of releases, and shall include an evaluation of worst case accidental releases;

(II) a program for preventing accidental releases of regulated substances, including safety precautions and maintenance, monitoring and employee training measures to be used at the source; and

(III) a response program providing for specific actions to be taken in response to an accidental release of a regulated substance so as to protect human health and the environment, including procedures for informing the public and local agencies responsible for responding to accidental releases, emergency health care, and employee training measures.

At the time regulations are promulgated under this subparagraph, the Administrator shall promulgate guidelines to assist stationary sources in the preparation of risk management plans. The guidelines shall, to the extent practicable, include model risk management plans.

(iii) The owner or operator of each stationary source covered by clause (ii) shall register a risk management plan prepared under this subparagraph with the Administrator before the effective date of regulations under clause (i) in such form and manner as the Administrator shall, by rule, require. Plans prepared pursuant to this subparagraph shall also be submitted to the Chemical Safety and Hazard Investigation Board, to the State in which the stationary source is located, and to any local agency or entity having responsibility for planning for or responding to accidental releases which may occur at such source, and shall be available to the public under section 7414(c) of this title. The Administrator shall establish, by rule, an auditing system to regularly review and, if necessary, require revision in risk management plans to assure that the plans comply with this subparagraph. Each such plan shall be updated periodically as required by the Administrator, by rule.

(C) Any regulations promulgated pursuant to this subsection shall to the maximum extent practicable, consistent with this subsection, be consistent with the recommendations and standards established by the American Society of Mechanical Engineers (ASME), the American National Standards Institute (ANSI) or the American Society of Testing Materials (ASTM). The Administrator shall take into consideration the concerns of small business in promulgating regulations under this subsection.

(D) In carrying out the authority of this paragraph, the Administrator shall consult with the Secretary of Labor and the Secretary of Transportation and shall coordinate any requirements under this paragraph with any requirements established for comparable purposes by the Occupational Safety and Health Administration or the Department of Transportation. Nothing in this subsection shall be interpreted, construed or applied to impose requirements affecting, or to grant the Administrator, the Chemical Safety and Hazard Investigation Board, or any other agency any authority to regulate (including requirements for hazard assessment), the accidental release of radionuclides arising from the construction and operation of facilities licensed by the Nuclear Regulatory Commission.

(E) After the effective date of any regulation or requirement imposed under this subsection, it shall be unlawful for any person to operate any stationary source subject to such regulation or requirement in violation of such regulation or requirement. Each regulation or requirement under this subsection shall for purposes of sections 7413, 7414, 7416, 7420, 7604, and 7607 of this title and other enforcement provisions of this chapter, be treated as a standard in effect under subsection (d) of this section.

(F) Notwithstanding the provisions of subchapter V of this chapter or this section, no stationary source shall be required to apply for, or operate pursuant to, a permit issued under such subchapter solely because such source is subject to regulations or requirements under this subsection.

**(G)** In exercising any authority under this subsection, the Administrator shall not, for purposes of section 653(b)(1) of Title 29, be deemed to be exercising statutory authority to prescribe or enforce standards or regulations affecting occupational safety and health.

**(H) Public access to off-site consequence analysis information**

  **(i) Definitions**

In this subparagraph:

    **(I) Covered person**

    The term "covered person" means--

    **(aa)** an officer or employee of the United States;

    **(bb)** an officer or employee of an agent or contractor of the Federal Government;

    **(cc)** an officer or employee of a State or local government;

    **(dd)** an officer or employee of an agent or contractor of a State or local government;

    **(ee)** an individual affiliated with an entity that has been given, by a State or local government, responsibility for preventing, planning for, or responding to accidental releases;

    **(ff)** an officer or employee or an agent or contractor of an entity described in item (ee); and

    **(gg)** a qualified researcher under clause (vii).

    **(II) Official use**

    The term "official use" means an action of a Federal, State, or local government agency or an entity referred to in subclause (I)(ee) intended to carry out a function relevant to preventing, planning for, or responding to accidental releases.

    **(III) Off-site consequence analysis information**

    The term "off-site consequence analysis information" means those portions of a risk management plan, excluding the executive summary of the plan, consisting of an evaluation of 1 or more worst-case release scenarios or alternative release scenarios, and any electronic data base created by the Administrator from those portions.

**(IV) Risk management plan**

The term "risk management plan" means a risk management plan submitted to the Administrator by an owner or operator of a stationary source under subparagraph (B)(iii).

**(ii) Regulations**

Not later than 1 year after August 5, 1999, the President shall--

**(I)** assess--

**(aa)** the increased risk of terrorist and other criminal activity associated with the posting of off-site consequence analysis information on the Internet; and

**(bb)** the incentives created by public disclosure of off-site consequence analysis information for reduction in the risk of accidental releases; and

**(II)** based on the assessment under subclause (I), promulgate regulations governing the distribution of off-site consequence analysis information in a manner that, in the opinion of the President, minimizes the likelihood of accidental releases and the risk described in subclause (I)(aa) and the likelihood of harm to public health and welfare, and--

**(aa)** allows access by any member of the public to paper copies of off-site consequence analysis information for a limited number of stationary sources located anywhere in the United States, without any geographical restriction;

**(bb)** allows other public access to off-site consequence analysis information as appropriate;

**(cc)** allows access for official use by a covered person described in any of items (cc) through (ff) of clause (i)(I) (referred to in this subclause as a "State or local covered person") to off-site consequence analysis information relating to stationary sources located in the person's State;

**(dd)** allows a State or local covered person to provide, for official use, off-site consequence analysis information relating to stationary sources located in the person's State to a State or local covered person in a contiguous State; and

**(ee)** allows a State or local covered person to obtain for official use, by request to the Administrator, off-site consequence analysis information that is not available to the person under item (cc).

**(iii) Availability under freedom of information act**

**(I) First year**

Off-site consequence analysis information, and any ranking of stationary sources derived from the information, shall not be made available under section 552 of Title 5, during the 1-year period beginning on August 5, 1999.


**(II) After first year**

If the regulations under clause (ii) are promulgated on or before the end of the period described in subclause (I), off-site consequence analysis information covered by the regulations, and any ranking of stationary sources derived from the information, shall not be made available under section 552 of Title 5, after the end of that period.


**(III) Applicability**

Subclauses (I) and (II) apply to off-site consequence analysis information submitted to the Administrator before, on, or after August 5, 1999.


**(iv) Availability of information during transition period**

The Administrator shall make off-site consequence analysis information available to covered persons for official use in a manner that meets the requirements of items (cc)through (ee) of clause (ii)(II), and to the public in a form that does not make available any information concerning the identity or location of stationary sources, during the period--


**(I)** beginning on August 5, 1999; and


**(II)** ending on the earlier of the date of promulgation of the regulations under clause (ii) or the date that is 1 year after August 5, 1999.


**(v) Prohibition on unauthorized disclosure of information by covered persons**

**(I) In general**

Beginning on August 5, 1999, a covered person shall not disclose to the public off-site consequence analysis information in any form, or any statewide or national ranking of identified stationary sources derived from such information, except as authorized by this subparagraph (including the regulations promulgated under clause (ii)). After the end of the 1-year period beginning on August 5, 1999, if regulations have not been promulgated under clause (ii), the preceding sentence shall not apply.


**(II) Criminal penalties**

Notwithstanding section 7413 of this title, a covered person that willfully violates a restriction or prohibition established by this subparagraph (including the regulations promulgated under clause (ii)) shall, upon conviction, be fined for an infraction under section 3571 of Title 18 (but shall not be subject to imprisonment) for each unauthorized disclosure of off-site consequence analysis information, except that subsection (d) of such section 3571 shall not apply to a case in which the offense results in pecuniary loss unless the defendant knew that such loss would occur.

The disclosure of off-site consequence analysis information for each specific stationary source shall be considered a separate offense. The total of all penalties that may be imposed on a single person or organization under this item shall not exceed $1,000,000 for violations committed during any 1 calendar year.

**(III) Applicability**

If the owner or operator of a stationary source makes off-site consequence analysis information relating to that stationary source available to the public without restriction--

**(aa)** subclauses (I) and (II) shall not apply with respect to the information; and

**(bb)** the owner or operator shall notify the Administrator of the public availability of the information.

**(IV) List**

The Administrator shall maintain and make publicly available a list of all stationary sources that have provided notification under subclause (III)(bb).

**(vi) Notice**

The Administrator shall provide notice of the definition of official use as provided in clause (i)(III) and examples of actions that would and would not meet that definition, and notice of the restrictions on further dissemination and the penalties established by this chapter to each covered person who receives off-site consequence analysis information under clause (iv) and each covered person who receives off-site consequence analysis information for an official use under the regulations promulgated under clause (ii).

**(vii) Qualified researchers**

**(I) In general**

Not later than 180 days after August 5, 1999, the Administrator, in consultation with the Attorney General, shall develop and implement a system for providing off-site consequence analysis information, including facility identification, to any qualified researcher, including a qualified researcher from industry or any public interest group.

**(II) Limitation on dissemination**

The system shall not allow the researcher to disseminate, or make available on the Internet, the off-site consequence analysis information, or any portion of the off-site consequence analysis information, received under this clause.

**(viii) Read-only information technology system**

In consultation with the Attorney General and the heads of other appropriate Federal agencies, the Administrator shall establish an information technology system that provides for the availability to the public of off-site consequence analysis

information by means of a central data base under the control of the Federal Government that contains information that users may read, but that provides no means by which an electronic or mechanical copy of the information may be made.

**(ix) Voluntary industry accident prevention standards**

The Environmental Protection Agency, the Department of Justice, and other appropriate agencies may provide technical assistance to owners and operators of stationary sources and participate in the development of voluntary industry standards that will help achieve the objectives set forth in paragraph (1).

**(x) Effect on State or local law**

**(I) In general**

Subject to subclause (II), this subparagraph (including the regulations promulgated under this subparagraph) shall supersede any provision of State or local law that is inconsistent with this subparagraph (including the regulations).

**(II) Availability of information under State law**

Nothing in this subparagraph precludes a State from making available data on the off-site consequences of chemical releases collected in accordance with State law.

**(xi) Report**

**(I) In general**

Not later than 3 years after August 5, 1999, the Attorney General, in consultation with appropriate State, local, and Federal Government agencies, affected industry, and the public, shall submit to Congress a report that describes the extent to which regulations promulgated under this paragraph have resulted in actions, including the design and maintenance of safe facilities, that are effective in detecting, preventing, and minimizing the consequences of releases of regulated substances that may be caused by criminal activity. As part of this report, the Attorney General, using available data to the extent possible, and a sampling of covered stationary sources selected at the discretion of the Attorney General, and in consultation with appropriate State, local, and Federal governmental agencies, affected industry, and the public, shall review the vulnerability of covered stationary sources to criminal and terrorist activity, current industry practices regarding site security, and security of transportation of regulated substances. The Attorney General shall submit this report, containing the results of the review, together with recommendations, if any, for reducing vulnerability of covered stationary sources to criminal and terrorist activity, to the Committee on Commerce of the United States House of Representatives and the Committee on Environment and Public Works of the United States Senate and other relevant committees of Congress.

**(II) Interim report**

Not later than 12 months after August 5, 1999, the Attorney General shall submit to the Committee on Commerce of the United States House of Representatives and the Committee on Environment and Public Works of the United States Senate, and other relevant committees of Congress, an interim report that includes, at a minimum--

**(aa)** the preliminary findings under subclause (I);

**(bb)** the methods used to develop the findings; and

**(cc)** an explanation of the activities expected to occur that could cause the findings of the report under subclause (I) to be different than the preliminary findings.

### (III) Availability of information

Information that is developed by the Attorney General or requested by the Attorney General and received from a covered stationary source for the purpose of conducting the review under subclauses(I) and (II) shall be exempt from disclosure under section 552 of Title 5 if such information would pose a threat to national security.

### (xii) Scope

This subparagraph--

**(I)** applies only to covered persons; and

**(II)** does not restrict the dissemination of off-site consequence analysis information by any covered person in any manner or form except in the form of a risk management plan or an electronic data base created by the Administrator from off-site consequence analysis information.

### (xiii) Authorization of appropriations

There are authorized to be appropriated to the Administrator and the Attorney General such sums as are necessary to carry out this subparagraph (including the regulations promulgated under clause (ii)), to remain available until expended.

## (8) Research on hazard assessments

The Administrator may collect and publish information on accident scenarios and consequences covering a range of possible events for substances listed under paragraph (3). The Administrator shall establish a program of long-term research to develop and disseminate information on methods and techniques for hazard assessment which may be useful in improving and validating the procedures employed in the preparation of hazard assessments under this subsection.

## (9) Order authority

**(A)** In addition to any other action taken, when the Administrator determines that there may be an imminent and substantial endangerment to the human health or welfare or the environment because of an actual or threatened accidental release of a regulated substance, the Administrator may secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The Administrator may also, after notice to the State in which the

stationary source is located, take other action under this paragraph including, but not limited to, issuing such orders as may be necessary to protect human health. The Administrator shall take action under section 7603 of this title rather than this paragraph whenever the authority of such section is adequate to protect human health and the environment.


**(B)** Orders issued pursuant to this paragraph may be enforced in an action brought in the appropriate United States district court as if the order were issued under section 7603 of this title.


**(C)** Within 180 days after November 15, 1990, the Administrator shall publish guidance for using the order authorities established by this paragraph. Such guidance shall provide for the coordinated use of the authorities of this paragraph with other emergency powers authorized by section 9606 of this title, sections 311(c), 308, 309 and 504(a) of the Federal Water Pollution Control Act [33 U.S.C.A. §§ 1321(c), 1318, 1319, 1364(a)], sections 3007, 3008, 3013, and 7003 of the Solid Waste Disposal Act [42 U.S.C.A. §§ 6927, 6928, 6934, 6973], sections 1445 and 1431 of the Safe Drinking Water Act [42 U.S.C.A. §§ 300j-4, 300i], sections 5 and 7 of the Toxic Substances Control Act [15 U.S.C.A. §§ 2604, 2606], and sections 7413, 7414, and 7603 of this title.


**(10) Presidential review**

The President shall conduct a review of release prevention, mitigation and response authorities of the various Federal agencies and shall clarify and coordinate agency responsibilities to assure the most effective and efficient implementation of such authorities and to identify any deficiencies in authority or resources which may exist. The President may utilize the resources and solicit the recommendations of the Chemical Safety and Hazard Investigation Board in conducting such review. At the conclusion of such review, but not later than 24 months after November 15, 1990, the President shall transmit a message to the Congress on the release prevention, mitigation and response activities of the Federal Government making such recommendations for change in law as the President may deem appropriate. Nothing in this paragraph shall be interpreted, construed or applied to authorize the President to modify or reassign release prevention, mitigation or response authorities otherwise established by law.


**(11) State authority**

Nothing in this subsection shall preclude, deny or limit any right of a State or political subdivision thereof to adopt or enforce any regulation, requirement, limitation or standard (including any procedural requirement) that is more stringent than a regulation, requirement, limitation or standard in effect under this subsection or that applies to a substance not subject to this subsection.


**(s) Periodic report**

Not later than January 15, 1993 and every 3 years thereafter, the Administrator shall prepare and transmit to the Congress a comprehensive report on the measures taken by the Agency and by the States to implement the provisions of this section. The Administrator shall maintain a database on pollutants and sources subject to the provisions of this section and shall include aggregate information from the database in each annual report. The report shall include, but not be limited to--


**(1)** a status report on standard-setting under subsections (d) and (f) of this section;


**(2)** information with respect to compliance with such standards including the costs of compliance experienced by sources in various categories and subcategories;

**(3)** development and implementation of the national urban air toxics program; and

**(4)** recommendations of the Chemical Safety and Hazard Investigation Board with respect to the prevention and mitigation of accidental releases.

**Credits**

(July 14, 1955, c. 360, Title I, § 112, as added Dec. 31, 1970, Pub.L. 91-604, § 4(a), 84 Stat. 1685; amended Aug. 7, 1977, Pub.L. 95-95, Title I, §§ 109(d)(2), 110, Title IV, § 401(c), 91 Stat. 701, 703, 791; Nov. 9, 1978, Pub.L. 95-623, § 13(b), 92 Stat. 3458; Nov. 15, 1990, Pub.L. 101-549, Title III, § 301, 104 Stat. 2531; Dec. 4, 1991, Pub.L. 102-187, 105 Stat. 1285; Nov. 10, 1998, Pub.L. 105-362, Title IV, § 402(b), 112 Stat. 3283; Aug. 5, 1999, Pub.L. 106-40, §§ 2, 3(a), 113 Stat. 207.)

**Editors' Notes**

### MEMORANDA OF PRESIDENT

### DELEGATION OF AUTHORITY TO REVIEW EMERGENCY RELEASE AUTHORITIES AND PREPARE AND TRANSMIT TO THE CONGRESS A MESSAGE CONCERNING SUCH AUTHORITIES

<Aug. 19, 1993, 58 F.R. 52397>

Memorandum for the Administrator of the Environmental Protection Agency

WHEREAS, the Environmental Protection Agency, the agencies and departments that are members of the National Response Team (authorized under Executive Order No. 12580, 52 Fed.Reg. 2923 (1987)) [set out as a note under section 9615 of this title], and other Federal agencies and departments undertake emergency release prevention, mitigation, and response activities pursuant to various authorities;

By the authority vested in me as President by the Constitution and the laws of the United States of America, including section 112(r)(10) of the Clean Air Act (the "Act") (section 7412(r)(10) of title 42 of the United States Code) [subsec. (r)(10) of this section] and section 301 of title 3 of the United States Code [section 301 of Title 3, The President], and in order to provide for the delegation of certain functions under the Act [42 U.S.C.A. § 7401 et seq.], I hereby:

**(1)** Authorize you, in coordination with agencies and departments that are members of the National Response Team and other appropriate agencies and departments, to conduct a review of release prevention, mitigation, and response authorities of Federal agencies in order to assure the most effective and efficient implementation of such authorities and to identify any deficiencies in authority or resources that may exist, to the extent such review is required by section 112(r)(10) of the Act; and

**(2)** Authorize you, in coordination with agencies and departments that are members of the National Response Team and other appropriate agencies and departments, to prepare and transmit a message to the Congress concerning the release prevention, mitigation, and response activities of the Federal Government with such recommendations for change in law as you deem appropriate, to the extent such message is required by section 112(r)(10) of the Act.

The authority delegated by this memorandum may be further redelegated within the Environmental Protection Agency.

You are hereby authorized and directed to publish this memorandum in the **Federal Register.**

WILLIAM J. CLINTON

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

**DELEGATION OF AUTHORITY TO CONDUCT ASSESSMENTS AND PROMULGATE REGULATIONS ON PUBLIC ACCESS TO OFF-SITE CONSEQUENCE ANALYSIS INFORMATION**

<Jan. 27, 2000, 65 F.R. 8631>

Memorandum for the Attorney General[,] the Administrator of the Environmental Protection Agency[,] and the Director of the Office of Management and Budget

By the authority vested in me as President by the Constitution and laws of the United States of America, including section 112(r)(7)(H) of the Clean Air Act ("Act") (42 U.S.C. 7412(r)(7)(H)) [subsec. (r)(7)(H) of this section], as added by section 3 of the Chemical Safety Information, Site Security and Fuels Regulatory Relief Act (Public Law 106-40), and section 301 of title 3, United States Code, I hereby delegate to:

**(1)** the Attorney General the authority vested in the President under section 112(r)(7)(H)(i)(II)(aa) of the Act [subsec. (r)(7)(H)(i)(II)(aa) of this section] to assess the increased risk of terrorist and other criminal activity associated with the posting of off-site consequence analysis information on the Internet;

**(2)** the Administrator of the Environmental Protection Agency (EPA) the authority vested in the President under section 112(r)(7)(H)(ii)(I)(bb) of the Act [subsec. (r)(7)(H)(ii)(I)(bb) of this section] to assess the incentives created by public disclosure of off-site consequence analysis information for reduction in the risk of accidental releases; and

**(3)** the Attorney General and the Administrator of EPA, jointly, the authority vested in the President under section 112(r)(7)(H)(ii)(II) of the Act [subsec. (r)(7)(H)(ii)(II) of this section] to promulgate regulations, based on these assessments, governing the distribution of off-site consequence analysis information. These regulations, in proposed and final form, shall be subject to review and approval by the Director of the Office of Management and Budget.

The Administrator of EPA is authorized and directed to publish this memorandum in the Federal Register.

WILLIAM J. CLINTON

**FLEXIBLE IMPLEMENTATION OF THE MERCURY AND AIR TOXICS STANDARDS RULE**

<Dec. 21, 2011, 76 F.R. 80727>

Memorandum for the Administrator of the Environmental Protection Agency

Today's issuance, by the Environmental Protection Agency (EPA), of the final Mercury and Air Toxics Standards rule for power plants (the "MATS Rule") represents a major step forward in my Administration's efforts to protect public health and the environment.

This rule, issued after careful consideration of public comments, prescribes standards under section 112 of the Clean Air Act to control emissions of mercury and other toxic air pollutants from power plants, which collectively are among the largest sources of such pollution in the United States. The EPA estimates that by substantially reducing emissions of pollutants that contribute to neurological damage, cancer, respiratory illnesses, and other health risks, the MATS Rule will produce major health benefits for millions of Americans_including children, older Americans, and other vulnerable populations. Consistent with Executive Order 13563 (Improving Regulation and Regulatory Review), the estimated benefits of the MATS Rule far exceed the estimated costs.

The MATS Rule can be implemented through the use of demonstrated, existing pollution control technologies. The United States is a global market leader in the design and manufacture of these technologies, and it is anticipated that U.S. firms and workers will provide much of the equipment and labor needed to meet the substantial investments in pollution control that the standards are expected to spur.

These new standards will promote the transition to a cleaner and more efficient U.S. electric power system. This system as a whole is critical infrastructure that plays a key role in the functioning of all facets of the U.S. economy, and maintaining its stability and reliability is of critical importance. It is therefore crucial that implementation of the MATS Rule proceed in a cost-effective manner that ensures electric reliability.

Analyses conducted by the EPA and the Department of Energy (DOE) indicate that the MATS Rule is not anticipated to compromise electric generating resource adequacy in any region of the country. The Clean Air Act offers a number of implementation flexibilities, and the EPA has a long and successful history of using those flexibilities to ensure a smooth transition to cleaner technologies.

The Clean Air Act provides 3 years from the effective date of the MATS Rule for sources to comply with its requirements. In addition, section 112(i)(3)(B) of the Act allows the issuance of a permit granting a source up to one additional year where necessary for the installation of controls. As you stated in the preamble to the MATS Rule, this additional fourth year should be broadly available to sources, consistent with the requirements of the law.

The EPA has concluded that 4 years should generally be sufficient to install the necessary emission control equipment, and DOE has issued analysis consistent with that conclusion. While more time is generally not expected to be needed, the Clean Air Act offers other important flexibilities as well. For example, section 113(a) of the Act provides the EPA with flexibility to bring sources into compliance over the course of an additional year, should unusual circumstances arise that warrant such flexibility.

To address any concerns with respect to electric reliability while assuring MATS' public health benefits, I direct you to take the following actions:

**1.** Building on the information and guidance that you have provided to the public, relevant stakeholders, and permitting authorities in the preamble of the MATS Rule, work with State and local permitting authorities to make the additional year for compliance with the MATS Rule provided under section 112(i)(3)(B) of the Clean Air Act broadly available to sources, consistent with law, and to invoke this flexibility expeditiously where justified.

**2.** Promote early, coordinated, and orderly planning and execution of the measures needed to implement the MATS Rule while maintaining the reliability of the electric power system. Consistent with Executive Order 13563, this process should be designed to "promote predictability and reduce uncertainty," and should include engagement and coordination with DOE, the Federal Energy Regulatory Commission, State utility regulators, Regional Transmission Organizations, the North American Electric Reliability Corporation and regional electric reliability organizations, other grid planning authorities, electric utilities, and other stakeholders, as appropriate.

**3.** Make available to the public, including relevant stakeholders, information concerning any anticipated use of authorities: (a) under section 112(i)(3)(B) of the Clean Air Act in the event that additional time to comply with the MATS Rule is necessary for the installation of technology; and (b) under section 113(a) of the Clean Air Act in the event that additional time to comply with the MATS Rule is necessary to address a specific and documented electric reliability issue. This information should describe the process for working with entities with relevant expertise to identify circumstances where electric reliability concerns might justify allowing additional time to comply.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

You are hereby authorized and directed to publish this memorandum in the Federal Register.

BARACK OBAMA

Notes of Decisions (74)

Footnotes

| | |
|---|---|
| 1 | So in original. Probably should be "effects". |
| 2 | So in original. |
| 3 | So in original. Probably should be "section". |
| 4 | So in original. Probably should be paragraph "(7)(B)". |
| 5 | So in original. Probably should be "subparagraph". |

42 U.S.C.A. § 7412, 42 USCA § 7412

Current through P.L. 113-9 (excluding P.L. 113-4) approved 5-1-13

---

**End of Document** © 2013 Thomson Reuters. No claim to original U.S. Government Works.

 © 2013 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
     Title 42. The Public Health and Welfare
         Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
             Subchapter I. Programs and Activities
                 Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7413

§ 7413. Federal enforcement

Currentness

(a) In general

(1) Order to comply with SIP

Whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated or is in violation of any requirement or prohibition of an applicable implementation plan or permit, the Administrator shall notify the person and the State in which the plan applies of such finding. At any time after the expiration of 30 days following the date on which such notice of a violation is issued, the Administrator may, without regard to the period of violation (subject to section 2462 of Title 28)--

**(A)** issue an order requiring such person to comply with the requirements or prohibitions of such plan or permit,

**(B)** issue an administrative penalty order in accordance with subsection (d) of this section, or

**(C)** bring a civil action in accordance with subsection (b) of this section.

(2) State failure to enforce SIP or permit program

Whenever, on the basis of information available to the Administrator, the Administrator finds that violations of an applicable implementation plan or an approved permit program under subchapter V of this chapter are so widespread that such violations appear to result from a failure of the State in which the plan or permit program applies to enforce the plan or permit program effectively, the Administrator shall so notify the State. In the case of a permit program, the notice shall be made in accordance with subchapter V of this chapter. If the Administrator finds such failure extends beyond the 30th day after such notice (90 days in the case of such permit program), the Administrator shall give public notice of such finding. During the period beginning with such public notice and ending when such State satisfies the Administrator that it will enforce such plan or permit program (hereafter referred to in this section as "period of federally assumed enforcement"), the Administrator may enforce any requirement or prohibition of such plan or permit program with respect to any person by--

**(A)** issuing an order requiring such person to comply with such requirement or prohibition,

**(B)** issuing an administrative penalty order in accordance with subsection (d) of this section, or

(C) bringing a civil action in accordance with subsection (b) of this section.


(3) EPA enforcement of other requirements

Except for a requirement or prohibition enforceable under the preceding provisions of this subsection, whenever, on the basis of any information available to the Administrator, the Administrator finds that any person has violated, or is in violation of, any other requirement or prohibition of this subchapter, section 7603 of this title, subchapter IV-A, subchapter V, or subchapter VI of this chapter, including, but not limited to, a requirement or prohibition of any rule, plan, order, waiver, or permit promulgated, issued, or approved under those provisions or subchapters, or for the payment of any fee owed to the United States under this chapter (other than subchapter II of this chapter), the Administrator may--


(A) issue an administrative penalty order in accordance with subsection (d) of this section,


(B) issue an order requiring such person to comply with such requirement or prohibition,


(C) bring a civil action in accordance with subsection (b) of this section or section 7605 of this title, or


(D) request the Attorney General to commence a criminal action in accordance with subsection (c) of this section.


(4) Requirements for orders

An order issued under this subsection (other than an order relating to a violation of section 7412 of this title) shall not take effect until the person to whom it is issued has had an opportunity to confer with the Administrator concerning the alleged violation. A copy of any order issued under this subsection shall be sent to the State air pollution control agency of any State in which the violation occurs. Any order issued under this subsection shall state with reasonable specificity the nature of the violation and specify a time for compliance which the Administrator determines is reasonable, taking into account the seriousness of the violation and any good faith efforts to comply with applicable requirements. In any case in which an order under this subsection (or notice to a violator under paragraph (1)) is issued to a corporation, a copy of such order (or notice) shall be issued to appropriate corporate officers. An order issued under this subsection shall require the person to whom it was issued to comply with the requirement as expeditiously as practicable, but in no event longer than one year after the date the order was issued, and shall be nonrenewable. No order issued under this subsection shall prevent the State or the Administrator from assessing any penalties nor otherwise affect or limit the State's or the United States authority to enforce under other provisions of this chapter, nor affect any person's obligations to comply with any section of this chapter or with a term or condition of any permit or applicable implementation plan promulgated or approved under this chapter.


(5) Failure to comply with new source requirements

Whenever, on the basis of any available information, the Administrator finds that a State is not acting in compliance with any requirement or prohibition of the chapter relating to the construction of new sources or the modification of existing sources, the Administrator may--

**(A)** issue an order prohibiting the construction or modification of any major stationary source in any area to which such requirement applies; [1]

**(B)** issue an administrative penalty order in accordance with subsection (d) of this section, or

**(C)** bring a civil action under subsection (b) of this section.

Nothing in this subsection shall preclude the United States from commencing a criminal action under subsection (c) of this section at any time for any such violation.

(b) Civil judicial enforcement

The Administrator shall, as appropriate, in the case of any person that is the owner or operator of an affected source, a major emitting facility, or a major stationary source, and may, in the case of any other person, commence a civil action for a permanent or temporary injunction, or to assess and recover a civil penalty of not more than $25,000 per day for each violation, or both, in any of the following instances:

**(1)** Whenever such person has violated, or is in violation of, any requirement or prohibition of an applicable implementation plan or permit. Such an action shall be commenced (A) during any period of federally assumed enforcement, or (B) more than 30 days following the date of the Administrator's notification under subsection (a)(1) of this section that such person has violated, or is in violation of, such requirement or prohibition.

**(2)** Whenever such person has violated, or is in violation of, any other requirement or prohibition of this subchapter, section 7603 of this title, subchapter IV-A, subchapter V, or subchapter VI of this chapter, including, but not limited to, a requirement or prohibition of any rule, order, waiver or permit promulgated, issued, or approved under this chapter, or for the payment of any fee owed the United States under this chapter (other than subchapter II of this chapter).

**(3)** Whenever such person attempts to construct or modify a major stationary source in any area with respect to which a finding under subsection (a)(5) of this section has been made.

Any action under this subsection may be brought in the district court of the United States for the district in which the violation is alleged to have occurred, or is occurring, or in which the defendant resides, or where the defendant's principal place of business is located, and such court shall have jurisdiction to restrain such violation, to require compliance, to assess such civil penalty, to collect any fees owed the United States under this chapter (other than subchapter II of this chapter) and any noncompliance assessment and nonpayment penalty owed under section 7420 of this title, and to award any other appropriate relief. Notice of the commencement of such action shall be given to the appropriate State air pollution control agency. In the case of any action brought by the Administrator under this subsection, the court may award costs of litigation (including reasonable attorney and expert witness fees) to the party or parties against whom such action was brought if the court finds that such action was unreasonable.

(c) Criminal penalties

**(1)** Any person who knowingly violates any requirement or prohibition of an applicable implementation plan (during any period of federally assumed enforcement or more than 30 days after having been notified under subsection (a)(1) of this section by the Administrator that such person is violating such requirement or prohibition), any order under subsection (a) of this section, requirement or prohibition of section 7411(e) of this title (relating to new source performance standards), section 7412 of this title, section 7414 of this title (relating to inspections, etc.), section 7429 of this title (relating to solid waste combustion), section 7475(a) of this title (relating to preconstruction requirements), an order under section 7477 of this title (relating to preconstruction requirements), an order under section 7603 of this title (relating to emergency orders), section 7661a(a) or 7661b(c) of this title (relating to permits), or any requirement or prohibition of subchapter IV-A of this chapter (relating to acid deposition control), or subchapter VI of this chapter (relating to stratospheric ozone control), including a requirement of any rule, order, waiver, or permit promulgated or approved under such sections or subchapters, and including any requirement for the payment of any fee owed the United States under this chapter (other than subchapter II of this chapter) shall, upon conviction, be punished by a fine pursuant to Title 18 or by imprisonment for not to exceed 5 years, or both. If a conviction of any person under this paragraph is for a violation committed after a first conviction of such person under this paragraph, the maximum punishment shall be doubled with respect to both the fine and imprisonment.

**(2)** Any person who knowingly--

**(A)** makes any false material statement, representation, or certification in, or omits material information from, or knowingly alters, conceals, or fails to file or maintain any notice, application, record, report, plan, or other document required pursuant to this chapter to be either filed or maintained (whether with respect to the requirements imposed by the Administrator or by a State);

**(B)** fails to notify or report as required under this chapter; or

**(C)** falsifies, tampers with, renders inaccurate, or fails to install any monitoring device or method required to be maintained or followed under this chapter [2]

shall, upon conviction, be punished by a fine pursuant to Title 18 or by imprisonment for not more than 2 years, or both. If a conviction of any person under this paragraph is for a violation committed after a first conviction of such person under this paragraph, the maximum punishment shall be doubled with respect to both the fine and imprisonment.

**(3)** Any person who knowingly fails to pay any fee owed the United States under this subchapter, subchapter III, IV-A, V, or VI of this chapter shall, upon conviction, be punished by a fine pursuant to Title 18 or by imprisonment for not more than 1 year, or both. If a conviction of any person under this paragraph is for a violation committed after a first conviction of such person under this paragraph, the maximum punishment shall be doubled with respect to both the fine and imprisonment.

**(4)** Any person who negligently releases into the ambient air any hazardous air pollutant listed pursuant to section 7412 of this title or any extremely hazardous substance listed pursuant to section 11002(a)(2) of this title that is not listed in section 7412 of this title, and who at the time negligently places another person in imminent danger of death or serious bodily injury shall, upon conviction, be punished by a fine under Title 18 or by imprisonment for not more than 1 year, or both. If a conviction of any person under this paragraph is for a violation committed after a first conviction of such person under this paragraph, the maximum punishment shall be doubled with respect to both the fine and imprisonment.

**(5)(A)** Any person who knowingly releases into the ambient air any hazardous air pollutant listed pursuant to section 7412 of this title or any extremely hazardous substance listed pursuant to section 11002(a)(2) of this title that is not listed in section 7412 of this title, and who knows at the time that he thereby places another person in imminent danger of death or serious bodily injury shall, upon conviction, be punished by a fine under Title 18 or by imprisonment of not more than 15 years, or both. Any person committing such violation which is an organization shall, upon conviction under this paragraph, be subject to a fine of not more than $1,000,000 for each violation. If a conviction of any person under this paragraph is for a violation committed after a first conviction of such person under this paragraph, the maximum punishment shall be doubled with respect to both the fine and imprisonment. For any air pollutant for which the Administrator has set an emissions standard or for any source for which a permit has been issued under subchapter V of this chapter, a release of such pollutant in accordance with that standard or permit shall not constitute a violation of this paragraph or paragraph (4).

**(B)** In determining whether a defendant who is an individual knew that the violation placed another person in imminent danger of death or serious bodily injury--

   **(i)** the defendant is responsible only for actual awareness or actual belief possessed; and

   **(ii)** knowledge possessed by a person other than the defendant, but not by the defendant, may not be attributed to the defendant;

except that in proving a defendant's possession of actual knowledge, circumstantial evidence may be used, including evidence that the defendant took affirmative steps to be shielded from relevant information.

**(C)** It is an affirmative defense to a prosecution that the conduct charged was freely consented to by the person endangered and that the danger and conduct charged were reasonably foreseeable hazards of--

   **(i)** an occupation, a business, or a profession; or

   **(ii)** medical treatment or medical or scientific experimentation conducted by professionally approved methods and such other person had been made aware of the risks involved prior to giving consent.

The defendant may establish an affirmative defense under this subparagraph by a preponderance of the evidence.

**(D)** All general defenses, affirmative defenses, and bars to prosecution that may apply with respect to other Federal criminal offenses may apply under subparagraph (A) of this paragraph and shall be determined by the courts of the United States according to the principles of common law as they may be interpreted in the light of reason and experience. Concepts of justification and excuse applicable under this section may be developed in the light of reason and experience.

**(E)** The term "organization" means a legal entity, other than a government, established or organized for any purpose, and such term includes a corporation, company, association, firm, partnership, joint stock company, foundation, institution, trust, society, union, or any other association of persons.

**(F)** The term "serious bodily injury" means bodily injury which involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

**(6)** For the purpose of this subsection, the term "person" includes, in addition to the entities referred to in section 7602(e) of this title, any responsible corporate officer.

(d) Administrative assessment of civil penalties

**(1)** The Administrator may issue an administrative order against any person assessing a civil administrative penalty of up to $25,000, per day of violation, whenever, on the basis of any available information, the Administrator finds that such person--

    **(A)** has violated or is violating any requirement or prohibition of an applicable implementation plan (such order shall be issued (i) during any period of federally assumed enforcement, or (ii) more than thirty days following the date of the Administrator's notification under subsection (a)(1) of this section of a finding that such person has violated or is violating such requirement or prohibition); or

    **(B)** has violated or is violating any other requirement or prohibition of this subchapter or subchapter III, IV-A, V, or VI of this chapter, including, but not limited to, a requirement or prohibition of any rule, order, waiver, permit, or plan promulgated, issued, or approved under this chapter, or for the payment of any fee owed the United States under this chapter (other than subchapter II of this chapter); or

    **(C)** attempts to construct or modify a major stationary source in any area with respect to which a finding under subsection (a)(5) of this section has been made.

The Administrator's authority under this paragraph shall be limited to matters where the total penalty sought does not exceed $200,000 and the first alleged date of violation occurred no more than 12 months prior to the initiation of the administrative action, except where the Administrator and the Attorney General jointly determine that a matter involving a larger penalty amount or longer period of violation is appropriate for administrative penalty action. Any such determination by the Administrator and the Attorney General shall not be subject to judicial review.

**(2)(A)** An administrative penalty assessed under paragraph (1) shall be assessed by the Administrator by an order made after opportunity for a hearing on the record in accordance with sections 554 and 556 of Title 5. The Administrator shall issue reasonable rules for discovery and other procedures for hearings under this paragraph. Before issuing such an order, the Administrator shall give written notice to the person to be assessed an administrative penalty of the Administrator's proposal to issue such order and provide such person an opportunity to request such a hearing on the order, within 30 days of the date the notice is received by such person.

**(B)** The Administrator may compromise, modify, or remit, with or without conditions, any administrative penalty which may be imposed under this subsection.

**(3)** The Administrator may implement, after consultation with the Attorney General and the States, a field citation program through regulations establishing appropriate minor violations for which field citations assessing civil penalties not to exceed $5,000 per day of violation may be issued by officers or employees designated by the Administrator. Any person to whom a field citation is assessed may, within a reasonable time as prescribed by the Administrator through regulation, elect to pay the penalty assessment or to request a hearing on the field citation. If a request for a hearing is not made within the time specified in the regulation, the penalty assessment in the field citation shall be final. Such hearing shall not be subject to section 554 or 556 of Title 5, but shall provide a reasonable opportunity to be heard and to present evidence. Payment of a civil penalty required by a field citation shall not be a defense to further enforcement by the United States or a State to correct a violation, or to assess the statutory maximum penalty pursuant to other authorities in the chapter, if the violation continues.

**(4)** Any person against whom a civil penalty is assessed under paragraph (3) of this subsection or to whom an administrative penalty order is issued under paragraph (1) of this subsection may seek review of such assessment in the United States District Court for the District of Columbia or for the district in which the violation is alleged to have occurred, in which such person resides, or where such person's principal place of business is located, by filing in such court within 30 days following the date the administrative penalty order becomes final under paragraph (2), the assessment becomes final under paragraph (3), or a final decision following a hearing under paragraph (3) is rendered, and by simultaneously sending a copy of the filing by certified mail to the Administrator and the Attorney General. Within 30 days thereafter, the Administrator shall file in such court a certified copy, or certified index, as appropriate, of the record on which the administrative penalty order or assessment was issued. Such court shall not set aside or remand such order or assessment unless there is not substantial evidence in the record, taken as a whole, to support the finding of a violation or unless the order or penalty assessment constitutes an abuse of discretion. Such order or penalty assessment shall not be subject to review by any court except as provided in this paragraph. In any such proceedings, the United States may seek to recover civil penalties ordered or assessed under this section.

**(5)** If any person fails to pay an assessment of a civil penalty or fails to comply with an administrative penalty order--

　　**(A)** after the order or assessment has become final, or

　　**(B)** after a court in an action brought under paragraph (4) has entered a final judgment in favor of the Administrator,

the Administrator shall request the Attorney General to bring a civil action in an appropriate district court to enforce the order or to recover the amount ordered or assessed (plus interest at rates established pursuant to section 6621(a)(2) of Title 26 from the date of the final order or decision or the date of the final judgment, as the case may be). In such an action, the validity, amount, and appropriateness of such order or assessment shall not be subject to review. Any person who fails to pay on a timely basis a civil penalty ordered or assessed under this section shall be required to pay, in addition to such penalty and interest, the United States enforcement expenses, including but not limited to attorneys fees and costs incurred by the United States for collection proceedings and a quarterly nonpayment penalty for each quarter during which such failure to pay persists. Such nonpayment penalty shall be 10 percent of the aggregate amount of such person's outstanding penalties and nonpayment penalties accrued as of the beginning of such quarter.

(e) Penalty assessment criteria

**(1)** In determining the amount of any penalty to be assessed under this section or section 7604(a) of this title, the Administrator or the court, as appropriate, shall take into consideration (in addition to such other factors as justice may require) the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith

efforts to comply, the duration of the violation as established by any credible evidence (including evidence other than the applicable test method), payment by the violator of penalties previously assessed for the same violation, the economic benefit of noncompliance, and the seriousness of the violation. The court shall not assess penalties for noncompliance with administrative subpoenas under section 7607(a) of this title, or actions under section 7414 of this title, where the violator had sufficient cause to violate or fail or refuse to comply with such subpoena or action.

**(2)** A penalty may be assessed for each day of violation. For purposes of determining the number of days of violation for which a penalty may be assessed under subsection (b) or (d)(1) of this section, or section 7604(a) of this title, or an assessment may be made under section 7420 of this title, where the Administrator or an air pollution control agency has notified the source of the violation, and the plaintiff makes a prima facie showing that the conduct or events giving rise to the violation are likely to have continued or recurred past the date of notice, the days of violation shall be presumed to include the date of such notice and each and every day thereafter until the violator establishes that continuous compliance has been achieved, except to the extent that the violator can prove by a preponderance of the evidence that there were intervening days during which no violation occurred or that the violation was not continuing in nature.

(f) Awards

The Administrator may pay an award, not to exceed $10,000, to any person who furnishes information or services which lead to a criminal conviction or a judicial or administrative civil penalty for any violation of this subchapter or subchapter III, IV-A, V, or VI of this chapter enforced under this section. Such payment is subject to available appropriations for such purposes as provided in annual appropriation Acts. Any officer, or employee of the United States or any State or local government who furnishes information or renders service in the performance of an official duty is ineligible for payment under this subsection. The Administrator may, by regulation, prescribe additional criteria for eligibility for such an award.

(g) Settlements; public participation

At least 30 days before a consent order or settlement agreement of any kind under this chapter to which the United States is a party (other than enforcement actions under this section, section 7420 of this title, or subchapter II of this chapter, whether or not involving civil or criminal penalties, or judgments subject to Department of Justice policy on public participation) is final or filed with a court, the Administrator shall provide a reasonable opportunity by notice in the Federal Register to persons who are not named as parties or intervenors to the action or matter to comment in writing. The Administrator or the Attorney General, as appropriate, shall promptly consider any such written comments and may withdraw or withhold his consent to the proposed order or agreement if the comments disclose facts or considerations which indicate that such consent is inappropriate, improper, inadequate, or inconsistent with the requirements of this chapter. Nothing in this subsection shall apply to civil or criminal penalties under this chapter.

(h) Operator

For purposes of the provisions of this section and section 7420 of this title, the term "operator", as used in such provisions, shall include any person who is senior management personnel or a corporate officer. Except in the case of knowing and willful violations, such term shall not include any person who is a stationary engineer or technician responsible for the operation, maintenance, repair, or monitoring of equipment and facilities and who often has supervisory and training duties but who is not senior management personnel or a corporate officer. Except in the case of knowing and willful violations, for purposes of subsection (c)(4) of this section, the term "a person" shall not include an employee who is carrying out his normal activities and who is not a part of senior management personnel or a corporate officer. Except in the case of knowing and willful violations, for

purposes of paragraphs (1), (2), (3), and (5) of subsection (c) of this section the term "a person" shall not include an employee who is carrying out his normal activities and who is acting under orders from the employer.


**Credits**

(July 14, 1955, c. 360, Title I, § 113, as added Dec. 31, 1970, Pub.L. 91-604, § 4(a), 84 Stat. 1686; amended Nov. 18, 1971, Pub.L. 92-157, Title III, § 302(b), (c), 85 Stat. 464; June 22, 1974, Pub.L. 93-319, § 6(a)(1) to (3), 88 Stat. 259; Aug. 7, 1977, Pub.L. 95-95, Title I, §§ 111, 112(a), 91 Stat. 704, 705; Nov. 16, 1977, Pub.L. 95-190, § 14(a)(10) to (21), (b)(1), 91 Stat. 1400, 1404; July 17, 1981, Pub.L. 97-23, § 2, 95 Stat. 139; Nov. 15, 1990, Pub.L. 101-549, Title VII, § 701, 104 Stat. 2672.)


Notes of Decisions (246)


Footnotes

1        So in original. The semicolon probably should be a comma.
2        So in original. Probably should be followed by a comma.

42 U.S.C.A. § 7413, 42 USCA § 7413

Current through P.L. 113-9 (excluding P.L. 113-4) approved 5-1-13

**End of Document**                                                 © 2013 Thomson Reuters. No claim to original U.S. Government Works.

ADD62

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
      Subchapter I. Programs and Activities
        Part A. Air Quality and Emissions Limitations (Refs & Annos)

42 U.S.C.A. § 7429

§ 7429. Solid waste combustion

Currentness

(a) New source performance standards

(1) In general

**(A)** The Administrator shall establish performance standards and other requirements pursuant to section 7411 of this title and this section for each category of solid waste incineration units. Such standards shall include emissions limitations and other requirements applicable to new units and guidelines (under section 7411(d) of this title and this section) and other requirements applicable to existing units.

**(B)** Standards under section 7411 of this title and this section applicable to solid waste incineration units with capacity greater than 250 tons per day combusting municipal waste shall be promulgated not later than 12 months after November 15, 1990. Nothing in this subparagraph shall alter any schedule for the promulgation of standards applicable to such units under section 7411 of this title pursuant to any settlement and consent decree entered by the Administrator before November 15, 1990: *Provided,* That, such standards are subsequently modified pursuant to the schedule established in this subparagraph to include each of the requirements of this section.

**(C)** Standards under section 7411 of this title and this section applicable to solid waste incineration units with capacity equal to or less than 250 tons per day combusting municipal waste and units combusting hospital waste, medical waste and infectious waste shall be promulgated not later than 24 months after November 15, 1990.

**(D)** Standards under section 7411 of this title and this section applicable to solid waste incineration units combusting commercial or industrial waste shall be proposed not later than 36 months after November 15, 1990, and promulgated not later than 48 months after November 15, 1990.

**(E)** Not later than 18 months after November 15, 1990, the Administrator shall publish a schedule for the promulgation of standards under section 7411 of this title and this section applicable to other categories of solid waste incineration units.

(2) Emissions standard

Standards applicable to solid waste incineration units promulgated under section 7411 of this title and this section shall reflect the maximum degree of reduction in emissions of air pollutants listed under section [1] (a)(4) that the Administrator, taking into

ADD63

consideration the cost of achieving such emission reduction, and any non-air quality health and environmental impacts and energy requirements, determines is achievable for new or existing units in each category. The Administrator may distinguish among classes, types (including mass-burn, refuse-derived fuel, modular and other types of units), and sizes of units within a category in establishing such standards. The degree of reduction in emissions that is deemed achievable for new units in a category shall not be less stringent than the emissions control that is achieved in practice by the best controlled similar unit, as determined by the Administrator. Emissions standards for existing units in a category may be less stringent than standards for new units in the same category but shall not be less stringent than the average emissions limitation achieved by the best performing 12 percent of units in the category (excluding units which first met lowest achievable emissions rates 18 months before the date such standards are proposed or 30 months before the date such standards are promulgated, whichever is later).

(3) Control methods and technologies

Standards under section 7411 of this title and this section applicable to solid waste incineration units shall be based on methods and technologies for removal or destruction of pollutants before, during, or after combustion, and shall incorporate for new units siting requirements that minimize, on a site specific basis, to the maximum extent practicable, potential risks to public health or the environment.

(4) Numerical emissions limitations

The performance standards promulgated under section 7411 of this title and this section and applicable to solid waste incineration units shall specify numerical emission limitations for the following substances or mixtures: particulate matter (total and fine), opacity (as appropriate), sulfur dioxide, hydrogen chloride, oxides of nitrogen, carbon monoxide, lead, cadmium, mercury, and dioxins and dibenzofurans. The Administrator may promulgate numerical emissions limitations or provide for the monitoring of postcombustion concentrations of surrogate substances, parameters or periods of residence time in excess of stated temperatures with respect to pollutants other than those listed in this paragraph.

(5) Review and revision

Not later than 5 years following the initial promulgation of any performance standards and other requirements under this section and section 7411 of this title applicable to a category of solid waste incineration units, and at 5 year intervals thereafter, the Administrator shall review, and in accordance with this section and section 7411 of this title, revise such standards and requirements.

(b) Existing units

(1) Guidelines

Performance standards under this section and section 7411 of this title for solid waste incineration units shall include guidelines promulgated pursuant to section 7411(d) of this title and this section applicable to existing units. Such guidelines shall include, as provided in this section, each of the elements required by subsection (a) of this section (emissions limitations, notwithstanding any restriction in section 7411(d) of this title regarding issuance of such limitations), subsection (c) of this section (monitoring), subsection (d) of this section (operator training), subsection (e) of this section (permits), and subsection (h)(4) [2] of this section (residual risk).

(2) State plans

Not later than 1 year after the Administrator promulgates guidelines for a category of solid waste incineration units, each State in which units in the category are operating shall submit to the Administrator a plan to implement and enforce the guidelines with respect to such units. The State plan shall be at least as protective as the guidelines promulgated by the Administrator and shall provide that each unit subject to the guidelines shall be in compliance with all requirements of this section not later than 3 years after the State plan is approved by the Administrator but not later than 5 years after the guidelines were promulgated. The Administrator shall approve or disapprove any State plan within 180 days of the submission, and if a plan is disapproved, the Administrator shall state the reasons for disapproval in writing. Any State may modify and resubmit a plan which has been disapproved by the Administrator.

(3) Federal plan

The Administrator shall develop, implement and enforce a plan for existing solid waste incineration units within any category located in any State which has not submitted an approvable plan under this subsection with respect to units in such category within 2 years after the date on which the Administrator promulgated the relevant guidelines. Such plan shall assure that each unit subject to the plan is in compliance with all provisions of the guidelines not later than 5 years after the date the relevant guidelines are promulgated.

(c) Monitoring

The Administrator shall, as part of each performance standard promulgated pursuant to subsection (a) of this section and section 7411 of this title, promulgate regulations requiring the owner or operator of each solid waste incineration unit--

(1) to monitor emissions from the unit at the point at which such emissions are emitted into the ambient air (or within the stack, combustion chamber or pollution control equipment, as appropriate) and at such other points as necessary to protect public health and the environment;

(2) to monitor such other parameters relating to the operation of the unit and its pollution control technology as the Administrator determines are appropriate; and

(3) to report the results of such monitoring.

Such regulations shall contain provisions regarding the frequency of monitoring, test methods and procedures validated on solid waste incineration units, and the form and frequency of reports containing the results of monitoring and shall require that any monitoring reports or test results indicating an exceedance of any standard under this section shall be reported separately and in a manner that facilitates review for purposes of enforcement actions. Such regulations shall require that copies of the results of such monitoring be maintained on file at the facility concerned and that copies shall be made available for inspection and copying by interested members of the public during business hours.

(d) Operator training

Not later than 24 months after November 15, 1990, the Administrator shall develop and promote a model State program for the training and certification of solid waste incineration unit operators and high-capacity fossil fuel fired plant operators. The Administrator may authorize any State to implement a model program for the training of solid waste incineration unit operators and high-capacity fossil fuel fired plant operators, if the State has adopted a program which is at least as effective as the model

program developed by the Administrator. Beginning on the date 36 months after the date on which performance standards and guidelines are promulgated under subsection (a) of this section and section 7411 of this title for any category of solid waste incineration units it shall be unlawful to operate any unit in the category unless each person with control over processes affecting emissions from such unit has satisfactorily completed a training program meeting the requirements established by the Administrator under this subsection.

(e) Permits

Beginning (1) 36 months after the promulgation of a performance standard under subsection (a) of this section and section 7411 of this title applicable to a category of solid waste incineration units, or (2) the effective date of a permit program under subchapter V of this chapter in the State in which the unit is located, whichever is later, each unit in the category shall operate pursuant to a permit issued under this subsection and subchapter V of this chapter. Permits required by this subsection may be renewed according to the provisions of subchapter V of this chapter. Notwithstanding any other provision of this chapter, each permit for a solid waste incineration unit combusting municipal waste issued under this chapter shall be issued for a period of up to 12 years and shall be reviewed every 5 years after date of issuance or reissuance. Each permit shall continue in effect after the date of issuance until the date of termination, unless the Administrator or State determines that the unit is not in compliance with all standards and conditions contained in the permit. Such determination shall be made at regular intervals during the term of the permit, such intervals not to exceed 5 years, and only after public comment and public hearing. No permit for a solid waste incineration unit may be issued under this chapter by an agency, instrumentality or person that is also responsible, in whole or part, for the design and construction or operation of the unit. Notwithstanding any other provision of this subsection, the Administrator or the State shall require the owner or operator of any unit to comply with emissions limitations or implement any other measures, if the Administrator or the State determines that emissions in the absence of such limitations or measures may reasonably be anticipated to endanger public health or the environment. The Administrator's determination under the preceding sentence is a discretionary decision.

(f) Effective date and enforcement

(1) New units

Performance standards and other requirements promulgated pursuant to this section and section 7411 of this title and applicable to new solid waste incineration units shall be effective as of the date 6 months after the date of promulgation.

(2) Existing units

Performance standards and other requirements promulgated pursuant to this section and section 7411 of this title and applicable to existing solid waste incineration units shall be effective as expeditiously as practicable after approval of a State plan under subsection (b)(2) of this section (or promulgation of a plan by the Administrator under subsection (b)(3) of this section) but in no event later than 3 years after the State plan is approved or 5 years after the date such standards or requirements are promulgated, whichever is earlier.

(3) Prohibition

After the effective date of any performance standard, emission limitation or other requirement promulgated pursuant to this section and section 7411 of this title, it shall be unlawful for any owner or operator of any solid waste incineration unit to which such standard, limitation or requirement applies to operate such unit in violation of such limitation, standard or requirement or for any other person to violate an applicable requirement of this section.

(4) Coordination with other authorities

For purposes of sections 7411(e), 7413, 7414, 7416, 7420, 7603, 7604, 7607 of this title and other provisions for the enforcement of this chapter, each performance standard, emission limitation or other requirement established pursuant to this section by the Administrator or a State or local government, shall be treated in the same manner as a standard of performance under section 7411 of this title which is an emission limitation.

(g) Definitions

For purposes of section 306 of the Clean Air Act Amendments of 1990 and this section only--

(1) Solid waste incineration unit

The term "solid waste incineration unit" means a distinct operating unit of any facility which combusts any solid waste material from commercial or industrial establishments or the general public (including single and multiple residences, hotels, and motels). Such term does not include incinerators or other units required to have a permit under section 3005 of the Solid Waste Disposal Act [42 U.S.C.A. § 6925]. The term "solid waste incineration unit" does not include (A) materials recovery facilities (including primary or secondary smelters) which combust waste for the primary purpose of recovering metals, (B) qualifying small power production facilities, as defined in section 796(17)(C) of Title 16, or qualifying cogeneration facilities, as defined in section 796(18)(B) of Title 16, which burn homogeneous waste (such as units which burn tires or used oil, but not including refuse-derived fuel) for the production of electric energy or in the case of qualifying cogeneration facilities which burn homogeneous waste for the production of electric energy and steam or forms of useful energy (such as heat) which are used for industrial, commercial, heating or cooling purposes, or (C) air curtain incinerators provided that such incinerators only burn wood wastes, yard wastes and clean lumber and that such air curtain incinerators comply with opacity limitations to be established by the Administrator by rule.

(2) New solid waste incineration unit

The term "new solid waste incineration unit" means a solid waste incineration unit the construction of which is commenced after the Administrator proposes requirements under this section establishing emissions standards or other requirements which would be applicable to such unit or a modified solid waste incineration unit.

(3) Modified solid waste incineration unit

The term "modified solid waste incineration unit" means a solid waste incineration unit at which modifications have occurred after the effective date of a standard under subsection (a) of this section if (A) the cumulative cost of the modifications, over the life of the unit, exceed 50 per centum of the original cost of construction and installation of the unit (not including the cost of any land purchased in connection with such construction or installation) updated to current costs, or (B) the modification is a physical change in or change in the method of operation of the unit which increases the amount of any air pollutant emitted by the unit for which standards have been established under this section or section 7411 of this title.

(4) Existing solid waste incineration unit

ADD67

The term "existing solid waste incineration unit" means a solid waste unit which is not a new or modified solid waste incineration unit.

(5) Municipal waste

The term "municipal waste" means refuse (and refuse-derived fuel) collected from the general public and from residential, commercial, institutional, and industrial sources consisting of paper, wood, yard wastes, food wastes, plastics, leather, rubber, and other combustible materials and non-combustible materials such as metal, glass and rock, provided that: (A) the term does not include industrial process wastes or medical wastes that are segregated from such other wastes; and (B) an incineration unit shall not be considered to be combusting municipal waste for purposes of section 7411 of this title or this section if it combusts a fuel feed stream, 30 percent or less of the weight of which is comprised, in aggregate, of municipal waste.

(6) Other terms

The terms "solid waste" and "medical waste" shall have the meanings established by the Administrator pursuant to the Solid Waste Disposal Act [42 U.S.C.A. § 6901 et seq.].

(h) Other authority

(1) State authority

Nothing in this section shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce any regulation, requirement, limitation or standard relating to solid waste incineration units that is more stringent than a regulation, requirement, limitation or standard in effect under this section or under any other provision of this chapter.

(2) Other authority under this chapter

Nothing in this section shall diminish the authority of the Administrator or a State to establish any other requirements applicable to solid waste incineration units under any other authority of law, including the authority to establish for any air pollutant a national ambient air quality standard, except that no solid waste incineration unit subject to performance standards under this section and section 7411 of this title shall be subject to standards under section 7412(d) of this title.

(3) Residual risk

The Administrator shall promulgate standards under section 7412(f) of this title for a category of solid waste incineration units, if promulgation of such standards is required under section 7412(f) of this title. For purposes of this [3] preceding sentence only--

(A) the performance standards under subsection (a) of this section and section 7411 of this title applicable to a category of solid waste incineration units shall be deemed standards under section 7412(d)(2) of this title, and

(B) the Administrator shall consider and regulate, if required, the pollutants listed under subsection (a)(4) of this section and no others.

(4) Acid rain

A solid waste incineration unit shall not be a utility unit as defined in subchapter IV-A of this chapter: *Provided,* That, more than 80 per centum of its annual average fuel consumption measured on a Btu basis, during a period or periods to be determined by the Administrator, is from a fuel (including any waste burned as a fuel) other than a fossil fuel.

(5) Requirements of parts C and D

No requirement of an applicable implementation plan under section 7475 of this title (relating to construction of facilities in regions identified pursuant to section 7407(d)(1)(A)(ii) or (iii) of this title) or under section 7502(c)(5) of this title (relating to permits for construction and operation in nonattainment areas) may be used to weaken the standards in effect under this section.

**Credits**

(July 14, 1955, c. 360, Title I, § 129, as added Nov. 15, 1990, Pub.L. 101-549, Title III, § 305(a), 104 Stat. 2577.)

Notes of Decisions (6)

Footnotes

| 1 | So in original. Probably should be "subsection". |
| 2 | So in original. Probably should be subsection "(h)(3)". |
| 3 | So in original. Probably should be "the". |

42 U.S.C.A. § 7429, 42 USCA § 7429

Current through P.L. 113-9 (excluding P.L. 113-4) approved 5-1-13

---

**End of Document**                                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
      Subchapter III. General Provisions

42 U.S.C.A. § 7601

§ 7601. Administration

Currentness

(a) Regulations; delegation of powers and duties; regional officers and employees

**(1)** The Administrator is authorized to prescribe such regulations as are necessary to carry out his functions under this chapter. The Administrator may delegate to any officer or employee of the Environmental Protection Agency such of his powers and duties under this chapter, except the making of regulations subject to section 7607(d) of this title, as he may deem necessary or expedient.

**(2)** Not later than one year after August 7, 1977, the Administrator shall promulgate regulations establishing general applicable procedures and policies for regional officers and employees (including the Regional Administrator) to follow in carrying out a delegation under paragraph (1), if any. Such regulations shall be designed--

**(A)** to assure fairness and uniformity in the criteria, procedures, and policies applied by the various regions in implementing and enforcing the chapter;

**(B)** to assure at least an adequate quality audit of each State's performance and adherence to the requirements of this chapter in implementing and enforcing the chapter, particularly in the review of new sources and in enforcement of the chapter; and

**(C)** to provide a mechanism for identifying and standardizing inconsistent or varying criteria, procedures, and policies being employed by such officers and employees in implementing and enforcing the chapter.

(b) Detail of Environmental Protection Agency personnel to air pollution control agencies

Upon the request of an air pollution control agency, personnel of the Environmental Protection Agency may be detailed to such agency for the purpose of carrying out the provisions of this chapter.

(c) Payments under grants; installments; advances or reimbursements

Payments under grants made under this chapter may be made in installments, and in advance or by way of reimbursement, as may be determined by the Administrator.

(d) Tribal authority

**(1)** Subject to the provisions of paragraph (2), the Administrator--

**(A)** is authorized to treat Indian tribes as States under this chapter, except for purposes of the requirement that makes available for application by each State no less than one-half of 1 percent of annual appropriations under section 7405 of this title; and

**(B)** may provide any such Indian tribe grant and contract assistance to carry out functions provided by this chapter.

**(2)** The Administrator shall promulgate regulations within 18 months after November 15, 1990, specifying those provisions of this chapter for which it is appropriate to treat Indian tribes as States. Such treatment shall be authorized only if--

**(A)** the Indian tribe has a governing body carrying out substantial governmental duties and powers;

**(B)** the functions to be exercised by the Indian tribe pertain to the management and protection of air resources within the exterior boundaries of the reservation or other areas within the tribe's jurisdiction; and

**(C)** the Indian tribe is reasonably expected to be capable, in the judgment of the Administrator, of carrying out the functions to be exercised in a manner consistent with the terms and purposes of this chapter and all applicable regulations.

**(3)** The Administrator may promulgate regulations which establish the elements of tribal implementation plans and procedures for approval or disapproval of tribal implementation plans and portions thereof.

**(4)** In any case in which the Administrator determines that the treatment of Indian tribes as identical to States is inappropriate or administratively infeasible, the Administrator may provide, by regulation, other means by which the Administrator will directly administer such provisions so as to achieve the appropriate purpose.

**(5)** Until such time as the Administrator promulgates regulations pursuant to this subsection, the Administrator may continue to provide financial assistance to eligible Indian tribes under section 7405 of this title.

**Credits**

(July 14, 1955, c. 360, Title III, § 301, formerly § 8, as added Dec. 17, 1963, Pub.L. 88-206, § 1, 77 Stat. 400, renumbered Oct. 20, 1965, Pub.L. 89-272, Title I, § 101(4), 79 Stat. 992; amended Nov. 21, 1967, Pub.L. 90-148, § 2, 81 Stat. 504; Dec. 31, 1970, Pub.L. 91-604, §§ 3(b)(2), 15(c)(2), 84 Stat. 1677, 1713; Aug. 7, 1977, Pub.L. 95-95, Title III, § 305(e), 91 Stat. 776; Nov. 15, 1990, Pub.L. 101-549, Title I, §§ 107(d), 108(i), 104 Stat. 2464, 2467.)

Notes of Decisions (10)

42 U.S.C.A. § 7601, 42 USCA § 7601
Current through P.L. 113-9 (excluding P.L. 113-4) approved 5-1-13

**End of Document**                              © 2013 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
      Subchapter III. General Provisions

42 U.S.C.A. § 7602

§ 7602. Definitions

Currentness

When used in this chapter--

**(a)** The term "Administrator" means the Administrator of the Environmental Protection Agency.

**(b)** The term "air pollution control agency" means any of the following:

**(1)** A single State agency designated by the Governor of that State as the official State air pollution control agency for purposes of this chapter.

**(2)** An agency established by two or more States and having substantial powers or duties pertaining to the prevention and control of air pollution.

**(3)** A city, county, or other local government health authority, or, in the case of any city, county, or other local government in which there is an agency other than the health authority charged with responsibility for enforcing ordinances or laws relating to the prevention and control of air pollution, such other agency.

**(4)** An agency of two or more municipalities located in the same State or in different States and having substantial powers or duties pertaining to the prevention and control of air pollution.

**(5)** An agency of an Indian tribe.

**(c)** The term "interstate air pollution control agency" means--

**(1)** an air pollution control agency established by two or more States, or

**(2)** an air pollution control agency of two or more municipalities located in different States.

**(d)** The term "State" means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, and American Samoa and includes the Commonwealth of the Northern Mariana Islands.

ADD73

**(e)** The term "person" includes an individual, corporation, partnership, association, State, municipality, political subdivision of a State, and any agency, department, or instrumentality of the United States and any officer, agent, or employee thereof.

**(f)** The term "municipality" means a city, town, borough, county, parish, district, or other public body created by or pursuant to State law.

**(g)** The term "air pollutant" means any air pollution agent or combination of such agents, including any physical, chemical, biological, radioactive (including source material, special nuclear material, and byproduct material) substance or matter which is emitted into or otherwise enters the ambient air. Such term includes any precursors to the formation of any air pollutant, to the extent the Administrator has identified such precursor or precursors for the particular purpose for which the term "air pollutant" is used.

**(h)** All language referring to effects on welfare includes, but is not limited to, effects on soils, water, crops, vegetation, manmade materials, animals, wildlife, weather, visibility, and climate, damage to and deterioration of property, and hazards to transportation, as well as effects on economic values and on personal comfort and well-being, whether caused by transformation, conversion, or combination with other air pollutants.

**(i)** The term "Federal land manager" means, with respect to any lands in the United States, the Secretary of the department with authority over such lands.

**(j)** Except as otherwise expressly provided, the terms "major stationary source" and "major emitting facility" mean any stationary facility or source of air pollutants which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant (including any major emitting facility or source of fugitive emissions of any such pollutant, as determined by rule by the Administrator).

**(k)** The terms "emission limitation" and "emission standard" mean a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and any design, equipment, work practice or operational standard promulgated under this chapter.. [1]

**(l)** The term "standard of performance" means a requirement of continuous emission reduction, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction.

**(m)** The term "means of emission limitation" means a system of continuous emission reduction (including the use of specific technology or fuels with specified pollution characteristics).

**(n)** The term "primary standard attainment date" means the date specified in the applicable implementation plan for the attainment of a national primary ambient air quality standard for any air pollutant.

**(o)** The term "delayed compliance order" means an order issued by the State or by the Administrator to an existing stationary source, postponing the date required under an applicable implementation plan for compliance by such source with any requirement of such plan.

**(p)** The term "schedule and timetable of compliance" means a schedule of required measures including an enforceable sequence of actions or operations leading to compliance with an emission limitation, other limitation, prohibition, or standard.

**(q)** For purposes of this chapter, the term "applicable implementation plan" means the portion (or portions) of the implementation plan, or most recent revision thereof, which has been approved under section 7410 of this title, or promulgated under section 7410(c) of this title, or promulgated or approved pursuant to regulations promulgated under section 7601(d) of this title and which implements the relevant requirements of this chapter.

**(r) Indian tribe.--**The term "Indian tribe" means any Indian tribe, band, nation, or other organized group or community, including any Alaska Native village, which is Federally recognized as eligible for the special programs and services provided by the United States to Indians because of their status as Indians.

**(s) VOC.--**The term "VOC" means volatile organic compound, as defined by the Administrator.

**(t) PM-10.--**The term "PM-10" means particulate matter with an aerodynamic diameter less than or equal to a nominal ten micrometers, as measured by such method as the Administrator may determine.

**(u) NAAQS and CTG.--**The term "NAAQS" means national ambient air quality standard. The term "CTG" means a Control Technique Guideline published by the Administrator under section 7408 of this title.

**(v) $NO_x$.--**The term "$NO_x$" means oxides of nitrogen.

**(w) CO**.--The term "CO" means carbon monoxide.

**(x) Small source.--**The term "small source" means a source that emits less than 100 tons of regulated pollutants per year, or any class of persons that the Administrator determines, through regulation, generally lack technical ability or knowledge regarding control of air pollution.

**(y) Federal implementation plan.--**The term "Federal implementation plan" means a plan (or portion thereof) promulgated by the Administrator to fill all or a portion of a gap or otherwise correct all or a portion of an inadequacy in a State implementation plan, and which includes enforceable emission limitations or other control measures, means or techniques (including economic incentives, such as marketable permits or auctions of emissions allowances), and provides for attainment of the relevant national ambient air quality standard.

**(z) Stationary source**.--The term "stationary source" means generally any source of an air pollutant except those emissions resulting directly from an internal combustion engine for transportation purposes or from a nonroad engine or nonroad vehicle as defined in section 7550 of this title.

**Credits**

(July 14, 1955, c. 360, Title III, § 302, formerly § 9, as added Dec. 17, 1963, Pub.L. 88-206, § 1, 77 Stat. 400, renumbered Oct. 20, 1965, Pub.L. 89-272, Title I, § 101(4), 79 Stat. 992; amended Nov. 21, 1967, Pub.L. 90-148, § 2, 81 Stat. 504; Dec. 31, 1970, Pub.L. 91-604, § 15(a)(1), (c)(1), 84 Stat. 1710, 1713; Aug. 7, 1977, Pub.L. 95-95, Title II, § 218(c), Title III, § 301, 91 Stat. 761, 769; Nov. 16, 1977, Pub.L. 95-190, § 14(a)(76), 91 Stat. 1404; Nov. 15, 1990, Pub.L. 101-549, Title I, §§ 101(d)(4), 107(a), (b), 108(j), 109(b), Title III, § 302(e), Title VII, § 709, 104 Stat. 2409, 2464, 2468, 2470, 2574, 2684.)

Notes of Decisions (11)

Footnotes

1        So in original.

42 U.S.C.A. § 7602, 42 USCA § 7602

Current through P.L. 113-9 (excluding P.L. 113-4) approved 5-1-13

---

End of Document                                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Title 42. The Public Health and Welfare
      Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
      Subchapter III. General Provisions

42 U.S.C.A. § 7604

§ 7604. Citizen suits

Currentness

(a) Authority to bring civil action; jurisdiction

Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf--

**(1)** against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation,

**(2)** against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator, or

**(3)** against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under part C of subchapter I of this chapter (relating to significant deterioration of air quality) or part D of subchapter I of this chapter (relating to nonattainment) or who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of any condition of such permit.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an emission standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties (except for actions under paragraph (2)). The district courts of the United States shall have jurisdiction to compel (consistent with paragraph (2) of this subsection) agency action unreasonably delayed, except that an action to compel agency action referred to in section 7607(b) of this title which is unreasonably delayed may only be filed in a United States District Court within the circuit in which such action would be reviewable under section 7607(b) of this title. In any such action for unreasonable delay, notice to the entities referred to in subsection (b)(1)(A) of this section shall be provided 180 days before commencing such action.

(b) Notice

No action may be commenced--

**(1)** under subsection (a)(1) of this section--

ADD77

**(A)** prior to 60 days after the plaintiff has given notice of the violation (i) to the Administrator, (ii) to the State in which the violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or

**(B)** if the Administrator or State has commenced and is diligently prosecuting a civil action in a court of the United States or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any person may intervene as a matter of right.

**(2)** under subsection (a)(2) of this section prior to 60 days after the plaintiff has given notice of such action to the Administrator,

except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of section 7412(i)(3)(A) or (f)(4) of this title or an order issued by the Administrator pursuant to section 7413(a) of this title. Notice under this subsection shall be given in such manner as the Administrator shall prescribe by regulation.

(c) Venue; intervention by Administrator; service of complaint; consent judgment

**(1)** Any action respecting a violation by a stationary source of an emission standard or limitation or an order respecting such standard or limitation may be brought only in the judicial district in which such source is located.

**(2)** In any action under this section, the Administrator, if not a party, may intervene as a matter of right at any time in the proceeding. A judgment in an action under this section to which the United States is not a party shall not, however, have any binding effect upon the United States.

**(3)** Whenever any action is brought under this section the plaintiff shall serve a copy of the complaint on the Attorney General of the United States and on the Administrator. No consent judgment shall be entered in an action brought under this section in which the United States is not a party prior to 45 days following the receipt of a copy of the proposed consent judgment by the Attorney General and the Administrator during which time the Government may submit its comments on the proposed consent judgment to the court and parties or may intervene as a matter of right.

(d) Award of costs; security

The court, in issuing any final order in any action brought pursuant to subsection (a) of this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate. The court may, if a temporary restraining order or preliminary injunction is sought, require the filing of a bond or equivalent security in accordance with the Federal Rules of Civil Procedure.

(e) Nonrestriction of other rights

Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief (including relief against the Administrator or a State agency). Nothing in this section or in any other law of the United States shall be construed to prohibit, exclude, or restrict any State, local, or interstate authority from--

(1) bringing any enforcement action or obtaining any judicial remedy or sanction in any State or local court, or

(2) bringing any administrative enforcement action or obtaining any administrative remedy or sanction in any State or local administrative agency, department or instrumentality,

against the United States, any department, agency, or instrumentality thereof, or any officer, agent, or employee thereof under State or local law respecting control and abatement of air pollution. For provisions requiring compliance by the United States, departments, agencies, instrumentalities, officers, agents, and employees in the same manner as nongovernmental entities, see section 7418 of this title.

(f) "Emission standard or limitation under this chapter" defined

For purposes of this section, the term "emission standard or limitation under this chapter" means--

(1) a schedule or timetable of compliance, emission limitation, standard of performance or emission standard,

(2) a control or prohibition respecting a motor vehicle fuel or fuel additive, or [1]

(3) any condition or requirement of a permit under part C of subchapter I of this chapter (relating to significant deterioration of air quality) or part D of subchapter I of this chapter (relating to nonattainment),, [2] section 7419 of this title (relating to primary nonferrous smelter orders), any condition or requirement under an applicable implementation plan relating to transportation control measures, air quality maintenance plans, vehicle inspection and maintenance programs or vapor recovery requirements, section 7545(e) and (f) of this title (relating to fuels and fuel additives), section 7491 of this title (relating to visibility protection), any condition or requirement under subchapter VI of this chapter (relating to ozone protection), or any requirement under section 7411 or 7412 of this title (without regard to whether such requirement is expressed as an emission standard or otherwise); [3] or

(4) any other standard, limitation, or schedule established under any permit issued pursuant to subchapter V of this chapter or under any applicable State implementation plan approved by the Administrator, any permit term or condition, and any requirement to obtain a permit as a condition of operations. [4]

which is in effect under this chapter (including a requirement applicable by reason of section 7418 of this title) or under an applicable implementation plan.

(g) Penalty fund

(1) Penalties received under subsection (a) of this section shall be deposited in a special fund in the United States Treasury for licensing and other services. Amounts in such fund are authorized to be appropriated and shall remain available until expended, for use by the Administrator to finance air compliance and enforcement activities. The Administrator shall annually report to the Congress about the sums deposited into the fund, the sources thereof, and the actual and proposed uses thereof.

**(2)** Notwithstanding paragraph (1) the court in any action under this subsection to apply civil penalties shall have discretion to order that such civil penalties, in lieu of being deposited in the fund referred to in paragraph (1), be used in beneficial mitigation projects which are consistent with this chapter and enhance the public health or the environment. The court shall obtain the view of the Administrator in exercising such discretion and selecting any such projects. The amount of any such payment in any such action shall not exceed $100,000.

**Credits**

(July 14, 1955, c. 360, Title III, § 304, as added Dec. 31, 1970, Pub.L. 91-604, § 12(a), 84 Stat. 1706; amended Aug. 7, 1977, Pub.L. 95-95, Title III, § 303(a)-(c), 91 Stat. 771, 772; Nov. 16, 1977, Pub.L. 95-190, § 14(a)(77), (78), 91 Stat. 1404; Nov. 15, 1990, Pub.L. 101-549, Title III, § 302(f), Title VII, § 707(a)-(g), 104 Stat. 2574, 2682, 2683.)

Notes of Decisions (329)

Footnotes

1       So in original. The word "or" probably should not appear.
2       So in original.
3       So in original. The semicolon probably should be comma.
4       So in original. The period probably should be a comma.

42 U.S.C.A. § 7604, 42 USCA § 7604

Current through P.L. 113-9 (excluding P.L. 113-4) approved 5-1-13

**End of Document**                                            © 2013 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 85. Air Pollution Prevention and Control (Refs & Annos)
      Subchapter III. General Provisions

42 U.S.C.A. § 7607

§ 7607. Administrative proceedings and judicial review

Currentness

(a) Administrative subpenas; confidentiality; witnesses

In connection with any determination under section 7410(f) of this title, or for purposes of obtaining information under section 7521(b)(4) or 7545(c)(3) of this title, any investigation, monitoring, reporting requirement, entry, compliance inspection, or administrative enforcement proceeding under the [1] chapter (including but not limited to section 7413, section 7414, section 7420, section 7429, section 7477, section 7524, section 7525, section 7542, section 7603, or section 7606 of this title),, [2] the Administrator may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and he may administer oaths. Except for emission data, upon a showing satisfactory to the Administrator by such owner or operator that such papers, books, documents, or information or particular part thereof, if made public, would divulge trade secrets or secret processes of such owner or operator, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of Title 18, except that such paper, book, document, or information may be disclosed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, to persons carrying out the National Academy of Sciences' study and investigation provided for in section 7521(c) of this title, or when relevant in any proceeding under this chapter. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person under this subparagraph, the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Administrator to appear and produce papers, books, and documents before the Administrator, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

(b) Judicial review

(1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title,, [2] any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title), any determination under section 7521(b)(5) of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or under section 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412 of this title, or under section 7420 of this title, or his action under section 1857c-10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977) or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title, or any other final action of the Administrator under this chapter (including any denial or

ADD81

disapproval by the Administrator under subchapter I of this chapter) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise. The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

**(2)** Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. Where a final decision by the Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to paragraph (1).

(c) Additional evidence

In any judicial proceeding in which review is sought of a determination under this chapter required to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as to [3] the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

(d) Rulemaking

**(1)** This subsection applies to--

(A) the promulgation or revision of any national ambient air quality standard under section 7409 of this title,

(B) the promulgation or revision of an implementation plan by the Administrator under section 7410(c) of this title,

(C) the promulgation or revision of any standard of performance under section 7411 of this title, or emission standard or limitation under section 7412(d) of this title, any standard under section 7412(f) of this title, or any regulation under section 7412(g)(1)(D) and (F) of this title, or any regulation under section 7412(m) or (n) of this title,

(D) the promulgation of any requirement for solid waste combustion under section 7429 of this title,

(E) the promulgation or revision of any regulation pertaining to any fuel or fuel additive under section 7545 of this title,

**(F)** the promulgation or revision of any aircraft emission standard under section 7571 of this title,

**(G)** the promulgation or revision of any regulation under subchapter IV-A of this chapter (relating to control of acid deposition),

**(H)** promulgation or revision of regulations pertaining to primary nonferrous smelter orders under section 7419 of this title (but not including the granting or denying of any such order),

**(I)** promulgation or revision of regulations under subchapter VI of this chapter (relating to stratosphere and ozone protection),

**(J)** promulgation or revision of regulations under part C of subchapter I of this chapter (relating to prevention of significant deterioration of air quality and protection of visibility),

**(K)** promulgation or revision of regulations under section 7521 of this title and test procedures for new motor vehicles or engines under section 7525 of this title, and the revision of a standard under section 7521(a)(3) of this title,

**(L)** promulgation or revision of regulations for noncompliance penalties under section 7420 of this title,

**(M)** promulgation or revision of any regulations promulgated under section 7541 of this title (relating to warranties and compliance by vehicles in actual use),

**(N)** action of the Administrator under section 7426 of this title (relating to interstate pollution abatement),

**(O)** the promulgation or revision of any regulation pertaining to consumer and commercial products under section 7511b(e) of this title,

**(P)** the promulgation or revision of any regulation pertaining to field citations under section 7413(d)(3) of this title,

**(Q)** the promulgation or revision of any regulation pertaining to urban buses or the clean-fuel vehicle, clean-fuel fleet, and clean fuel programs under part C of subchapter II of this chapter,

**(R)** the promulgation or revision of any regulation pertaining to nonroad engines or nonroad vehicles under section 7547 of this title,

**(S)** the promulgation or revision of any regulation relating to motor vehicle compliance program fees under section 7552 of this title,

ADD83

**(T)** the promulgation or revision of any regulation under subchapter IV-A of this chapter (relating to acid deposition),

**(U)** the promulgation or revision of any regulation under section 7511b(f) of this title pertaining to marine vessels, and

**(V)** such other actions as the Administrator may determine.

The provisions of section 553 through 557 and section 706 of Title 5 shall not, except as expressly provided in this subsection, apply to actions to which this subsection applies. This subsection shall not apply in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of subsection 553(b) of Title 5.

**(2)** Not later than the date of proposal of any action to which this subsection applies, the Administrator shall establish a rulemaking docket for such action (hereinafter in this subsection referred to as a "rule"). Whenever a rule applies only within a particular State, a second (identical) docket shall be simultaneously established in the appropriate regional office of the Environmental Protection Agency.

**(3)** In the case of any rule to which this subsection applies, notice of proposed rulemaking shall be published in the Federal Register, as provided under section 553(b) of Title 5, shall be accompanied by a statement of its basis and purpose and shall specify the period available for public comment (hereinafter referred to as the "comment period"). The notice of proposed rulemaking shall also state the docket number, the location or locations of the docket, and the times it will be open to public inspection. The statement of basis and purpose shall include a summary of--

**(A)** the factual data on which the proposed rule is based;

**(B)** the methodology used in obtaining the data and in analyzing the data; and

**(C)** the major legal interpretations and policy considerations underlying the proposed rule.

The statement shall also set forth or summarize and provide a reference to any pertinent findings, recommendations, and comments by the Scientific Review Committee established under section 7409(d) of this title and the National Academy of Sciences, and, if the proposal differs in any important respect from any of these recommendations, an explanation of the reasons for such differences. All data, information, and documents referred to in this paragraph on which the proposed rule relies shall be included in the docket on the date of publication of the proposed rule.

**(4)(A)** The rulemaking docket required under paragraph (2) shall be open for inspection by the public at reasonable times specified in the notice of proposed rulemaking. Any person may copy documents contained in the docket. The Administrator shall provide copying facilities which may be used at the expense of the person seeking copies, but the Administrator may waive or reduce such expenses in such instances as the public interest requires. Any person may request copies by mail if the person pays the expenses, including personnel costs to do the copying.

**(B)(i)** Promptly upon receipt by the agency, all written comments and documentary information on the proposed rule received from any person for inclusion in the docket during the comment period shall be placed in the docket. The transcript of public hearings, if any, on the proposed rule shall also be included in the docket promptly upon receipt from the person who transcribed

such hearings. All documents which become available after the proposed rule has been published and which the Administrator determines are of central relevance to the rulemaking shall be placed in the docket as soon as possible after their availability.

**(ii)** The drafts of proposed rules submitted by the Administrator to the Office of Management and Budget for any interagency review process prior to proposal of any such rule, all documents accompanying such drafts, and all written comments thereon by other agencies and all written responses to such written comments by the Administrator shall be placed in the docket no later than the date of proposal of the rule. The drafts of the final rule submitted for such review process prior to promulgation and all such written comments thereon, all documents accompanying such drafts, and written responses thereto shall be placed in the docket no later than the date of promulgation.

**(5)** In promulgating a rule to which this subsection applies (i) the Administrator shall allow any person to submit written comments, data, or documentary information; (ii) the Administrator shall give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions; (iii) a transcript shall be kept of any oral presentation; and (iv) the Administrator shall keep the record of such proceeding open for thirty days after completion of the proceeding to provide an opportunity for submission of rebuttal and supplementary information.

**(6)(A)** The promulgated rule shall be accompanied by (i) a statement of basis and purpose like that referred to in paragraph (3) with respect to a proposed rule and (ii) an explanation of the reasons for any major changes in the promulgated rule from the proposed rule.

**(B)** The promulgated rule shall also be accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period.

**(C)** The promulgated rule may not be based (in part or whole) on any information or data which has not been placed in the docket as of the date of such promulgation.

**(7)(A)** The record for judicial review shall consist exclusively of the material referred to in paragraph (3), clause (i) of paragraph (4)(B), and subparagraphs (A) and (B) of paragraph (6).

**(B)** Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed. If the Administrator refuses to convene such a proceeding, such person may seek review of such refusal in the United States court of appeals for the appropriate circuit (as provided in subsection (b) of this section). Such reconsideration shall not postpone the effectiveness of the rule. The effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months.

**(8)** The sole forum for challenging procedural determinations made by the Administrator under this subsection shall be in the United States court of appeals for the appropriate circuit (as provided in subsection (b) of this section) at the time of the substantive review of the rule. No interlocutory appeals shall be permitted with respect to such procedural determinations. In

reviewing alleged procedural errors, the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made.

**(9)** In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be--

   **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

   **(B)** contrary to constitutional right, power, privilege, or immunity;

   **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or

   **(D)** without observance of procedure required by law, if (i) such failure to observe such procedure is arbitrary or capricious, (ii) the requirement of paragraph (7)(B) has been met, and (iii) the condition of the last sentence of paragraph (8) is met.

**(10)** Each statutory deadline for promulgation of rules to which this subsection applies which requires promulgation less than six months after date of proposal may be extended to not more than six months after date of proposal by the Administrator upon a determination that such extension is necessary to afford the public, and the agency, adequate opportunity to carry out the purposes of this subsection.

**(11)** The requirements of this subsection shall take effect with respect to any rule the proposal of which occurs after ninety days after August 7, 1977.

(e) Other methods of judicial review not authorized

Nothing in this chapter shall be construed to authorize judicial review of regulations or orders of the Administrator under this chapter, except as provided in this section.

(f) Costs

In any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appropriate.

(g) Stay, injunction, or similar relief in proceedings relating to noncompliance penalties

In any action respecting the promulgation of regulations under section 7420 of this title or the administration or enforcement of section 7420 of this title no court shall grant any stay, injunctive, or similar relief before final judgment by such court in such action.

(h) Public participation

It is the intent of Congress that, consistent with the policy of subchapter II of chapter 5 of Title 5, the Administrator in promulgating any regulation under this chapter, including a regulation subject to a deadline, shall ensure a reasonable period for public participation of at least 30 days, except as otherwise expressly provided in section [4] 7407(d), 7502(a), 7511(a) and (b), and 7512(a) and (b) of this title.


**Credits**

(July 14, 1955, c. 360, Title III, § 307, as added Dec. 31, 1970, Pub.L. 91-604, § 12(a), 84 Stat. 1707; amended Nov. 18, 1971, Pub.L. 92-157, Title III, § 302(a), 85 Stat. 464; June 22, 1974, Pub.L. 93-319, § 6(c), 88 Stat. 259; Aug. 7, 1977, Pub.L. 95-95, Title III, §§ 303(d), 305(a), (c), (f)-(h), 91 Stat. 772, 776, 777; Nov. 16, 1977, Pub.L. 95-190, § 14(a)(79), (80), 91 Stat. 1404; Nov. 15, 1990, Pub.L. 101-549, Title I, §§ 108(p), 110(5), Title III, § 302(g), (h), Title VII, §§ 702(c), 703, 706, 707(h), 710(b), 104 Stat. 2469, 2470, 2574, 2681-2684.)


Notes of Decisions (291)


Footnotes

1       So in original. Probably should be "this".
2       So in original.
3       So in original. The word "to" probably should not appear.
4       So in original. Probably should be "sections".

42 U.S.C.A. § 7607, 42 USCA § 7607

Current through P.L. 113-9 (excluding P.L. 113-4) approved 5-1-13

**End of Document**                                        © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
    Title 40. Protection of Environment
        Chapter I. Environmental Protection Agency (Refs & Annos)
            Subchapter C. Air Programs
                Part 63. National Emission Standards for Hazardous Air Pollutants for Source Categories (Refs & Annos)
                    Subpart A. General Provisions (Refs & Annos)

40 C.F.R. § 63.2

§ 63.2 Definitions.

Effective: May 16, 2007

Currentness

The terms used in this part are defined in the Act or in this section as follows:

Act means the Clean Air Act (42 U.S.C. 7401 et seq., as amended by Pub.L. 101–549, 104 Stat. 2399).

Actual emissions is defined in subpart D of this part for the purpose of granting a compliance extension for an early reduction of hazardous air pollutants.

Administrator means the Administrator of the United States Environmental Protection Agency or his or her authorized representative (e.g., a State that has been delegated the authority to implement the provisions of this part).

Affected source, for the purposes of this part, means the collection of equipment, activities, or both within a single contiguous area and under common control that is included in a section 112(c) source category or subcategory for which a section 112(d) standard or other relevant standard is established pursuant to section 112 of the Act. Each relevant standard will define the "affected source," as defined in this paragraph unless a different definition is warranted based on a published justification as to why this definition would result in significant administrative, practical, or implementation problems and why the different definition would resolve those problems. The term "affected source," as used in this part, is separate and distinct from any other use of that term in EPA regulations such as those implementing title IV of the Act. Affected source may be defined differently for part 63 than affected facility and stationary source in parts 60 and 61, respectively. This definition of "affected source," and the procedures for adopting an alternative definition of "affected source," shall apply to each section 112(d) standard for which the initial proposed rule is signed by the Administrator after June 30, 2002.

Alternative emission limitation means conditions established pursuant to sections 112(i)(5) or 112(i)(6) of the Act by the Administrator or by a State with an approved permit program.

Alternative emission standard means an alternative means of emission limitation that, after notice and opportunity for public comment, has been demonstrated by an owner or operator to the Administrator's satisfaction to achieve a reduction in emissions of any air pollutant at least equivalent to the reduction in emissions of such pollutant achieved under a relevant design, equipment, work practice, or operational emission standard, or combination thereof, established under this part pursuant to section 112(h) of the Act.

Alternative test method means any method of sampling and analyzing for an air pollutant that is not a test method in this chapter and that has been demonstrated to the Administrator's satisfaction, using Method 301 in appendix A of this part, to produce results adequate for the Administrator's determination that it may be used in place of a test method specified in this part.

Approved permit program means a State permit program approved by the Administrator as meeting the requirements of part 70 of this chapter or a Federal permit program established in this chapter pursuant to title V of the Act (42 U.S.C. 7661).

Area source means any stationary source of hazardous air pollutants that is not a major source as defined in this part.

Commenced means, with respect to construction or reconstruction of an affected source, that an owner or operator has undertaken a continuous program of construction or reconstruction or that an owner or operator has entered into a contractual obligation to undertake and complete, within a reasonable time, a continuous program of construction or reconstruction.

Compliance date means the date by which an affected source is required to be in compliance with a relevant standard, limitation, prohibition, or any federally enforceable requirement established by the Administrator (or a State with an approved permit program) pursuant to section 112 of the Act.

Compliance schedule means: (1) In the case of an affected source that is in compliance with all applicable requirements established under this part, a statement that the source will continue to comply with such requirements; or

(2) In the case of an affected source that is required to comply with applicable requirements by a future date, a statement that the source will meet such requirements on a timely basis and, if required by an applicable requirement, a detailed schedule of the dates by which each step toward compliance will be reached; or

(3) In the case of an affected source not in compliance with all applicable requirements established under this part, a schedule of remedial measures, including an enforceable sequence of actions or operations with milestones and a schedule for the submission of certified progress reports, where applicable, leading to compliance with a relevant standard, limitation, prohibition, or any federally enforceable requirement established pursuant to section 112 of the Act for which the affected source is not in compliance. This compliance schedule shall resemble and be at least as stringent as that contained in any judicial consent decree or administrative order to which the source is subject. Any such schedule of compliance shall be supplemental to, and shall not sanction noncompliance with, the applicable requirements on which it is based.

Construction means the on-site fabrication, erection, or installation of an affected source. Construction does not include the removal of all equipment comprising an affected source from an existing location and reinstallation of such equipment at a new location. The owner or operator of an existing affected source that is relocated may elect not to reinstall minor ancillary equipment including, but not limited to, piping, ductwork, and valves. However, removal and reinstallation of an affected source will be construed as reconstruction if it satisfies the criteria for reconstruction as defined in this section. The costs of replacing minor ancillary equipment must be considered in determining whether the existing affected source is reconstructed.

Continuous emission monitoring system (CEMS) means the total equipment that may be required to meet the data acquisition and availability requirements of this part, used to sample, condition (if applicable), analyze, and provide a record of emissions.

Continuous monitoring system (CMS) is a comprehensive term that may include, but is not limited to, continuous emission monitoring systems, continuous opacity monitoring systems, continuous parameter monitoring systems, or other manual or automatic monitoring that is used for demonstrating compliance with an applicable regulation on a continuous basis as defined by the regulation.

Continuous opacity monitoring system (COMS) means a continuous monitoring system that measures the opacity of emissions.

Continuous parameter monitoring system means the total equipment that may be required to meet the data acquisition and availability requirements of this part, used to sample, condition (if applicable), analyze, and provide a record of process or control system parameters.

Effective date means: (1) With regard to an emission standard established under this part, the date of promulgation in the Federal Register of such standard; or

(2) With regard to an alternative emission limitation or equivalent emission limitation determined by the Administrator (or a State with an approved permit program), the date that the alternative emission limitation or equivalent emission limitation becomes effective according to the provisions of this part.

Emission standard means a national standard, limitation, prohibition, or other regulation promulgated in a subpart of this part pursuant to sections 112(d), 112(h), or 112(f) of the Act.

Emissions averaging is a way to comply with the emission limitations specified in a relevant standard, whereby an affected source, if allowed under a subpart of this part, may create emission credits by reducing emissions from specific points to a level below that required by the relevant standard, and those credits are used to offset emissions from points that are not controlled to the level required by the relevant standard.

EPA means the United States Environmental Protection Agency.

Equivalent emission limitation means any maximum achievable control technology emission limitation or requirements which are applicable to a major source of hazardous air pollutants and are adopted by the Administrator (or a State with an approved permit program) on a case-by-case basis, pursuant to section 112(g) or (j) of the Act.

Excess emissions and continuous monitoring system performance report is a report that must be submitted periodically by an affected source in order to provide data on its compliance with relevant emission limits, operating parameters, and the performance of its continuous parameter monitoring systems.

Existing source means any affected source that is not a new source.

Federally enforceable means all limitations and conditions that are enforceable by the Administrator and citizens under the Act or that are enforceable under other statutes administered by the Administrator. Examples of federally enforceable limitations and conditions include, but are not limited to:

(1) Emission standards, alternative emission standards, alternative emission limitations, and equivalent emission limitations established pursuant to section 112 of the Act as amended in 1990;

(2) New source performance standards established pursuant to section 111 of the Act, and emission standards established pursuant to section 112 of the Act before it was amended in 1990;

(3) All terms and conditions in a title V permit, including any provisions that limit a source's potential to emit, unless expressly designated as not federally enforceable;

(4) Limitations and conditions that are part of an approved State Implementation Plan (SIP) or a Federal Implementation Plan (FIP);

(5) Limitations and conditions that are part of a Federal construction permit issued under 40 CFR 52.21 or any construction permit issued under regulations approved by the EPA in accordance with 40 CFR part 51;

(6) Limitations and conditions that are part of an operating permit where the permit and the permitting program pursuant to which it was issued meet all of the following criteria:

(i) The operating permit program has been submitted to and approved by EPA into a State implementation plan (SIP) under section 110 of the CAA;

(ii) The SIP imposes a legal obligation that operating permit holders adhere to the terms and limitations of such permits and provides that permits which do not conform to the operating permit program requirements and the requirements of EPA's underlying regulations may be deemed not "federally enforceable" by EPA;

(iii) The operating permit program requires that all emission limitations, controls, and other requirements imposed by such permits will be at least as stringent as any other applicable limitations and requirements contained in the SIP or enforceable under the SIP, and that the program may not issue permits that waive, or make less stringent, any limitations or requirements contained in or issued pursuant to the SIP, or that are otherwise "federally enforceable";

(iv) The limitations, controls, and requirements in the permit in question are permanent, quantifiable, and otherwise enforceable as a practical matter; and

(v) The permit in question was issued only after adequate and timely notice and opportunity for comment for EPA and the public.

(7) Limitations and conditions in a State rule or program that has been approved by the EPA under subpart E of this part for the purposes of implementing and enforcing section 112; and

(8) Individual consent agreements that the EPA has legal authority to create.

Fixed capital cost means the capital needed to provide all the depreciable components of an existing source.

Force majeure means, for purposes of § 63.7, an event that will be or has been caused by circumstances beyond the control of the affected facility, its contractors, or any entity controlled by the affected facility that prevents the owner or operator from complying with the regulatory requirement to conduct performance tests within the specified timeframe despite the affected facility's best efforts to fulfill the obligation. Examples of such events are acts of nature, acts of war or terrorism, or equipment failure or safety hazard beyond the control of the affected facility.

Fugitive emissions means those emissions from a stationary source that could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening. Under section 112 of the Act, all fugitive emissions are to be considered in determining whether a stationary source is a major source.

Hazardous air pollutant means any air pollutant listed in or pursuant to section 112(b) of the Act.

Issuance of a part 70 permit will occur, if the State is the permitting authority, in accordance with the requirements of part 70 of this chapter and the applicable, approved State permit program. When the EPA is the permitting authority, issuance of a title V permit occurs immediately after the EPA takes final action on the final permit.

Major source means any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants, unless the Administrator establishes a lesser quantity, or in the case of radionuclides, different criteria from those specified in this sentence.

Malfunction means any sudden, infrequent, and not reasonably preventable failure of air pollution control and monitoring equipment, process equipment, or a process to operate in a normal or usual manner which causes, or has the potential to cause,

the emission limitations in an applicable standard to be exceeded. Failures that are caused in part by poor maintenance or careless operation are not malfunctions.

Monitoring means the collection and use of measurement data or other information to control the operation of a process or pollution control device or to verify a work practice standard relative to assuring compliance with applicable requirements. Monitoring is composed of four elements:

(1) Indicator(s) of performance--the parameter or parameters you measure or observe for demonstrating proper operation of the pollution control measures or compliance with the applicable emissions limitation or standard. Indicators of performance may include direct or predicted emissions measurements (including opacity), operational parametric values that correspond to process or control device (and capture system) efficiencies or emissions rates, and recorded findings of inspection of work practice activities, materials tracking, or design characteristics. Indicators may be expressed as a single maximum or minimum value, a function of process variables (for example, within a range of pressure drops), a particular operational or work practice status (for example, a damper position, completion of a waste recovery task, materials tracking), or an interdependency between two or among more than two variables.

(2) Measurement techniques--the means by which you gather and record information of or about the indicators of performance. The components of the measurement technique include the detector type, location and installation specifications, inspection procedures, and quality assurance and quality control measures. Examples of measurement techniques include continuous emission monitoring systems, continuous opacity monitoring systems, continuous parametric monitoring systems, and manual inspections that include making records of process conditions or work practices.

(3) Monitoring frequency--the number of times you obtain and record monitoring data over a specified time interval. Examples of monitoring frequencies include at least four points equally spaced for each hour for continuous emissions or parametric monitoring systems, at least every 10 seconds for continuous opacity monitoring systems, and at least once per operating day (or week, month, etc.) for work practice or design inspections.

(4) Averaging time--the period over which you average and use data to verify proper operation of the pollution control approach or compliance with the emissions limitation or standard. Examples of averaging time include a 3–hour average in units of the emissions limitation, a 30–day rolling average emissions value, a daily average of a control device operational parametric range, and an instantaneous alarm.

New affected source means the collection of equipment, activities, or both within a single contiguous area and under common control that is included in a section 112(c) source category or subcategory that is subject to a section 112(d) or other relevant standard for new sources. This definition of "new affected source," and the criteria to be utilized in implementing it, shall apply to each section 112(d) standard for which the initial proposed rule is signed by the Administrator after June 30, 2002. Each relevant standard will define the term "new affected source," which will be the same as the "affected source" unless a different collection is warranted based on consideration of factors including:

(1) Emission reduction impacts of controlling individual sources versus groups of sources;

(2) Cost effectiveness of controlling individual equipment;

(3) Flexibility to accommodate common control strategies;

(4) Cost/benefits of emissions averaging;

(5) Incentives for pollution prevention;

(6) Feasibility and cost of controlling processes that share common equipment (e.g., product recovery devices);

(7) Feasibility and cost of monitoring; and

(8) Other relevant factors.

New source means any affected source the construction or reconstruction of which is commenced after the Administrator first proposes a relevant emission standard under this part establishing an emission standard applicable to such source.

One-hour period, unless otherwise defined in an applicable subpart, means any 60–minute period commencing on the hour.

Opacity means the degree to which emissions reduce the transmission of light and obscure the view of an object in the background. For continuous opacity monitoring systems, opacity means the fraction of incident light that is attenuated by an optical medium.

Owner or operator means any person who owns, leases, operates, controls, or supervises a stationary source.

Performance audit means a procedure to analyze blind samples, the content of which is known by the Administrator, simultaneously with the analysis of performance test samples in order to provide a measure of test data quality.

Performance evaluation means the conduct of relative accuracy testing, calibration error testing, and other measurements used in validating the continuous monitoring system data.

Performance test means the collection of data resulting from the execution of a test method (usually three emission test runs) used to demonstrate compliance with a relevant emission standard as specified in the performance test section of the relevant standard.

Permit modification means a change to a title V permit as defined in regulations codified in this chapter to implement title V of the Act (42 U.S.C. 7661).

Permit program means a comprehensive State operating permit system established pursuant to title V of the Act (42 U.S.C. 7661) and regulations codified in part 70 of this chapter and applicable State regulations, or a comprehensive Federal operating permit system established pursuant to title V of the Act and regulations codified in this chapter.

Permit revision means any permit modification or administrative permit amendment to a title V permit as defined in regulations codified in this chapter to implement title V of the Act (42 U.S.C. 7661).

Permitting authority means: (1) The State air pollution control agency, local agency, other State agency, or other agency authorized by the Administrator to carry out a permit program under part 70 of this chapter; or

(2) The Administrator, in the case of EPA-implemented permit programs under title V of the Act (42 U.S.C. 7661).

Pollution Prevention means source reduction as defined under the Pollution Prevention Act (42 U.S.C. 13101–13109). The definition is as follows:

(1) Source reduction is any practice that:

(i) Reduces the amount of any hazardous substance, pollutant, or contaminant entering any waste stream or otherwise released into the environment (including fugitive emissions) prior to recycling, treatment, or disposal; and

ADD93

(ii) Reduces the hazards to public health and the environment associated with the release of such substances, pollutants, or contaminants.

(2) The term source reduction includes equipment or technology modifications, process or procedure modifications, reformulation or redesign of products, substitution of raw materials, and improvements in housekeeping, maintenance, training, or inventory control.

(3) The term source reduction does not include any practice that alters the physical, chemical, or biological characteristics or the volume of a hazardous substance, pollutant, or contaminant through a process or activity which itself is not integral to and necessary for the production of a product or the providing of a service.

Potential to emit means the maximum capacity of a stationary source to emit a pollutant under its physical and operational design. Any physical or operational limitation on the capacity of the stationary source to emit a pollutant, including air pollution control equipment and restrictions on hours of operation or on the type or amount of material combusted, stored, or processed, shall be treated as part of its design if the limitation or the effect it would have on emissions is federally enforceable.

Reconstruction, unless otherwise defined in a relevant standard, means the replacement of components of an affected or a previously nonaffected source to such an extent that:

(1) The fixed capital cost of the new components exceeds 50 percent of the fixed capital cost that would be required to construct a comparable new source; and

(2) It is technologically and economically feasible for the reconstructed source to meet the relevant standard(s) established by the Administrator (or a State) pursuant to section 112 of the Act. Upon reconstruction, an affected source, or a stationary source that becomes an affected source, is subject to relevant standards for new sources, including compliance dates, irrespective of any change in emissions of hazardous air pollutants from that source.

Regulation promulgation schedule means the schedule for the promulgation of emission standards under this part, established by the Administrator pursuant to section 112(e) of the Act and published in the Federal Register.

Relevant standard means:

(1) An emission standard;

(2) An alternative emission standard;

(3) An alternative emission limitation; or

(4) An equivalent emission limitation established pursuant to section 112 of the Act that applies to the collection of equipment, activities, or both regulated by such standard or limitation. A relevant standard may include or consist of a design, equipment, work practice, or operational requirement, or other measure, process, method, system, or technique (including prohibition of emissions) that the Administrator (or a State) establishes for new or existing sources to which such standard or limitation applies. Every relevant standard established pursuant to section 112 of the Act includes subpart A of this part, as provided by § 63.1(a) (4), and all applicable appendices of this part or of other parts of this chapter that are referenced in that standard.

Responsible official means one of the following:

ADD94

(1) For a corporation: A president, secretary, treasurer, or vice president of the corporation in charge of a principal business function, or any other person who performs similar policy or decision-making functions for the corporation, or a duly authorized representative of such person if the representative is responsible for the overall operation of one or more manufacturing, production, or operating facilities and either:

(i) The facilities employ more than 250 persons or have gross annual sales or expenditures exceeding $25 million (in second quarter 1980 dollars); or

(ii) The delegation of authority to such representative is approved in advance by the Administrator.

(2) For a partnership or sole proprietorship: a general partner or the proprietor, respectively.

(3) For a municipality, State, Federal, or other public agency: either a principal executive officer or ranking elected official. For the purposes of this part, a principal executive officer of a Federal agency includes the chief executive officer having responsibility for the overall operations of a principal geographic unit of the agency (e.g., a Regional Administrator of the EPA).

(4) For affected sources (as defined in this part) applying for or subject to a title V permit: "responsible official" shall have the same meaning as defined in part 70 or Federal title V regulations in this chapter (42 U.S.C. 7661), whichever is applicable.

Run means one of a series of emission or other measurements needed to determine emissions for a representative operating period or cycle as specified in this part.

Shutdown means the cessation of operation of an affected source or portion of an affected source for any purpose.

Six-minute period means, with respect to opacity determinations, any one of the 10 equal parts of a 1–hour period.

Source at a Performance Track member facility means a major or area source located at a facility which has been accepted by EPA for membership in the Performance Track Program (as described at www.epa.gov/PerformanceTrack) and is still a member of the Program. The Performance Track Program is a voluntary program that encourages continuous environmental improvement through the use of environmental management systems, local community outreach, and measurable results.

Standard conditions means a temperature of 293 K (68degrees F) and a pressure of 101.3 kilopascals (29.92 in. Hg).

Startup means the setting in operation of an affected source or portion of an affected source for any purpose.

State means all non-Federal authorities, including local agencies, interstate associations, and State-wide programs, that have delegated authority to implement: (1) The provisions of this part and/or (2) the permit program established under part 70 of this chapter. The term State shall have its conventional meaning where clear from the context.

Stationary source means any building, structure, facility, or installation which emits or may emit any air pollutant.

Test method means the validated procedure for sampling, preparing, and analyzing for an air pollutant specified in a relevant standard as the performance test procedure. The test method may include methods described in an appendix of this chapter, test methods incorporated by reference in this part, or methods validated for an application through procedures in Method 301 of appendix A of this part.

Title V permit means any permit issued, renewed, or revised pursuant to Federal or State regulations established to implement title V of the Act (42 U.S.C. 7661). A title V permit issued by a State permitting authority is called a part 70 permit in this part.

Visible emission means the observation of an emission of opacity or optical density above the threshold of vision.

Working day means any day on which Federal Government offices (or State government offices for a State that has obtained delegation under section 112(l)) are open for normal business. Saturdays, Sundays, and official Federal (or where delegated, State) holidays are not working days.

**Credits**

[67 FR 16596, April 5, 2002; 68 FR 32600, May 30, 2003; 69 FR 21752, April 22, 2004; 72 FR 27443, May 16, 2007]

SOURCE: 57 FR 61992, Dec. 29, 1992; 59 FR 12430, March 16, 1994, unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401 et seq.

Notes of Decisions (5)

Current through May 30, 2013; 78 FR 32362.

---

End of Document                                                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

# DECLARATIONS

## <u>INDEX OF DECLARATIONS</u>

### <u>Expert Declarations</u>                                          **Page**

Declaration of James M. Hecker………………...………………...     DEC1

Declaration of Charles McPhedran…………………..…………..     DEC24

Declaration of Ranajit Sahu…....…………………..…………….     DEC27

### <u>Membership Declarations</u>

Declaration of Yolanda M. Andersen....……………..……………     DEC59

Declaration of Deirdre Butler…....…………..…………………     DEC61

Declaration of Richard Cargill…....…………..………………..     DEC63

Declaration of Neil Carman…………….…..…………………….     DEC66

Declaration of Kathryn Tilson……………...…………………..     DEC80

Declaration of Jane Williams………………..…………………..     DEC83

Supplemental Declaration of Jane Williams………..……………..     DEC91

Declaration of James E. Schermbeck……………..………………     DEC101

Declaration of Brenda Bibee……………….…..………………..     DEC104

Declaration of Rebecca Bornhorst……………….…..……………..     DEC106

Declaration of Sue Pope……………….…..……………………..     DEC112

Declaration of Ann Sears…………………..…..………………..     DEC115

Declaration of Jennifer Swearingen……………..………………...     DEC117

Declaration of Tim Crawford…………….…..…………………..     DEC156

Declaration of Linda Lopez……………...……………………    DEC159

Declaration of Bill Almon……………...………………………..    DEC161

Declaration of Allie Sheffield……………...……………………    DEC163

Declaration of Kemp Burdette……………...……………………    DEC168

Declaration of Robert Parr……………...………………………..    DEC173

## DECLARATION OF JAMES M. HECKER

1.      Since 1990, I have been the Director of the Environmental Enforcement Project at Public Justice.

2.      In this position, I coordinate all of Public Justice's environmental citizen suit litigation. My entire practice focuses on this type of litigation in federal courts throughout the country.

3.      At Public Justice, I have litigated over 30 citizen suits in fourteen states under federal environmental statutes regulating clean air, clean water, hazardous waste, and coal mining. Before coming to Public Justice, I litigated, on the plaintiff's side, many environmental citizen suits under the Clean Water Act.

4.      I have lectured on citizen suits at the George Washington University's National Law Center, the Vermont Law School, the American Bar Association's Section on Litigation, the ALI-ABA Course on Environmental Law, the Environmental Law Institute, and the National College of Advocacy, which is run by the Association of Trial Lawyers of America (now the American Association for Justice). I have also published articles in national publications on citizen suits, including the attached article, *The Difficulty of Citizen Enforcement of the Clean Air Act*, 10 Widener L. Rev. 303 (2004).

5.      In 1997, I was the lead attorney in a Clean Air Act citizen suit enforcement action filed by Texans United for a Safe Economy Education Fund, the Natural Resources Defense Council, Sierra Club, and three individual plaintiffs against Crown Central Petroleum Corporation, an oil refinery in Pasadena, Texas.

6.      We alleged some 15,000 hours of violations of the Clean Air Act and sought injunctive relief as well as civil penalties.

DEC1

7.     Among other defenses, Crown raised the defense that all or most of its violations were excusable because they occurred during "startup, shutdown, or malfunction" ("SSM") events.

8.     Crown's assertion of this defense was a major factor leading us to settle the case rather than litigate it because the defense imposed many more costs on us, which we otherwise would not have faced.

9.     To rebut Crown's SSM defense, we had to evaluate whether Crown followed adequate operation and maintenance practices, whether its violations were infrequent and unavoidable, and whether the violations could have been prevented through careful planning, proper design, or better operation and maintenance practices.

10.     Doing this, while also addressing Crown's other defenses, significantly increased the time and complexity of discovery. As I explained in the attached law review article, "During discovery, Crown produced 116 boxes containing hundreds of thousands of pages and over four gigabytes of electronic files on multiple CD-ROMs. From those boxes, we selected more than 32,000 pages of documents for copying and more intensive review." Jim Hecker, *The Difficulty of Citizen Enforcement of the Clean Air Act*, 10 Widener L. Rev. 303, 310 (2004).

11.     In addition to discovery, we had to engage in "highly technical discussions with process and chemical engineering experts." *Id.* We were fortunate that Texas required Crown to pay for independent consultants to audit its operations and analyze the causes of its air pollution violations. We relied on this work to reduce our own expert costs. If we had had to pay the full costs of hiring our own experts to conduct this analysis, the case would probably have been much more expensive to litigate.

DEC2

12.     To support a planned motion for summary judgment on Crown's liability for its air pollution violations, I sent Crown a lengthy request asking Crown to admit that its own measured emission data exceeded its New Source Performance Standards ("NSPS") limits and violated the Clean Air Act. Crown's response, which consumed several hundred pages, raised detailed factual assertions claiming that all or most of the exceedances resulted from SSM events. As a result, I abandoned the summary judgment motion and expected that a very lengthy and expensive trial would be necessary to resolve the disputed factual issues underlying Crown's SSM defense, including the adequacy of Crown's operation and maintenance practices, and whether its violations were infrequent and unavoidable and could have been prevented.

13.     The difficulty of rebutting Crown's SSM defense was a major factor in plaintiffs' decision to settle with Crown. By doing so, I estimate that we probably avoided an additional million dollars in costs and fees that we would have incurred if we had had to take the case to trial. However, we also gave up the opportunity to obtain greater civil penalties at trial.

14.     Even with the settlement, the suit was very time and resource intensive, consuming about 5000 hours of attorney time and over $100,000 in expert costs.

15.     The overall lesson I learned from the Crown case was that even with strong evidence of a massive number of Clean Air Act violations, the factual complexity inherent in a dispute over whether violations are infrequent and unavoidable, and could have been prevented through acceptable operating and maintenance practices makes it very difficult to bring a Clean Air Act citizen suit in a cost-effective manner.

DEC3

16.    I have not taken on any Clean Air Act citizen enforcement suits since this case against facilities that have the potential to raise an SSM defense to a substantial number of violations, because of the difficulties I encountered with that defense in the Crown case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 31st day of May, 2013.

James M. Hecker

DEC4

Attachment

# WIDENER
# LAW REVIEW

| Volume 10 | 2004 | Issue 2 |
|---|---|---|

## THE DIFFICULTY OF CITIZEN ENFORCEMENT OF THE CLEAN AIR ACT

### Jim Hecker[*]

Prior to 1990, citizen enforcement of the Clean Air Act (CAA)[1] was hampered by several deficiencies that made the statute less attractive to citizen suit litigators compared to the Clean Water Act (CWA).[2] Citizens could only seek injunctive relief and could not obtain civil penalties for violations. Monitoring of pollutant emissions was so infrequent that it did not provide an accurate measure of compliance. Determining applicable emission limits was difficult because there were no federal requirements for operating permits. When Congress amended the CAA in 1990, it added several provisions that were intended to address these problems and improve its enforceability. Congress gave the courts authority to impose civil penalties in citizen suits, required additional monitoring and reporting of emissions, and created a new permit program (Title V) modeled after the CWA.

These changes held out the promise that the CAA would become as enforceable as the CWA, which is widely regarded as providing the best mechanisms for citizen enforcement. However, that promise has not been fulfilled. A decade of experience with citizen enforcement has shown that the CAA is very difficult to enforce. This article explores those difficulties by describing Trial Lawyers for Public Justice's (TLPJ's) experience litigating five citizen suits in five different states between 1995 and the present. None of these suits involved enforcement of the new Title V permits that are supposed to improve citizen enforcement. Consequently, this article does not explore that issue. However, experience with enforcement of Title V permits will probably not be very different because Title V is designed primarily as a procedural mechanism to assemble all applicable limitations in one document. It does not add any new emission limitations. Its primary benefit will be to simplify analysis of permit limits and monitoring and reporting data.

---

* Environmental Enforcement Director, Trial Lawyers for Public Justice, Washington, D.C. (www.tlpj.org). This article is based on pleadings, briefs and other documents on file with author.
1. Clean Air Act, 42 U.S.C. §§ 7401-7671q (2000).
2. Clean Water Act, 33 U.S.C. §§ 1251-1387 (2000).

DEC6

STATUTORY BACKGROUND

Section 304 of the CAA authorizes citizens to sue for violations of two types of legal requirements: "(A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation."[3]  Part A refers to federally enforceable standards.  Part B refers to United States Environmental Protection Agency (EPA) or State orders relating to those standards.  Thus, the citizen suit provision makes federal standards enforceable both directly, by their terms, and indirectly, by their inclusion in an EPA or State order.

Federally enforceable standards are defined in section 304(f).[4]  These standards include an emission limitation that is part of an EPA-approved State Implementation Plan (SIP), a standard of performance for new sources under section 111 (NSPS), and a compliance schedule.[5]  They also include "any other standard, limitation or schedule" that is in effect under a SIP, including emission limits in a Title V permit.[6]

EPA has defined "federally enforceable" requirements to include "all limitations and conditions which are enforceable by the Administrator . . . including operating permits issued under an EPA-approved program that is incorporated into the State implementation plan and expressly requires adherence to any permit issued under such program."[7]  Consequently, state permits issued pursuant to an EPA-approved permit program in a SIP are federally enforceable.[8]  These permits are called "federally enforceable state operating permit[s]" (FESOPs).[9]

EPA and citizen authority to enforce standards and limitations in SIPs is coextensive.

> Once included within the SIP, a state control becomes enforceable not only by the state which is its primary regulating authority, but also by the Administrator under § 113 of the Act, 42 U.S.C. § 7413, and, in certain settings, by private citizens, who can bring suit for noncompliance with federal pollution control programs under § 304, 42 U.S.C. § 7604.[10]

There are two limitations on the right of citizens to bring suit.  First, the citizen must give sixty days notice of intent to file suit to EPA, the state, and the violator.[11]  Second, a citizen may not commence a suit if EPA or the state has

---

3. 42 U.S.C. § 7604(a)(1) (2000).

4. *See id.* § 7604(f).

5. *See id.* § 7604(f)(1).

6. *See id.* § 7604(f)(4).

7. 40 C.F.R. § 51.166(b)(17) (2002).

8. United States v. La. Pac. Corp., 908 F. Supp. 835, 842 (D. Colo. 1995).

9. *Id.*

10. Nat'l Mining Ass'n v. United States EPA, 59 F.3d 1351, 1363 (D.C. Cir. 1995).

11. 42 U.S.C. § 7604(b)(1)(A) (2000).

HeinOnline -- 10 Widener L. Rev. 304 2003-2004

DEC7

commenced and is "diligently prosecuting a civil action in a court of the United States or a State to require compliance."[12] If the citizen prevails in a citizen suit, the court may order injunctive relief and/or impose civil penalties of up to $25,000 per day for each violation.[13]

## NRDC v. NJ STEEL

Before and after 1990, New Jersey's SIP required facilities to obtain construction and operating permits and to comply with the emission limits in those permits. It therefore has a FESOP program. In 1994, the New Jersey Department of Environmental Protection (NJDEP) issued a construction permit to New Jersey Steel (NJ Steel) to construct a new steel mill. The mill was part of a growing segment of the steel industry that makes new steel by recycling and melting scrap steel rather than making steel from raw materials. The plant annually produced a half million tons of reinforcing steel bars for the construction industry. The construction permit limited emissions of nitrogen oxides (NOx), carbon monoxide (CO), volatile organic compounds (VOC), and particulate matter (measured as opacity) through the mill's single stack. It required the plant to measure its emissions with continuous emission monitors (CEMs) at the end of this stack. These monitors are the best method for measuring compliance, because they contain continuous, real-time data of actual emissions. The permit stated that CEM data could be used to measure compliance. It also required NJ Steel to submit quarterly reports disclosing any permit violations.[14]

TLPJ requested copies of NJ Steel's quarterly CEM reports from NJDEP. The CEM reports showed that the plant was violating its permit limits for NOx, CO, VOC, and opacity on a massive scale. It reported 15,541 violations in a fifteen-month time period. Many of those violations exceeded the permit limits by more than two or three times. Cumulatively, these violations represented emissions of more than 900 tons of illegal pollution. The plant was in violation between 47% and 72% of its operating time for each quarter. Based on this seemingly horrible record of noncompliance, TLPJ's clients, the Natural Resources Defense Council, and New Jersey Public Interest Research Group, filed a citizen suit against NJ Steel in March 1996.[15]

NJ Steel raised one primary defense—that, despite its installation of the "Best Available Control Technology (BACT)," its permit limits were impossible to meet and were too stringent.[16] It applied to NJDEP to modify its permit and increase its limits. To calculate those limits, NJ Steel took its "worst case" actual

---

12. *See* 42 U.S.C. § 7604(b)(1)(B) (2000).

13. *See id.* §§ 7604(a), 7413(b).

14. Supporting documentation on file with author, *supra* note *.

15. Natural Res. Def. Council v. N.J. Steel Corp., No. 96-1060 (D.N.J. Apr. 1, 1998).

16. *Id.*

DEC8

emissions since it began operations and added a 5% "margin of safety." Thus, if the modified permit were issued as requested, NJ Steel would have been able to achieve compliance without doing anything to improve its operations and could have even increased its emissions.

For citizen suit litigators accustomed to enforcing the CWA, this defense was surprising. The CWA contains anti-backsliding and anti-degradation provisions that make it difficult to increase water quality-based permit limits.[17] In addition, CWA permit-writers are required to calculate technology-based permit limits based on the 95th and 99th percentile of past, long-term, daily variability for monthly average and daily maximum limits, respectively.[18] The CWA does not give polluters a "margin of safety" to reduce the chance of violations. EPA has recognized that "[i]f permit limits are set too lenient relative to the long-term average, a discharger not complying with expected performance will not exceed the limits."[19]

NJ Steel's defense forced us to research whether the CAA had similar provisions and how permit limits were set. EPA staff told us that there is no EPA guidance or limitation on how BACT-based emission limits should be calculated under the CAA. If the Prevention of Significant Deterioration (PSD) increments are not exceeded, and PSD is therefore not triggered, and if there is no applicable New Source Performance Standard, states can set whatever limits they want, subject to the vague narrative limitation that new, major sources must install BACT.

An emission limitation under BACT must be "based on the maximum degree of reduction of each pollutant . . . which the permitting authority . . . determines is achievable for such facility through application of production processes and available methods, systems, and techniques."[20] The key to setting a BACT limit is to determine what is "achievable" by the facility.[21] TLPJ had to determine and identify the optimum performance that this facility could achieve. As a result, the citizen suit litigation was replaced by a battle of the experts over the application of BACT to this plant.

BACT analysis under the CAA is much more technically complex than analysis of wastewater control options under the CWA. There are a fairly limited number of wastewater treatment technologies, and they are often applied similarly in many different types of industries. In contrast, BACT focuses far more narrowly on the particular industry and its particular air pollution control technology. NJ Steel used a "Consteel" technology for its electric arc furnace that was used only

---

17. *See* 33 U.S.C. § 1342(o) (2000); 40 C.F.R. § 131.12 (2002).

18. 40 C.F.R. § 122.45(d) (2002); U.S. ENVTL. PROT. AGENCY, NPDES PERMIT WRITERS' MANUAL 73-74 (Dec. 1996).

19. U.S. ENVTL. PROT. AGENCY, *supra* note 18, at 74.

20. 42 U.S.C. § 7479(3) (2000).

21. *Id.*

DEC9

by a handful of other facilities in the United States.[22] NJ Steel argued that even these facilities were too different to be comparable, and sought to place itself in a category by itself. We hired an engineering expert to dig into this fact-intensive issue at considerable expense. After months of analysis and negotiations with NJ Steel and NJDEP, we ultimately agreed on revised permit limits that were higher than those in the original permit, but lower than NJ Steel requested. In addition, NJ Steel agreed to pay a $1.2 million civil penalty for its past violations and $100,000 for a supplemental environmental project.[23]

The lesson from this case is that a citizen suit that started out as a straightforward enforcement case, based on unimpeachable monitoring data and clear numerical permit limits, turned into a fact-intensive battle of the experts applying a fuzzy narrative standard that EPA has never clarified.

## TEXANS UNITED V. CROWN CENTRAL PETROLEUM

TLPJ's experience with NJ Steel counseled that we should be wary of cases where the emission limits were "soft" and could be modified during the litigation. We researched CEM reports in Texas, and uncovered chronic violations at a petroleum refinery operated by Crown Central Petroleum, just outside Houston, Texas.[24] Crown's emission limits were different from NJ Steel, because they were based on federal New Source Performance Standards (NSPS) for petroleum refineries. EPA had promulgated these limits in 1974 for the entire industrial category of petroleum refineries, not just in an individual facility permit, and they were fixed in federal regulations.[25] It seemed very unlikely that these limits could be changed.

Crown's certified CEM reports showed that it exceeded the federal NSPS emission limits for hydrogen sulfide and sulfur dioxide during more than 15,000 hours between 1992 and 1998.[26] These violations constituted up to 26% of operating time during some three-month reporting periods. The violations also represented more than 1,600 tons of excess pollution. TLPJ sued Crown on behalf of three environmental organizations—Texans United, NRDC and Sierra Club—and several individuals who lived and traveled near the refinery.[27] The nearby residents complained that the smell from Crown was so bad that they would have to remain indoors with the windows closed, and would get nauseated while driving by the plant.

Despite this clear harm, Crown filed a motion for summary judgment

---

22. Natural Res. Def. Council v. N.J. Steel, Civil No. 96-1060 (D.N.J. Apr. 1, 1998).
23. *Id.*
24. *Id.*
25. 40 C.F.R. §§ 60.104(a)(2)(i), 60.104(a)(1) (2002).
26. Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp., 207 F.3d 789, 791 (5th Cir. 2000).
27. *Id.* at 790.

DEC10

challenging plaintiffs' standing to sue.[28] At the time this case was filed, the trend in the federal courts was toward a tightening of standing requirements. Crown took seven depositions of plaintiffs' representatives and one deposition of plaintiffs' expert on standing issues. Our expert prepared an air modeling analysis to show that Crown's plume of excess sulfur dioxide produced detectable odors at plaintiffs' homes and violated the National Ambient Air Quality Standard (NAAQS) for sulfur dioxide for a distance of one mile into the nearby community.

Despite this report, the district court found that plaintiffs' standing was "questionable at best."[29] The court also found that the citizen suit was precluded by the state's prior administrative enforcement orders, even though the statute clearly provides that a CAA citizen suit can only be precluded by an action "in [a] court."[30] On appeal, the Fifth Circuit reversed, holding that plaintiffs had standing and that only judicial enforcement actions by a state or federal government can preclude a CAA citizen suit.[31]

On remand, we faced a difficult task on the merits. Crown raised two defenses to liability—data quality, and operational malfunctions. On the first, Crown argued that compliance could only be determined by the performance tests specified in EPA regulations, not by Crown's self-certified emissions data. On the second, Crown argued that excess emissions during periods of startup, shutdown and malfunction of process equipment were not violations.

Defenses to liability are less restricted under the CAA than under the CWA. It is very difficult for a defendant to challenge or impeach its own monitoring data that it reports on discharge monitoring reports (DMRs) under the CWA. DMRs are often regarded as conclusive evidence of violations.[32] "The DMR . . . is the key reportage document in the administrative scheme set up by the Act, [and] must control unless there is convincing evidence of an error."[33] In addition, malfunction-related defenses under the CWA are usually limited to bypass and upset defenses, which are narrowly defined in EPA regulations.[34] As a result, these defenses are not usually a major issue in CWA citizen suits.[35]

In contrast, there is very little case law on defenses to liability under the CAA,

---

28. *Texans United*, 207 F.3d at 791.

29. Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp., No. H-97-2427, 1998 U.S. Dist. LEXIS 16146, at *9 (S.D. Tex. July 31, 1998), *rev'd*, 207 F.3d 789 (5th Cir. 2000).

30. *Id.* at *8. *See* 42 U.S.C. § 7604(b)(1)(B) (2000).

31. *Texans United*, 207 F.3d at 795.

32. United States v. Murphy Oil USA, Inc., 143 F. Supp. 2d 1054, 1111 (W.D. Wis. 2001).

33. Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc., 800 F. Supp. 1, 19 (D. Del. 1992), *aff'd in part and rev'd in part*, 2 F.3d 493 (3d Cir. 1993).

34. 40 C.F.R. § 122.41(m)-(n) (2002).

35. *See, e.g.*, Pub. Interest Research Group v. United States Metals Ref. Co., 681 F. Supp. 237, 242-43 (D.N.J. 1987) (rejecting both defenses).

DEC11

and EPA regulations on data quality and operational malfunctions are not as narrowly drawn. As to data quality, the general rule is that "any credible evidence," not just test methods designated in EPA's rules, can be used to establish liability.[36] Based on this rule, one court has relied on CEM reports to grant summary judgment on liability in a CAA citizen suit.[37] However, EPA has explained that its rule means the evidence "must be related to reference test data in some fashion," such as "by a qualified expert opinion that a reference test would have demonstrated noncompliance in these same circumstances."[38] If the reference test is complicated, and the defendant wants to litigate the issue aggressively, proof of credible evidence under this test can be a difficult task requiring considerable expert analysis. Ironically, the citizen plaintiffs could not use the state administrative orders to demonstrate the quality of Crown's CEM data, even though Texas had relied on much of that same data as the basis for those orders and Crown had consented to entry of those orders. The orders expressly provided that they did not constitute an admission by Crown, and could not be used in any other proceeding.

On the malfunction issue, EPA's general rule for measuring the performance of facilities regulated under the NSPS states that "[o]perations during periods of startup, shutdown, and malfunction shall not constitute representative conditions for the purpose of a performance test . . . unless otherwise specified in the applicable standard."[39] EPA has also defined a "test . . . malfunction" as "any *sudden, infrequent, and not reasonably preventable* failure of air pollution control equipment, process equipment, or a process to operate in a normal or usual manner. Failures that are caused in part by poor maintenance or careless operation are not malfunctions."[40] This general exemption is limited by another EPA rule which provides:

> At all times, *including periods of startup, shutdown, and malfunction*, owners and operators shall, to the extent practicable, maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions. Determination of whether acceptable operating and maintenance procedures are being used will be based on information available to the Administrator which may include, but is not limited to, monitoring results, opacity observations, review of operating and maintenance procedures, and inspection of the source.[41]

The language in these regulations invites factual disputes over what is "good air pollution control practice" and what equipment failures are "not reasonably preventable." EPA has not offered much additional guidance; rather it has only

36. 42 U.S.C. § 7413(e) (2000); 40 C.F.R. § 60.11(g) (2002).
37. Sierra Club v. Pub. Serv. Co. of Colo., 894 F. Supp. 1455, 1459, 1461 (D. Colo. 1995).
38. 62 Fed. Reg. 8314, 8319 (Feb. 24, 1997).
39. 40 C.F.R. § 60.8(c) (2002).
40. *Id.* § 60.2 (emphasis added).
41. *Id.* § 60.11(d) (emphasis added).

DEC12

stated that "[a] basic assumption of EPA air pollution control rulemaking . . . under . . . the NSPS program, is that an emission limit should be established at a point where a well operated and maintained source can achieve the limit under all expected operating conditions . . . ."[42]  In addition, "[a]lthough compliance with emission limitations may be exempted in some circumstances during conditions such as startup and shutdown, an owner or operator still is required to operate and maintain a source in accordance with good air pollution control practices for minimizing emissions during such periods."[43]

To defeat these defenses based on data quality and operational malfunctions, we needed to evaluate whether Crown followed good operation and maintenance practices, whether its violations were avoidable, and whether the monitoring results were representative of actual emissions. Undertaking this investigation for thousands of violations over many years required fact-intensive discovery. During discovery, Crown produced 116 boxes containing hundreds of thousands of pages and over four gigabytes of electronic files on multiple CD-ROMs. From those boxes, we selected more than 32,000 pages of documents for copying and more intensive review.

A large petroleum refinery is an exceptionally complex industrial operation. In order to understand Crown's violations, we had to understand not only how Crown's pollution control equipment worked, but also how the upstream processes leading into that equipment worked, because many of Crown's violations were caused by upstream contaminants and breakdowns. Refinery processes involve complex chemical reactions and equipment. Our analysis required intensive document review and highly technical discussions with process and chemical engineering experts.

As the litigation progressed, state and federal enforcement agencies joined the fray, using the more expeditious mechanism of administrative consent orders. These agencies refused to coordinate their activities with the citizen suit, and instead litigated separately. Their actions forced Crown to hire outside experts to audit its operations, pay penalties, and recommend corrective measures. While the citizen suit was the catalyst for these other actions, they complicated the citizen suit by partially mooting the need for injunctive relief and civil penalties. After the citizen suit was filed, Crown paid more than one million dollars in penalties to the state for some of the same violations and spent several million additional dollars on corrective measures. The CAA provides that, in assessing penalties, the court must consider penalties already assessed.[44]  Thus, the administrative penalties could be offset against any assessed later in the citizen suit. This was a disincentive to try the citizen suit. We faced the prospect of having to prove every one of the violations that Crown had already admitted in the administrative consent orders, and then having to measure our success by the

---

42. 62 Fed. Reg. 54,900, 54,918 (Oct. 22, 1997).

43. *Id.* at 54,931.

44. 42 U.S.C. § 7413(e) (2000).

DEC13

incremental amount that the court-imposed penalty exceeded the administrative penalties that the state had already received. At the same time, the attorneys' fees and costs necessary to litigate the case to a conclusion would likely dwarf that incremental penalty amount.

With these difficulties facing us, we settled the case prior to trial. The consent decree required Crown to pay $434,575 in penalties on top of those already imposed in the state administrative order, but allowed Crown to offset penalties that could be imposed in the future in two other pending state and federal enforcement actions. The decree also required Crown to pay stipulated penalties if its excess emissions exceed approximately 2% of operating time. It further required Crown to send its monitoring reports to local officials so that the public could review that material much more easily than in the past and monitor Crown's future compliance with the CAA.

The lesson from the *Crown* case was that, even with strong evidence of a massive number of violations, the factual complexity of the defenses based on data quality and operational malfunctions, and the lack of coordination with state and federal enforcement agencies, can make it difficult to bring a CAA citizen suit to trial in a cost-effective manner.

## CATE V. TRANSCO[45]

Cate owned a home in rural Virginia near a natural gas pipeline and an associated compressor station owned by the Transcontinental Gas Pipe Line Corporation (Transco).[46] The compressor station's diesel engines emitted 2,300 tons of nitrogen oxides (NOx) per year. That was a huge amount. When these emissions were combined with emissions from four other similar compressor stations along the same pipeline, they represented 12.6% of all NOx emissions from stationary sources in the entire state of Virginia. Because the station was built in 1950, before the CAA was enacted, it was grandfathered and did not need an air permit. There were no other significant air pollution sources in the area. The Virginia Department of Air Pollution Control (DAPC) modeled the NOx emissions and determined that the ambient NOx concentration beyond the station's fence line was more than seven times higher than the NAAQS for NOx.[47] DAPC also found that the NOx created a nuisance odor that violated the state's odor rule in its SIP.[48]

DAPC signed an agreement with Transco requiring it to develop a plan to control its emissions and achieve compliance with the odor rule and the NAAQS.[49] After years of noncompliance with the agreement, Cate brought a

---

45. Cate v. Transcon. Gas Pipe Line Corp., 904 F. Supp. 526 (W.D. Va. 1995).
46. *Id.* at 528.
47. *Id.* at 529.
48. *Id.*
49. *Id.*

DEC14

CAA citizen suit alleging that Transco was in violation of the state order enforcing the NAAQS, the NAAQS itself, and the odor rule in the SIP.[50] Cate also included a pendent claim for state common law nuisance.[51] The strength of the case was that it involved an unenforced state order, huge pollutant emissions, state findings of NAAQS and odor violations, and a plaintiff with clear standing to sue. The major uncertainty was whether the violations fell within the scope of federally enforceable violations under the citizen suit provision.[52]

*Cate* explored the outer limits of what is federally enforceable under the CAA. We argued that a federally enforceable standard can be more than just a limit on air pollution coming out of a stack. It can also include a compliance schedule, an ambient standard like a NAAQS, and other requirements.[53]

The state order applied two federally enforceable standards—a NAAQS and an odor rule—to a specific source. It required Transco to take specific actions—in a compliance schedule—to achieve those standards.[54] The order was a site-specific application of federal law and therefore should have been enforceable in a citizen suit.

The plaintiff's citizen suit in *Cate* was consistent with congressional intent concerning the purpose of such suits. Congress wanted citizen suits to be simple and straightforward and to be based on a objective standard for liability.[55] The standard for Transco's liability was clear because Virginia had already investigated its facility, found violations of federal law, and set a timetable for compliance. Cate sought to enforce that schedule and to ensure that compliance was achieved at that specific facility.

The court's jurisdiction was supported by the plain language of sections 304(a) and (f).[56] Congress established a two-step process in those sections to define the scope of viable citizen suits. Under step one, section 304(a) provides that citizens can enforce two types of regulatory actions. The first type is an "emission standard or limitation under this chapter."[57] The second type is a state order "with respect to" those standards.[58] These two types of regulatory action—standards and orders—are well-known in administrative law. Agencies can act by setting rules of general applicability through rulemaking. Alternatively, they can act on a case-by-case basis through adjudications that result in orders in specific cases. In section 304(a), Congress provided that citizens can enforce

---

50. *Cate*, 904 F. Supp. at 528.

51. *Id.*

52. *Id.* at 530.

53. *Id.* at 530-31.

54. *Id.* at 532.

55. S. REP. NO. 91-1196, at 36-39 (1970), *reproduced in* Natural Res. Def. Council, Inc. v. Train, 510 F.2d 692, 723-24 (D.C. Cir. 1974).

56. 42 U.S.C. §§ 7604(a), (f) (2000).

57. *See id.* § 7604(f).

58. *See id.* § 7604(a).

DEC15

either type of regulatory action.[59]

Under step two, Congress defined in section 304(f) what categories of standards are federally enforceable in citizen suits. Congress listed four categories of enforceable standards.[60] Three of the categories, in subsections (f)(1), (f)(2) and (f)(3), were enacted before 1990 and included compliance schedules, controls on motor vehicles, and permit conditions.[61] The fourth category, subsection (f)(4), was added in 1990.[62] It contained catch-all language embracing "any other standard [or] limitation" under a federal permit or an approved SIP, as well as any permit terms and conditions, and any requirement to obtain a federal permit.[63]

The district court agreed with Cate that the state order contained an enforceable "emission standard or limitation" under section 304(a), because it set forth a "schedule . . . of compliance" under section 304(f)(1) to achieve compliance with the NAAQS for NOx.[64] The order told Transco to take a number of steps to eliminate its violation of this federal standard and gave it a timetable for completing those steps. However, the court held that the schedule was not enforceable by citizens, because the order had not been formally approved by EPA or adopted as a part of Virginia's SIP and therefore was not "in effect" under section 304(f).[65] The court acknowledged that Cate's contrary interpretation "has a great deal of intuitive appeal" but declined to be the first court to accept it.[66]

Under our interpretation, section 304(f) provides two methods for federal enforcement of compliance schedules: they can be incorporated in the SIP, or they can be "in effect under" the Act. These two methods are stated as alternatives in the last phrase of section 304(f). Either one is sufficient to make a schedule federally enforceable. A schedule could therefore be federally enforceable even if it was not yet a part of Virginia's SIP.

Transco's schedule was "in effect" under the CAA because Virginia was required by the CAA to impose that schedule. Section 110(a) provides that each state's SIP must attain and enforce compliance with the NAAQS.[67] EPA regulations similarly provide that the state must have authority to prevent operations by facilities which prevent attainment of a NAAQS.[68] In its order, Virginia selected Transco's compliance schedule as a specific strategy to prevent

---

59. 42 U.S.C. § 7604(a) (2000).

60. *Id.* § 7604(f).

61. *See id.* § 7604(f)(1)-(3).

62. *See id.* § 7604(f)(4).

63. *Id.*

64. Cate v. Transcon. Gas Pipe Line Corp., 904 F. Supp. 526, 530-32 (W.D. Va. 1995).

65. *Id.* at 532-35.

66. *Id.* at 533.

67. 42 U.S.C. § 7410(a) (2000).

68. 40 C.F.R. § 51.230 (2002).

DEC16

a violation of the NAAQS for NOx in the area near Transco's facility.[69]  The compliance schedule therefore contained all of the elements needed for federal enforcement: a list of required measures, a timetable for implementation, and a direct connection to achievement of federal standards.

Thus, "in effect under this Act" should be read broadly to mean "in effect according to actions taken within the framework of this Act." The Seventh Circuit has supported this broad reading, explaining that state air pollution rules were federally enforceable, because they were adopted under, and satisfy, the CAA.[70]  Similarly, the state order in *Cate* was adopted under, and satisfies, Virginia's obligations to comply with the CAA.[71]

The district court decided in *Cate* to read the Act narrowly to mean in effect as a requirement expressly set forth under this Act.[72]  As a result, it effectively required four levels of government action, when only three should have been necessary. First, EPA set a NAAQS for NOx.[73]  Second, it approved Virginia's SIP with measures to achieve the NAAQS for NOx.[74]  These two steps set the legal standards and gave the state the compliance tools. Third, Virginia applied these standards and tools and ordered Transco to take the actions necessary to prevent a violation of the NAAQS.[75]  These three steps should be sufficient to trigger citizen enforcement. There should not have to be a fourth step in which EPA must approve the state order to make it effective.[76]  EPA has already set the framework for the state to act and the state is simply acting within that framework.

As an alternative to enforcing the NAAQS indirectly through the state order, Cate sought to enforce the NAAQS directly as a stand-alone, federally-enforceable requirement.[77]  The court rejected this argument, relying on prior cases (all but one decided before the 1990 amendments) and "policy concerns."[78]  However, there is a substantial argument that the court has misread the plain language of the statute and that a NAAQS is a federally enforceable standard within the scope of section 304(f)(4). That subsection defines a federally enforceable standard to include "any other standard" which is "in effect" under a SIP.[79]  The NAAQS for NOx is a standard, and it was "in effect" under Virginia's SIP. It is squarely within the plain language of this subsection. The

---

69. *Cate*, 904 F. Supp. at 532.

70. Vill. of Oconomowoc Lake v. Dayton Hudson Corp., 24 F.3d 962, 964 (7th Cir. 1994).

71. *Cate*, 904 F. Supp. at 532.

72. *Id.* at 532-33.

73. *Id.* at 528.

74. *Id.*

75. *Id.* at 529.

76. *Id.* at 533.

77. *Id.* at 535-36.

78. *Id.* at 536.

79. 42 U.S.C. § 7604(f)(4) (2000).

DEC17

structure of the Act also supports this conclusion. The words "other standard" mean that Congress was referring to standards different from, or in addition to, the standards it listed earlier in subsection (f)(1). Those two standards are an emission standard and a standard of performance. If "other standard" is read according to its plain meaning, it must not overlap with those two standards in subsection (f)(1). The (f)(1) standards are quite broad, and cover both numerical emission limits and non-numerical work practices. However, the (f)(1) standards would not include a NAAQS. It is therefore logical to conclude that when Congress added (f)(4), it wanted to cover a NAAQS.

The legislative history of the CAA supports this conclusion. Congress added section 304(f)(4) in 1990 as a floor amendment to the House bill.[80] It was carried over into the conference bill that eventually passed in both Houses.[81] In discussing this provision, its author, Representative Collins, stated that it "expands and enumerates areas of the Clean Air Act that absolutely can be challenged in Federal court by private citizens. The expansion includes: Any aspect of a State implementation plan; any aspect of a permit; and the failure to obtain a permit."[82] Thus, "any other standard" means "any aspect" of a SIP. Given this expansive intent, "any other standard" can be read to include all standards in a SIP, including a NAAQS.

Finally, Cate sought to enforce the odor rule in Virginia's SIP.[83] The court rejected this claim on the ground that Virginia submitted the rule to EPA "for informational purposes only" and did not intend to make it federally enforceable.[84] While the court was probably correct in this instance, two other federal courts have held that state odor rules are federally enforceable in other states even though they are not a required element in a SIP.[85] Citizen plaintiffs should therefore closely examine state SIPs to identify all potentially enforceable provisions, even if they are not required to be in a SIP. For example, in the *Ellis* case discussed below, the defendants violated a SIP provision prohibiting visible emissions from crossing the plant boundary.[86] The simple enforceability of this provision through eyewitness testimony and videotape makes it an especially powerful tool for citizen enforcers.

After Cate's federal claims were dismissed, the case continued on his state common law nuisance claim, and was eventually settled on that basis. The lesson of *Cate* is that, even with a facility with large air emissions, violations of a

---

80. 136 CONG. REC. 11,893 (May 23, 1990).

81. Clean Air Act, Pub. L. No. 101-549, § 707, 104 Stat. 2683 (1990).

82. 136 CONG. REC. 11,918 (May 23, 1990) (statement of Rep. Collins).

83. *Cate*, 904 F. Supp. at 536.

84. *Id.* at 537-38.

85. Concerned Citizens v. United States EPA, 836 F.2d 777 (3d Cir. 1987); Save Our Health Org. v. Recomp of Minn., Inc., 829 F. Supp. 288 (D. Minn. 1993), *aff'd*, 37 F.3d 1334 (8th Cir. 1994).

86. *See* Ellis v. Gallatin Steel Co., No. 99-242 (E.D. Ky. Oct. 8, 2002).

DEC18

NAAQS, and a state administrative enforcement order, there may be no federally enforceable standards to support a citizen suit.

### CARR V. EL DORADO CHEMICAL CO.

El Dorado Chemical Company operated a plant in Arkansas that converted liquefied ammonia into nitric acid, sulfuric acid, and ammonium nitrate.[87] It released large amounts of nitrogen oxide, sulfur dioxide, ammonia, and sulfuric acid mist into the air. On dozens of occasions, nearby residents saw toxic white, brown, and yellow clouds, made up of combinations of these chemicals, drifting across their property. Residents exposed to the clouds reported coughing, wheezing, chest pain, burning eyes, and difficulty breathing.

The Company's air permit contained numerical emission limits for opacity, nitrogen dioxide, and sulfuric acid mist. These limits were federally-enforceable because they were based on an NSPS. The permit also provided that "[t]he facility shall not be operated in a manner which would cause visible emissions to extend beyond the property line of the facility." This provision was not federally-enforceable because it had not been approved by EPA as part of the Arkansas SIP. To show that the plant had emitted illegal amounts of pollutants, we used the company's upset reports required by its air permit, as well as its required reports of releases of hazardous substances under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), and Emergency Planning and Community Right-to-Know Act (EPCRA). These reports provided evidence of more than 160 permit violations.

In 1996, TLPJ, together with Sam Ledbetter and Bruce McMath in an Arkansas law firm, sued the company on behalf of members of five families who lived near the plant. The complaint alleged that the company: (1) made major modifications of its facility and increased its air emissions without applying for a permit under the Prevention of Significant Deterioration (PSD) provisions of the CAA; (2) violated the emission standards in its air permit; (3) violated discharge limitations in its permit under the CWA; (4) violated section 103 of CERCLA by failing to report releases of hazardous substances; (5) violated section 304 of EPCRA by failing to report releases of extremely hazardous substances; and (6) violated section 111(g) of CERCLA by failing to notify potential injured parties of its releases of hazardous substances by publishing notices in local newspapers. A separate complaint by the same plaintiffs, based on diversity jurisdiction, alleged claims of common law nuisance, negligence, trespass, and strict liability. Plaintiffs' principal complaint centered around the release of toxic gas clouds that periodically invaded plaintiffs' property.

Based on the Company's own reports of its releases, Carr moved for a

---

87. Carr v. El Dorado Chem. Co., No. 96-1081 (W.D. Ark. Apr. 14, 1997) (supporting documentation on file with author, *supra* note *).

DEC19

preliminary injunction to compel compliance with the CAA, CERCLA, and EPCRA. Shortly before a scheduled hearing on that motion, the Company agreed to a consent order that prohibited it from sending visible ground-level emissions beyond its property line and onto plaintiffs' property, required it to comply with the emission standards in its air permit, and required it to provide plaintiffs with reports of any instances of noncompliance. Within a few weeks thereafter, plaintiffs observed and/or videotaped clouds from the plant crossing their property lines on seven occasions. Based on this evidence, plaintiffs moved for contempt sanctions of $25,000 per incident and an award of attorneys' fees and costs.

To succeed on the contempt motion, Carr had the burden of proving the emissions by clear and convincing evidence. The court applied this standard quite strictly by requiring unequivocal testimony and evidence that the emissions originated with an identifiable malfunction at the plant, traveled across El Dorado's property line, and were clearly visible on plaintiffs' property. Plaintiffs presented direct, eyewitness testimony from several plaintiffs who saw the clouds while they were standing on or near their own property and corroborated these accounts with photographs of the clouds and Company records showing that El Dorado had experienced upsets at the same times.[88] This evidence showed that violations were highly probable. Nevertheless, the court gave the defendant the benefit of the doubt when there was any conflicting evidence about the extent and nature of the release. As a result, the court found El Dorado in contempt for only one of the seven emission events.[89] In addition, the court imposed a minimal fine of only $500 (payable to the plaintiff whose property was affected) for the one violation, plus attorneys' fees and costs related to proving that violation.[90]

Based on El Dorado's responses to requests for admissions concerning the nature and amount of its releases of pollutants, Carr then moved for summary judgment on El Dorado's liability for violations of the CAA. In response, El Dorado argued that its emission limits were not federally enforceable, that there were disputed factual issues about whether its excess emissions were caused by upset conditions, that the alleged violations were not supported by credible evidence, and that to establish standing plaintiffs had to submit medical evidence showing a causal connection between El Dorado's emissions and their health problems. Prior to a decision on this motion, El Dorado agreed to a consent decree requiring compliance with its air permit, corrective actions, an independent audit of its operations, civil penalties payable to the U. S. Treasury, and a settlement of the common law damage claims.

While this citizen suit was successful, it demonstrated the difficulty of

---

88. Carr v. El Dorado Chem. Co., Civ. No. 96-1081 (W.D. Ark. Apr. 14, 1997) (supporting documentation on file with author, *supra* note *).

89. *Id.* at 5.

90. *Id.*

DEC20

enforcing violations when the standard for compliance is measured by impacts on a neighboring property, rather than emissions at the plant's stack or the plant boundary.

### *Ellis v. Gallatin Steel and Harsco*[91]

Vernon Ellis and his two sons, Richard and Thomas, live on a 168-acre tract in rural Kentucky. Prior to 1995, their land and the surrounding area was predominantly a quiet, rural countryside, where the Ellises enjoyed spending time outdoors. There was no large industrial development in the area.

In 1995, Gallatin Steel Company built a large steel mill about one-quarter of a mile from their homes. Like NJ Steel's mill, the Gallatin mill used an electric arc furnace to melt scrap steel and turn it into new carbon steel rolls, at a rate of two hundred tons per hour. The furnace cannot produce steel without making hot, molten slag as an unwanted byproduct. Gallatin generated one-tenth of a ton of slag for every ton of steel produced. Because Gallatin produced over one million tons of steel per year, this amounted to over 100,000 tons (two hundred million pounds) of slag per year.

Gallatin poured the molten slag into large pots, and farmed out the job of removing the pots and processing the slag to a different company—Harsco Corporation. Gallatin and Harsco were mutually interdependent, since Gallatin sent all of its slag to Harsco, and Harsco received all of its slag from Gallatin. Harsco transported the slag pots about one-quarter of a mile to its property, which was directly adjacent to Gallatin's property, and upwind from the Ellises' property.

More than twenty times a day, Harsco dumped the hot, molten slag on the ground in a pit, with no air pollution controls of any kind. The molten slag sometimes exploded like a bomb when it trapped and vaporized water on the ground. In addition, the slag dumping generated huge dust clouds that drifted over and settled on the Ellises' property. Alarmed by this bombardment, Ellis bought a video camera, set up an observation post next to Harsco's site, and videotaped hundreds of hours of dust clouds and explosions from Harsco's operations.

Ellis raised three air pollution claims. First, he contended that Gallatin and Harsco were a single source, and that the two companies had evaded the PSD provisions of the CAA by failing to obtain a PSD permit for emissions from Harsco's slag operations. Second, he contended that Gallatin and Harsco had violated a provision in the federally-approved Kentucky SIP that prohibited visible fugitive emissions from crossing a facility's property line. (Unlike the similar limit in *Carr*, this limit was federally enforceable). Third, he claimed that

---

91. Ellis v. Gallatin Steel Co., No. 99-242 (E.D. Ky. Oct. 8, 2002) (supporting documentation on file with author, *supra* note *).

DEC21

Gallatin and Harsco had created a private nuisance under state common law.

On the PSD claim, both companies argued that Ellis was making an impermissible collateral attack on Gallatin's PSD permit, because Kentucky determined when it issued the permit that Gallatin and Harsco were not a single source. However, Ellis was not challenging that permit or Gallatin's permitted activities. Instead, he was challenging Harsco's slag dumping emissions, which were not covered by that permit. Furthermore, collateral attack is not a valid defense under the statute. The CAA specifically authorizes citizens to sue a facility for an unpermitted emissions unit and puts no preconditions or limitations on bringing such a suit. It was therefore irrelevant whether or not Kentucky determined in 1997 that no permit was required. In any event, even if Kentucky had decided previously not to regulate these emissions, the state reversed that decision while Ellis' citizen suit was pending, finding that two companies were a single source and that a PSD permit was required. In response, Gallatin and Harsco both appealed the state's decision administratively, and asked the federal court to defer ruling on the PSD claim until those appeals were completed. The federal court granted that request for a deferral. Ellis then intervened in the state administrative proceeding to support the state's position, lost the first round on an administrative law judge's recommended decision, won the second round on the agency's final decision, and won the next round on the first level of judicial review. A year after its deferral decision, however, the federal court reversed direction and dismissed the PSD claim, holding that it was an impermissible collateral attack on the state's permitting decision, even though Ellis and the state were now on the same side of that issue, and the two companies were the ones attacking the state.

On the statutory fugitive dust claim under the CAA, Ellis documented dozens of violations, starting in 1998 and continuing for four years throughout the litigation. Defendants' strategy was to deny liability, try to block Ellis' claim on jurisdictional grounds by arguing that Ellis' notice letter was defective, negotiate a consent decree with the federal government in the meantime covering many of the same violations, and then move to dismiss the citizen suits based on *res judicata*. That strategy was partially successful. The United States filed consent decrees against both companies, and the court approved them over Ellis' objection that they imposed inadequate penalties and injunctive relief to stop the violations. The court then dismissed all violations in the citizen suit that predated the consent decrees, but allowed Ellis to continue to sue for post-decree violations.

The common law nuisance claim used the same evidence of cross-boundary fugitive dust emissions, with the added element of establishing that the dust impacted Ellis' property. The companies argued that Ellis had not established any actual damages, and that the dust on his property came from other sources. The district court held a two-day trial on the nuisance claim and post-decree statutory fugitive dust violations. It found that the defendants had created a

DEC22

nuisance, had acted willfully, wantonly and oppressively and had committed post-decree violations. It enjoined both companies from sending more dust across their respective property lines, ordered them to pay about $100,000 in compensatory damages and $750,000 in punitive damages to the four plaintiffs, and appointed a Special Master to investigate and oversee future compliance. The latter remedy is a first for citizen suits and validated Ellis' claim that EPA, with its inspectors hundreds of miles away in Atlanta, could not monitor and enforce compliance. The court agreed, finding that "enforcement by the EPA due to budgetary constraints and limitations of time and personnel must of necessity be inadequate."

Both sides have appealed to the Sixth Circuit, so the final chapter in this case has not yet been written. However, this case certainly demonstrates the complexity of citizen suit enforcement under the CAA. The citizen suit litigation is in its fourth year. It has not only required direct litigation of the citizen suit, but also intervention in state administrative proceedings, participation in subsequent judicial review in the state courts, and intervention in two separate U.S. consent decree cases in federal court. Citizen suit litigation seems to be a major exception to the rule that "the plaintiff is master of his own complaint."[92] Instead, a citizen plaintiff must contend with parallel state and federal enforcement actions that frequently complicate and undermine his case.

---

92. United States v. Hooker Chems. & Plastics Corp., 749 F.2d 968, 980 (2d Cir. 1984).

DEC23

**DECLARATION OF CHARLES MCPHEDRAN**

1.       I am a staff attorney at Earthjustice, where my work focuses on air quality and energy matters. From 1999 to 2011, I served as senior attorney and law staff chair at Citizens for Pennsylvania's Future (PennFuture) in Philadelphia, where I worked on litigation and policy matters regarding air quality, clean water, and energy. Previously, I worked for nine years at the United States Environmental Protection Agency (EPA) in Philadelphia and Washington, D.C., where I enforced federal statutes and spent a year writing opinions for EPA's administrative law judges. In recognition of my enforcement accomplishments at EPA, I twice received the Toxic Avenger award for administrative enforcement of the Clean Air Act and other statutes.

2.       I have extensive experience evaluating and litigating citizen suit enforcement actions. As part of my work at Earthjustice, I litigate citizen suit enforcement actions against facilities that violate the Clean Air Act. During my 12 years at PennFuture, I brought citizen suits under both the Clean Air Act and Clean Water Act. Prior to that, as an attorney at EPA, I brought enforcement actions under those statutes as well as the Toxic Substances Control Act and the Federal Insecticide, Fungicide, and Rodenticide Act.

3.       I have litigated citizen suit enforcement actions in Pennsylvania and Texas. For example, I have filed citizen suits for violations involving the opacity of smokestack emissions in both Pennsylvania and Texas.  For these cases, Pennsylvania does not allow facilities to invoke an "affirmative defense" to shield themselves from either liability or civil penalties. Texas, on the other hand, does.

4.       In one of my cases that is now in litigation, the defendant raised an affirmative defense provision under the state's Clean Air Act implementation plan.  Based on my

DEC24

experience, I expect that the defendants will seek to take advantage of an affirmative defense in cases of malfunction in cases in which such a defense is available

5.      I have reviewed the penalty assessment criteria in Clean Air Act § 113(e)(1), 42 U.S.C. § 7413(e)(1), and the affirmative defense EPA established in 40 C.F.R. § 63.1344. EPA's affirmative defense purports to preclude a district court from imposing civil penalties—even when a court's consideration of the § 113(e)(1) criteria supports doing so—if the agency's separate regulatory criteria in 40 C.F.R. § 63.1344 are met. For example, a district court that found penalties to be appropriate based on the seriousness of the violation and economic benefits of noncompliance, *see* 42 U.S.C. § 7413(e)(1), could nonetheless be barred from imposing penalties.

6.      Based on my experience with citizen enforcement suits, I expect that the affirmative defense in 40 C.F.R. § 63.1344(a) will make getting penalties in enforcement cases more difficult, time-consuming, and expensive, and will reduce violators' incentives to settle the cases.

7.      Whether in a citizen suit or in government enforcement, it is critical to be able to seek civil penalties to the full extent the governing statute allows. I have routinely sought such penalties in my cases.  The credible threat of significant penalties for violations makes violators more willing to negotiate and makes them more willing to take meaningful action to fix the problems that cause the violations. Moreover, in my experience, the credible threat of civil penalties affects the quality of the injunctive relief available in citizen and government enforcement.

8.      The affirmative defense in 40 C.F.R. § 63.1344 will hamper enforcement of the Clean Air Act. It will reduce the deterrent value of civil penalties by making them more difficult

DEC25

to obtain, and thus a less credible threat. As a result, violators will feel less pressure to reduce

their emissions to lawful levels. If there were no affirmative defense, the deterrent value of civil

penalties would be improved.


       I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed this _4th____ day of June, 2013.

_____
       Charles McPhedran

DEC26

**DECLARATION OF RANAJIT SAHU**

1. I am an engineer and an environmental consultant. I have over twenty one years of experience in the fields of environmental, mechanical, and chemical engineering including: program and project management services; design and specification of pollution control equipment; soils and groundwater remediation; combustion engineering evaluations; energy studies; multimedia environmental regulatory compliance (involving statutes and regulations such as the Federal CAA and its Amendments, Clean Water Act, TSCA, RCRA, CERCLA, SARA, OSHA, NEPA as well as various related state statutes); transportation air quality impact analysis; multimedia compliance audits; multimedia permitting (including air quality NSR/PSD permitting, Title V permitting, NPDES permitting for industrial and storm water discharges, RCRA permitting, etc.), multimedia/multi-pathway human health risk assessments for toxics; air dispersion modeling; and regulatory strategy development and support including negotiation of consent agreements and orders. Specifically, I have consulted for various clients with regards to Clean Air Act rulemakings by the EPA for over 10 years. A copy of my resume is provided at Attachment A to this Declaration.

2. I was asked by counsel to estimate emissions of filterable particulate matter (fPM), a type of air pollutant, from cement kilns and to compare them to the standards for this pollutant that EPA promulgated in 2010 and 2013. Typically, emissions of this pollutant are controlled by an air pollution control device called a baghouse or fabric filter. Another air pollution control device that can control fPM is called an electrostatic precipitator (ESP). Typically, baghouses can provide better control of fPM than ESPs. Thus, I was asked to estimate emissions of fPM after such controls, thereby representing emissions

that would be directed at the atmosphere.  Specifically, I have conducted these calculations for three example cement kilns – the California Portland Cement (CPC) kiln located in Mojave, CA; the Cemex kiln located in Knoxville, TN; and the Cemex kiln located in Lyons, CO.  For the CPC kiln, I conducted the calculations for two conditions, namely with the raw mill on and with the raw mill off.  The results of the calculations are provided in spreadsheets provided in Attachment B to this Declaration.

3.   In estimating the emissions of fPM, I am reporting all emissions in the units of pounds of fPM per ton of clinker produced, a common normalization of such emissions from kilns, that allows for emissions comparisons across different kilns.  It is also the same normalization EPA uses in its 2010 and 2013 standards for existing cement kilns.  Clinker is a product of the kiln or pyro processing system, which is subsequently converted to cement in later stages in a cement plant.  Clinker is produced in the kiln when raw materials (mainly limestone, silica sand and various additives) are calcined.  Typically, the ratio of raw feed mass to the kiln as compared to the clinker produced by the kiln is 1.65.  While this ratio can vary from kiln to kiln and also from batch to batch within a kiln, it is a reasonable approximation of the relationship between raw feed and clinker masses.  As such EPA has used this ratio in its calculations and rule makings.  *See, e.g.*, 78 Fed. Reg. 10,006, 10,038/2 (Feb. 12, 2013) (codified at 40 C.F.R. § 63.1343(b)(2))  I too use this ratio, as needed, in some of my calculations.

4.   For the CPC Mojave kiln as well as the Cemex Knoxville kiln, my calculations rely on source test or stack test measurements conducted by third-party stack testing companies hired by the companies.  The results of the stack tests are available in reports submitted to respective regulatory agencies and online through EPA's WebFIRE website.  Typically, a

DEC28

test sequence involves three individual test runs.  Citations for the specific tests and the data used are shown in Attachment B.  In addition to computing the individual run fPM emission rates using the measured (lb/hr) emissions rates during a specific test run and the reported raw feed rate (which was converted to the clinker produced rate using the 1.65 factor discussed above) or the clinker rate directly reported during the test, Attachment B also shows the average fPM emission rate for each of these two kilns.  In addition, Attachment B also shows a statistical emission rate called the 99 UPL or the 99th percentile Upper Prediction Limit, which, in simple terms, uses the variability observed in the emission rate (between the three runs for each kiln test sequence) in predicting what the 99th percentile of the average 3-run emission rate might be in a future 3-run test sequence.  As such, the 99 UPL metric has been used by the EPA in its various rule-makings to set so-called "floor" emission levels that sources have to meet.  In estimating the 99 UPL, I have used the exact same methodology (and the same spreadsheet, with the test results updated) that EPA used in its rule making for the cement industry. *See Final Portland Cement Reconsideration Technical Support Document* app.F (EPA-HQ-OAR-2011-0817-0845, Dec. 20, 2012), *available at* www.regulations.gov/#!documentDetail;D=EPA-HQ-OAR-2011-0817-0845 (click on icon labeled "XLS") .

5.  For the third kiln, namely Cemex at Lyons, I did not have stack test data.  Instead, I used annual estimated average fPM (actually, $PM_{10}$, which includes all particles that are 10 microns in aerodynamic diameter, or smaller in size – which is what one would expect from the baghouse) emissions from this kiln in 2009, 2010, and 2011 along with production data (i.e., raw feed rate for these years, converted to clinker production rates,

DEC29

using the same 1.65 factor discussed earlier). These data were reported to the Colorado regulators by the company. In this case, given that the data available was an annual average values for each of three years, I did not compute the 99 UPL value. Instead just the annual values and the average are shown for this kiln in Attachment B.

6. Based on the data and calculations shown in Attachment B, I calculate that the fPM emission rates (in lbs/ton clinker produced in all cases) for the CPC Mojave kiln during the raw mill on condition are as follows: 0.0619, 0.0645, and 0.1097 for the three test runs; an arithmetic average rate of 0.0787 and a 99 UPL value of 0.232. For this same kiln during the raw mill off condition I calculate that the fPM emission rates (in lbs/ton clinker produced in all cases) as follows: 0.1069, 0.1011, and 0.0824 for the three test runs; an arithmetic average rate of 0.0968 and a 99 UPL value of 0.170. All the arithmetic average and 99 UPL values exceed the 0.07 lb/ton clinker standard EPA established in 2013 for particulate matter, as well as the 0.04 lb/ton clinker standard EPA established in 2010 for particulate matter.

7. Based on the data and calculations shown in Attachment B, I calculate that the fPM emission rates (in lbs/ton clinker produced in all cases) for the Cemex Knoxville kiln are as follows: 0.1960, 0.1809, and 0.2007 for the three test runs; an arithmetic average rate of 0.1925 and a 99 UPL value of 0.251. The arithmetic average and 99 UPL values exceed the 0.07 lb/ton clinker standard EPA established in 2013 for particulate matter, as well as the 0.04 lb/ton clinker standard EPA established in 2010 for particulate matter.

8. Based on the data and calculations shown in Attachment B, I calculate that the $fPM_{10}$ average annual emission rates (in lbs/ton clinker produced in all cases) for the Cemex Lyons kiln are as follows: 0.1847 for year 2009, 0.1983 for year 2010, and 0.2017 for

DEC30

year 2011. The average emission rate for all three years is 0.1949. Each annual average and the combined arithmetic average values exceed the 0.07 lb/ton clinker standard EPA established in 2013 for particulate matter, as well as the 0.04 lb/ton clinker standard EPA established in 2010 for particulate matter.

9. Counsel also asked me to estimate emissions of mercury, another air pollutant, from the Cemex Lyons cement kiln's stack and to compare it to the standard EPA promulgated in 2010 and reaffirmed in 2013. In estimating the emissions, I am reporting the end result in the units of pounds of mercury per million tons of clinker produced, the same normalization EPA uses in its cement rule. I use the same 1.65 ratio of raw feed mass to clinker mass produced as discussed above. Again, as above, I did not have stack test data for the Cemex Lyons kiln. Instead, I used the mercury emissions the company reported to the Colorado regulators for the years 2009, 2010, and 2011. The results of the calculations are provided in spreadsheets provided in Attachment B to this Declaration.

10. Based on the data and calculations shown in Attachment B, I calculate that the mercury average annual emission rates (in lbs/million tons clinker produced in all cases) for the Cemex Lyons kiln are as follows: 105.4835 for year 2009, 177.6098 for year 2010, and 181.8203 for year 2011. The average emission rate for all three years is 154.9712. All these averages exceed the 55 lb/million tons clinker standard for mercury EPA established in 2010 and reaffirmed in 2013.

11. Counsel also asked me to review the results of Part 1 of EPA's Information Collection Request (EPA-HQ-OAR-2002-0051-3401, July 28, 2009). In that document, the list of cement plants that reported using an ESP, rather than a baghouse or fabric filter, to control fPM, or no fPM control at all includes: the Lafarge plant in Joppa, Massac

DEC31

County, IL; the Lone Star plant in Oglesby, Lasalle County, IL; the Essroc plant in Speed, Clark County, IN; the Lehigh plant in Mitchell, Lawrence County, IN; the Ash Grove plant in Montana City, Jefferson County, MT; the Holcim plant in Trident, Gallatin County, MT; the Ash Grove plant in Louisville, Cass County, NE; the Lafarge plant in Ravena, Albany County, NY; the Holcim plant in Ada, Pontotoc County, OK; the Cemex plant in Wampum, Lawrence County, PA; and the TXI plant in Hunter, Comal County, TX.

12. I also reviewed at Counsel's request EPA's estimates of plants with $fPM_{10}$ rates (in EPA-HQ-OAR-2002-0051-3480).  In that document, EPA estimated that at least the following cement plants emitted $fPM_{10}$ at one or more of their kilns at a rate that exceeded 0.07 lbs/ton clinker produced: the CalPortland plant in Rillito, Pima County, AZ; the Cemex plant in Brooksville, Hernando County, FL; the Cemex plant in Clinchfield, Houston County, GA; the Buzzi plant in Stockertown, Northampton, PA; the GCC plant in Rapid City, Pennington County, SD; and the Lehigh plant in Waco, McLennan County, TX.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16th day of April, 2013.

Ranajit Sahu

DEC32

**ATTACHMENT A**

**RANAJIT (RON) SAHU**, Ph.D, QEP, CEM (Nevada)

**CONSULTANT, ENVIRONMENTAL AND ENERGY ISSUES**

**311 North Story Place**
**Alhambra, CA 91801**
**Phone:  626-382-0001**
**e-mail (preferred): sahuron@earthlink.net**

EXPERIENCE SUMMARY

Dr. Sahu has over twenty one years of experience in the fields of environmental, mechanical, and chemical engineering including: program and project management services; design and specification of pollution control equipment; soils and groundwater remediation; combustion engineering evaluations; energy studies; multimedia environmental regulatory compliance (involving statutes and regulations such as the Federal CAA and its Amendments, Clean Water Act, TSCA, RCRA, CERCLA, SARA, OSHA, NEPA as well as various related state statutes); transportation air quality impact analysis; multimedia compliance audits; multimedia permitting (including air quality NSR/PSD permitting, Title V permitting, NPDES permitting for industrial and storm water discharges, RCRA permitting, etc.), multimedia/multi-pathway human health risk assessments for toxics; air dispersion modeling; and regulatory strategy development and support including negotiation of consent agreements and orders.

He has over nineteen years of project management experience and has successfully managed and executed numerous projects in this time period.  This includes basic and applied research projects, design projects, regulatory compliance projects, permitting projects, energy studies, risk assessment projects, and projects involving the communication of environmental data and information to the public.  Notably, he has successfully managed a complex soils and groundwater remediation project with a value of over $140 million involving soils characterization, development and implementation of the remediation strategy, regulatory and public interactions and other challenges.

He has provided consulting services to numerous private sector, public sector and public interest group clients. His major clients over the past twenty one years include various steel mills, petroleum refineries, cement companies, aerospace companies, power generation facilities, lawn and garden equipment manufacturers, spa manufacturers, chemical distribution facilities, and various entities in the public sector including EPA, the US Dept. of Justice, California DTSC, various municipalities, etc.).  Dr. Sahu has performed projects in over 44 states, numerous local jurisdictions and internationally.

Dr. Sahu's experience includes various projects in relation to industrial waste water as well as storm water pollution compliance include obtaining appropriate permits (such as point source NPDES permits) as well development of plans, assessment of remediation technologies, development of monitoring reports, and regulatory interactions.  Over the years, he has provided consulting services relating to industrial wastewater pre-treatment options and permitting aspects to a range of clients [industrial, regulatory, public interest] for a range of industries including petroleum refineries, aerospace manufacturing, chemical distribution, brass foundry, electroplating operations, jewelry manufacturing, steel mills, and coal-fired power units.

In addition to consulting, Dr. Sahu has taught numerous courses in several Southern California universities including UCLA (air pollution), UC Riverside (air pollution, process hazard analysis), and Loyola Marymount University (air pollution, risk assessment, hazardous waste management) for the past seventeen years.  In this time period he has also taught at Caltech, his alma mater (various engineering courses), at the University of Southern California (air pollution controls) and at California State University, Fullerton (transportation and air quality).

DEC33

Dr. Sahu has and continues to provide expert witness services in a number of environmental areas discussed above in both state and Federal courts as well as before administrative bodies (please see Annex A).

## EXPERIENCE RECORD

2000-present    **Independent Consultant.**  Providing a variety of private sector (industrial companies, land development companies, law firms, etc.) public sector (such as the US Department of Justice) and public interest group clients with project management, air quality consulting, waste remediation and management consulting, as well as regulatory and engineering support consulting services.

1995-2000    Parsons ES, **Associate, Senior Project Manager and Department Manager for** Air Quality/Geosciences/Hazardous Waste Groups, Pasadena.  Responsible for the management of a group of approximately 24 air quality and environmental professionals, 15 geoscience, and 10 hazardous waste professionals providing full-service consulting, project management, regulatory compliance and A/E design assistance in all areas.

Parsons ES, **Manager for Air Source Testing Services**.  Responsible for the management of 8 individuals in the area of air source testing and air regulatory permitting projects located in Bakersfield, California.

1992-1995    Engineering-Science, Inc.  **Principal Engineer and Senior Project Manager** in the air quality department.  Responsibilities included multimedia regulatory compliance and permitting (including hazardous and nuclear materials), air pollution engineering (emissions from stationary and mobile sources, control of criteria and air toxics, dispersion modeling, risk assessment, visibility analysis, odor analysis), supervisory functions and project management.

1990-1992    Engineering-Science, Inc.  **Principal Engineer and Project Manager** in the air quality department.  Responsibilities included permitting, tracking regulatory issues, technical analysis, and supervisory functions on numerous air, water, and hazardous waste projects.  Responsibilities also include client and agency interfacing, project cost and schedule control, and reporting to internal and external upper management regarding project status.

1989-1990    Kinetics Technology International, Corp.  **Development Engineer.**  Involved in thermal engineering R&D and project work related to low-NOx ceramic radiant burners, fired heater NOx reduction, SCR design, and fired heater retrofitting.

1988-1989    Heat Transfer Research, Inc.  **Research Engineer**.  Involved in the design of fired heaters, heat exchangers, air coolers, and other non-fired equipment.  Also did research in the area of heat exchanger tube vibrations.

## EDUCATION

1984-1988    Ph.D., Mechanical Engineering, California Institute of Technology (Caltech), Pasadena, CA.

1984    M. S., Mechanical Engineering, Caltech, Pasadena, CA.

1978-1983    B. Tech (Honors), Mechanical Engineering, Indian Institute of Technology (IIT) Kharagpur, India

## TEACHING EXPERIENCE

Caltech

"Thermodynamics," Teaching Assistant, California Institute of Technology, 1983, 1987.

"Air Pollution Control," Teaching Assistant, California Institute of Technology, 1985.

"Caltech Secondary and High School Saturday Program," - taught various mathematics (algebra through calculus) and science (physics and chemistry) courses to high school students, 1983-1989.

8

DEC34

"Heat Transfer," - taught this course in the Fall and Winter terms of 1994-1995 in the Division of Engineering and Applied Science.

"Thermodynamics and Heat Transfer," Fall and Winter Terms of 1996-1997.

U.C. Riverside, Extension

"Toxic and Hazardous Air Contaminants," University of California Extension Program, Riverside, California. Various years since 1992.

"Prevention and Management of Accidental Air Emissions," University of California Extension Program, Riverside, California. Various years since 1992.

"Air Pollution Control Systems and Strategies," University of California Extension Program, Riverside, California, Summer 1992-93, Summer 1993-1994.

"Air Pollution Calculations," University of California Extension Program, Riverside, California, Fall 1993-94, Winter 1993-94, Fall 1994-95.

"Process Safety Management," University of California Extension Program, Riverside, California. Various years since 1992-2010.

"Process Safety Management," University of California Extension Program, Riverside, California, at SCAQMD, Spring 1993-94.

"Advanced Hazard Analysis - A Special Course for LEPCs," University of California Extension Program, Riverside, California, taught at San Diego, California, Spring 1993-1994.

"Advanced Hazardous Waste Management" University of California Extension Program, Riverside, California. 2005.

Loyola Marymount University

"Fundamentals of Air Pollution - Regulations, Controls and Engineering," Loyola Marymount University, Dept. of Civil Engineering. Various years since 1993.

"Air Pollution Control," Loyola Marymount University, Dept. of Civil Engineering, Fall 1994.

"Environmental Risk Assessment," Loyola Marymount University, Dept. of Civil Engineering. Various years since 1998.

"Hazardous Waste Remediation" Loyola Marymount University, Dept. of Civil Engineering. Various years since 2006.

University of Southern California

"Air Pollution Controls," University of Southern California, Dept. of Civil Engineering, Fall 1993, Fall 1994.

"Air Pollution Fundamentals," University of Southern California, Dept. of Civil Engineering, Winter 1994.

University of California, Los Angeles

"Air Pollution Fundamentals," University of California, Los Angeles, Dept. of Civil and Environmental Engineering, Spring 1994, Spring 1999, Spring 2000, Spring 2003, Spring 2006, Spring 2007, Spring 2008, Spring 2009.

International Programs

"Environmental Planning and Management," 5 week program for visiting Chinese delegation, 1994.

"Environmental Planning and Management," 1 day program for visiting Russian delegation, 1995.

"Air Pollution Planning and Management," IEP, UCR, Spring 1996.

"Environmental Issues and Air Pollution," IEP, UCR, October 1996.

DEC35

**PROFESSIONAL AFFILIATIONS AND HONORS**

President of India Gold Medal, IIT Kharagpur, India, 1983.

Member of the Alternatives Assessment Committee of the Grand Canyon Visibility Transport Commission, established by the Clean Air Act Amendments of 1990, 1992-present.

American Society of Mechanical Engineers: Los Angeles Section Executive Committee, Heat Transfer Division, and Fuels and Combustion Technology Division, 1987-present.

Air and Waste Management Association, West Coast Section, 1989-present.


**PROFESSIONAL CERTIFICATIONS**

EIT, California (# XE088305), 1993.

REA I, California (#07438), 2000.

Certified Permitting Professional, South Coast AQMD (#C8320), since 1993.

QEP, Institute of Professional Environmental Practice, since 2000.

CEM, State of Nevada (#EM-1699).  Expiration 10/07/2011.


**PUBLICATIONS (PARTIAL LIST)**

"Physical Properties and Oxidation Rates of Chars from Bituminous Coals," with Y.A. Levendis, R.C. Flagan and G.R. Gavalas, *Fuel*, **67**, 275-283 (1988).

"Char Combustion: Measurement and Analysis of Particle Temperature Histories," with R.C. Flagan, G.R. Gavalas and P.S. Northrop, *Comb. Sci. Tech.* **60**, 215-230 (1988).

"On the Combustion of Bituminous Coal Chars," PhD Thesis, California Institute of Technology (1988).

"Optical Pyrometry:  A Powerful Tool for Coal Combustion Diagnostics," *J. Coal Quality*, **8**, 17-22 (1989).

"Post-Ignition Transients in the Combustion of Single Char Particles," with Y.A. Levendis, R.C.Flagan and G.R. Gavalas, *Fuel*, **68**, 849-855 (1989).

"A Model for Single Particle Combustion of Bituminous Coal Char." Proc. ASME National Heat Transfer Conference, Philadelphia, **HTD-Vol. 106**, 505-513 (1989).

"Discrete Simulation of Cenospheric Coal-Char Combustion," with R.C. Flagan and G.R.Gavalas, *Combust. Flame*, **77**, 337-346 (1989).

"Particle Measurements in Coal Combustion," with R.C. Flagan, in "**Combustion Measurements**" (ed. N. Chigier), Hemisphere Publishing Corp. (1991).

"Cross Linking in Pore Structures and Its Effect on Reactivity," with G.R. Gavalas in preparation.

"Natural Frequencies and Mode Shapes of Straight Tubes," Proprietary Report for Heat Transfer Research Institute, Alhambra, CA (1990).

"Optimal Tube Layouts for Kamui SL-Series Exchangers," with K. Ishihara, Proprietary Report for Kamui Company Limited, Tokyo, Japan (1990).

"HTRI Process Heater Conceptual Design," Proprietary Report for Heat Transfer Research Institute, Alhambra, CA (1990).

"Asymptotic Theory of Transonic Wind Tunnel Wall Interference," with N.D. Malmuth and others, Arnold Engineering Development Center, Air Force Systems Command, USAF (1990).

"Gas Radiation in a Fired Heater Convection Section," Proprietary Report for Heat Transfer Research Institute, College Station, TX (1990).

DEC36

"Heat Transfer and Pressure Drop in NTIW Heat Exchangers," Proprietary Report for Heat Transfer Research Institute, College Station, TX (1991).

"NOx Control and Thermal Design," Thermal Engineering Tech Briefs, (1994).

"From Puchase of Landmark Environmental Insurance to Remediation: Case Study in Henderson, Nevada," with Robin E. Bain and Jill Quillin, presented at the AQMA Annual Meeting, Florida, 2001.

"The Jones Act Contribution to Global Warming, Acid Rain and Toxic Air Contaminants," with Charles W. Botsford, presented at the AQMA Annual Meeting, Florida, 2001.

## PRESENTATIONS (PARTIAL LIST)

"Pore Structure and Combustion Kinetics - Interpretation of Single Particle Temperature-Time Histories," with P.S. Northrop, R.C. Flagan and G.R. Gavalas, presented at the AIChE Annual Meeting, New York (1987).

"Measurement of Temperature-Time Histories of Burning Single Coal Char Particles," with R.C. Flagan, presented at the American Flame Research Committee Fall International Symposium, Pittsburgh, (1988).

"Physical Characterization of a Cenospheric Coal Char Burned at High Temperatures," with R.C. Flagan and G.R. Gavalas, presented at the Fall Meeting of the Western States Section of the Combustion Institute, Laguna Beach, California (1988).

"Control of Nitrogen Oxide Emissions in Gas Fired Heaters - The Retrofit Experience," with G. P. Croce and R. Patel, presented at the International Conference on Environmental Control of Combustion Processes (Jointly sponsored by the American Flame Research Committee and the Japan Flame Research Committee), Honolulu, Hawaii (1991).

"Air Toxics - Past, Present and the Future," presented at the Joint AIChE/AAEE Breakfast Meeting at the AIChE 1991 Annual Meeting, Los Angeles, California, November 17-22 (1991).

"Air Toxics Emissions and Risk Impacts from Automobiles Using Reformulated Gasolines," presented at the Third Annual Current Issues in Air Toxics Conference, Sacramento, California, November 9-10 (1992).

"Air Toxics from Mobile Sources," presented at the Environmental Health Sciences (ESE) Seminar Series, UCLA, Los Angeles, California, November 12, (1992).

"Kilns, Ovens, and Dryers - Present and Future," presented at the Gas Company Air Quality Permit Assistance Seminar, Industry Hills Sheraton, California, November 20, (1992).

"The Design and Implementation of Vehicle Scrapping Programs," presented at the 86th Annual Meeting of the Air and Waste Management Association, Denver, Colorado, June 12, 1993.

"Air Quality Planning and Control in Beijing, China," presented at the 87th Annual Meeting of the Air and Waste Management Association, Cincinnati, Ohio, June 19-24, 1994.

DEC37

**Annex A**

Expert Litigation Support

1. Matters for which Dr. Sahu has have provided depositions and affidavits/expert reports include:

(a)  Deposition on behalf of Rocky Mountain Steel Mills, Inc. located in Pueblo, Colorado – dealing with the manufacture of steel in mini-mills including methods of air pollution control and BACT in steel mini-mills and opacity issues at this steel mini-mill

(b)  Affidavit for Rocky Mountain Steel Mills, Inc. located in Pueblo Colorado – dealing with the technical uncertainties associated with night-time opacity measurements in general and at this steel mini-mill.

(c)  Expert reports and depositions (2/28/2002 and 3/1/2002; 12/2/2003 and 12/3/2003; 5/24/2004) on behalf of the US Department of Justice in connection with the Ohio Edison NSR Cases. *United States, et al. v. Ohio Edison Co., et al.*, C2-99-1181 (S.D. Ohio).

(d)  Expert reports and depositions (5/23/2002 and 5/24/2002) on behalf of the US Department of Justice in connection with the Illinois Power NSR Case. *United States v. Illinois Power Co., et al.*, 99-833-MJR (S.D. Ill.).

(e)  Expert reports and depositions (11/25/2002 and 11/26/2002) on behalf of the US Department of Justice in connection with the Duke Power NSR Case. *United States, et al. v. Duke Energy Corp.*, 1:00-CV-1262 (M.D.N.C.).

(f)  Expert reports and depositions (10/6/2004 and 10/7/2004; 7/10/2006) on behalf of the US Department of Justice in connection with the American Electric Power NSR Cases. *United States, et al. v. American Electric Power Service Corp., et al.*, C2-99-1182, C2-99-1250 (S.D. Ohio).

(g)  Affidavit (March 2005) on behalf of the Minnesota Center for Environmental Advocacy and others in the matter of the Application of Heron Lake BioEnergy LLC to construct and operate an ethanol production facility – submitted to the Minnesota Pollution Control Agency.

(h)  Expert reports and depositions (10/31/2005 and 11/1/2005) on behalf of the US Department of Justice in connection with the East Kentucky Power Cooperative NSR Case. *United States v. East Kentucky Power Cooperative, Inc*., 5:04-cv-00034-KSF (E.D. KY).

(i)  Deposition (10/20/2005) on behalf of the US Department of Justice in connection with the Cinergy NSR Case. *United States, et al. v. Cinergy Corp., et al.*, IP 99-1693-C-M/S (S.D. Ind.).

(j)  Affidavits and deposition on behalf of Basic Management Inc. (BMI) Companies in connection with the BMI vs. USA remediation cost recovery Case.

(k)  Expert report on behalf of Penn Future and others in the Cambria Coke plant permit challenge in Pennsylvania.

(l)  Expert report on behalf of the Appalachian Center for the Economy and the Environment and others in the Western Greenbrier permit challenge in West Virginia.

(m)  Expert report, deposition (via telephone on January 26, 2007) on behalf of various Montana petitioners (Citizens Awareness Network (CAN), Women's Voices for the Earth (WVE) and the Clark Fork Coalition (CFC)) in the Thompson River Cogeneration LLC Permit No. 3175-04 challenge.

(n)  Expert report and deposition (2/2/07) on behalf of the Texas Clean Air Cities Coalition at the Texas State Office of Administrative Hearings (SOAH) in the matter of the permit challenges to TXU Project Apollo's eight new proposed PRB-fired PC boilers located at seven TX sites.

(o)  Expert testimony (July 2007) on behalf of the Izaak Walton League of America and others in connection with the acquisition of power by Xcel Energy from the proposed Gascoyne Power Plant – at the State of Minnesota, Office of Administrative Hearings for the Minnesota PUC (MPUC No. E002/CN-06-1518; OAH No. 12-2500-17857-2).

DEC38

(p)  Affidavit (July 2007) Comments on the Big Cajun I Draft Permit on behalf of the Sierra Club – submitted to the Louisiana DEQ.

(q)  Expert reports and deposition (12/13/2007) on behalf of Commonwealth of Pennsylvania – Dept. of Environmental Protection, State of Connecticut, State of New York, and State of New Jersey (Plaintiffs) in connection with the Allegheny Energy NSR Case. *Plaintiffs v. Allegheny Energy Inc., et al.,* 2:05cv0885 (W.D. Pennsylvania).

(r)  Expert reports and pre-filed testimony before the Utah Air Quality Board on behalf of Sierra Club in the Sevier Power Plant permit challenge.

(s)  Expert reports and deposition (October 2007) on behalf of MTD Products Inc., in connection with General Power Products, LLC v MTD Products Inc., 1:06 CVA 0143 (S.D. Ohio, Western Division)

(t)  Experts report and deposition (June 2008) on behalf of Sierra Club and others in the matter of permit challenges (Title V: 28.0801-29 and PSD: 28.0803-PSD) for the Big Stone II unit, proposed to be located near Milbank, South Dakota.

(u)  Expert reports, affidavit, and deposition (August 15, 2008) on behalf of Earthjustice in the matter of air permit challenge (CT-4631) for the Basin Electric Dry Fork station, under construction near Gillette, Wyoming before the Environmental Quality Council of the State of Wyoming.

(v)  Affidavits (May 2010/June 2010 in the Office of Administrative Hearings))/Declaration and Expert Report (November 2009 in the Office of Administrative Hearings) on behalf of NRDC and the Southern Environmental Law Center in the matter of the air permit challenge for Duke Cliffside Unit 6.  Office of Administrative Hearing Matters 08 EHR 0771, 0835 and 0836 and 09 HER 3102, 3174, and 3176 (consolidated).

(w)  Declaration (August 2008), Expert Report (January 2009), and Declaration (May 2009) on behalf of Southern Alliance for Clean Energy et al., v Duke Energy Carolinas, LLC. in the matter of the air permit challenge for Duke Cliffside Unit 6.  *Southern Alliance for Clean Energy et al., v. Duke Energy Carolinas, LLC*, Case No. 1:08-cv-00318-LHT-DLH (Western District of North Carolina, Asheville Division).

(x)  Dominion Wise County MACT Declaration (August 2008)

(y)  Expert Report on behalf of Sierra Club for the Green Energy Resource Recovery Project, MACT Analysis (June 13, 2008).

(z)  Expert Report on behalf of Sierra Club and the Environmental Integrity Project in the matter of the air permit challenge for NRG Limestone's proposed Unit 3 in Texas (February 2009).

(aa)  Expert Report and deposition on behalf of MTD Products, Inc., in the matter of Alice Holmes and Vernon Holmes v. Home Depot USA, Inc., et al. (June 2009, July 2009).

(bb)  Expert Report on behalf of Sierra Club and the Southern Environmental Law Center in the matter of the air permit challenge for Santee Cooper's proposed Pee Dee plant in South Carolina (August 2009).

(cc)  Statements (May 2008 and September 2009) on behalf of the Minnesota Center for Environmental Advocacy to the Minnesota Pollution Control Agency in the matter of the Minnesota Haze State Implementation Plans.

(dd)  Expert Report (August 2009) and Deposition (October 2009) on behalf of Environmental Defense, in the matter of permit challenges to the proposed Las Brisas coal fired power plant project at the Texas State Office of Administrative Hearings (SOAH).

(ee)  Deposition (October 2009) on behalf of Environmental Defense and others, in the matter of challenges to the proposed Coleto Creek coal fired power plant project at the Texas State Office of Administrative Hearings (SOAH).  (October 2009).

(ff)  Expert Report, Rebuttal Report (September 2009) and Deposition (October 2009) on behalf of the Sierra Club, in the matter of challenges to the proposed Medicine Bow Fuel and Power IGL plant in Cheyenne, Wyoming.

(gg)  Expert Report (December 2009), Rebuttal reports (May 2010 and June 2010) and depositions (June 2010) on behalf of the US Department of Justice in connection with the Alabama Power Company NSR Case. *United States v. Alabama Power Company*, CV-01-HS-152-S (Northern District of Alabama, Southern Division).

13

(hh)  Prefiled testimony (October 2009) and Deposition (December 2009) on behalf of Environmental Defense and others, in the matter of challenges to the proposed White Stallion Energy Center coal fired power plant project at the Texas State Office of Administrative Hearings (SOAH).

(ii)  Deposition (October 2009) on behalf of Environmental Defense and others, in the matter of challenges to the proposed Tenaska coal fired power plant project at the Texas State Office of Administrative Hearings (SOAH). (April 2010).

(jj)  Written Direct Testimony (July 2010) and Written Rebuttal Testimony (August 2010) on behalf of the State of New Mexico Environment Department in the matter of Proposed Regulation 20.2.350 NMAC – *Greenhouse Gas Cap and Trade Provisions,* No. EIB 10-04 (R), to the State of New Mexico, Environmental Improvement Board.

(kk)  Expert report (August 2010) and Rebuttal Expert Report (October 2010) on behalf of the US Department of Justice in connection with the Louisiana Generating NSR Case. *United States v. Louisiana Generating, LLC*, 09-CV100-RET-CN (Middle District of Louisiana) – Liability Phase.

(ll)  Declaration (August 2010), Reply Declaration (November 2010), Expert Report (April 2011), Supplemental and Rebuttal Expert Report (July 2011) on behalf of the US EPA and US Department of Justice in the matter of DTE Energy Company and Detroit Edison Company (Monroe Unit 2). *United States of America v. DTE Energy Company and Detroit Edison Company*, Civil Action No. 2:10-cv-13101-BAF-RSW (US District Court for the Eastern District of Michigan).

(mm)  Expert Report and Deposition (August 2010) as well as Affidavit (September 2010) on behalf of Kentucky Waterways Alliance, Sierra Club, and Valley Watch in the matter of challenges to the NPDES permit issued for the Trimble County power plant by the Kentucky Energy and Environment Cabinet to Louisville Gas and Electric, File No. DOW-41106-047.

(nn)  Expert Report (August 2010), Rebuttal Expert Report (September 2010), Supplemental Expert Report (September 2011), and Declaration (November 2011) on behalf of Wild Earth Guardians in the matter of opacity exceedances and monitor downtime at the Public Service Company of Colorado (Xcel)'s Cherokee power plant.  No. 09-cv-1862 (D. Colo.).

(oo)  Written Direct Expert Testimony (August 2010) and Affidavit (February 2012) on behalf of Fall-Line Alliance for a Clean Environment and others in the matter of the PSD Air Permit for Plant Washington issued by Georgia DNR at the Office of State Administrative Hearing, State of Georgia (OSAH-BNR-AQ-1031707-98-WALKER).

(pp)  Deposition (August 2010) on behalf of Environmental Defense, in the matter of the remanded permit challenge to the proposed Las Brisas coal fired power plant project at the Texas State Office of Administrative Hearings (SOAH).

(qq)  Expert Report, Supplemental/Rebuttal Expert Report, and Declarations (October 2010, September 2012) on behalf of New Mexico Environment Department (Plaintiff-Intervenor), Grand Canyon Trust and Sierra Club (Plaintiffs) in the matter of Public Service Company of New Mexico (PNM)'s Mercury Report for the San Juan Generating Station, CIVIL NO. 1:02-CV-0552 BB/ATC (ACE).  US District Court for the District of New Mexico.

(rr)  Comment Report (October 2010) on the Draft Permit Issued by the Kansas DHE to Sunflower Electric for Holcomb Unit 2.  Prepared on behalf of the Sierra Club and Earthjustice.

(ss)  Expert Report (October 2010) and Rebuttal Expert Report (November 2010) (BART Determinations for PSCo Hayden and CSU Martin Drake units) to the Colorado Air Quality Commission on behalf of Coalition of Environmental Organizations.

(tt)  Expert Report (November 2010) (BART Determinations for TriState Craig Units, CSU Nixon Unit, and PRPA Rawhide Unit) to the Colorado Air Quality Commission on behalf of Coalition of Environmental Organizations.

(uu)  Declaration (November 2010) on behalf of the Sierra Club in connection with the Martin Lake Station Units 1, 2, and 3. *Sierra Club v. Energy Future Holdings Corporation and Luminant Generation Company  LLC*, Case No. 5:10-cv-00156-DF-CMC (US District Court for the Eastern District of Texas, Texarkana Division).

DEC40

(vv)  Comment Report (December 2010) on the Pennsylvania Department of Environmental Protection (PADEP)'s Proposal to grant Plan Approval for the Wellington Green Energy Resource Recovery Facility on behalf of the Chesapeake Bay Foundation, Group Against Smog and Pollution (GASP), National Park Conservation Association (NPCA), and the Sierra Club.

(ww)  Written Expert Testimony (January 2011) and Declaration (February 2011) to the Georgia Office of State Administrative Hearings (OSAH) in the matter of Minor Source HAPs status for the proposed Longleaf Energy Associates power plant (OSAH-BNR-AQ-1115157-60-HOWELLS) on behalf of the Friends of the Chattahoochee and the Sierra Club).

(xx)  Declaration (February 2011) in the matter of the Draft Title V Permit for RRI Energy MidAtlantic Power Holdings LLC Shawville Generating Station (Pennsylvania), ID No. 17-00001 on behalf of the Sierra Club.

(yy)  Expert Report (March 2011), Rebuttal Expert Report (Jue 2011) on behalf of the United States in *United States of America v. Cemex, Inc.*, Civil Action No. 09-cv-00019-MSK-MEH (US District Court for the District of Colorado).

(zz)  Declaration (April 2011) and Expert Report (July 16, 2012) in the matter of the Lower Colorado River Authority (LCRA)'s Fayette (Sam Seymour) Power Plant on behalf of the Texas Campaign for the Environment. *Texas Campaign for the Environment v. Lower Colorado River Authority,* Civil Action No. 4:11-cv-00791 (US District Court for the Southern District of Texas, Houston Division).

(aaa)  Declaration (June 2011) on behalf of the Plaintiffs MYTAPN in the matter of Microsoft-Yes, Toxic Air Pollution-No (MYTAPN) v. State of Washington, Department of Ecology and Microsoft Corporation Columbia Data Center to the Pollution Control Hearings Board, State of Washington, Matter No. PCHB No. 10-162.

(bbb)  Expert Report (June 2011) on behalf of the New Hampshire Sierra Club at the State of New Hampshire Public Utilities Commission, Docket No. 10-261 – the 2010 Least Cost Integrated Resource Plan (LCIRP) submitted by the Public Service Company of New Hampshire (re. Merrimack Station Units 1 and 2).

(ccc)  Declaration (August 2011) in the matter of the Sandy Creek Energy Associates L.P. Sandy Creek Power Plant on behalf of Sierra Club and Public Citizen. *Sierra Club, Inc. and Public Citizen, Inc. v. Sandy Creek Energy Associates, L.P.,* Civil Action No. A-08-CA-648-LY (US District Court for the Western District of Texas, Austin Division).

(ddd)  Expert Report (October 2011) on behalf of the Defendants in the matter of *John Quiles and Jeanette Quiles et al. v. Bradford-White Corporation, MTD Products, Inc., Kohler Co., et al.,* Case No. 3:10-cv-747 (TJM/DEP) (US District Court for the Northern District of New York).

(eee)  Declaration (February 2012) and Second Declaration (February 2012) in the matter of *Washington Environmental Council and Sierra Club Washington State Chapter v. Washington State Department of Ecology and Western States Petroleum Association,* Case No. 11-417-MJP (US District Court for the Western District of Washington).

(fff)  Expert Report (March 2012) in the matter of *Environment Texas Citizen Lobby, Inc and Sierra Club v. ExxonMobil Corporation et al.,* Civil Action No. 4:10-cv-4969 (US District Court for the Southern District of Texas, Houston Division).

(ggg)  Declaration (March 2012) in the matter of *Center for Biological Diversity, et al. v. United States Environmental Protection Agency,* Case No. 11-1101 (consolidated with 11-1285, 11-1328 and 11-1336) (US Court of Appeals for the District of Columbia Circuit).

(hhh)  Declaration (March 2012) in the matter of *Sierra Club v. The Kansas Department of Health and Environment*, Case No. 11-105,493-AS (Holcomb power plan) (Supreme Court of the State of Kansas).

(iii)  Declaration (March 2012) in the matter of the Las Brisas Energy Center *Environmental Defense Fund et al., v. Texas Commission on Environmental Quality,* Cause No. D-1-GN-11-001364 (District Court of Travis County, Texas, 261st Judicial District).

(jjj)  Expert Report (April 2012), Supplemental and Rebuttal Expert Report (July 2012), and Supplemental Rebuttal Expert Report (August 2012) in the matter of the Portland Power plant *State of New Jersey and State of Connecticut (Intervenor-Plaintiff) v. RRI Energy Mid-Atlantic Power Holdings et al.,* Civil Action No. 07-CV-5298 (JKG) (US District Court for the Eastern District of Pennsylvania).

15

(kkk)  Declaration (April 2012) in the matter of the EPA's EGU MATS Rule, on behalf of the Environmental Integrity Project

(lll)  Declaration (September 2012) in the Matter of the Application of *Energy Answers Incinerator, Inc.* for a Certificate of Public Convenience and Necessity to Construct a 120 MW Generating Facility in Baltimore City, Maryland, before the Public Service Commission of Maryland, Case No. 9199.

(mmm)  Expert report (August 2012) on behalf of the US Department of Justice in connection with the Louisiana Generating NSR Case. *United States v. Louisiana Generating, LLC*, 09-CV100-RET-CN (Middle District of Louisiana) – Harm Phase.

2. Occasions where Dr. Sahu has provided <u>Written or Oral testimony before Congress</u>:

(nnn)  In July 2012, provided expert written and oral testimony to the House Subcommittee on Energy and the Environment, Committee on Science, Space, and Technology at a Hearing entitled "Hitting the Ethanol Blend Wall – Examining the Science on E15."

3. Occasions where Dr. Sahu has provided oral testimony <u>at trial or in similar proceedings</u> include the following:

(ooo)  In February, 2002, provided expert witness testimony on emissions data on behalf of Rocky Mountain Steel Mills, Inc. in Denver District Court.

(ppp)  In February 2003, provided expert witness testimony on regulatory framework and emissions calculation methodology issues on behalf of the US Department of Justice in the Ohio Edison NSR Case in the US District Court for the Southern District of Ohio.

(qqq)  In June 2003, provided expert witness testimony on regulatory framework, emissions calculation methodology, and emissions calculations on behalf of the US Department of Justice in the Illinois Power NSR Case in the US District Court for the Southern District of Illinois.

(rrr)  In August 2006, provided expert witness testimony regarding power plant emissions and BACT issues on a permit challenge (Western Greenbrier) on behalf of the Appalachian Center for the Economy and the Environment in West Virginia.

(sss)  In May 2007, provided expert witness testimony regarding power plant emissions and BACT issues on a permit challenge (Thompson River Cogeneration) on behalf of various Montana petitioners (Citizens Awareness Network (CAN), Women's Voices for the Earth (WVE) and the Clark Fork Coalition (CFC)) before the Montana Board of Environmental Review.

(ttt)  In October 2007, provided expert witness testimony regarding power plant emissions and BACT issues on a permit challenge (Sevier Power Plant) on behalf of the Sierra Club before the Utah Air Quality Board.

(uuu)  In August 2008, provided expert witness testimony regarding power plant emissions and BACT issues on a permit challenge (Big Stone Unit II) on behalf of the Sierra Club and Clean Water before the South Dakota Board of Minerals and the Environment.

(vvv)  In February 2009, provided expert witness testimony regarding power plant emissions and BACT issues on a permit challenge (Santee Cooper Pee Dee units) on behalf of the Sierra Club and the Southern Environmental Law Center before the South Carolina Board of Health and Environmental Control.

(www)  In February 2009, provided expert witness testimony regarding power plant emissions, BACT issues and MACT issues on a permit challenge (NRG Limestone Unit 3) on behalf of the Sierra Club and the Environmental Integrity Project before the Texas State Office of Administrative Hearings (SOAH) Administrative Law Judges.

(xxx)  In November 2009, provided expert witness testimony regarding power plant emissions, BACT issues and MACT issues on a permit challenge (Las Brisas Energy Center) on behalf of the Environmental Defense Fund before the Texas State Office of Administrative Hearings (SOAH) Administrative Law Judges.

(yyy)    In February 2010, provided expert witness testimony regarding power plant emissions, BACT issues and MACT issues on a permit challenge (White Stallion Energy Center) on behalf of the Environmental Defense Fund before the Texas State Office of Administrative Hearings (SOAH) Administrative Law Judges.

(zzz)    In September 2010 provided oral trial testimony on behalf of Commonwealth of Pennsylvania – Dept. of Environmental Protection, State of Connecticut, State of New York, State of Maryland, and State of New Jersey (Plaintiffs) in connection with the Allegheny Energy NSR Case in US District Court in the Western District of Pennsylvania. *Plaintiffs v. Allegheny Energy Inc., et al.,* 2:05cv0885 (W.D. Pennsylvania).

(aaaa)    Oral Direct and Rebuttal Expert Testimony (September 2010) on behalf of Fall-Line Alliance for a Clean Environment and others in the matter of the PSD Air Permit for Plant Washington issued by Georgia DNR at the Office of State Administrative Hearing, State of Georgia (OSAH-BNR-AQ-1031707-98-WALKER).

(bbbb)    Oral Testimony (September 2010) on behalf of the State of New Mexico Environment Department in the matter of Proposed Regulation 20.2.350 NMAC – *Greenhouse Gas Cap and Trade Provisions,* No. EIB 10-04 (R), to the State of New Mexico, Environmental Improvement Board.

(cccc)    Oral Testimony (October 2010) regarding mercury and total PM/PM10 emissions and other issues on a remanded permit challenge (Las Brisas Energy Center) on behalf of the Environmental Defense Fund before the Texas State Office of Administrative Hearings (SOAH) Administrative Law Judges.

(dddd)    Oral Testimony (November 2010) regarding BART for PSCo Hayden, CSU Martin Drake units before the Colorado Air Quality Commission on behalf of the Coalition of Environmental Organizations.

(eeee)    Oral Testimony (December 2010) regarding BART for TriState Craig Units, CSU Nixon Unit, and PRPA Rawhide Unit) before the Colorado Air Quality Commission on behalf of the Coalition of Environmental Organizations.

(ffff)    Deposition (December 2010) on behalf of the US Department of Justice in connection with the Louisiana Generating NSR Case. *United States v. Louisiana Generating, LLC,* 09-CV100-RET-CN (Middle District of Louisiana).

(gggg)    Deposition (February 2011 and January 2012) on behalf of Wild Earth Guardians in the matter of opacity exceedances and monitor downtime at the Public Service Company of Colorado (Xcel)'s Cherokee power plant. No. 09-cv-1862 (D. Colo.).

(hhhh)    Oral Expert Testimony (February 2011) to the Georgia Office of State Administrative Hearings (OSAH) in the matter of Minor Source HAPs status for the proposed Longleaf Energy Associates power plant (OSAH-BNR-AQ-1115157-60-HOWELLS) on behalf of the Friends of the Chattahoochee and the Sierra Club).

(iiii)    Deposition (August 2011) on behalf of the United States in *United States of America v. Cemex, Inc.*, Civil Action No. 09-cv-00019-MSK-MEH (US District Court for the District of Colorado).

(jjjj)    Deposition (July 2011) and Oral Testimony at Hearing (February 2012) on behalf of the Plaintiffs MYTAPN in the matter of Microsoft-Yes, Toxic Air Pollution-No (MYTAPN) v. State of Washington, Department of Ecology and Microsoft Corporation Columbia Data Center to the Pollution Control Hearings Board, State of Washington, Matter No. PCHB No. 10-162.

(kkkk)    Oral Testimony at Hearing (March 2012) on behalf of the US Department of Justice in connection with the Louisiana Generating NSR Case. *United States v. Louisiana Generating, LLC*, 09-CV100-RET-CN (Middle District of Louisiana).

(llll)    Oral Testimony at Hearing (April 2012) on behalf of the New Hampshire Sierra Club at the State of New Hampshire Public Utilities Commission, Docket No. 10-261 – the 2010 Least Cost Integrated Resource Plan (LCIRP) submitted by the Public Service Company of New Hampshire (re. Merrimack Station Units 1 and 2).

DEC43

**ATTACHMENT B**

COPIES OF CALCULATIONS SPREADSHEETS

DEC44

CPC Mojave CA, Mill-On

| | |
|---|---|
| Company | CalPortland Cement (CPC) |
| Location | Mojave, CA |
| Type of Kiln | Long, Dry |
| Emission Location | Baghouse |
| Pollutant | filterable PM (fPM) |
| Test Method | EPA Method 5 |
| Source of Data | CPC Mojave Plant, Final Test Report, URS, 12/7/12 |

Data

Average Run Time    1-Hr (approx, 72 mins)

| Run # | | 1 | 2 | 3 | Average | |
|---|---|---|---|---|---|---|
| Filterable PM | lb/hr | 11.7 | 12 | 19.2 | 14.3 | |
| Raw Materials Processed | tons/hr | | | | | [Not required, clinker data directly from test] |
| Estimated Clinker Produced | tons/hr | 189 | 186 | 175 | 183.3 | |
| fPM Emission Rate | lb/ton clinker | 0.0619 | 0.0645 | 0.1097 | 0.0787 | |

| 99 UPL | lb/ton clinker | 0.232 | [from EPA UPL Calculator, m=3] |
|---|---|---|---|

DEC45

CPC Mojave Mill-On UPL

Appendix F:

PM UPL Calculation for New Sources

New PM UPL
Runs

NonCISWI Kiln Emissions (lb/ton clinker)
CalPortland, Mojave, Mill-On

| | |
|---|---|
| 1 | 0.061904762 |
| 2 | 0.064516129 |
| 3 | 0.109714286 |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |
| 29 | |
| 30 | |
| 31 | |
| 32 | |
| 33 | |
| 34 | |
| 35 | |

DEC46

CPC Mojave Mill-On UPL

Appendix F:    PM UPL Calculation for New Sources

ni = number test runs =    3

Number of sources =    $N$    1

n = Total # test runs    $\sum_{i=1}^{N} n_i$    3

$df = \left( \sum_{i=1}^{N} n_i \right) - 1$    2

This step is for QC only:

means    $\overline{x}_i = \frac{1}{n_i} \sum_{k=1}^{n_i} x_{ik}$    0.078711726

Mean    $\overline{\overline{X}} = \frac{1}{n} \sum_{i=1}^{N} \sum_{j=1}^{n_i} x_{ij}$    0.078711726

Pooled Variance =    0.000722574

$s^2 = \frac{1}{n-1} \sum_{i=1}^{n} (x_i - \overline{X})^2$

m = number future runs =    3

Term1    $\frac{1}{n} \frac{1}{m}$    0.666666667

Term2    $s^2 \left( \frac{1}{n} + \frac{1}{m} \right)$    0.000481716

Squared root Term2    $\sqrt{s^2 \left( \frac{1}{n} + \frac{1}{m} \right)}$    0.021948027

Page 2 of 3

DEC47

Appendix F:          PM UPL Calculation for New Sources

CPC Mojave Mill-On UPL

NOTE: the pvalue for the t-statistic is calculated as: 2*alpha, where 1-alpha is desired confidence, so if 99% confidence is desired then alpha=0.01 and 2*alpha=2*(0.01)

t-statistic    $t_{df}$    = quantile t-distribution with df degrees of freedom at .99 confidence level =          6.964556734

UPL POOLED VARIANCE =    0.231570008

$$\overline{X} + t_{df, p} \sqrt{s^2 \left( \frac{1}{n} + \frac{1}{m} \right)}$$

DEC48

CPC Mojave CA, Mill-Off

| Company | CalPortland Cement (CPC) |
| Location | Mojave, CA |
| Type of Kiln | Long, Dry |
| Emission Location | Baghouse |
| Pollutant | filterable PM (fPM) |
| Test Method | EPA Method 5 |
| Source of Data | CPC Mojave Plant, Final Test Report, URS, 12/7/12 |

Data

Average Run Time    1-Hr

| Run # | | 1 | 2 | 3 | Average | |
|---|---|---|---|---|---|---|
| Filterable PM | lb/hr | 15.4 | 18 | 13.6 | 15.7 | |
| Raw Materials Processed | tons/hr | | | | | [Not required, clinker data directly from test] |
| Estimated Clinker Produced | tons/hr | 144 | 178 | 165 | 162.3 | |
| fPM Emission Rate | lb/ton clinker | 0.1069 | 0.1011 | 0.0824 | 0.0968 | |

| 99 UPL | lb/ton clinker | 0.170 | [from EPA UPL Calculator, m=3] |
|---|---|---|---|

Page 1 of 1

DEC49

CPC Mojave Mill-Off UPL

Appendix F:

PM UPL Calculation for New Sources

New PM UPL
Runs

NonCISWI Kiln Emissions (lb/ton clinker)
CalPortland, Mojave, Mill-Off

| | |
|---|---|
| 1 | 0.106944444 |
| 2 | 0.101123596 |
| 3 | 0.082424242 |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |
| 29 | |
| 30 | |
| 31 | |
| 32 | |
| 33 | |
| 34 | |
| 35 | |

DEC50

## CPC Mojave Mill-Off UPL

**Appendix F:** PM UPL Calculation for New Sources

ni = number test runs =   3

Number of sources =   $N$   1

n =Total # test runs =   $\sum_{i=1}^{N} n_i$   3

$$df = \left(\sum_{i=1}^{N} n_i\right) - 1$$   2

This step is for QC only:

means   $\bar{x}_i = \dfrac{1}{n_i}\sum_{k=1}^{n_i} x_{ik}$   0.096830761

Mean   $\bar{X} = \dfrac{1}{n}\sum_{i=1}^{N}\sum_{j=1}^{n_i} x_{ij}$   0.096830761

Pooled Variance =   $s^2 = \dfrac{1}{n-1}\sum_{i=1}^{n}(x_i - \bar{X})^2$   0.000164131

m= number future runs =   3

Term1   $\dfrac{1}{n} + \dfrac{1}{m}$   0.666666667

Term2   $s^2\left(\dfrac{1}{n}+\dfrac{1}{m}\right)$   0.000109421

Squared root Term2   $\sqrt{s^2\left(\dfrac{1}{n}+\dfrac{1}{m}\right)}$   0.010460446

0   0   0   0   0   0   0   0   0   0   0   0

DEC51

CPC Mojave Mill-Off UPL

Appendix F:        PM UPL Calculation for New Sources

NOTE: the pvalue for the t-statistic is calculated as: 2*alpha, where 1-alpha is desired confidence, so if 99% confidence is desired then alpha=0.01 and 2*alpha=2*(0.01)

t-statistic    $t_{df}$    = quantile t-distribution with df degrees of freedom at .99 confidence level =        6.964556734

UPL POOLED VARIANCE =        0.169683131

$$\overline{X} + t_{df,P} \sqrt{s^2 \left( \frac{1}{n} + \frac{1}{m} \right)}$$

DEC52

Cemex Knoxville TN

| Company | Cemex |
|---|---|
| Location | Knoxville, TN |
| Type of Kiln | Long, Dry |
| Emission Location | Baghouse |
| Pollutant | filterable PM (fPM) |
| Test Method | EPA Method 5 |
| Sources of Data | Cemex Knoxville Kiln PM Compliance Test, Final Test Report, URS, 8/27/12 & Compliance Test Report for the |
| | Kiln Baghouse Stack: Dioxin/Furans & Particulate Matter, URS, 8/27/12 |

Data

Average Run Time          3-Hrs

| Run # | | 1 | 2 | 3 | Average | |
|---|---|---|---|---|---|---|
| Filterable PM | lb/hr | 19.01 | 17.54 | 19.46 | 18.67 | |
| Raw Materials Processed | tons/hr | 160 | 160 | 160 | 160 | [Used Raw Materials/Clinker = 1.65, per EPA] |
| Estimated Clinker Produced | tons/hr | 97 | 97 | 97 | 97 | |
| fPM Emission Rate | lb/ton clinker | 0.1960 | 0.1809 | 0.2007 | 0.1925 | |

| 99 UPL | lb/ton clinker | 0.251 | | | [from EPA UPL Calculator, m=3] |
|---|---|---|---|---|---|

DEC53

Cemex Knoxville UPL

Appendix F:    PM UPL Calculation for New Sources

New PM UPL Runs

NonCISWI Kiln Emissions (lb/ton clinker)
Cemex, Knoxville TN

| # | Value |
|---|-------|
| 1 | 0.196040625 |
| 2 | 0.18088125 |
| 3 | 0.20068125 |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |
| 29 | |
| 30 | |
| 31 | |
| 32 | |
| 33 | |
| 34 | |
| 35 | |

DEC54

Cemex Knoxville UPL

Appendix F:    PM UPL Calculation for New Sources

ni = number test runs = 3

Number of sources = $N$    1

n = Total # test runs = $\sum_{i=1}^{N} n_i$    3

$df = \left( \sum_{i=1}^{N} n_i \right) - 1$    2

This step is for QC only:

means   $\overline{x}_i = \frac{1}{n_i} \sum_{k=1}^{n_i} x_{ki}$    0.19254375

Mean = $\overline{X} = \frac{1}{n} \sum_{i=1}^{N} \sum_{j=1}^{n_i} x_{ij}$    0.19254375

Pooled Variance = $s^2 = \frac{1}{n-1} \sum_{i=1}^{n} (x_i - \overline{X})^2$    0.00010723

m = number future runs = 3

Term1   $\frac{1}{n} + \frac{1}{m}$    0.666666667

Term2   $s^2 \left( \frac{1}{n} + \frac{1}{m} \right)$    7.14869E-05

Squared root Term2   $\sqrt{s^2 \left( \frac{1}{n} + \frac{1}{m} \right)}$    0.008454992

0   0   0   0   0   0   0   0   0   0   0   0

DEC55

Appendix F:          PM UPL Calculation for New Sources          Cemex Knoxville UPL

NOTE: the pvalue for the t-statistic is calculated as: 2*alpha, where 1-alpha is desired confidence, so if 99% confidence is desired then alpha=0.01 and 2*alpha=2*(0.01)

t-statistic    $t_{df}$    = quantile t-distribution with df degrees of freedom at .99 confidence level =          6.964556734

UPL POOLED VARIANCE =    0.251419648

$$\overline{X} + t_{df,P}\sqrt{s^2\left(\frac{1}{n} + \frac{1}{m}\right)}$$

DEC56

Cemex, Lyons CO

| Company | Cemex |
|---|---|
| Location | Lyons, CO |
| Type of Kiln | |
| Emission Location | Baghouse |
| Pollutant | filterable PM (FPM) |
| Test Method | Reported emissions |
| Source of Data | Colorado Department of Public Health and Environment Emissions Inventory |

Data
Average Run Time    N/A

| Year | | 2009 | 2010 | 2011 | Average | |
|---|---|---|---|---|---|---|
| Filterable PM10 | lb/year | 35,016 | 41,300 | 42,160 | 39,492 | |
| Raw Materials Processed | tons/yr | 312,845 | 343,731 | 344,846 | | |
| Estimated Clinker Produced | tons/yr | 189,603.0 | 208,321.8 | 208,997.6 | 202,307.5 | [Using 1.65=Raw Materials/Clinker Ratio, from EPA] |
| FPM Emission Rate | lb/ton clinker | 0.1847 | 0.1983 | 0.2017 | 0.1949 | |

| 99 UPL | lb/ton clinker | Not calculated, given data source |
|---|---|---|

DEC57

Cemex, Lyons CO (Hg)

| Company | Cemex |
|---|---|
| Location | Lyons, CO |
| Type of Kiln | |
| Emission Location | Baghouse |
| Pollutant | Mercury (Hg) |
| Test Method | Reported emissions |
| Source of Data | Colorado Department of Public Health and Environment Emissions Inventory |

Data

Average Run Time    N/A

| Year | | 2009 | 2010 | 2011 | Average | |
|---|---|---|---|---|---|---|
| Mercury | lb/year | 20 | 37 | 38 | 32 | |
| Raw Materials Processed | tons/yr | 312,845 | 343,731 | 344,846 | | |
| Estimated Clinker Produced | tons/yr | 189,603.0 | 208,321.8 | 208,997.6 | 202,307.5 | [Using 1.65=Raw Materials/Clinker Ratio, from EPA] |
| Mercury Emission Rate | lb/million tons clinker | 105.4835 | 177.6098 | 181.8203 | 154.9712 | |

| 99 UPL | lb/million tons clinker | Not calculated, given data source |
|---|---|---|

DEC58

## DECLARATION OF YOLANDA M. ANDERSEN

1. I am the Director of Membership Operations and Member Services for the Sierra Club, a non-profit corporation organized under the laws of the State of California. I work in Sierra Club's national office in San Francisco, California. I became Director of Membership Operations and Member Services in 2010. In that capacity, I am responsible for planning, developing, and directing the programs, operations, and Club staff responsible for: providing information services to members, the operational and user aspects of the Club's member/donor database, the delivery of member/donor acknowledgments, the membership renewal and the door-to-door membership acquisition and conservation outreach program. My work requires that I be familiar with the Club's purpose, organization, structure and activities, and with environmental interests and concerns of Club members. My work also requires me to be familiar with the nature and scope of the Club's membership programs, its membership records, and the manner in which information on members can be retrieved.

2. The Sierra Club is a nonprofit corporation existing under the laws of California, with its principal place of business in San Francisco, CA. The Club is a membership organization dedicated to exploring, enjoying, and protecting the wild places of the earth, and to protecting and restoring the quality of the natural and human environment. The Club's actions to protect and enhance the environment include advocacy and litigation to strengthen and enforce environmental laws and regulations. Club members are greatly concerned about air quality, and the Club has a long history of activities at both the local and national levels to protect air quality, often working closely with our members to provide them with services and information that are helpful to them locally.

3. The Club regularly maintains membership records that include the address of each member. These records are regularly updated each business day to add new members, reflect address changes, and change membership status for those who are no longer active members. The records are maintained on a computer database, from which I obtained the information provided below.

4. Sierra Club currently has 598,309 individual members, residing in all 50 states.

5. Sierra Club has the following number of members residing in each of the following counties:

     a. Pima County, AZ: 3,258.

     b. Kern County, CA: 914

     c. Boulder County, CO: 2,991

     d. Hernando County, FL: 229

     e. Houston County, GA: 58

     f. Massac County, IL: 14

     g. Lasalle County, IL: 155

    h.  Clark County, IN: 87

    i.  Lawrence County, IN: 35

    j.  Jefferson County, MT: 29

    k.  Gallatin County, MT: 369

    l.  Cass County, NE: 28

    m.  Albany County, NY: 852

    n.  Warren County, NY: 157

    o.  Pontotoc County, OK: 20

    p.  Lawrence County, PA: 76

    q.  Northampton County, PA: 574

    r.  Pennington County, SD: 147

    s.  Knox County, TN: 715

    t.  Comal County, TX: 160

    u.  Ellis County, TX: 72

    v.  McLennan County, TX: 146

6.  These are just some examples.  Sierra Club members also live in many other cities, towns, and counties throughout the United States.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of March, 2013.

*Yolanda Andersen*

Yolanda M. Andersen

DEC60

## DECLARATION OF DEIRDRE BUTLER

1.    I am a member of Sierra Club, and have been since 2000. I currently serve as the Co-Chair and Treasurer for the Indian Peaks Group of the Rocky Mountain Chapter of the Club. I am also the Newsletter Editor and the Wildlife Chair, and I am a Local Outings Leader. I've also served in various other capacities on the Indian Peaks Group's Executive Committee since about 2003, including as Chair and Vice Chair.

2.    I live with my husband in Lyons, Colorado, about 3 miles north-northwest of Cemex's Lyons cement plant. I've lived in that house since moving to Colorado in 2000. Until I retired in 2005, I worked in pharmaceuticals and medical devices and have a bachelor of science in biological sciences. Because of my involvement with the Sierra Club, I've kept learning about biology and ecology.

3.    The Cemex plant is by the junction of Routes 36 and 66. I drive by the junction about once a week and can see the plant's smokestack. Once or twice a month, I can see white smoke coming out of it.

4.    I go at least twice a week to work at Stonebridge Farm, a community supported agriculture (CSA) farm, from March until November. The farm is across the road and about 200 yards east of the Cemex plant. We have been involved with the farm for 8 years. Initially, we were paying members of the CSA who also volunteered to work there. We are now "barter" members, meaning that we work on the farm in exchange for our share of vegetables and fruits grown there. We get a wide variety of fruits and vegetables from the farm, including different types of lettuces, different types of peas, carrots, rutabagas, turnips, parsnips, garlic, onions, leeks, eggplant, tomatoes, cucumbers, peppers (bell, chilies), herbs (thyme, oregano, dill, parsley, cilantro, peppermint, basil), raspberries, and strawberries.

5.    I also go to Boulder County Open Space 3 times a week for hiking. The Boulder County Open Space is about 1-3 miles from the plant. It's a combination of Ponderosa forest, grasslands, and

DEC61

high mountain meadows. There I see nesting eagles, mule deer, elk, bear, and bobcat. I also see bald eagles along the St. Vrain River, just down from the Cemex plant.

6. My husband and I do not eat meat, nor do we eat fish at home. During the summer, all the vegetables we eat come from Stonebridge Farm. We also eat eggs from the chickens we keep at home. I particularly value eating local food because I believe it is less contaminated with industrial chemicals and the like than mass-produced foods.

7. We're breathing in the plant's emissions all the time: it's only 3 miles from my house. It is a concern. The food I eat and the air I breathe affect my health. Thus, the pollution from the plant enters my body and threatens my health. The longer the plant spews out more dangerous pollutants, the worse for me.

8. My husband and I have a very close relationship with Stonebridge Farm. We work there regularly (and enjoy it), and a large portion of the food we eat comes from there, too. I am concerned that prolonged high emissions from the plant would mean that the farm would have to close because of contamination concerns. I also very much enjoy my hikes, and enjoy seeing the birds and various mammals while I hike. I am concerned about impacts of emissions from the plant on our local ecosystem and wildlife. I am particularly concerned about the impact of mercury emissions from the plant on the ecosystem. Mercury accumulates up the food chain and doesn't dissipate.


I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29ᵗʰ day of March, 2013.


Deirdre J. Butler

DEC62

## DECLARATION OF RICHARD CARGILL

1. I am a member of Sierra Club, and have been since 2002.

2. I am 74 years old. I live with my wife in Longmont, Colorado, about 2 miles east of Cemex's Lyons cement plant. I can see the Cemex plant's smokestack from my home, and I can hear it operating. Now it operates generally at night. I've lived in that house since moving to Colorado in 1996 or 1997. My daughter lives in Lyons, about 10 miles from me, along with my 8-year-old grandson, who visits frequently.

3. I have been concerned about emissions from the Cemex plant since I moved here. In 1998, I helped organize a citizens' group to try to force the plant to clean up its emissions. As part of our efforts, I learned a lot about what cement plants emit, and how dangerous those pollutants are to human health and the environment. We also did research into meteorology and where the Cemex plant's emissions end up. We learned that a lot of heavy metals may end up in Lyons.

4. I am aware that EPA published a rule in 2013 that weakens the particulate matter standard for cement plants and gives them until September 2015 to come into compliance with the standards it published in 2010 and weakened in 2013. 78 Fed. Reg. 10,006, 10,053 (Feb. 12, 2013) (codified at 40 C.F.R. § 63.1351(c)). In the 2010 rule, EPA gave kilns until September 2013 to come into compliance with the standards. 78 Fed. Reg. at 10,022.

5. I am also aware, from air emissions data reported to the Colorado Department of Public Health and Environment, that the Cemex kiln will have to reduce its particulate matter pollution and mercury pollution emissions to come into compliance with either of EPA's cement rules.

DEC63

USCA Case #13-1112    Document #1439775    Filed: 06/05/2013    Page 259 of 372

6.    I spend a lot of time outside—we get about 300 days of sunshine a year. I tend to our family's horses. I also care for our trees and garden. I grow potatoes, onions, tomatoes (60-80 plants), jalapeño and habanero peppers, parsnips, carrots, spinach, squash, melons, rhubarb, and grapes. We eat a lot of what we grow, and give the rest away.

7.    I'm always working to stay in good health. I hike the roads and trails right by my house. I walk a couple or even 5 miles every other day. I regularly go on a road that's just out my door and goes into the countryside. I enjoy seeing the eagles, hawks, and coyotes in the area.

8.    I am aware that mercury and particulate matter discharges from the cement plant can harm ecosystems and thus the plants and animals in the area. I am concerned that if the Cemex kiln is allowed to emit more dangerous pollution like mercury and particulate matter, it will harm the animals I enjoy seeing and the plants I enjoy growing and eating. I am also aware that mercury remains highly toxic long after it is emitted from a smokestack. Thus, the effects of the mercury the kiln emits in the two years between September 2013 and September 2015 will continue for a long time.

9.    I am very concerned about emissions from the Cemex plant's kiln. Living as close to it as I do, and spending as much time outside in the area as I do, I am concerned that I breathe in what the plant puts out. What I breathe in affects my health. I know people who've died out here with respiratory illnesses, and I know that particulate matter pollution is especially dangerous for seniors. My health is also affected by the pollutants that deposit on the ground and that get into the soil I touch and the food I eat. We know what particulates and lead and mercury do—they are dangerous for people. I strongly believe that we need to have the strongest standards for those emissions, and that cement plants need to come into compliance with them as soon as possible.

DEC64

10.    I am also concerned about the effect of the emissions on my 8-year-old grandson. He works with me on my garden, and he lives in Lyons, where a lot of the heavy metals from the plant may wind up. I know that the pollution the plant emits is especially bad for developing kids like him. He's one reason I've worked so hard to get the Cemex Lyons plant to clean up and come into compliance with federal standards. The longer the kiln emits more dangerous pollutants, the worse for me and for my grandson.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _10_ day of April, 2013.

Richard Cargill

Richard Cargill

3

DEC65

DECLARATION OF DR. NEIL CARMAN

1. I am a member of the Sierra Club, and have been since 1992.

2. I am the Clean Air Program Director of the Sierra Club Lone Star Chapter.

3. I have 33 years of combined experience in the field of air pollution control.

4. I served 12 years (1980-1992) as a state environmental regulatory official at the Texas Air Control Board ("TACB"), now the Texas Commission on Environmental Quality ("TCEQ"), which has federal regulatory oversight of industrial plants in Texas. My years at the TACB were spent in the field inspecting, for state and federal air regulatory compliance, a broad range of industrial plant sites, including Portland cement kilns, incinerators, oil refineries, and petrochemical plants. I conducted compliance inspections and monitoring at more than 200 industrial plants annually.

5. During this time, I worked on enforcement actions against industrial plants that were in violation of their permits. I wrote up investigation reports about violations. When a case would get referred to the Texas Attorney General's Office, I would provide technical and other information to the lawyers and testify in the cases against the polluters. In doing this, I learned about how Clean Air Act enforcement works in Texas

6. More recently, I have spent 21 years working in environmental regulation and policy implementation primarily in the state of Texas with non-governmental organizations, including Sierra Club's Lone Star Chapter.

7. My work for TACB and non-governmental organizations like Sierra Club has made me aware of the strong need for adequate enforcement of the Clean Air Act and air permits and the difficulties in achieving it. Texas has a huge number of plants subject to

the Act, and for enforcement of the Clean Air Act to mean anything, it is vital that citizens be able to aid the government in holding industry to the law.

8.   During my time working with Sierra Club's Lone Star Chapter, I have been actively involved in all the citizen suit enforcement actions that Sierra Club has brought against plants in Texas that violated regulatory requirements. My responsibilities include serving as the sole liaison between the attorneys working on the case and the state chapter and national Sierra Club organization. I work on getting approval for the litigation to proceed. I also work with the lawyers while they research possible cases, actively participating in settlement meetings, and participate in the discussions about whether to bring a suit. I travel around the state to investigate potential suits.

9.   The suits in which I have been involved in this capacity for Sierra Club include

- A suit filed in 1997 against Crown Central Petroleum Corporation for violations at a refinery it owned (suit was settled in 2001),

- A suit filed in 2004 against American Electric Power for violations at a coal-fired power plant it owned (suit was settled around 2008),

- A suit filed in January 2008 against Shell Oil Company and two affiliates for violations at a refinery and chemical plant they owned (suit was settled in April 2009),

- A suit filed in August 2009 against Chevron Phillips Chemical Company for violations at a chemical plant it owned (suit was settled in November 2010),

2

DEC67

- At least two suits commenced in September 2010 and May 2012 against Energy Future Holdings Corp. and Luminant Generation Company for violations at power plants they own (suits are ongoing), and

- A suit commenced in December 2010 against ExxonMobil Corporation and two subsidiaries for violations at a refinery and chemical plant complex they own (suit is ongoing).

10. I have also been involved in a number of investigations that did not lead to suits being filed.

11. Citizen enforcement of the Act is an important supplement to state and federal enforcement. When governments don't enforce it, citizens are the only backstop. And even if the state might enforce the Act, citizen suits can obtain relief that the state probably would not. For example, in enforcement actions against chemical plants in Texas, we were able to get the defendants to agree to install technologies that Texas does not require, but that other states do. If Texas had brought the enforcement actions, the plants would likely not have installed these technology requirements, and the plants would not be operating as cleanly as they could.

12. We have sought civil penalties in all of the Clean Air Act citizen suit enforcement actions we have brought. We seek penalties because they make the most powerful deterrent against violations.

13. We also seek penalties because, when there are hundreds or thousands of violations, a request for civil penalties makes the violator more willing to negotiate to settle or otherwise resolve the case. It is the threat of having to pay penalties that forces them to the table.

DEC68

14. In addition, we seek civil penalties because they can be used to support projects that benefit public health and the environment in the area that suffered as a result of the plant's violations. For example, in our suit against Shell, the civil penalties from our settlement went toward environmental, public health, and education projects in the county that is home to the plant. The purpose of one of the projects was to reduce diesel emissions from school buses. Similarly, in settling our suit with Chevron Phillips, part of the agreement was that the civil penalties would go to fund a multi-year environmental health project in the area near the plant. This included a mobile health clinic and providing continuing education to health professionals regarding a comprehensive, integrated environmental health assessment and management approach.

15. I am aware that as part of its state implementation plan ("SIP"), Texas has previously allowed and proposed once again to allow industry to invoke an affirmative defense against civil penalties for violations that occur during periods of startup, shutdown, and malfunction ("SSM"). In one of the Luminant cases, the defendants filed a motion to dismiss that relied in part on the affirmative defense to civil penalties in cases of malfunction that is available in Texas's SIP. That motion has been denied, but the defendants may still raise the affirmative defense at later stages in the litigation.

16. In Texas, in my experience, companies state on essentially all their reports of emission exceedance events that a malfunction, like a power failure or equipment failure, was the cause.

17. When deciding whether to bring a case, we consider the impact of the affirmative defense. If it is available, it completely changes the calculus of the case, and we are less likely to bring a case.

DEC69

18. For one, the affirmative defense undercuts the credibility of civil penalties, seriously weakening the deterrent effect of citizen enforcement actions. The threat of injunctive relief standing alone, without the strong threat of civil penalties, is not nearly as powerful.

19. Also, there are cases with significant violations that we are unable to bring because the affirmative defense will make them too expensive or time consuming.

20. If each violation is subject to the affirmative defense, our projected costs in litigation are significantly increased. I expect that we would have to engage in expensive discovery about each violation or type of violation and present argument to the court about why each one does not qualify for the defense. I further expect that we would have to present expert testimony on why specific violations do not qualify for the affirmative defense. The trial would thus be more time-consuming and expensive for us.

21. In the absence of the defense, we would not have to engage in discovery about affirmative defense issues, or present argument or testimony on these issues, because the violator's mandatory reporting would establish liability subject to penalties. Thus, the cost and time involved in bringing enforcement suits would not be increased, and we would be more likely to bring a citizen enforcement suit in a case with significant violations.

22. There are 9 Portland cement plants, operating one or multiple cement kilns, in Texas. There are also 2 plants that produce cement but that EPA classifies as consisting of commercial or industrial solid waste incinerators.

DEC70

23. I am aware, based on the attached reports, that plants like the TXI cement plant in Midlothian often exceed their emission standards and attribute all or almost all of their exceedances to malfunctions.

24. Until the D.C. Circuit vacated the SSM exemption from compliance with hazardous air pollutant emission standards, cement plants had no obligation to meet such standards during malfunctions. Accordingly, cement plants could not be held liable for violating hazardous air pollutant emissions standards during malfunctions unless it could be proved that a plant was not actually malfunctioning or that it was not meeting its obligation to use acceptable operation and maintenance procedures, consistent with good air pollution control practice for minimizing emissions.

25. Sierra Club has brought Clean Air Act citizen enforcement suits against a variety of industrial sources in the past, and would, as feasible, bring enforcement suits under the Act against cement kilns that violate the air toxics standards.

26. In such a suit, Sierra Club would almost certainly seek civil penalties both to deter future violations and to compel violators to mitigate the damage caused by their excess toxic pollution. With violations better deterred, there will be fewer exceedances, resulting in less air pollutants being emitted. There will thus be less damage to health and the environment. When violations occur, mitigation penalties under the Clean Air Act will help to reduce the damage and suffering they cause.

27. In addition, Sierra Club would almost certainly seek civil penalties because when faced with civil penalties, violators are more willing to negotiate to settle the suit. This can provide mitigative and ameliorative measures more quickly. In fact, in several of our cases where we were able to negotiate a settlement, the defendants have come into

6

DEC71

compliance with the settlements much faster than we could have envisioned when we were negotiating. As a result, they have reduced the number of exceedances and the volumes of pollutants emitted during malfunctions, greatly benefiting our members. Without the threat of civil penalties, I do not believe we would have been able to obtain such good and speedy results.

28. If our suits are subject to the affirmative defense against civil penalties that EPA has included in the cement kilns rule, based on my experience with Clean Air Act citizen suits in Texas, and my work for Sierra Club, Sierra Club will be less able to enforce emission standards for cement plants, less able to deter violations of those standards, and less able to protect our members from the damage that such violations cause.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 31 day of May, 2013.

Neil Carman

DEC72

# Attachments

USCA Case #13-1112     Document #1439775     Filed: 06/05/2013     Page 269 of 372



SITE SEARCH:

please enter search phrase   Go

SUBJECT INDEX
> Air   > Water   > Waste

> Search TCEQ Data
> Agency Organization Map

# Emission Event Reporting Database

| Regulated entity name | TXI OPERATIONS | Physical location | 245 WARD RD, MIDLOTHIAN, TX |
|---|---|---|---|
| Regulated entity RN number | RN100217199 | City, County | MIDLOTHIAN, ELLIS |
| Type(s) of air emissions event: | EXCESS OPACITY | Event began: | 02/11/2011 6:51AM |
| This is based on the: | INITIAL REPORT | Event ended: | 02/11/2011 7:05AM |
| Cause | Due to inclement weather (Excessive low temperatures) - air lines froze causing plant to lose air to #1 RTO which caused drive to stop. Drive stoppage caused outlet temperature to rise on #1 RTO which caused excess opacity. | | |
| Action taken | Thawed line - restored air. | | |
| Emissions estimation method | COMs | | |

## Source 1: #5 Kiln Stack , EPN number E2-22

| Contaminant | Authorization | Limit | Amount Released |
|---|---|---|---|
| Opacity | 1360A permit; 40 CFR LLL | 10.0 % op | 37.0 % op (est.) |

## Source 2: #5 Kiln Stack , FIN number E-2-22

## Source 3: #5 Kiln Stack , FIN number

## No other sources

Document #1439775        Filed: 06/05/2013        Page 270 of 372

Return to search form

Air subjects

Region contact information

Air emissions events/maintenance activity forms

30 TAC air quality rules    Exit...

DEC75



SITE SEARCH:

please enter search phrase   Go

SUBJECT INDEX
  - Air - Water - Waste

- Search TCEQ Data
- Agency Organization Map

# Emission Event Reporting Database

| | | | |
|---|---|---|---|
| Regulated entity name | TXI OPERATIONS | Physical location | 245 WARD RD, MIDLOTHIAN, TX |
| Regulated entity RN number | RN100217199 | City, County | MIDLOTHIAN, ELLIS |
| Type(s) of air emissions event: | EXCESS OPACITY | Event began: | 06/10/2012 3:56PM |
| This is based on the: | INITIAL REPORT | Event ended: | 06/10/2012 3:58PM |
| Cause | Stage 1a east cyclone plugged (preheater tower). Stage 1a cyclone is approx. 320 feet in the air. The plug resulted in the vessel filling with kiln feed (very fine - 92% passing 200 screen). The material flowed through the kiln system and exited the clinker cooler. The material flushed through inspection ports and the kiln inlet seal and the kiln discharge seal. The dusting from this event crossed over the plant boundary. | | |
| Action taken | The system was shut down immediately. | | |
| Emissions estimation method | | | |

## Source 1: Kiln 5 System , EPN number not applicable

| Contaminant | Authorization | Limit | Amount Released |
|---|---|---|---|
| Opacity | 1360A Air Permit | 0.0 | 90.0 % op (est.) |

## Source 2: Kiln 5 System , FIN number Kiln 5 System

## Source 3: Kiln 5 System , FIN number

DEC76

# No other sources

Return to search form

Air subjects

Region contact information

Air emissions events/maintenance activity forms

30 TAC air quality rules 

USCA Case #13-1112     Document #1439775     Filed: 06/05/2013     Page 273 of 372



SITE SEARCH:

please enter search phrase   Go

SUBJECT INDEX

➤ Air   ➤ Water   ➤ Waste

➤ Search TCEQ Data
➤ Agency Organization Map

**TEXAS COMMISSION ON ENVIRONMENTAL QUALITY**

# Emission Event Reporting Database

| | | | |
|---|---|---|---|
| Regulated entity name | TXI OPERATIONS | Physical location | 245 WARD RD, MIDLOTHIAN, TX |
| Regulated entity RN number | RN100217199 | City, County | MIDLOTHIAN, ELLIS |
| Type(s) of air emissions event: | EXCESS OPACITY | Event began: | 02/18/2011 10:56AM |
| This is based on the: | INITIAL REPORT | Event ended: | 02/18/2011 11:26AM |
| Cause | #5 Kiln went down at approximately 09:30am when the main baghouse fan had to be shut down due to excessive vibration. During the repairs to this fan, other repairs were made to the kiln system including electrical components on the RTOs.During these repairs while the kiln was down, without feed and all main fans down, an opacity excursion occurred at approximately 10:56am. The kiln remained non-operational until repairs were completed to the main baghouse. | | |
| Action taken | Completion of repairs to the electrical components of the RTO corrected the opacity excursion. | | |
| Emissions estimation method | COMs | | |

## Source 1: #5 Kiln Stack , EPN number E2-22

| Contaminant | Authorization | Limit | Amount Released |
|---|---|---|---|
| Opacity | 1360A permit; 40CFR LLL | 10.0 % op | 34.7 % op (est.) |

## Source 2: #5 Kiln Stack , FIN number E-2-22

## Source 3: #5 Kiln Stack , FIN number

DEC78

USCA Case #13-1112     Document #1439775     Filed: 06/05/2013     Page 274 of 372

# No other sources

Return to search form

Air subjects

Region contact information

Air emissions events/maintenance activity forms

30 TAC air quality rules 

## DECLARATION OF KATHRYN TILSON

1.    I am a member of the Sierra Club, and have been continuously since 2011.

2.    My husband and I live in Knoxville, Tennessee, about a mile and a quarter from the Cemex cement plant along the Holston River. We are so close that we can feel blasting or other large earth-moving work on the plant's grounds. We have lived in our home since 1991.

3.    The plant is very visible from I-40 at the exit to our neighborhood. We drive past it regularly.

4.    I am aware that EPA published a rule in 2013 that weakens the particulate matter standard for cement plants and gives them two more years than it gave them in 2010 to come into compliance with the standards it published in 2010 and weakened in 2013.

5.    We have a lot of air pollution problems in Knoxville. We are at the foothills of the Great Smoky Mountains, and we also get a lot of weather inversions, which trap air pollution in Knoxville. In summer in particular, we have a lot of warnings about bad air quality. I am aware that Knoxville is designated nonattainment for fine particulate matter pollution. My husband and I have allergies that cause difficulty breathing.

6.    I'm concerned about the effects of pollution on me. Breathing is obviously an important part of my life. I am aware that mercury is a deadly neurotoxin. I am also aware that soot pollution can kill. And I am aware from published reports that soot pollution is harmful to plants and ecosystems, especially those near cement plants.

7.    I regularly spend time outside in my neighborhood. We have a nice, big yard, about 1.5 acres, with blueberries, raspberries, and pears. My husband and I have also

DEC80

been planting a lot of trees in our yard over the last several years, and we regularly mulch or otherwise tend to them. We have a birch, a cedar, a white oak, a magnolia, dogwoods, pears, and white pines. I also dry my laundry on clotheslines in our yard, so am often outside dealing with that.

8.     We also walk and bike regularly in the neighborhood.

9.     Because of our proximity to the Holston River and its tributary Loves Creek, the area has a lot of green and attracts a lot of wildlife. There are coyotes, opossums, and turkeys right around our house, for example. I also love birds and bird-watching. We have birdfeeders in our yard, including one specifically for finches. We have titmice, cardinals, blue jays, golden finches, and house finches.

10.    We enjoy eating the fruit we grow ourselves, and I am looking forward to returning to vegetable gardening, too.

11.    I am aware from published reports and information on the Cemex plant's emissions that the plant will have to clean up its emissions to come into compliance with EPA's mercury and particulate matter standards. But because of the 2-year delay, the plant will be allowed to emit more of these dangerous pollutants for longer than it otherwise would.

12.    I am aware that mercury remains in the environment long after it is emitted from a smokestack or other source. So, the longer the Cemex plant is allowed to emit high levels of mercury, the more mercury there will be in the area around me, effectively permanently.

2

DEC81

13.    The air I breathe affects my health. When I am outside, I breathe the air. By breathing, I am exposed to air pollutants, including particulate matter and hazardous air pollutants like mercury, emitted by the Cemex plant. These pollutants are dangerous. The more of them in the air I breathe, the greater the danger. My exposure to pollutants cannot be undone. And if Cemex is allowed to emit more of them for longer, the more dangerous for me. I am concerned about the impacts of the dirty air on me. Further, these pollutants are harmful for the ecosystem around me, including the vegetation in my yard, like the fruit we grow and eat. I am also concerned about the impacts of the pollution on the wildlife in the area and the birds that I enjoy watching in my yard.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of April, 2013.

_Kathryn Tilson_

Kathryn Tilson

3

DEC82

## DECLARATION OF JANE WILLIAMS

1.      I am a member of the Sierra Club, and have been since 1997.

2.      I am a member of the Sierra Club's Clean Air Team, which is responsible for air toxics litigation, air toxics policy, and providing direct support to communities facing air toxics problems.

3.      I also am the executive director of California Communities Against Toxics, an environmental justice network in California and an active member of Desert Citizens Against Pollution, a nonprofit environmental health group that works on desert pollution issues.

4.      Since 1992, I have worked on behalf of Desert Citizens Against Pollution to improve efforts by EPA to control and reduce emissions of air pollutants from cement kilns in California. Because I am aware that cement kilns emit vast quantities of air pollutants, I have worked on behalf of Desert Citizens Against Pollution for 17 years specifically to ensure that federal regulations contain provisions limiting toxic pollution from cement kilns. In 2010, Desert Citizens Against Pollution intervened to defend EPA's 2010 rule that finally established lawful limits on toxic air pollution from cement kilns. *See* 75 Fed. Reg. 54,970 (Sept. 9, 2010).

5.      My family and I live on our ranch in Rosamond, CA.

6.      Our ranch in Rosamond is approximately 12 miles from the CalPortland cement kiln in Mojave, 20 miles from the Lehigh cement kiln in Tehachapi, and 25 miles from the National Cement Company cement kiln in Gorman/Lebec. I am aware from published reports and EPA documents that all these kilns will almost certainly have to take action to come into compliance with the standards EPA established in 2010.

7.      EPA estimates that the Tehachepi kiln has very high mercury emissions: 1,690 lb/million tons clinker. EPA-HQ-OAR-2002-0051-3480 at 14. The kiln owner itself reported that

the Tehachepi kiln emitted over 1,349 pounds of mercury in 2011, and that over the last 12 years, it has averaged over 1,489 pounds per year. *See* Ex. A (excerpted from http://iaspub.epa.gov/triexplorer/facility_data?tri_facility_id=93561CLVRS13573&tri=TRIQ1). Once the kiln comes into compliance with the standard (55 lb/million tons clinker), EPA estimates its mercury emissions will shrink by 1,750 pounds per year, to about 35 pounds per year. EPA-HQ-OAR-2002-0051-3480 at 14. I am also aware from a published report that Lehigh plans to install an activated carbon injection system that would provide some control of mercury emissions (though not necessarily down to the level of the standard). http://www.tehachapinews.com/news/local/x59956471/Lehigh-Cement-system-will-reduce-mercury.

8.      Further, I regularly see kiln upsets at the Tehachapi kiln. I drive by it a couple times a month, and roughly every three times I drive by I see visible emissions. During normal operations, emissions are not supposed to be visible. During upsets, I see a giant cloud of light grey smoke. There is a nasty smell, like something is burning; it is acrid. My throat gets really dry. If I am too close, my eyes start to water. If I drive by the kiln and see that there is an upset, I do not engage in activities outdoors near my home.

9.      Similarly, EPA estimates show that the Mojave kiln emits more particulate matter (and non-mercury metals, for which particulate matter is EPA's surrogate) than would be allowed under the 2010 PM standard or the 2013 PM standard. I requested and reviewed stack test data for this kiln and am aware that it can and does emit more PM than would be allowed under either PM standard. Further, EPA's estimate of the Mojave kiln's PM emissions—0.08 lb/ton—is higher than the levels that would be allowed by either the 2010 rule or the 2013 rule. EPA-HQ-OAR-2002-0051-3480 at 14.

DEC84

10.    Further, emissions tests show that the Mojave kiln emits more than is allowed by the hydrochloric acid gas ("HCl") standard—it emits above 55 ppmvd (corrected to 7% oxygen). EPA-HQ-OAR-2002-0051-3468. The HCl standard is 3 ppmvd (corrected to 7% oxygen). 40 C.F.R. § 63.1343 tbl.1. Once the kiln brings its emissions under the HCl standard, its annual emissions will drop from 391.92 tons/year to 0.39 tons/year. EPA-HQ-OAR-2002-0051-3480 at 14, 18.

11.    In addition, EPA estimates that the Mojave kiln would have to reduce its mercury emissions to meet the mercury standard in the 2013 rule.  It emits, according to EPA, 68.65 lb/million tons clinker. EPA-HQ-OAR-2002-0051-3480 at 14.  The standard is 55 lb/million tons of clinker. Once the kiln comes into compliance with the mercury standard, EPA estimates its mercury emissions will shrink by 102 pounds per year, to about 2 pounds per year. EPA-HQ-OAR-2002-0051-3480 at 14.

12.    I am aware that the Mojave kiln is subject to a consent decree that required it to install certain pollution control equipment by February 2013, and although it may curb some acid gas emissions (though not necessarily down to the level of the standard), none of that equipment controls particulate matter emissions,. *See* Consent Decree ¶¶ 9, 13 tbl.1, *in United States v. CalPortland Co.*, No. 11-cv-2064 (E.D. Cal. Feb. 10, 2012); *see also id.* ¶¶ 6(v), 83 (defining "lime injection system," or "LIS," and establishing "effective date" as date of entry of consent decree).

13.    EPA also estimates that the Gorman kiln does not comply with the mercury standard in the 2010 rule, emitting over 110 lb/million tons clinker. EPA-HQ-OAR-2002-0051-3480 at 14. The kiln owner itself reported that the Gorman kiln emitted 74 pounds of mercury in 2011, and that over the last 12 years (not counting 2009, for which it submitted no information),

DEC85

it has averaged over 66 pounds per year. *See* Ex. A (excerpted from

http://iaspub.epa.gov/triexplorer/facility_data?tri_facility_id=93243NTNLCSTATE&tri=TRIQ1.

14.     I am aware that EPA published a rule in 2013 that weakens the particulate matter

standard and gives cement kilns until September 2015 to come into compliance with the

standards it published in 2010 and weakened in 2013. 78 Fed. Reg. 10,006, 10,053 (Feb. 12,

2013) (codified at 40 C.F.R. § 63.1351(c)). In the 2010 rule, EPA gave kilns until September

2013 to come into compliance with the standards. 75 Fed. Reg. at 55,063 (codified at 40 C.F.R.

§ 63.1351(b)).

15.     Every day I can, I spend a significant amount of time outside. I walk outside for at

least thirty minutes every day during the week. My family and I spend significant time outdoors

in and around my home/ranch in Rosamond, CA, where we ride horses, ride bikes, swim, hike,

and recreate outdoors. We can see the Mojave plant's smokestack from our ranch, and the

prevailing winds blow strongly from the plant to our home. (There are many wind farms already

around me, and more proposed.) When I am outside, I breathe the air. When my family is

outside, they breathe the air.

16.     One of my children, who is 12 years old, and my nephew who is 13 years old are

often outdoors with me breathing outdoor air. My son and nephew are more susceptible to air

pollution because they breathe more air per pound of body weight than adults, and their bodies

are still developing. As a result, they have a greater sensitivity and are more at risk to air

pollution than the population in general.

17.     By breathing, my family and I are exposed to air pollutants, including particulate

matter and hazardous air pollutants, emitted by cement kilns operating in the

DEC86

Gorman/Mojave/Rosamond area. I have a heart murmur and have been told to avoid strenuous activities on bad air days.

18.     I am aware that hazardous air pollutants can be transported great distances by air currents. Therefore, by breathing, my family and I also are exposed to hazardous air pollutants emitted by sources that operate outside the immediate area of my residence. These other sources also contribute to my family's cumulative exposure to persistent, bioaccumulative toxins.

19.     I am aware that hazardous air pollutants such as mercury are deposited on water and soil, where they persist for long periods of time and bioaccumulate in wildlife and livestock. By eating fish, meat, and dairy products, my family and I are exposed to hazardous air pollutants emitted by sources in the Gorman/Mojave/Rosamond area and also to hazardous air pollutants emitted elsewhere and transported to areas where the food we eat is raised or caught. I am a vegetarian due to health concerns about, among other things, bioaccumulation of pollutants. If it were safe to eat local fish, I would like to eat them. My son, nephew, and I go fishing about half a dozen times a year at Bryce Lake, but we have to throw the fish back because there is a fish consumption warning there due to mercury. The mercury contamination in the lake diminishes my enjoyment of fishing. And, if it were safe to eat the fish, we would go more often (and eat them, too).

20.     My family and I are deeply concerned about the damage that is being done and will be done by emissions from the three cement plants near us and other cement plants to our area's parks and our ranch land, to the rivers and streams that flow through them, and to the plant and animal species that inhabit these water bodies and lands. In particular, we are concerned that persistent and bioaccumulative pollutants, such as mercury and cadmium, contaminate the air, water, wildlife, and food sources on our property and in the community where we live and

DEC87

recreate. In addition, I am aware that particulate matter that falls to earth can harm vegetation and ecosystems, particularly near sources like cement kilns. The pollution deposited on our land diminishes our enjoyment of recreational activities there.

21.    Because mercury and other persistent and bioaccumulative pollutants persist in the environment, any of them that are emitted into the air and fall back to the ground stay in the environment without breaking down. Thus, it is difficult if not impossible to take the emitted mercury (and other similar toxins) back out of the environment once they come out of a kiln's smoke stack. Because EPA has given kilns two extra years to reduce their emissions of these pollutants to the legally allowed levels, plants will be able to—and will—emit more of these pollutants than they otherwise would. The mercury and other persistent bioaccumulative toxics emitted during the two-year compliance date delay thus irreversibly damage the natural world around me that I enjoy. They prevent me from undertaking activities I otherwise would enjoy, and diminish my enjoyment of activities that I do engage in.

22.    Based on the sources indicated, I am aware of the following:

a. Portland cement kilns emit, among other things, mercury, cadmium, lead, total hydrocarbons, polycyclic organic matter (POM), hydrochloric acid, and particulate matter. 75 Fed. Reg. 54,970, 54,970 (Sept. 9, 2010); 63 Fed. Reg. 14,182, 14,183 (Mar. 24, 1998).

b. Exposure to these pollutants can cause adverse health effects including cancer, liver disease, reproductive disorders, immune disorders, respiratory disease, asthma attacks, heart problems, kidney disease, and death. 75 Fed. Reg. at 54,979; 63 Fed. Reg. at 14,184-85.

DEC88

c. Emissions from Portland cement kilns are preferentially deposited on land and water bodies located near their source, and are also transported over great distances. EPA, Deposition of Air Pollutants to the Great Waters, First Report to Congress (1994) ("Great Waters Report"), Executive Summary at x-xi.

d. Some emissions from Portland cement kilns, including mercury, cadmium, and lead, persist in soil and water for long periods of time. In addition, they are absorbed by plants and bioaccumulate in fish and animals. Great Waters Report, Executive Summary at ix-x.

e. Mercury inhalation can affect the central nervous system, kidneys, and heart. CalEPA, OEHHA, *Technical Support Document For the Derivation of Noncancer Reference Exposure Levels* app. D, at Mercury-7 to -8.

f. Particulate matter likely harms vegetation and ecosystems, especially near cement kilns. 78 Fed. Reg. 3086, 3203 (Jan. 15, 2013).

23.    My family and I, and our property, are exposed to pollutants emitted by the Tehachapi, Mojave, and Gorman plants, including mercury, cadmium, total hydrocarbons, hydrochloric acid, and particulate matter. These emissions enter our bodies when we breathe. We are also exposed to these substances by drinking water, eating food, and touching water and soil. Emissions from these plants threaten our health, cause us concern about their impact on our health and property, and prevent me from engaging in activities I otherwise would engage in, like jogging. They also cause irreparable damage to the natural environment around me, diminishing my enjoyment of it.

24.    If EPA's 2013 rule remains effective while this litigation is pending, there will be more toxic pollution released into the community where my family and I live, work, and recreate

7

DEC89

than there would be in its absence. My family and I will be forced to breathe in more hazardous pollution than we otherwise would, and consequently will face greater danger to our health. If the rule remains in effect, the damage to our ability to enjoy daily life and recreational activities on our ranch and in the surrounding community will be prolonged, depriving us permanently of the ability to fully enjoy our lives here during that time. If the rule were stayed, my concerns about its impacts on our health would be lessened, and my family's health and enjoyment of our activities would be heightened.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of March, 2013.

Jane Williams

DEC90

## SUPPLEMENTAL DECLARATION OF JANE WILLIAMS

1.      I am a member of the Sierra Club, and have been since 1997.

2.      I am a member of the Sierra Club's Clean Air Team, which is responsible for air toxics litigation, air toxics policy, and providing direct support to communities facing air toxics problems. Sierra Club's core mission includes bringing Clean Air Act enforcement cases to protect its members, many of whom do not have the resources to bring enforcement actions on their own behalf, from toxic pollution in general and cement plants' toxic pollution in particular. Sierra Club also works to educate our members about the health and environmental impacts of pollution from cement plants, the need for protective limits on this pollution, and the need for effective enforcement of such limits.

3.      I also am the executive director of California Communities Against Toxics, an environmental justice network in California and an active member of Desert Citizens Against Pollution, a nonprofit environmental health group that works on desert pollution issues. As a key part of its core mission, Desert Citizens Against Pollution uses citizen enforcement suits to protect its members and constituents from toxic pollution in general and the toxic pollution emitted by cement plants in particular. Desert Citizens Against Pollution also works to educate our members about the health and environmental impacts of pollution from cement plants, the need for protective limits on this pollution, and the need for effective enforcement of such limits.

4.      Since 1992, I have worked on behalf of Desert Citizens Against Pollution to improve efforts by EPA to control and reduce emissions of air pollutants from cement kilns in California. For example, I commented on EPA's proposed regulations on hazardous waste combustors, which included cement kilns that burn hazardous waste. I also worked with the EPA on developing air permits for the Calaveras (now the Lehigh Southwest Cement Company)

DEC91

Cement Kiln in Tehachapi, California. I was party to a suit against the Kern County Air Pollution Control District regarding a cement kiln (now the CalPortland kiln) in Mojave that wanted to burn tires. Desert Citizens Against Pollution also threatened to sue the Mojave Air District for its actions at the Oro Grande kiln in San Bernardino because the local air district was going to allow that kiln to burn tires and industrial waste without an environmental review. In the 1990s, Desert Citizens Against Pollution sued the National Cement Company, which operates a kiln in Gorman/Lebec, under RCRA. Desert Citizens Against Pollution was also involved in bringing about EPA's intervention when the kiln in Tehachapi made illegal permit modifications.

5.      Desert Citizens Against Pollution has also brought suits against other environmental threats, like suing to block a proposed landfill.

6.      Because I am aware that cement kilns emit vast quantities of air pollutants, I have worked on behalf of Desert Citizens Against Pollution for 17 years specifically to ensure that federal regulations contain provisions limiting toxic pollution from cement kilns. In 2010, Desert Citizens Against Pollution intervened to defend EPA's 2010 rule that finally established lawful limits on toxic air pollution from cement kilns. *See* 75 Fed. Reg. 54,970 (Sept. 9, 2010).

7.      We work, and will continue to work, to enforce the standards for emissions of toxic pollutants from cement kilns, including by bringing citizen suits against cement plants in our area when they violate the standards. Previously, the standards were virtually impossible to enforce because they unlawfully exempted cement plants from compliance with emission standards during startups, shutdowns, and malfunctions. Now that that unlawful exemption has been eliminated, we intend to protect our members by bringing enforcement cases against cement plants that violate their emission standards during periods of equipment malfunction.

DEC92

8.      In such citizen suits, we will seek civil penalties to deter future violations. We will also urge courts to use penalties applied to violators to mitigate the damage caused by excess emissions and also. The availability of civil penalties gives polluters an incentive to negotiate settlements in enforcement cases, which they would be unlikely to do if penalties were not available. Being able to resolve enforcement cases through settlement will allow us to protect our members more effectively with the limited resources that are available to us.

9.      I am aware that EPA has eliminated the compliance exemption for startups, shutdowns, and malfunctions but established a new affirmative defense against civil penalties in cases of malfunction in the cement kilns rule. The affirmative defense purports to allow cement companies that violate their emission standards during a period of equipment malfunction to avoid paying any civil penalties if they meet certain criteria established by the agency. The Clean Air Act does not contain any bar to the application of penalties where a violation of emission standards has occurred. Based on cement plants use of the startup, shutdown, and malfunction exemption in previous enforcement actions, I am confident  that cement plants will raise affirmative defense in future enforcement actions.  Sierra Club and Desert Citizens Against Pollution will have to contest polluters claims to the affirmative defense, and this additional layer of litigation will make enforcement suits more time consuming and expensive.. Therefore, the affirmative defense makes it less likely that we will bring suit to enforce the new standards, even where violations have occurred. The affirmative defense also makes it harder for us to bring a cement company to the negotiating table because cement companies it will be aware of the additional costs that the affirmative defense creates for us and aware that the affirmative defense may enable them to avoid civil penalties even where they have violated the law. Thus, it restricts

3

DEC93

our ability to protect our members by deterring future violations of the standards and mitigating damages from the excess emissions.

10.    I am aware that EPA published a rule in 2013 that weakens the particulate matter standard from what it set in 2010 and gives cement kilns until September 2015 to come into compliance with the standards it published in 2010 and weakened in 2013. 78 Fed. Reg. 10,006, 10,053 (Feb. 12, 2013) (codified at 40 C.F.R. § 63.1351(c)). In the 2010 rule, EPA gave kilns until September 2013 to come into compliance with the standards. 75 Fed. Reg. at 55,063 (codified at 40 C.F.R. § 63.1351(b)).

11.    My family and I live on our ranch in Rosamond, CA.

12.    Our ranch in Rosamond is approximately 12 miles from the CalPortland cement kiln in Mojave, 20 miles from the Lehigh cement kiln in Tehachapi, and 25 miles from the National Cement Company cement kiln in Gorman/Lebec.

13.    I regularly see kiln upsets at the Tehachapi kiln. I drive by it a couple times a month, and roughly every three times I drive by I see visible emissions. During normal operations, emissions are not supposed to be visible. During upsets, I see a giant cloud of light grey smoke. There is a nasty smell, like something is burning; it is acrid. My throat gets really dry. If I am too close, my eyes start to water. If I drive by the kiln and see that there is an upset, I do not engage in activities outdoors near my home.

14.    I observe visible emissions at the Tehachapi kiln more often than at the other kilns. I see the kiln in Mojave almost daily, and I do not observe nearly as many upsets there. I occasionally pass by the National Cement Company kiln in Gorman, but have not seen visible emissions there.

DEC94

15.     Every day I can, I spend a significant amount of time outside. I walk outside for at least thirty minutes every day during the week. My family and I spend significant time outdoors in and around my home/ranch in Rosamond, CA, where we ride horses, ride bikes, swim, hike, and recreate outdoors. We can see the Mojave plant's smokestack from our ranch, and the prevailing winds blow strongly from the plant to our home. (There are many wind farms already around me, and more proposed.) When I am outside, I breathe the air. When my family is outside, they breathe the air.

16.     One of my children, who is 12 years old, and my nephew who is 13 years old are often outdoors with me breathing outdoor air. My son and nephew are more susceptible to air pollution because they breathe more air per pound of body weight than adults, and their bodies are still developing. As a result, they have a greater sensitivity and are more at risk to air pollution than the population in general.

17.     By breathing, my family and I are exposed to air pollutants, including fine particulate matter and hazardous air pollutants, emitted by cement kilns, including during kiln upsets, operating in the Gorman/Mojave/Rosamond area. I have a heart murmur and have been told to avoid strenuous activities on bad air days. As such, when I am aware of an upset, I avoid such activities.

18.     I am aware that hazardous air pollutants can be transported great distances by air currents. Therefore, by breathing, my family and I also are exposed to hazardous air pollutants emitted by sources, including during kiln upsets, that operate outside the immediate area of my residence. These other sources also contribute to my family's cumulative exposure to persistent, bioaccumulative toxins.

DEC95

19.    I am aware that hazardous air pollutants such as dioxins, mercury, and polychlorinated biphenyls (PCBs) are deposited on water and soil, where they persist for long periods of time and bioaccumulate in wildlife and livestock. By eating fish, meat, and dairy products, my family and I are exposed to hazardous air pollutants emitted by sources, including during kiln upsets, in the Gorman/Mojave/Rosamond area and also to hazardous air pollutants emitted elsewhere and transported to areas where the food we eat is raised or caught. I am a vegetarian due to health concerns about, among other things, bioaccumulation of pollutants. If it were safe to eat local fish, I would like to eat them. My son, nephew, and I go fishing about half a dozen times a year at Bryce Lake, but we have to throw the fish back because there is a fish consumption warning there due to mercury. The mercury contamination in the lake diminishes my enjoyment of fishing. And, if it were safe to eat the fish, we would go more often (and eat them, too).

20.    My family and I are deeply concerned about the damage that is being done and will be done by emissions, including upset emissions, from the three cement plants near us and other cement plants to our area's parks and our ranch land, to the rivers and streams that flow through them, and to the plant and animal species that inhabit these water bodies and lands. In particular, we are concerned that persistent and bioaccumulative pollutants, such as mercury, cadmium, and dioxins, contaminate the air, water, wildlife, and food sources on our property and in the community where we live and recreate. In addition, I am aware that particulate matter that falls to earth can harm vegetation and ecosystems, particularly near sources like cement kilns. The pollution deposited on our land diminishes our enjoyment of recreational activities there.

21.    Because mercury and other persistent and bioaccumulative pollutants persist in the environment, any of them that are emitted into the air and fall back to the ground stay in the

6

DEC96

environment without breaking down. Thus, it is difficult if not impossible to take the emitted mercury (and other similar toxins) back out of the environment once they come out of a kiln's smoke stack. Because EPA has given kilns two extra years to reduce their emissions of these pollutants to the legally allowed levels, plants will be able to—and will—emit more of these pollutants than they otherwise would. The mercury and other persistent bioaccumulative toxics emitted during the two-year compliance delay thus will irreversibly damage the natural world around me that I enjoy. They will prevent me from undertaking activities I otherwise would enjoy, and diminish my enjoyment of activities that I do engage in.

22.     Based on the sources indicated, I am aware of the following:

a. Portland cement kilns emit, among other things, mercury, dioxins, cadmium, lead, total hydrocarbons, polycyclic organic matter (POM), hydrochloric acid, and particulate matter. 75 Fed. Reg. 54,970, 54,970 (Sept. 9, 2010); 63 Fed. Reg. 14,182, 14,183 (Mar. 24, 1998).

b. Exposure to these pollutants can cause adverse health effects including cancer, liver disease, reproductive disorders, immune disorders, respiratory disease, asthma attacks, heart problems, kidney disease, and death. 75 Fed. Reg. at 54,979; 63 Fed. Reg. at 14184-14185.

c. Emissions from Portland cement kilns are preferentially deposited on land and water bodies located near their source, and are also transported over great distances. EPA, Deposition of Air Pollutants to the Great Waters, First Report to Congress (1994) ("Great Waters Report"), Executive Summary at x-xi.

d. Some emissions from Portland cement kilns, including mercury, dioxins, cadmium, and lead, persist in soil and water for long periods of time. In addition,

7

DEC97

they are absorbed by plants and bioaccumulate in fish and animals. Great Waters

Report, Executive Summary at ix-x.

e. Mercury inhalation can affect the central nervous system, kidneys, and heart.

CalEPA, OEHHA, *Technical Support Document For the Derivation of Noncancer*

*Reference Exposure Levels* app. D, at Mercury-7 to -8.

f. Particulate matter likely harms vegetation and ecosystems, especially near cement

kilns. 78 Fed. Reg. 3086, 3203 (Jan. 15, 2013).

23.     My family and I, and our property, are exposed to pollutants emitted (during

normal operation and also during upset events) by the Tehachapi, Mojave, and Gorman plants,

including mercury, cadmium, dioxins, total hydrocarbons, hydrochloric acid, and particulate

matter. These emissions enter our bodies when we breathe. We are also exposed to these

substances by drinking water, eating food, and touching water and soil. Emissions (including

upset emissions) from these plants threaten our health, cause us concern about their impact on

our health and property, and prevent me from engaging in activities I otherwise would engage in,

like jogging. They also cause irreparable damage to the natural environment around me,

diminishing my enjoyment of it.

24.     If there were fewer kiln upsets, there would be less toxic pollution around me and

my family. The affirmative defense restricts the ability of Sierra Club and Desert Citizens

Against Pollution to deter violations and mitigate their effects through bringing enforcement

suits against cement companies that violate their emission standards. Therefore it restricts our

ability to protect our members and constituents from cement plants' toxic pollution. Elimination

of the affirmative defense would also remove these restrictions and allow us to better protect our

members. It would also allow me to better protect myself and my family from toxic pollution..

8

DEC98

25.     If kilns had to comply with the 2013 standards sooner and if the particulate matter standard were more stringent than the one EPA ultimately weakened it to, there would be less toxic pollution around me and my family. My concerns about its impacts on our health would be lessened, and my family's health and enjoyment of our activities would be heightened.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of June, 2013.

_Jane Williams_

Jane Williams

DEC99

**Exhibit A**

Data Source: 2011 Data Update as of March 2013

| Facility name | TRI ID | Address | City | County | State | Zip Code | Year | Chemical | Stack Air |
|---|---|---|---|---|---|---|---|---|---|
| LEHIGH SOUTHWEST CEMENT CO | 93561CLVRS13573 | 13573 TEHACHAPI BLVD | TEHACHAPI | KERN | CA | '93561' | 2000 | MERCURY COMPOUNDS | 2580 |
| LEHIGH SOUTHWEST CEMENT CO | 93561CLVRS13573 | 13573 TEHACHAPI BLVD | TEHACHAPI | KERN | CA | '93561' | 2001 | MERCURY COMPOUNDS | 2547 |
| LEHIGH SOUTHWEST CEMENT CO | 93561CLVRS13573 | 13573 TEHACHAPI BLVD | TEHACHAPI | KERN | CA | '93561' | 2002 | MERCURY COMPOUNDS | 2345.2 |
| LEHIGH SOUTHWEST CEMENT CO | 93561CLVRS13573 | 13573 TEHACHAPI BLVD | TEHACHAPI | KERN | CA | '93561' | 2003 | MERCURY COMPOUNDS | 2594 |
| LEHIGH SOUTHWEST CEMENT CO | 93561CLVRS13573 | 13573 TEHACHAPI BLVD | TEHACHAPI | KERN | CA | '93561' | 2004 | MERCURY COMPOUNDS | 2505.68 |
| LEHIGH SOUTHWEST CEMENT CO | 93561CLVRS13573 | 13573 TEHACHAPI BLVD | TEHACHAPI | KERN | CA | '93561' | 2005 | MERCURY COMPOUNDS | 697.85 |
| LEHIGH SOUTHWEST CEMENT CO | 93561CLVRS13573 | 13573 TEHACHAPI BLVD | TEHACHAPI | KERN | CA | '93561' | 2006 | MERCURY COMPOUNDS | 586.28 |
| LEHIGH SOUTHWEST CEMENT CO | 93561CLVRS13573 | 13573 TEHACHAPI BLVD | TEHACHAPI | KERN | CA | '93561' | 2007 | MERCURY COMPOUNDS | 144.08 |
| LEHIGH SOUTHWEST CEMENT CO | 93561CLVRS13573 | 13573 TEHACHAPI BLVD | TEHACHAPI | KERN | CA | '93561' | 2008 | MERCURY COMPOUNDS | 944.8 |
| LEHIGH SOUTHWEST CEMENT CO | 93561CLVRS13573 | 13573 TEHACHAPI BLVD | TEHACHAPI | KERN | CA | '93561' | 2009 | MERCURY COMPOUNDS | 711.08 |
| LEHIGH SOUTHWEST CEMENT CO | 93561CLVRS13573 | 13573 TEHACHAPI BLVD | TEHACHAPI | KERN | CA | '93561' | 2010 | MERCURY COMPOUNDS | 870.32 |
| LEHIGH SOUTHWEST CEMENT CO | 93561CLVRS13573 | 13573 TEHACHAPI BLVD | TEHACHAPI | KERN | CA | '93561' | 2011 | MERCURY COMPOUNDS | 1349.77 |

Average: 1489.67

Data Source: 2011 Data Update as of March 2013

| Facility name | TRI ID | Address | City | County | State | Zip Code | Year | Chemical | Stack Air |
|---|---|---|---|---|---|---|---|---|---|
| NATIONAL CEMENT CO OF CALIFORNIA INC | 93243NTNLCSTATE | 5 MILES E OF I-5, OFF HWY 138 | LEBEC | KERN | CA | '93243' | 2000 | MERCURY COMPOUNDS | 144 |
| NATIONAL CEMENT CO OF CALIFORNIA INC | 93243NTNLCSTATE | 5 MILES E OF I-5, OFF HWY 138 | LEBEC | KERN | CA | '93243' | 2001 | MERCURY COMPOUNDS | 138 |
| NATIONAL CEMENT CO OF CALIFORNIA INC | 93243NTNLCSTATE | 5 MILES E OF I-5, OFF HWY 138 | LEBEC | KERN | CA | '93243' | 2002 | MERCURY COMPOUNDS | 42 |
| NATIONAL CEMENT CO OF CALIFORNIA INC | 93243NTNLCSTATE | 5 MILES E OF I-5, OFF HWY 138 | LEBEC | KERN | CA | '93243' | 2003 | MERCURY COMPOUNDS | 8 |
| NATIONAL CEMENT CO OF CALIFORNIA INC | 93243NTNLCSTATE | 5 MILES E OF I-5, OFF HWY 138 | LEBEC | KERN | CA | '93243' | 2004 | MERCURY COMPOUNDS | 76 |
| NATIONAL CEMENT CO OF CALIFORNIA INC | 93243NTNLCSTATE | 5 MILES E OF I-5, OFF HWY 138 | LEBEC | KERN | CA | '93243' | 2005 | MERCURY COMPOUNDS | 70 |
| NATIONAL CEMENT CO OF CALIFORNIA INC | 93243NTNLCSTATE | 5 MILES E OF I-5, OFF HWY 138 | LEBEC | KERN | CA | '93243' | 2006 | MERCURY COMPOUNDS | 59 |
| NATIONAL CEMENT CO OF CALIFORNIA INC | 93243NTNLCSTATE | 5 MILES E OF I-5, OFF HWY 138 | LEBEC | KERN | CA | '93243' | 2007 | MERCURY COMPOUNDS | 55 |
| NATIONAL CEMENT CO OF CALIFORNIA INC | 93243NTNLCSTATE | 5 MILES E OF I-5, OFF HWY 138 | LEBEC | KERN | CA | '93243' | 2008 | MERCURY COMPOUNDS | 55 |
| NATIONAL CEMENT CO OF CALIFORNIA INC | 93243NTNLCSTATE | 5 MILES E OF I-5, OFF HWY 138 | LEBEC | KERN | CA | '93243' | 2010 | MERCURY COMPOUNDS | 6 |
| NATIONAL CEMENT CO OF CALIFORNIA INC | 93243NTNLCSTATE | 5 MILES E OF I-5, OFF HWY 138 | LEBEC | KERN | CA | '93243' | 2011 | MERCURY COMPOUNDS | 78.4 |

Average: 66.49

Note: All units for emissions are pounds.

DEC100

## DECLARATION OF JAMES E. SCHERMBECK

1.      I have been involved in Downwinders At Risk since its founding in 1993-94. I am a member and its director.

2.      Downwinders At Risk was organized because of concerns about toxic pollution from the TXI, Ash Grove, and Holcim cement plants in Midlothian. (I am aware that EPA considers the Ash Grove and Holcim cement plants to be incinerators.) Since the organization began, it has been fighting to reduce this pollution.

3.      From 1994 through 1999, we advocated against TXI's application to burn hazardous waste. Although that was unsuccessful, we have continued to fight (successfully) against TXI's attempts in 2003 to obtain approval to turn off the regenerative thermal oxidizer, an important piece of pollution control equipment, at its kiln. TXI received a permit in 2011 to burn new types of waste at its kiln. Downwinders At Risk engaged in public education activities, submitting comments, and participating in hearings to fight it.

4.      From 1998 through 2001, we also engaged in advocacy concerning Holcim's request for a permit to build a new kiln at its plant and Holcim's subsequent request for a permit amendment. Through those efforts, we secured Holcim's agreement to provide monitoring and to provide $2.25 million in grants for clean air projects in the Dallas-Fort Worth area. Holcim also agreed to test emission reduction technology at its Midlothian plant; this technology worked, and the plant was fully retro-fitted to use it. In 2005-06, we also engaged in advocacy during Holcim's application to get permit adjustments so it could burn different kinds of waste.

5.      When necessary, Downwinders At Risk has used litigation to protect its members. We have sued EPA in the past over rules that affect the cement kilns, including a suit around 2002 over the state's plan to control ozone in the Dallas-Fort Worth area. As a result of the suit,

DEC101

we got the state to do a study on selective catalytic reduction technology, which we have used in our advocacy and educational campaigns.

6.      Because dry cement kilns produce less pollution than older wet kilns, we have engaged in a campaign since 2007 to try to get cities to pass legislation binding them to purchase only cement made in dry kilns.

7.      I am aware that EPA's regulations used to exempt cement kilns from compliance with emission standards for hazardous air pollutants during malfunctions, but that exemption was found unlawful. In addition, there did not used to be standards for many toxic pollutants, and kilns were not required to monitor their emissions on a realtime basis. The absence of emission standards for key pollutants such as heavy metals, the absence of emission monitoring requirements, and the malfunction exemption rendered the prospect of attempting to enforce EPA's prior cement kiln rules daunting and unattractive.

8.      I am aware that although EPA's new cement kiln rule does not include a malfunction exemption, it does include an affirmative defense against civil penalties in cases of malfunctions in its new cement kiln rule.

9.      Downwinders At Risk wants the new standards to be well enforced. We are concerned about the health impacts toxic pollutants have on our members. We rely on federal laws to protect us against the toxic pollution from the kilns around us. Downwinders At Risk regards citizen suits as an important tool in the toolbox available to it, especially because the state does very little to enforce environmental laws. In fact, I'm not aware of Texas bringing any enforcement cases against cement plants for violating air toxics standards.

10.      Downwinders At Risk is an entirely local group. We have a very low budget and are a small operation. Costs are a major consideration for us.

2

DEC102

11.    In deciding whether to engage in a citizen suit against a cement plant that violates its emission standards, we would want to obtain penalties that would both mitigate the harms from excess emissions and would provide a deterrent against future violations. In making our decision, however, we would also consider the costs of a suit. If seeking civil penalties would cause us to have to expend significant funds to take discovery or hire experts to overcome the affirmative defense, we would be less likely to bring the suit. In that way, the affirmative defense makes it less likely that we would bring a suit in two ways. It reduces the likely benefit we would get from the suit, and it increases the likely costs we would incur in bringing it.

12.    In addition, if civil penalties are not available, the kilns that violate their standards will have less incentive to negotiate with us.

13.    If the affirmative defense is removed from the rule, we will be better able to bring a suit against a violator that will mitigate harms from excess emissions and deter future violations, thus bringing us significant benefits. We will also find it easier to bring violators into negotiations with us.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of May, 2013.

_____

James E. Schermbeck

3

DEC103

USCA Case #13-1112     Document #1439775     Filed: 06/05/2013     Page 299 of 372

## DECLARATION OF BRENDA BIBEE

1.    I am a member of Desert Citizens Against Pollution and have been for at least 10 years. I serve on its advisory council.

2.    I am 72 years old. I live in Rosamond, California. My house is about 12 miles southwest of the CalPortland cement plant in Mojave. The wind often blows strongly from the plant toward my home. I have lived here for about 3 years. It's very windy here. When I moved, I got horses and other animals, like peacocks and a goat. I moved from San Pedro, CA, down by the Port of Los Angeles.

3.    I have serious lung problems. I have had asthma since I was 4. I use inhalers usually twice a day, and more as needed, and am on medication (Singulair) and Advair for my asthma. I also have a nebulizer that I use to treat my asthma. In addition to the problems my asthma causes me, I also had to have part of my lung removed because of sarcoidosis.

4.    Asthma is really hard to live with. Some days it's worse, and if I get tired or walk, it flares up. Then I can't walk far because I can't breathe. I stay out of the wind as much as I can. I take my medicines and try to breathe. I stay in my house quite a bit—sadly housebound. I'm working toward getting up on the horses, but I can't breathe well enough to get up on them. I would like to ride them—I used to enjoy riding—and I would like to be able to go outside more regularly.

5.    I am aware that particulate matter is especially dangerous for older adults, like me, and those with lung conditions, like me. I am very concerned about the effects of pollutants including particulate matter on my health.

DEC104

6.    I am also aware that EPA published a rule in 2013 that delays by 2 years the deadline for cement plants to come into compliance with standards for pollutants including particulate matter.

7.    If EPA's 2013 rule remains effective while this litigation is pending, there will be more pollution released into the community where I live and recreate than there would be in its absence. I will be forced to breathe in more dangerous pollution than I otherwise would, and consequently will face greater danger to my health. If the rule remains in effect, the damage to my ability to enjoy daily life and recreational activities in and around my home will be prolonged, depriving me permanently of the ability to fully enjoy my life here during that time. If the rule were stayed, my concerns about its impacts on my health and would be lessened, and my health and enjoyment of my activities would be heightened.


I declare under penalty of perjury that the foregoing is true and correct.


Executed this 15th day of April, 2013.


*Brenda Bibee*

Brenda Bibee

DEC105

## DECLARATION OF REBECCA BORNHORST

I , Rebecca Bornhorst, hereby declare and state:

1.      I am a member of Downwinders At Risk and have been for 18 years. Since 2010,
I have been the chairperson of Downwinders At Risk's 501(c)(4).

2.      In 2010, Desert Citizens Against Pollution intervened to defend EPA's 2010 rule
that finally established lawful limits on toxic air pollution from cement kilns. *See* 75 Fed. Reg.
54,970 (Sept. 9, 2010).

3.      I live in DeSoto, Texas, with my husband. We have two children, ages 26 and 29,
who lived in DeSoto for 19 years. My daughter, who is 26, moved back home again in 2013. She
has resumed hiking and biking in the area around Joe Pool Lake, and I am concerned that the
poor air quality may cause her asthma to flare back up. My elderly father, sister and her family,
nephews, and niece also live in the area.

4.      The TXI Portland Cement Plant is near my home. It is about 10 miles away, and I
pass near it whenever I drive down Highway 67. I drive by a few times a month. I try not to go
that way because I don't want to get any closer to it.

5.      In addition, the Ash Grove and Holcim cement plants are about 10 and 5 miles
away, respectively. I am aware that EPA has categorized both as incinerators because of the fuels
they use.

6.      Prevailing winds blow from all these plants toward my home. I can see emissions
from my neighborhood, and I have been concerned about emissions from these plants since
about 1988. My daughter was a soccer player and she had exercise-induced asthma. She also has
hormonal problems and I believe the pollutants she was exposed to in her early years are
responsible.

7.    I am aware that EPA published a rule in 2013 that weakens the particulate matter standard for cement plants and gives them until September 2015 to come into compliance with the standards it published in 2010 and weakened in 2013. 78 Fed. Reg. 10,006, 10,053 (Feb. 12, 2013) (codified at 40 C.F.R. § 63.1351(c)). In the 2010 rule, EPA gave kilns until September 2013 to come into compliance with the standards. 75 Fed. Reg. at 55,063 (codified at 40 C.F.R. § 63.1351(b)).

8.    I am aware that EPA estimates that the TXI plant would have to reduce its mercury emissions to meet the mercury standard in the 2013 rule. It emits, according to EPA, 138.61 lb/million tons clinker. EPA-HQ-OAR-2002-0051-3480 at 16. The standard is 55 lb/million tons of clinker. Once the kiln comes into compliance with the mercury standard, EPA estimates its mercury emissions will shrink by 294 pounds per year, to about 6 pounds per year. EPA-HQ-OAR-2002-0051-3480 at 17.

9.    In addition, EPA's estimate of the TXI plant's PM emissions—0.08 lb/ton clinker—is higher than the levels that would be allowed by either the 2010 or 2013 rule. EPA-HQ-OAR-2002-0051-3480 at 21.

10.    My family and I regularly eat locally grown fruits and vegetables and grass-fed beef. I don't eat any local fish because of my concerns about mercury, but I would otherwise like to.

11.    I have a small garden, but would be eating more fresh produce if I weren't so worried about toxics accumulated in the soil and vegetables.

12.    We have 23 acres of land in DeSoto where we have campfires and picnics, walk our dog, and plant wildflowers. We also sail and camp in the area on Joe Pool Lake and Cedar Hill State Park. Our concerns about air pollution have affected all our outdoor activities. I am

DEC107

aware that once mercury is deposited on land or in the water, it persists and bioaccumulates in wildlife. Because of the air pollution, including mercury, that comes from the cement plants in the area, I do not think it is safe to swim in the water at Joe Pool Lake, so I do not swim there, nor do I believe it is safe to eat fish from the lake, though I would eat it if it were safe. We simply have no choice but to use these outdoor areas – we cannot stay indoors.

13.    I enjoy outdoor walking, hiking, and bicycling. I used to swim in Joe Pool Lake. I have sinus and allergy problems and would like to exercise more, but I consider it risky to be outdoors due to emissions from the plants near my home, including emissions of PM and mercury from the TXI plant.

14.    I am aware of the following:

a. Portland cement kilns emit, among other things, mercury, cadmium, lead, total hydrocarbons, polycyclic organic matter (POM), hydrochloric acid, and particulate matter. 75 Fed. Reg. 54,970, 54,970 (Sept. 9, 2010); 63 Fed. Reg. 14,182, 14,183 (Mar. 24, 1998).

b. Exposure to these pollutants can cause adverse health effects including cancer, liver disease, reproductive disorders, immune disorders, respiratory disease, asthma attacks, heart problems, kidney disease, and death. 75 Fed. Reg. at 54,979; 63 Fed. Reg. at 14,184-85.

c. Emissions from Portland cement kilns are preferentially deposited on land and water bodies located near their source, and are also transported over great distances. EPA, Deposition of Air Pollutants to the Great Waters, First Report to Congress (1994) ("Great Waters Report"), Executive Summary at x-xi.

DEC108

d. Some emissions from Portland cement kilns, including mercury, cadmium, and lead, persist in soil and water for long periods of time. In addition, they are absorbed by plants and bioaccumulate in fish and animals. Great Waters Report, Executive Summary at ix-x.

e. Mercury inhalation can affect the central nervous system, kidneys, and heart. CalEPA, OEHHA, *Technical Support Document For the Derivation of Noncancer Reference Exposure Levels* app. D, at Mercury-7 to -8.

f. Particulate matter likely harms vegetation and ecosystems, especially near cement kilns. 78 Fed. Reg. 3086, 3203 (Jan. 15, 2013).

g. The reduction in fine particulate pollution alone from the recent rulemaking is anticipated to save from 960 to 2,500 lives per year. 75 Fed. Reg. at 55,026 tbl.13. Reduction in or delay of the protections the 2010 rule provides would increase my exposure to fine particulate pollution and the harm that it causes.

15.   My family and I are exposed to pollutants emitted by the TXI plant, including mercury, cadmium, total hydrocarbons, hydrochloric acid, and particulate matter, by breathing air, drinking water, eating food, and touching water and soil. Emissions from this plant, as well as the other cement manufacturers in the area, threaten our health, and cause us to limit or avoid activities that we otherwise would enjoy.

16.   My family and I are also exposed to transported emissions from Portland cement kilns elsewhere in the country, especially emissions of mercury, cadmium, and lead, which persist in the environment, bioaccumulate in the food we eat, and can be transported great distances. Therefore, by breathing, my family and I also are exposed to hazardous air pollutants

DEC109

emitted by sources that operate outside the immediate area of my residence. These other sources also contribute to my family's cumulative exposure to persistent, bioaccumulative toxins.

17.    The longer the emissions go on, and the higher the levels of emissions, the more dangerous pollution we are exposed to. And the more exposed we are to it, the longer we must refrain from activities we otherwise would enjoy, and the greater the threat to our health.

18.    My family and I are deeply concerned about the damage that is being done and will be done by toxic emissions from the TXI plant and other cement plants to our land in DeSoto, and to Joe Pool Lake and Cedar Hill State Park, to the rivers and streams in these areas, and to the plant and animal species that inhabit the water bodies and park. In particular, we are concerned that persistent and bioaccumulative pollutants, such as mercury and cadmium, contaminate the air, water, wildlife, and food sources on our property and in the community where we live and recreate. The pollution caused by these cement plants diminishes our enjoyment of recreational activities in DeSoto, and to Joe Pool Lake and Cedar Hill State Park.

19.    Mercury and other persistent and bioaccumulative pollutants persist in the environment, meaning that those that are emitted into the air and fall back to earth stay in the environment without breaking down. Thus, once mercury (and other similar toxins) come out of a plant's smoke stack, they are effectively in the environment to stay. Because EPA has given kilns two extra years to reduce their emissions of these pollutants to the legally allowed levels, plants will be able to—and will—emit more of these pollutants than they otherwise would. The mercury and other persistent bioaccumulative toxics emitted during the two-year compliance date delay thus irreversibly damage the natural world around me that I enjoy. They prevent me from undertaking activities I otherwise would enjoy, like swimming in Joe Pool Lake, and

DEC110

diminish my enjoyment of activities that I do engage in, like sailing, camping, walking, hiking, and biking.

20.     If EPA's 2013 rule remains effective while this litigation is pending, there will be more toxic pollution released into the community where my family and I live, work, and recreate than there would be in its absence. My family and I will be forced to breathe in more hazardous pollution than we otherwise would, and consequently will face greater danger to our health. If the rule remains in effect, the damage to our ability to enjoy daily life and recreational activities at our home and in the surrounding community will be prolonged, depriving us permanently of the ability to fully enjoy our lives here during that time. If the rule were stayed, my concerns about its impacts on our health would be lessened, and my family's health and enjoyment of our activities would be heightened.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _14_ day of April, 2013.

*Rebecca Bornhorst*

Rebecca Bornhorst

DEC111

### DECLARATION OF SUE POPE

1. I am one of the founders of Downwinders At Risk and am still a member, as I have been since it was organized in 1993 and 1994.

2. I live in Midlothian, Texas. I am 72 years old.

3. I live on land that has been in my family for about 100 years. It is about 70 acres. On it, I have about 40 head of cattle (the number varies) and 2 horses. I know I should move, but all my memories of my deceased only child and husband of fifty two years are here. This land was also my grandfather's.

· 4. My property is about 7.5 miles from the TXI cement plant in Midlothian. I am downwind of it.

5. It is also about 4 miles from the Ash Grove plant and under a mile from the Holcim cement plant property.

6. My family and I have long had to deal with the emissions from the plants in the area. In the 1990s, our cattle and horses started suffering birth deformities, and in 1997, I had to quit breeding horses. In the mid 1990's, tests showed that my husband had high levels of cadmium. He developed prostate cancer and after four bouts with it, he died in January 2011. Everyone one around got sick when the kilns started.

7. I have developed serious heart and lung problems. I am on oxygen continually and regularly go to a lung doctor. I have only about $1/3^{rd}$ of my lung function remaining. I have asthma; but because of my heart problems, I cannot regularly take my asthma medication, which raises my blood pressure.

8. I am aware from EPA documents that particulate matter is especially dangerous for older adults, like myself, and those with heart and/or lung conditions. I am very concerned

about the effects of particulate matter on my health. When I sense odors which are not natural or normal, and the wind direction is towards the farm, I must go inside to try and prevent attacks. Just recently, I was outside planting flowers when a concerned friend called to tell me that she smelled an abnormal odor coming from the closest plant and suggested I go indoors. We can see the stacks of one of the plants from our property and we are downwind of all particulate sources in Midlothian the greater part of the time.

9.      I am also aware from my work on fighting against the pollution that affects my community that particulate matter and other pollutants that cement plants emit, like mercury and heavy metals, harm the environment. I live in the country. I see what's so important about the environment. What the Lord has given us is too precious to destroy. I just feel real strongly about it. When the environment around me is harmed, it does damage to my property and it affects my enjoyment of my everyday life.

10.     I had two little girls visit me with their aunt last fall. The air was bad—I could feel it. They both had asthma attacks while they were here. One had to go to the hospital later that night. They also live in the area. Two other children moved to the farm 8 years ago. They have developed learning disabilities that I am concerned are related to the cement plants in the area. I am also concerned that their continual respiratory problems are related to the plants' emissions.

11.     I am aware that EPA published a rule in 2013 that weakens the particulate matter standard for cement plants and gives them until September 2015 to come into compliance with the standards it published in 2010 and weakened in 2013. 78 Fed. Reg. 10,006, 10,053 (Feb. 12, 2013) (codified at 40 C.F.R. § 63.1351(c)). In the 2010 rule, EPA gave kilns until September 2013 to come into compliance with the standards. 78 Fed. Reg. at 10,022.

2

12.    If EPA's 2013 rule remains effective while this litigation is pending, there will be more toxic pollution released into the community where my family and I live, work, and recreate than there would be in its absence. I will be forced to breathe in more dangerous pollution than I otherwise would, and consequently will face greater danger to my health. If the rule remains in effect, the damage to my ability to enjoy daily life and recreational activities, in and around my home, will be prolonged; depriving me permanently of the ability to fully enjoy my life here during that time. My concerns about damage to my property and my livestock would also be lessened. If the rule were stayed, my concerns about its impacts on my health and my land would be lessened, and my health and enjoyment of my activities would be heightened.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15 day of April, 2013.

Sue Pope

3

## DECLARATION OF ANN SEARS

1.      I am a member of Downwinders At Risk, as I have been since the 1990s.

2.      I live on Cement Valley Road, in Midlothian, Texas. I am 78 years old.

3.      My home sits is about a mile from the TXI cement plant in Midlothian. I moved here in 1982. I can sometimes smell the plant. It's a bad smell, a little like rotten eggs.

4.      I have had heart surgery because of a heart murmur. Sometimes, I find it hard to catch my breath.

5.      I am aware that particulate matter is especially dangerous for older adults and those with heart or lung conditions, like me. I am very concerned about the effects of particulate matter on my health. I am 78 years old, and I'd like to live a little longer.

6.      I've got about 10 acres, and I like spending time outside on it. I especially like sitting out on my porch swing. But when there's the bad smell from the plant, I stay inside.

7.      I have double-paned windows and I don't open them based on my concerns about the emissions from the TXI plant.

8.      I want the cleanest air possible. Health and quality of life are very important to me. We've put up with bad air here for a long time, and I believe the cement companies need to follow the law.

9.      I am aware that EPA put out a rule in 2013 that gave cement plants an extra two years to bring their emissions of pollutants including particulate matter into compliance with federal standards.

10.      If EPA's 2013 rule remains effective while this litigation is pending, there will be more toxic pollution released into the community where I live and recreate than there would be in its absence. I will be forced to breathe in more dangerous pollution than I otherwise would,

and consequently will face greater danger to my health. If the rule remains in effect, the damage to my ability to enjoy daily life and recreational activities in and around my home will be prolonged, depriving me permanently of the ability to fully enjoy my life here during that time. If the rule were stayed, my concerns about its impacts on my health would be lessened, and my health and enjoyment of my activities would be heightened.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this /6 day of April, 2013.

Ann Sears

Ann Sears

2

## DECLARATION OF JENNIFER SWEARINGEN

1.    I am a member of Montanans Against Toxic Burning and have been since about 1992. I am a board member and have been for about 8 years.

2.    I am married and have two grown sons, age 26 and 29.

3.    I live in Bozeman, Montana, which is downwind from Holcim Inc.'s Trident Plant, a wet-process Portland cement kiln.

4.    This cement kiln is located at the headwaters of the Missouri River, adjacent to historic Headwaters State Park. The Park encompasses the wetlands and riparian habitat that the confluence of the three headwater rivers to the Missouri creates, which support nesting sites for bald eagles, great blue herons, osprey, and many other bird species. Two of these rivers, the Madison and Gallatin, have been recognized by the state as high-quality Blue Ribbon trout streams.

5.    For the last 12 years, I have become increasingly concerned with the emissions from this plant with every passing year. In 2010, Montanans Against Toxic Burning intervened to defend EPA's 2010 rule that finally established lawful limits on toxic air pollution from cement kilns. *See* 75 Fed. Reg. 54,970 (Sept. 9, 2010). I am particularly concerned about the frequency and severity of upset emissions.

6.    The outdated wet-process Trident kiln, which burns large amounts of petroleum coke, coal, and lead-smelter slag, is in the same valley as my house, about 20 miles away. The kiln experiences frequent upsets and malfunctions. During these malfunctions, pollutants are spewed into the air uncontrolled. Sometimes these upsets last for more than 24 hours. I have driven closer to the kiln and smelled a rotten egg odor so strong that it got in even with the

windows rolled up. When I called DEQ about the conditions, they told me that there had been a serious malfunction.

7.    In the winter, when weather inversions are very common in our valley and often last for several days, emissions from the kiln, including during upsets, cause big buildups of pollutants, including high levels of particulate matter. In an inversion, it's like there's a lid on the valley. When this happens, I cannot see any mountains (which I can see easily on a clear day), and the air is hazy and tinged with brown. The haze especially hugs the headwaters rivers during inversions and at night.

8.    I have scarred lung tissue from a bad case of pneumonia and flu. When the air gets bad in our valley, I can really feel it—I find it harder to breathe and difficult to do any strenuous activity. There have been times when the pollution has been so bad that the air has left a metallic taste in my mouth.

9.    From EPA documents and my work on this kiln, I am aware that the Trident kiln will have to take action to come into compliance with the standards EPA established. The kiln's only control for particulate matter is an electrostatic precipitator. EPA estimates that it emitted PM10 at a rate of 0.4 lb/ton clinker in 2008—10 times the 2010 standard and well over the 2013 standard. EPA-HQ-OAR-2002-0051-3480 at 19. Its current operating permit allows it to emit PM at a rate up to 0.77 lb/ton clinker. http://www.deq.mt.gov/airquality/ARMpermits/OP0982-02FNL.pdf at 15.

10.    EPA also estimates that the kiln releases over 111 pounds of mercury per million tons clinker, which is more than twice the standard. EPA-HQ-OAR-2002-0051-3480 at 15. In a health risk assessment from 2006, the company estimated its Trident kiln emitted 102 lb/year of

DEC118

mercury. EPA estimates that, as of 2008, it emitted 34.39 lb/year, and that after the kiln comes

into compliance, its mercury emissions will drop by 31 lb/year, to under 3.5 lb/year.

11.    I have examined malfunction reports that the Trident kiln has submitted over at

least the last 12 years to the Montana Department of Environmental Quality ("DEQ"). In 2002,

the plant was in exceedance of its permitted limits more than 6% of the time it was operating. It

suffered a litany of major equipment failures that led to these upsets. This included 5 induction

fan failures, 10 pollution control device failures, and 6 failures of the kiln main drive. In the first

two months of 2005, the kiln had 10 major emission exceedance events, caused by generically

labeled "malfunction[s]" and "ring push," which is when material builds up along the kiln walls

and then a large mass of material exits the kiln and overwhelms the clinker cooler, causing a

malfunction. These malfunctions in January and February 2005 caused exceedances that totaled

about 90 hours in all.

12.    In January 2010, the Trident kilns suffered an upset that lasted about 22 hours

over two days and caused 16 exceedances of the opacity standard. (The self-reported Facility

Upset Report that Trident submitted to DEQ is attached.) During the worst of these, which lasted

over 8 hours, the opacity level averaged over 75% and reached a high of 93.65%. The report said

that the "Specific Cause of Malfunction" was that the kiln went into "shutdown due to excess

ring build-up." It further averred in this signed document that "Holcim (US) Inc. – Trident Plant

believes that the equipment malfunction could not have been prevented and was not a result of

poor maintenance, careless operation, or poor design." I have noticed over the last few years that

the company always includes this last sentence when it reports an exceedance.

13.    The plant continues to report suffering malfunctions that cause it to exceed

standards. (See attached.) For example, on March 1, 2011, it suffered an upset that lasted over 11

3

DEC119

hours, causing 7 exceedances of the opacity standard. During the worst of these, lasting over 9 hours, the opacity level averaged almost 83% and reached a high of 95.76%. The plant blamed a "Process Problem"—the "Removal of Rings." Over May 21-23, 2011, the ESP pollution control device malfunctioned, causing 15 exceedances of the opacity standards. The worst lasted over 2 hours, with the opacity level averaging over 37% and peaking at almost 91%. On January 31, 2012, the kiln fan malfunctioned repeatedly, causing 4 exceedances that lasted over 5 hours. The longest lasted nearly 5 hours on its own, during which the opacity level averaged 67% and hit a high over 94%. Ring build-up continued to be a problem, too. For instance, the plant attributed its 20 exceedances (for a total of over 7.5 hours) of the opacity standard on April 2, 2012, to ring removal. The longest single exceedance that day lasted almost 4 hours and featured an average opacity level of over 42% and a high of over 93%.

14.    I am aware that EPA's regulations previously exempted Holcim from compliance with emission standards for hazardous air pollutants during malfunction events but that exemption was found unlawful and does not exist in EPA's new cement plant standards.

15.    Montanans Against Toxic Burning is a grassroots citizens advocacy group whose mission is to help protect people and the environment from toxic pollution from the Holcim plant.

16.    Montanans Against Toxic Burning has been extensively involved in pushing the kiln to be cleaner. Beginning in 2000, when Holcim sought a permit to allow the kiln to burn whole tires and other industrial wastes as fuel, we used the evidence we gathered about upsets to fight against it. Since the draft environmental impact statement and draft permit came out in 2006 and we challenged DEQ's findings, nothing has happened with the proposal. Earlier, we fought against Holcim's efforts to increase the percentage of petroleum coke that it burns. We

4

DEC120

have also used evidence about upsets to ask DEQ and EPA to take enforcement action against Holcim. Neither agency acted.

17.    Montanans Against Toxic Burning is especially concerned about dioxin emissions from the plant and wants to ensure that Holcim complies continuously with the dioxin standard, as well as the other new standards. If it is feasible to bring an enforcement action when Holcim violates the new emission standards, we will do so. In any such suit, we would seek civil penalties both to deter the Holcim from future violations and to force Holcim to mitigate the damage caused by its excess toxic emissions. I believe that the imposition of penalties and the threat of penalties are the only things that will prevent Holcim from continuing to violate its emission standards.

18.    I am aware that the cement kiln rule allows companies to invoke an affirmative defense against civil penalties in cases of malfunction. I anticipate, based on my review of Holcim's reports, that the plant would invoke this defense against civil penalties when we sue it, injecting a new step into the enforcement suit.

19.    Montanans Against Toxic Burning has a limited budget. By making it more difficult and costly to seek civil penalties, EPA has diminished our ability to deter Holcim from emitting excess pollution or to win penalties that fund local projects to enhance local public health and the environment. In addition, EPA has made it harder for Montanans Against Toxic Burning to bring Holcim to enter negotiations about preventing future pollution and mitigating the impacts of its excess emissions. If the affirmative defense is eliminated, Montanans Against Toxic Burning will be better able to deter Holcim's violations of emission standards and obtain mitigation penalties to help reduce the damage that these violations cause.

DEC121

20.     I am aware from reading hundreds of malfunction reports for the Trident kiln that during upsets and during shutdown, the electrostatic precipitator is usually turned off, meaning that PM emissions go uncontrolled. If the kiln had a baghouse, it could provide control of PM emissions during these events.

21.     I am aware that EPA published a rule in 2013 that weakens the particulate matter standard and gives cement kilns until September 2015 to come into compliance with the standards it published in 2010 and weakened in 2013. 78 Fed. Reg. 10,006, 10,053 (Feb. 12, 2013) (codified at 40 C.F.R. § 63.1351(c)). In the 2010 rule, EPA gave kilns until September 2013 to come into compliance with the standards. 75 Fed. Reg. at 55,063 (codified at 40 C.F.R. § 63.1351(b)).

22.     I am aware from reading Portland Cement Association submissions to the docket for this rule that under the 2010 rule, the Trident kiln would have had to replace or supplement its electrostatic precipitator with a baghouse. EPA-HQ-OAR-2011-0817-0505 at 8. ("ESPs cannot achieve the 0.04 lbs/ton clinker limit." (emphasis in original)). But the facility will be able to reduce its emissions less to meet the weaker standard, and may not even need to install a baghouse on the kiln. *See* PCA, *The Impact of a Change in the Cement NESHAP PM Limit On Compliance Strategies and Schedules* 2-3 (EPA-HQ-OAR-2011-0817-0154, Apr. 9, 2012).

23.     I spend a lot of time outdoors. I enjoy walking, hiking, biking, skiing, fishing, gardening, bird watching, and canoeing in the area. My family practices catch and release fishing, in part because of our concerns about the safety of eating fish, and I am concerned about the health of the local fish population. I would like to be able to eat some of the fish we catch, but refrain because of my concerns. I am also very concerned about the birds and wildlife, including bald eagles, osprey, and herons, that I enjoy watching and that subsist on the local fish.

6

DEC122

24.    During my daily walks, I can sometimes see plumes from the kiln. During an upset, there is gray-brown smoke. When the plant is running normally, it cannot have such dark emissions. When that happens, I stop and turn around. On days when it's obvious that air quality's bad or we know the kiln has had upsets, we stay indoors.

25.    We eat a lot of local food, including local grass-fed lamb and beef, abundant amounts of local produce, and milk products from the local dairy herds. We also grow some of our own produce. We really value clean food and water, and emissions from the kiln, especially of dioxins, cause us significant concern for our health due to the impacts the emissions, including upset emissions, can have on the local food and water.

26.    My family and I are concerned about the damage that is being done and will be done to the area, the water bodies in it, and the plant and animal species that inhabit these water bodies and surrounding area by emissions from the Trident Plant and other cement plants. In particular, we are concerned that persistent and bioaccumulative pollutants, such as mercury, cadmium, and dioxins, contaminate the air, water, wildlife and food sources on our property and in the area where we live and recreate. In addition, I am aware that particulate matter that falls to earth can harm vegetation and ecosystems, particularly near sources like cement kilns. The pollution from the Trident Plant diminishes our enjoyment of the recreational activities in which we engage, including hiking and skiing, which we curtail when emissions are prominent.

27.    Because mercury and other persistent and bioaccumulative pollutants persist in the environment, any of them that are emitted into the air and fall back to the ground stay in the environment without breaking down. Thus, it is difficult if not impossible to take the emitted mercury (and other similar toxins) back out of the environment once they come out of a kiln's smoke stack. Because EPA has given kilns two extra years to reduce their emissions of these

7

DEC123

pollutants to the legally allowed levels, plants will be able to—and will—emit more of these pollutants than they otherwise would. The mercury and other persistent bioaccumulative toxics emitted during the two-year compliance date delay thus irreversibly damage the natural world around me that I enjoy. They prevent me from undertaking activities I otherwise would enjoy, and diminish my enjoyment of activities that I do engage in.

28.    Based on the sources indicated, I am aware of the following:

a. Portland cement kilns emit, among other things, mercury, dioxins, cadmium, lead, total hydrocarbons, polycyclic organic matter (POM), hydrochloric acid, and particulate matter. 75 Fed. Reg. 54,970, 54,970 (Sept. 9, 2010); 63 Fed. Reg. 14,182, 14,183 (Mar. 24, 1998).

b. Exposure to these pollutants can cause adverse health effects including cancer, liver disease, reproductive disorders, immune disorders, respiratory disease, asthma attacks, bronchitis, heart problems, kidney disease, and death. 75 Fed. Reg. at 54,979; 63 Fed. Reg. at 14,184-85.

c. Emissions from Portland cement kilns are preferentially deposited on land and water bodies located near their source, and are also transported over great distances. EPA, Deposition of Air Pollutants to the Great Waters, First Report to Congress (1994) ("Great Waters Report"), Executive Summary at x-xi.

d. Some emissions from Portland cement kilns, including mercury, dioxins, cadmium, and lead, persist in soil and water for long periods of time. In addition, they are absorbed by plants and bioaccumulate in fish and animals. Great Waters Report, Executive Summary at ix-x.

DEC124

e. Mercury inhalation can affect the central nervous system, kidneys, and heart. CalEPA, OEHHA, *Technical Support Document For the Derivation of Noncancer Reference Exposure Levels* app. D, at Mercury-7 to -8.

f. Particulate matter likely harms vegetation and ecosystems, especially near cement kilns. 78 Fed. Reg. 3086, 3203 (Jan. 15, 2013).

29.    My family and I are exposed to pollutants emitted by the Trident Plant, including mercury, dioxins, cadmium, lead, total hydrocarbons, and particulate matter, by breathing air, drinking water, eating food, and touching water and soil. Emissions from this plant enter our bodies, threaten our health, and cause us to limit or avoid activities that we otherwise would enjoy. They also cause irreparable damage to the natural environment around me, diminishing my enjoyment of it.

30.    My family and I are also exposed to transported emissions from Portland cement kilns elsewhere in the country, especially emissions of mercury, dioxins, cadmium, and lead, which persist in the environment, bioaccumulate in the food we eat, and can be transported great distances. Therefore, emissions from Portland cement kilns elsewhere in the country also threaten our health, as will emissions from new Portland cement kilns that are built.

31.    If the rate and severity of the local cement kiln upsets decreased, my concerns would be lessened because there would be less toxic pollution dumped into the air and my enjoyment of various activities, like hiking, walking, and skiing, would be improved; I would engage in similar recreational activities more; and I would not have to cut short my daily walks as often. Elimination of the affirmative defense would also make it easier for Montanans Against Toxic Burning to challenge the Trident plant's exceedances of emission standards.

9

32.    Similarly, if kilns had to comply with the 2013 standards sooner and if the particulate matter standard were more stringent than the one EPA ultimately weakened it to, there would be less toxic pollution around me and my family. As a result of the delay and the possible continued use of the electrostatic precipitator, PM emissions, especially during upsets, will be higher than they otherwise would be. And mercury emissions will also be higher than they otherwise would be. If the compliance date were sooner, and the PM standard stricter, my concerns about cement plants' impacts on our health would be lessened, and my family's health and enjoyment of our activities, like hiking, walking, and skiing, would be heightened. I declare under penalty of perjury that the foregoing is true and correct.


Executed this 24th day of May, 2013.


Jennifer Swearingen

Jennifer Swearingen

10

DEC126

# Attachments

DEC127

**DEPARTMENT OF ENVIRONMENTAL QUALITY**
Permitting and Compliance Division
*Air Resources Management Bureau*
Facility Upset Report

| | | | |
|---|---|---|---|
| 1520 E. 6th Ave. | (406) 444-3490 | MT DEQ | (406) 258-4907 |
| P.O. Box 200901 | Fax (406) 444-1499 | 301 West Alder Street | Fax (406) 258-4781 |
| Helena, MT 59620-0901 | | Missoula, MT 59802 | |

Report Date:  <u>January 28, 2010</u>

Select the most appropriate categories:

Start-up (Production): <u>X</u>                       Shutdown (Production): <u>X</u>

Start-up (repair/maintenance): <u>N/A</u>              Shutdown (repair/maintenance): <u>N/A</u>

Exceedance:                                            Malfunction: <u>N/A</u>

If reporting under ARM 17.8.110 (Malfunction Rule), please complete this entire form. *(Additional information may be needed).*

DEQ must be notified promptly by telephone/fax, whenever a malfunction occurs that is expected to create excess emissions in excess of any applicable emission limitation, or to continue for a period greater than 4 hours. Within 1 week after a malfunction has been corrected, the owner or operator must submit a written report to the department that includes this primary information. See ARM 17.8.110 for specific instructions. The malfunction rule section is referenced in parentheses.

Company: <u>Holcim (US) Inc. – Trident Plant</u>       Person Reporting: <u>Greg Gannon, Environmental Manager</u>

Date and time of DEQ notification (2): <u>01/26/2010  09:54</u>        Contact: <u>Faxed to 406.444.1499 &</u>
<u>01/26/2010  13:49</u>                      <u>Faxed to 406.258.4781</u>

Date and time event occurred:
Begin (2c): <u>Please see table below.</u>        End: <u>Please see table below.</u>        Total Time: <u>Please see table below.</u>

| EXCURSION | | | #-6 | Measured OPACITY (%) | |
|---|---|---|---|---|---|
| DATE | START TIME | END TIME | MIN | AVG. | MAX. |
| 01/25/10 | 09:18 | 10:18 | 10 | 39.69 | 59.78 |
| 01/25/10 | 10:42 | 10:48 | 1 | 38.86 | 38.86 |
| 01/25/10 | 11:30 | 11:42 | 2 | 28.30 | 34.36 |
| 01/25/10 | 11:48 | 11:54 | 1 | 45.85 | 45.85 |
| 01/25/10 | 12:12 | 12:18 | 1 | 53.59 | 53.59 |
| 01/25/10 | 12:42 | 12:54 | 2 | 35.05 | 43.93 |
| 01/25/10 | 13:18 | 13:30 | 2 | 27.93 | 32.83 |
| 01/25/10 | 14:06 | 14:18 | 2 | 28.31 | 31.66 |
| 01/25/10 | 14:48 | 14:54 | 1 | 36.13 | 36.13 |
| 01/25/10 | 15:12 | 15:24 | 2 | 26.33 | 32.29 |
| 01/25/10 | 16:06 | 16:12 | 1 | 31.01 | 31.01 |
| 01/25/10 | 16:54 | 17:06 | 2 | 23.16 | 23.81 |
| 01/25/10 – 01/26/10 | 17:36 | 01:42 | 81 | 75.37 | 93.65 |
| 01/26/10 | 04:00 | 04:06 | 1 | 20.07 | 20.07 |
| 01/26/10 | 04:36 | 04:42 | 1 | 20.45 | 20.45 |
| 01/26/10 | 07:00 | 07:12 | 2 | 57.89 | 88.56 |

Emission Point (2a): <u>Kiln Stack (ESP).</u>

Monitor/Method 9 Opacity Readings (2b): <u>A continuous opacity monitor system has been installed on the stack. The measured opacity readings in the table above are values as recorded in the plant data historian.</u>

Specific Cause of Malfunction (5b) (2a): <u>The kiln was in shutdown due to excess ring build-up.</u>

Verify malfunction has been corrected (5a): <u>Measured opacity at the stack returned to permitted levels.</u>

Corrective Action Taken (2d): <u>Plant personnel immediately decreased kiln revolutions, cut the fuel, worked to remove the ring and managed kiln conditions to bring the stack opacity back within permitted limits.</u>

Measures to prevent recurrence (5c): <u>Holcim is continually endeavoring to reduce upset/malfunction conditions. Data from this event will be included in future analyses. Upsets, in addition to having potential for causing excess emissions, have potential for adversely impacting production rates and plant economics. As a result, Holcim has a strong interest in reducing the frequency and duration of upset conditions.</u>

Verify the event was not caused by poor maintenance, careless operation, poor design, or any other preventable upset condition or breakdown (5d): <u>Holcim (US) Inc. – Trident Plant believes that the equipment malfunction could not have been prevented and was not a result of poor maintenance, careless operation, or poor design.</u>

Based on the information and belief formed after reasonable inquiry, the statements and information in the document are true, accurate, and complete.

_____         January 28, 2010
Signature                                              Date

Holcim (US) Inc – Trident Plant
Plant Manager or Plant Manager Designee

Inspector Comments: _____
_____
_____

**Montana Department of**
**ENVIRONMENTAL QUALITY**

Steve Bullock, Governor
Tracy Stone-Manning, Director

P. O. Box 200901     Helena, MT 59620-0901     (406) 444-2544     Website: www.deq.mt.gov

February 19, 2013

Jennifer Swearingen
502 South Sixth Avenue
Bozeman, MT 59715

Dear Mrs. Swearingen:

Please find enclosed copies of the Opacity Reports from Holcim for calendar years 2011 and 2012.

Should you have further questions about Holcim's operations, please contact me at kawilson@mt.gov.

Sincerely,

Karen J. Wilson, MS
Senior Environmental Science Specialist

Air Resources Management Bureau
Montana Department of Environmental Quality
301 West Alder Street
Missoula, MT 59802
(406-258-4907)

c:     Dan Walsh, MT DEQ

Enc.

Holcim

Holcim (US) Inc.
4070 Trident Road
Three Forks, MT 59752

Phone 406 285 3241
Fax 406 285 3100
www.holcim.com/us

July 29, 2011

MDEQ – Air Resources Bureau
Attn: Vickie Walsh
P.O. Box 200901
Helena, MT 59620-0901

**VIA CERTIFIED US MAIL**

RE:   OPACITY REPORTS – HOLCIM (US) INC. - TRIDENT PLANT
       FIRST AND SECOND QUARTER 2011

Dear Ms. Walsh:

In compliance with reporting requirements (typical of Air Quality Permit #0982-10, Section II.E.9) Holcim (US) Inc. – Trident Plant (Holcim) is submitting Excess Emission Summary Reports for the continuous opacity monitoring systems (COMS) for the first and second quarters of 2011.

With this submittal, Holcim concludes that applicable COMS reporting requirements have been met for this period. If MDEQ does not concur, please notify Holcim immediately.

If you have any questions or comments, please contact me at 406-285-4977.

Sincerely,

Greg Gannon
Environmental Manager

**RECEIVED**

AUG 1 2011

**Dept. of Environmental
Quality**

Attachments:  1st & 2nd Quarter Summary Reports
              Excess Opacity Emissions – 1st Half of 2011

cc:      Karen Wilson, MDEQ, 301 W. Alder, Missoula MT 59802
        John Goetz, Plant Manager

DEC131

**Summary Report – Excess Emissions and Monitoring System Performance
for Continuous Opacity Monitoring Systems
1ST QUARTER 2011**

This report is submitted as required by 40 CFR Part 60.7 Section (c). The format is taken from Figure 1.

| | |
|---|---|
| Pollutant: | Opacity |
| Reporting Period Dates: | From 01/01/11 @ 07:00 to 04/01/11 @ 07:00 |
| Company: | Holcim (US) Inc. – Trident Plant |
| Emission Limitation: | 20% |
| Plant Address: | 4070 Trident Road, Three Forks, MT 59752 |
| Monitor Manufacturer and Model No.: | Teledyne Monitor Labs, LightHawk 560 |
| Date of Latest COMS Certification or Audit: | Annual Certification & Audit on February 2, 2011 |
| Process Unit Description: | Wet process cement manufacturing kiln stack |
| Total Source Operating Time in Reporting Period (hours): | 98,046 minutes (1,634.1 hours) |

**Opacity Emission Data Summary[1]**
1. Duration of excess emission in reporting period due to:

| | |
|---|---|
| a. Startup/shutdown | 2,322 minutes |
| b. Control equipment problems | 48 minutes |
| c. Process problems | 1,020 minutes |
| d. Other known causes | 0 minutes |
| e. Unknown causes | 0 minutes |
| 2. Total duration of excess emissions: | 3,390 minutes |
| 3. Total duration of excess emissions * (100) / [Total source operating time].[2] | 3.46 % |

**COMS Performance Summary[1]**
1. COMS downtime in reporting due to:

| | |
|---|---|
| Monitor equipment malfunctions | 18 minutes |
| Non-monitor equipment malfunctions | 330 minutes |
| Quality assurance calibration | 672 minutes |
| Other known causes | 0 minutes |
| Unknown causes | 0 minutes |
| 2. Total COMS downtime: | 1,020 minutes |
| 3. [Total COMS downtime] * (100) / [Total source operating time].[2] | 1.04 % |

1. For opacity, record all times in minutes. For gases, record all times in hours.
2. For the reporting period: If the total duration of excess emissions is 1% or greater of the total operating time or the total COMS downtime is 5% or greater of the total operating time, both the summary report form and the excess emission report described in §60.7(c) shall be submitted.

**Opacity Excess Emissions**
The following section individually identifies each period of excess opacity emissions. If no periods of excess emissions occurred, a statement to that effect is included. As applicable, period(s) occurring during startup, shutdown or malfunction are identified. Cause(s) of malfunction and corrective action taken or preventative measures adopted are identified.

Please see attached spreadsheet "Excess Opacity Emissions – 1st Half of 2011".

**Opacity Downtime**
The following section individually identifies each period of time when the COMS was inoperative. If the COMS has not been inoperative, a statement to that effect is included. As allowed, automatic zero and upscale check periods are not included as downtime and downtime while the source was not operating is not included.

COMS downtime occurred during the reporting period due to COMS equipment calibration and/or preventative maintenance conducted by instrumentation technicians for a total of 672 minutes (January 19 and 26; annual third party certification on February 1 and 2). A data recording error occurred on January 25 for 18 minutes. PDH system maintenance accounted for 330 minutes of downtime (February 12, March 22 and March 23). For additional detail, please see attached spreadsheet "Excess Opacity Emissions – 1st Half of 2011".

DEC132

Description of any changes since last quarter in COMS, process or controls:

☒ No changes, so no separate description sheet is enclosed.
☐ Changes have been, and are included on a separate sheet [as required by 40 CFR 60.7 (d)].

By signing this report, I certify that, having been duly authorized by Holcim (US) Inc.'s Vice President of Manufacturing, Gian Raffainer, I am a responsible official for the Holcim (US) Inc. – Trident Plant. I further certify, based on reasonable inquiry, that the statements and details enclosed are to the best of my knowledge and belief, true, accurate, and complete.

Name:       John Goetz

Signature:  

Title:      Plant Manager

Date:       July    , 2011

DEC133

Summary Report – Excess Emissions and Monitoring System Performance
for Continuous Opacity Monitoring Systems
2ND QUARTER 2011

This report is submitted as required by 40 CFR Part 60.7 Section (c). The format is taken from Figure 1.

| Pollutant: | Opacity |
|---|---|
| Reporting Period Dates: | From 4/01/11 @ 07:00 to 07/01/11 @ 07:00 |
| Company: | Holcim (US) Inc. – Trident Plant |
| Emission Limitation: | 20% |
| Plant Address: | 4070 Trident Road, Three Forks, MT  59752 |
| Monitor Manufacturer and Model No.: | Teledyne Monitor Labs, LightHawk 560 |
| Date of Latest COMS Certification or Audit: | Annual Certification & Audit on February 2, 2011 |
| Process Unit Description: | Wet process cement manufacturing kiln stack |
| Total Source Operating Time in Reporting Period (hours): | 101,322 minutes (1,688.7 hours) |

## Opacity Emission Data Summary[1]
1. Duration of excess emission in reporting period due to:

| | |
|---|---|
| a. Startup/shutdown | 2,040 minutes |
| b. Control equipment problems | 450 minutes |
| c. Process problems | 0 minutes |
| d. Other known causes | 0 minutes |
| e. Unknown causes | 0 minutes |
| 2. Total duration of excess emissions: | 2,490 minutes |
| 3. Total duration of excess emissions * (100) / [Total source operating time].[2] | 2.46 % |

## COMS Performance Summary[1]
1. COMS downtime in reporting due to:

| | |
|---|---|
| Monitor equipment malfunctions | 12 minutes |
| Non-monitor equipment malfunctions | 0 minutes |
| Quality assurance calibration | 180 minutes |
| Other known causes | 60 minutes |
| Unknown causes | 0 minutes |
| 2. Total COMS downtime: | 252 minutes |
| 3. [Total COMS downtime] * (100) / [Total source operating time].[2] | 0.25% |

1. For opacity, record all times in minutes.  For gases, record all times in hours.
2. For the reporting period:  If the total duration of excess emissions is 1% or greater of the total operating time or the total COMS downtime is 5% or greater of the total operating time, both the summary report form and the excess emission report described in §60.7(c) shall be submitted.

## Opacity Excess Emissions
The following section individually identifies each period of excess opacity emissions. If no periods of excess emissions occurred, a statement to that effect is included.   As applicable, period(s) occurring during startup, shutdown or malfunction are identified.   Cause(s) of malfunction and corrective action taken or preventative measures adopted are identified.

Please see attached spreadsheet "Excess Opacity Emissions - 1st Half of 2011".

## Opacity Downtime
The following section individually identifies each period of time when the COMS was inoperative.  If the COMS has not been inoperative, a statement to that effect is included.  As allowed, automatic zero and upscale check periods are not included as downtime and downtime while the source was not operating is not included.

COMS downtime occurred during the reporting period due to COMS equipment calibration and/or preventative maintenance conducted by instrumentation technicians for a total of 180 minutes (May 25).  A data recording error occurred on June 6 for 12 minutes.  PDH system maintenance accounted for 60 minutes of downtime (April 11). For additional detail, please see attached spreadsheet "Excess Opacity Emissions – 1st Half of 2011".

DEC134

Description of any changes since last quarter in COMS, process or controls:

☒ No changes, so no separate description sheet is enclosed.

☐ Changes have been, and are included on a separate sheet [as required by 40 CFR 60.7 (d)].

By signing this report, I certify that, having been duly authorized by Holcim (US) Inc.'s Vice President of Manufacturing, Gian Raffainer, I am a responsible official for the Holcim (US) Inc. – Trident Plant. I further certify, based on reasonable inquiry, that the statements and details enclosed are to the best of my knowledge and belief, true, accurate, and complete.

Name:        John Goetz

Signature:

Title:        Plant Manager

Date:        July   , 2011

DEC135

Excess Opacity Emissions - 1st Half of 2011

| DATE | EXCURSION | | | OPACITY (%) | | CAUSE | CORRECTIVE ACTION |
| | START TIME | END TIME | # - 6 MIN | AVG. | MAX. | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 01/12/11 | 0:12 | 0:18 | 1 | 20.98 | 20.98 | Source Startup | Startup Procedure Followed |
| 01/12/11 | 0:42 | 0:48 | 1 | 46.88 | 46.88 | | |
| 01/12/11 | 6:12 | 6:18 | 1 | 21.3 | 21.3 | | |
| 01/12/11 | 12:18 | 12:24 | 1 | 28.25 | 28.25 | | |
| 01/12/11 | 12:48 | 13:00 | 2 | 37.23 | 39.47 | | |
| 01/12/11 | 13:12 | 13:18 | 1 | 32.48 | 32.48 | | |
| 01/12/11 | 13:30 | 13:36 | 1 | 25.25 | 25.25 | | |
| 01/12/11 | 13:48 | 13:54 | 1 | 24.33 | 24.33 | | |
| 01/12/11 | 14:06 | 14:18 | 2 | 20.79 | 20.27 | | |
| 01/12/11 | 14:54 | 23:12 | 83 | 36.61 | 91.93 | | |
| 01/12/11 | 23:36 | 23:42 | 1 | 20.71 | 20.71 | | |
| 01/12/11-01/13/11 | 23:36 | 0:24 | 8 | 22.05 | 23.8 | | |
| 01/13/11 | 0:30 | 0:54 | 4 | 22.39 | 24.43 | | |
| 01/13/11 | 1:30 | 1:54 | 4 | 24.26 | 24.96 | | |
| 01/13/11 | 2:06 | 3:54 | 18 | 41.29 | 93.79 | | |
| 01/13/11 | 5:18 | 5:24 | 1 | 21.55 | 21.55 | | |
| 01/13/11 | 5:30 | 5:42 | 2 | 21.36 | 21.36 | | |
| 01/13/11 | 8:00 | 8:06 | 1 | 37.92 | 37.92 | | |
| 01/15/11 | 6:12 | 6:24 | 2 | 27.16 | 29.84 | Source Shutdown | Shutdown Procedure Followed |
| 01/16/11 | 11:00 | 11:12 | 2 | 54.91 | 85.19 | | |
| 01/16/11 | 12:06 | 12:30 | 4 | 24.8 | 30.56 | | |
| 01/16/11 | 12:42 | 13:24 | 7 | 27.6 | 42.32 | | |
| 1/16/2011 | 13:48 | 14:12 | 4 | 28.53 | 31.7 | | |
| 01/16/11 | 14:54 | 20:12 | 53 | 28.22 | 31.42 | | |
| 01/16/11 | 20:18 | 22:06 | 16 | 42.31 | 53.42 | | |
| 01/17/11 | 0:18 | 0:24 | 1 | 28.52 | 28.52 | | |
| 01/17/11 | 0:54 | 1:00 | 1 | 21.91 | 21.91 | | |
| 01/17/11 | 1:24 | 1:30 | 1 | 27.75 | 27.75 | | |
| 01/17/11 | 2:00 | 2:18 | 3 | 23.78 | 27.04 | | |
| 01/17/11 | 2:36 | 2:42 | 1 | 27.95 | 27.95 | | |
| 01/17/11 | 3:42 | 3:48 | 1 | 26.3 | 26.3 | | |
| 01/17/11 | 4:12 | 4:18 | 1 | 24.05 | 24.05 | | |
| 01/17/11 | 4:48 | 4:54 | 1 | 25.32 | 25.32 | | |
| 01/17/11 | 5:24 | 5:30 | 1 | 26.06 | 26.06 | | |
| 01/17/11 | 6:00 | 6:06 | 1 | 25.51 | 25.51 | | |
| 01/17/11 | 6:36 | 6:42 | 1 | 27.31 | 27.31 | | |
| 01/17/11 | 7:06 | 7:12 | 1 | 26.7 | 26.7 | | |
| 01/17/11 | 7:42 | 7:48 | 1 | 28.25 | 28.25 | | |
| 01/17/11 | 8:12 | 8:16 | 1 | 32.4 | 32.4 | | |
| 01/17/11 | 8:48 | 8:54 | 1 | 27.05 | 27.05 | | |
| 01/17/11 | 9:18 | 9:24 | 1 | 24.76 | 24.76 | | |
| 01/17/11 | 9:54 | 10:00 | 1 | 26.34 | 26.34 | | |
| 01/17/11 | 10:24 | 10:30 | 1 | 24.7 | 24.7 | | |
| 01/17/11 | 11:30 | 11:36 | 1 | 26.14 | 26.14 | | |
| 01/17/11 | 12:00 | 12:06 | 1 | 21.49 | 21.49 | | |
| 01/17/11 | 12:36 | 12:42 | 1 | 28.43 | 28.43 | | |
| 01/17/11 | 13:06 | 13:12 | 1 | 23.09 | 23.09 | | |
| 01/17/11 | 13:42 | 13:48 | 1 | 26.69 | 26.69 | | |
| 01/17/11 | 14:12 | 14:18 | 1 | 26.1 | 26.1 | | |
| 01/17/11 | 14:42 | 14:48 | 1 | 26.75 | 26.75 | | |
| 01/17/11 | 15:48 | 15:54 | 1 | 27.84 | 27.84 | | |
| 01/17/11 | 16:54 | 17:00 | 1 | 28.51 | 28.51 | | |
| 01/17/11 | 17:48 | 18:00 | 2 | 21.8 | 22.95 | | |
| 01/17/11 | 18:54 | 19:00 | 1 | 20.16 | 20.16 | | |
| 01/17/11 | 20:00 | 20:06 | 1 | 24.11 | 24.11 | | |
| 01/17/11 | 21:06 | 21:12 | 1 | 24.33 | 24.33 | | |
| 01/17/11 | 22:06 | 22:12 | 1 | 20.83 | 20.83 | | |
| 01/17/11 | 23:12 | 23:18 | 1 | 27.85 | 27.85 | | |
| 01/18/11 | 0:18 | 0:24 | 1 | 22.27 | 22.27 | | |
| 01/18/11 | 1:18 | 1:24 | 1 | 23.92 | 23.92 | | |
| 01/18/11 | 2:24 | 2:30 | 1 | 23.52 | 23.52 | | |
| 01/18/11 | 3:24 | 3:30 | 1 | 24.17 | 24.17 | | |
| 01/18/11 | 4:30 | 4:36 | 1 | 22.78 | 22.78 | | |
| 01/19/11 | 8:12 | 10:30 | 23 | - | - | Other Known Cause Calibration Audit | Audit Completed |
| 01/20/11 | 17:18 | 17:24 | 1 | 24.66 | 24.66 | Source Startup | Startup Procedure Followed |
| 01/21/11 | 9:24 | 10:00 | 6 | 29.6 | 38.05 | Source Shutdown | Shutdown Procedure followed |
| 01/22/11 | 13:12 | 13:42 | 1 | 27.69 | 27.69 | | |
| 01/22/11 | 16:54 | 17:00 | 1 | 37.17 | 37.17 | | |
| 01/24/11 | 12:18 | 12:30 | 2 | 20.96 | 21.15 | Source Startup | Startup Procedure Followed |
| 01/24/11 | 23:48 | 23:54 | 1 | 22.6 | 22.6 | | |
| 01/25/11 | 0:00 | 9:18 | 93 | 66.18 | 94.81 | | |
| 01/25/11 | 10:24 | 11:30 | 11 | 22.02 | 27.27 | | |
| 01/25/11 | 22:06 | 22:24 | 3 | - | - | Other Known Cause COMS - Error | Audit Conducted on 01/26/11 |
| 01/26/11 | 10:24 | 11:00 | 6 | - | - | Other Known Cause Calibration Audit | Audit Completed |
| 01/30/11 | 4:00 | 4:12 | 2 | 21.97 | 22.38 | Malfunction - ESP efficiency | Malfunction Procedure Followed |
| 02/01/11 | 10:54 | 16:42 | 58 | - | - | Other Known Cause Annual Clear Stack Auditing | Audit Completed |
| 02/02/11 | 13:12 | 15:42 | 25 | - | - | Other Known Cause Calibration Audit | Audit Completed |
| 2/12/2011* | 6:30 | 11:12 | 45 | - | - | Other Known Cause PDH system reset | System Rest |
| (47 - 6-Minute intervals however, 2 noted below makes 45) | | | | | | | |
| 2/12/2011* | 7:54 | 8:06 | 2 | 100 | 100 | Malfunction Process Problem - ESP Tripped for Safety | Malfunction Procedure Followed |
| 02/12/11 | 20:48 | 21:06 | 3 | 57.09 | 96.59 | Process Problem | Shutdown/Startup Procedure Followed |

DEC136

| Date | Start | End | Min | Opacity 1 | Opacity 2 | Cause | Action |
|---|---|---|---|---|---|---|---|
| 02/13/11 | 5:42 | 5:48 | 1 | 30.39 | 30.39 | Removal of Rings | |
| 02/13/11 | 7:46 | 8:00 | 2 | 24.94 | 26.59 | | |
| 02/13/11 | 8:12 | 13:30 | 53 | 64.92 | 93.76 | | |
| 02/15/11 | 3:42 | 3:48 | 1 | 30.75 | 30.75 | Malfunction — Process Problem - ESP Tripped for Safety | Malfunction Procedure Followed |
| 02/19/11 | 20:00 | 20:06 | 1 | 33.88 | 33.88 | Malfunction — Process Problem - ESP Tripped for Safety | Malfunction Procedure Followed |
| 03/01/11 | 7:36 | 7:42 | 1 | 49.09 | 49.09 | Process Problem — Removal of Rings | Shutdown/Startup Procedures followed |
| 03/01/11 | 8:48 | 8:54 | 1 | 27.12 | 27.12 | | |
| 03/01/11 | 9:06 | 9:18 | 2 | 29.92 | 36.11 | | |
| 03/01/11 | 9:24 | 9:30 | 1 | 20.98 | 20.98 | | |
| 03/01/11 | 9:36 | 10:06 | 5 | 34.73 | 52.64 | | |
| 03/01/11 | 10:18 | 11:12 | 9 | 32.98 | 36.96 | | |
| 03/01/11 | 11:24 | 20:36 | 92 | 82.97 | 95.76 | | |
| 03/22/11 | 8:00 | 8:42 | 7 | - | - | Other Known Cause — PDH Reset - clock reset | PDH back on-line |
| 03/22/11 | 21:48 | 21:54 | 1 | 42.37 | 42.37 | Malfunction — Process Problem - ESP Tripped for Safety | Malfunction Procedure Followed |
| 03/23/11 | 10:42 | 10:48 | 1 | - | - | Other Known Cause — Electrical communication error | Communication Restored |
| | 10:54 | 11:06 | 2 | - | - | | |
| 03/23/11 | 20:54 | 21:00 | 1 | 47.48 | 47.48 | Malfunction — Process Problem - ESP Tripped for Safety | Malfunction Procedure Followed |
| | 21:06 | 21:18 | 2 | 56.92 | 59.82 | | |
| 03/25/11 | 15:06 | 15:12 | 1 | 30.56 | 30.56 | Malfunction — Process Problem - ESP Tripped for Safety | Malfunction Procedure Followed |
| 03/30/11 | 9:24 | 9:36 | 2 | 26.31 | 27.67 | Malfunction — Process Problem - ESP Tripped for Safety | Malfunction Procedure Followed |
| 03/31/11 | 13:54 | 14:08 | 2 | 25.09 | 29.15 | Malfunction — Process Problem - ESP Tripped for Safety | Malfunction Procedure Followed |
| 04/11/11 | 10:30 | 11:30 | 10 | - | - | Other Known Cause — PDH system reset | System Rest |
| 04/13/11 | 6:48 | 6:54 | 1 | 40.1 | 40.1 | Malfunction — Process Problem - ESP Tripped for Safety | Malfunction Procedure Followed |
| 04/28/11-04/29/11 | 9:36 | 0:30 | 149 | 81.56 | 94.7 | Source Shutdown | Shutdown Procedure Followed |
| 04/29/11 | 2:06 | 2:12 | 1 | 24.18 | 24.18 | | |
| 04/29/11 | 10:54 | 11:00 | 1 | 23.01 | 23.01 | | |
| 04/29/11 | 23:30 | 23:42 | 2 | 27.62 | 31.25 | | |
| 04/30/11 | 14:24 | 14:30 | 1 | 21.52 | 21.52 | | |
| 05/01/11 | 1:06 | 1:18 | 2 | 26.94 | 29.85 | | |
| 05/01/11 | 5:00 | 5:06 | 1 | 20.92 | 20.92 | | |
| 05/02/11 | 0:00 | 0:18 | 3 | 36.84 | 46.59 | | |
| 05/02/11 | 13:48 | 13:06 | 3 | 20.34 | 20.34 | | |
| 05/04/11 | 8:42 | 9:06 | 4 | 73.46 | 93.13 | Source in Shutdown Status | Shutdown Procedure followed |
| 05/17/11 | 19:12 | 19:18 | 1 | 20.64 | 20.64 | Source Startup | Startup Procedure Followed |
| 05/17/11 | 19:36 | 19:42 | 1 | 22.84 | 22.84 | | |
| 05/17/11 | 20:00 | 20:06 | 1 | 21.13 | 21.13 | | |
| 05/17/11 | 20:24 | 20:30 | 1 | 23.12 | 23.12 | | |
| 05/17/11 | 20:48 | 20:54 | 1 | 22.56 | 22.56 | | |
| 05/18/11 | 6:42 | 6:48 | 1 | 38.01 | 38.01 | | |
| 05/18/11 | 7:06 | 7:18 | 2 | 31.96 | 38.66 | | |
| 05/18/11 | 7:24 | 13:24 | 60 | 45.29 | 89.2 | | |
| 05/18/11 | 14:00 | 14:06 | 1 | 21.86 | 21.86 | | |
| 05/18/11 | 17:18 | 17:24 | 1 | 86.47 | 86.47 | | |
| 05/19/11 | 1:12 | 1:18 | 1 | 23.04 | 23.04 | | |
| 05/21/11 | 20:06 | 20:12 | 1 | 20.41 | 20.41 | Malfunction - ESP efficiency | Malfunction Procedure Followed |
| 05/21/11 | 20:36 | 20:42 | 1 | 20.11 | 20.11 | | |
| 05/21/11 | 21:12 | 21:18 | 1 | 20.34 | 20.34 | | |
| 05/21/11 | 22:12 | 22:24 | 2 | 21.93 | 22.26 | | |
| 05/21/11 | 22:30 | 22:48 | 3 | 20.61 | 21.26 | | |
| 05/21/11 | 22:54 | 23:18 | 4 | 21.16 | 21.86 | | |
| 05/22/11 | 0:30 | 1:00 | 5 | 24.27 | 30.67 | | |
| 05/22/11 | 2:48 | 3:00 | 2 | 25.55 | 26.11 | | |
| 05/22/11 | 18:30 | 19:18 | 8 | 24.09 | 27.36 | | |
| 05/22/11 | 19:24 | 19:30 | 1 | 21.19 | 21.19 | | |
| 05/23/11 | 1:24 | 1:36 | 2 | 24.22 | 27.59 | | |
| 05/23/11 | 2:12 | 2:36 | 4 | 23.7 | 25.66 | | |
| 05/23/11 | 2:54 | 3:36 | 7 | 23.36 | 26.81 | | |
| 05/23/11 | 9:18 | 11:24 | 21 | 37.79 | 90.85 | | |
| 05/23/11 | 15:06 | 15:18 | 2 | 28.81 | 31.86 | | |
| 05/25/11 | 10:06 | 13:06 | 30 | - | - | Other Known Cause — Calibration Audit | Audit Completed |
| 06/06/11 | 17:12 | 17:24 | 2 | 38.15 | 43.11 | Other Known Cause — COMS - Error | System returned to normal following severe meteorological event. |
| 06/06/11 | 23:30 | 23:42 | 2 | 57.02 | 78.61 | Malfunction — Process Problem - ESP Tripped for Safety | SSM procedures followed |
| 06/11/11 | 12:30 | 12:42 | 2 | 40.54 | 59.05 | Malfunction — Process Problem - ESP Tripped for Safety | SSM procedures followed |
| 06/13/11 | 20:24 | 20:30 | 1 | 85.64 | 85.64 | Malfunction — Process Problem - ESP Tripped for Safety | SSM procedures followed |
| 06/16/11 | 0:42 | 0:48 | 1 | 23.02 | 23.02 | Malfunction — Process Problem - ESP Tripped for Safety | SSM procedures followed |
| 06/16/11 | 7:06 | 11:00 | 39 | 54.82 | 91.42 | Source Shutdown — Removal of Rings & ESP Troubleshooting | Startup Procedure Followed |
| 06/16/11 | 11:18 | 11:24 | 1 | 29.37 | 29.37 | | |
| 06/16/11 | 11:36 | 17:48 | 62 | 67.37 | 93.91 | | |
| 06/20/11 | 12:18 | 12:24 | 1 | 58.7 | 58.7 | Malfunction — Process Problem - ESP Tripped for Safety | SSM procedures followed |
| 06/22/11 | 8:36 | 8:42 | 1 | 34.79 | 34.79 | Malfunction — Process Problem - ESP Tripped for Safety | SSM procedures followed |
| | 8:48 | 8:54 | 1 | 47.2 | 47.2 | | |
| 06/25/11 | 22:00 | 22:06 | 1 | 67.64 | 67.64 | Malfunction — Process Problem - ESP Tripped for Safety | SSM procedures followed |

* 02/12/11: As shown on the "Facility Upset Report" this excursion occurred while COMS was offline; therefore the noted opacity readings are reported as worst case scenario; also, since the system was offline at this time, the noted offline time was reduced by 2 6-minutes due to the upset report

DEC137

# Holcim

RECEIVED

JAN 3 1 2012

**Dept. of Environmental Quality**

Msla office

January 30, 2012

MDEQ – Air Resources Bureau
Attn: Vickie Walsh
P.O. Box 200901
Helena, MT 59620-0901

**VIA CERTIFIED US MAIL**

RE:    OPACITY REPORTS – HOLCIM (US) INC. - TRIDENT PLANT
       THIRD AND FOURTH QUARTER 2011

Dear Ms. Walsh:

In compliance with reporting requirements (typical of Air Quality Permit #0982-10, Section II.E.9) Holcim (US) Inc. – Trident Plant (Holcim) is submitting Excess Emission Summary Reports for the continuous opacity monitoring systems (COMS) for the third and fourth quarters of 2011.

With this submittal, Holcim concludes that applicable COMS reporting requirements have been met for this period. If MDEQ does not concur, please notify Holcim immediately.

If you have any questions or comments, please contact me at 406-285-4977.

Sincerely,

Greg Gannon
Environmental Manager

Attachments:    3rd & 4th Quarter Summary Reports
                Excess Opacity Emissions – 2nd Half of 2011

cc:    Karen Wilson, MDEQ, 301 W. Alder, Missoula MT 59802
       John Goetz, Plant Manager

Strength. Performance. Passion.

DEC138

**Summary Report – Excess Emissions and Monitoring System Performance
for Continuous Opacity Monitoring Systems
3RD QUARTER 2011**

This report is submitted as required by 40 CFR Part 60.7 Section (c). The format is taken from Figure 1.

| | |
|---|---|
| Pollutant: | Opacity |
| Reporting Period Dates: | From 07/01/11 @ 07:00 to 10/01/11 @ 07:00 |
| Company: | Holcim (US) Inc. – Trident Plant |
| Emission Limitation: | 20% |
| Plant Address: | 4070 Trident Road, Three Forks, MT 59752 |
| Monitor Manufacturer and Model No.: | Teledyne Monitor Labs, LightHawk 560 |
| Date of Latest COMS Certification or Audit: | Annual Certification & Audit on February 2, 2011 |
| Process Unit Description: | Wet process cement manufacturing kiln stack |
| Total Source Operating Time in Reporting Period (hours): | 130,806 minutes (2,180.1 hours) |

**Opacity Emission Data Summary[1]**
1. Duration of excess emission in reporting period due to:

| | |
|---|---|
| a. Startup/shutdown | 1,212 minutes |
| b. Control equipment problems | 144 minutes |
| c. Process problems | 0 minutes |
| d. Other known causes | 0 minutes |
| e. Unknown causes | 0 minutes |
| 2. Total duration of excess emissions: | 1,356 minutes |
| 3. Total duration of excess emissions * (100) / [Total source operating time].[2] | 1.04% |

**COMS Performance Summary[1]**
1. COMS downtime in reporting due to:

| | |
|---|---|
| Monitor equipment malfunctions | 6 minutes (severe weather conditions) |
| Non-monitor equipment malfunctions | 12 minutes (power outage) |
| Quality assurance calibration | 264 minutes |
| Other known causes | 0 minutes |
| Unknown causes | 0 minutes |
| 2. Total COMS downtime: | 282 minutes |
| 3. [Total COMS downtime] * (100) / [Total source operating time].[2] | 0.22% |

1. For opacity, record all times in minutes. For gases, record all times in hours.
2. For the reporting period: If the total duration of excess emissions is 1% or greater of the total operating time or the total COMS downtime is 5% or greater of the total operating time, both the summary report form and the excess emission report described in §60.7(c) shall be submitted.

**Opacity Excess Emissions**
The following section individually identifies each period of excess opacity emissions. If no periods of excess emissions occurred, a statement to that effect is included.   As applicable, period(s) occurring during startup, shutdown or malfunction are identified.   Cause(s) of malfunction and corrective action taken or preventative measures adopted are identified.

Please see attached spreadsheet "Excess Opacity Emissions – 2nd Half of 2011".

**Opacity Downtime**
The following section individually identifies each period of time when the COMS was inoperative.  If the COMS has not been inoperative, a statement to that effect is included.  As allowed, automatic zero and upscale check periods are not included as downtime and downtime while the source was not operating is not included.

COMS downtime occurred during the reporting period due to COMS equipment calibration and/or preventative maintenance conducted by instrumentation technicians for a total of 264 minutes (August 22).  A data recording error occurred on July for 6 minutes caused by severe weather conditions.  A power outage accounted for 12

Holcim (US) Inc.    Trident Plant

**Excess Opacity Emissions – 2nd Half of 2011**

| DATE | EXCURSION | | | OPACITY (%) | | CAUSE | CORRECTIVE ACTION |
|---|---|---|---|---|---|---|---|
| | START TIME | END TIME | # - 6 MIN | AVG. | MAX. | | |
| 07/10/11 | 1:12 | 1:54 | 7 | 47.76 | 65.52 | Source Shutdown | Shutdown/Startup Procedures Followed |
| 07/10/11 | 2:24 | 2:48 | 4 | 48.61 | 69.27 | Removal of Rings | |
| 07/10/11 | 4:42 | 4:54 | 2 | 66.14 | 89.01 | | |
| 07/10/11 | 6:54 | 10:30 | 36 | 72.54 | 93 | | |
| 07/10/11 | 10:48 | 10:54 | 1 | 25.5 | 25.5 | | |
| 07/10/11 | 11:06 | 11:18 | 2 | 24.64 | 28.94 | | |
| 07/10/11 | 11:36 | 11:48 | 2 | 48.24 | 51.24 | | |
| 07/10/11 | 12:00 | 17:36 | 56 | 79.69 | 96.39 | | |
| 07/10/11 | 17:42 | 17:54 | 2 | 30.89 | 32.26 | | |
| 07/10/11 | 18:00 | 18:12 | 2 | 24 | 26.23 | | |
| 07/10/11 | 18:18 | 18:30 | 2 | 21.34 | 21.48 | | |
| 07/10/11 | 18:48 | 18:54 | 1 | 21.95 | 21.95 | | |
| 07/11/11 | 18:30 | 18:36 | 1 | 28.48 | 28.48 | Other Known Cause | COMS Returned to Normal Operation |
| | | | | | | COMS - Error - Severe Weather | |
| 07/25/11 | 6:48 | 6:54 | 1 | 66.17 | 66.17 | Source Shutdown | Shutdown/Startup Procedures Followed |
| 07/25/11 | 8:00 | 8:12 | 2 | 46.45 | 68.53 | Removal of Rings | |
| 07/25/11 | 8:18 | 8:30 | 2 | 42.36 | 51.42 | | |
| 07/25/11 | 8:36 | 8:42 | 1 | 43.76 | 43.76 | | |
| 07/25/11 | 9:24 | 9:30 | 1 | 24.08 | 24.08 | | |
| 07/25/11 | 9:54 | 10:18 | 4 | 24.77 | 26.37 | | |
| 07/25/11 | 10:36 | 10:42 | 1 | 36.45 | 36.45 | | |
| 07/25/11 | 10:54 | 12:00 | 11 | 49.22 | 82.71 | | |
| 07/25/11 | 12:06 | 13:42 | 16 | 51.74 | 94.38 | | |
| 07/25/11 | 15:00 | 15:30 | 5 | 64.38 | 96.63 | | |
| 08/02/11 | 13:24 | 13:30 | 1 | 20.95 | 20.95 | Malfunction | Malfunction Procedure Followed |
| | | | | | | Process Problem - ESP Tripped for Safety | |
| 08/03/11 | 22:18 | 22:36 | 3 | 20.66 | 20.88 | Source Shutdown | Shutdown/Startup Procedures Followed |
| 08/03/11 - 08/04/11 | 22:42 | 2:06 | 34 | 31.5 | 76.48 | Clinker Cooler Maintenance | |
| 08/04/11 | 6:48 | 7:00 | 2 | 64.78 | 65.69 | | |
| 08/06/11 | 1:12 | 1:18 | 1 | 77.69 | 77.69 | Source Shutdown | Shutdown/Startup Procedures Followed |
| 08/06/11 | 2:12 | 2:18 | 1 | 45.58 | 45.58 | Ring Push - Source in Shutdown Mode | |
| 08/08/11 | 13:12 | 13:18 | 1 | 60.13 | 60.13 | Malfunction | Malfunction Procedure Followed |
| 08/12/11 | 16:18 | 16:24 | 1 | 36.63 | 36.63 | Process Problem - ESP Tripped for Safety | |
| 08/12/11 | 16:30 | 16:42 | 2 | 42.88 | 52.77 | | |
| 08/12/11 | 16:48 | 17:12 | 4 | 53.78 | 83.72 | | |
| 08/14/11 | 10:12 | 10:18 | 1 | 25.78 | 25.78 | | |
| 08/19/11 | 17:42 | 17:48 | 1 | 33.21 | 33.21 | Malfunction | Malfunction Procedure Followed |
| 08/21/11 | 0:06 | 0:12 | 1 | 23.45 | 23.45 | Process Problem - ESP Tripped for Safety | |
| 08/21/11 | 13:12 | 13:18 | 1 | 30.82 | 30.82 | | |
| 08/21/11 | 7:24 | 7:30 | 1 | 47.89 | 47.89 | | |
| 08/22/11 | 10:18 | 14:36 | 44 | - | - | Other Known Cause | Audit Completed |
| | | | | | | Calibration Audit | |
| 09/09/11 | 19:36 | 19:48 | 2 | 54.76 | 83.8 | Malfunction | Malfunction Procedure Followed |
| 09/09/11 | 19:54 | 20:18 | 4 | 78.15 | 94.79 | Process Problem - ESP Tripped for Safety | |
| 09/11/11 | 21:30 | 21:36 | 1 | 48.22 | 48.22 | | |
| 09/16/11 [a] | 8:12 | 8:30 | 3 | 33.12 | 38.1 | Malfunction | Malfunction Procedures Followed |
| 09/17/11 [b] | 6:18 | 6:30 | 2 | 63.05 | 73.77 | a. ESP Efficiency  b. Power Loss | |
| 10/01/11 | 4:24 | 4:30 | 1 | 57.48 | 57.48 | Malfunction | Malfunction Procedure Followed |
| | | | | | | Process Problem - ESP Tripped for Safety | |
| 10/05/11 | 9:00 | 10:18 | 13 | 32.26 | 43.89 | Malfunction | Malfunction Procedure Followed |
| 10/05/11 | 10:30 | 10:48 | 3 | 24.01 | 26.31 | Control Problem - ESP Power Low | |
| 10/05/11 | 11:18 | 11:24 | 1 | 20.17 | 20.17 | | |
| 10/05/11 | 12:18 | 13:06 | 8 | 23.87 | 27.83 | | |
| 10/13/11 | 11:06 | 11:12 | 1 | 60.28 | 60.28 | Malfunction | Malfunction Procedure Followed |
| | | | | | | Process Problem - ESP Tripped for Safety | |
| 10/22/11 | 21:48 | 21:54 | 1 | 47.58 | 47.58 | Malfunction | Malfunction Procedure Followed |
| | | | | | | Process Problem - ESP Tripped for Safety | |
| 11/09/11 | 8:00 | 11:00 | 30 | - | - | Other Known Cause | Audit Completed |
| | | | | | | Calibration Audit | |
| 11/09/11 | 17:00 | 17:06 | 1 | 27.07 | 27.07 | Source Shutdown | Shutdown Procedure Followed |
| 11/09/11 | 17:12 | 17:24 | 2 | 34.55 | 41.39 | Kiln Taken Off-Line | |
| 11/09/11 | 17:36 | 17:48 | 2 | 30.78 | 33.64 | | |
| 11/09/11 | 18:06 | 18:12 | 1 | 23.88 | 23.88 | | |
| 11/09/11 | 20:54 | 21:00 | 1 | 22.39 | 22.39 | | |
| 11/10/11 | 11:24 | 21:18 | 99 | 54.46 | 92.87 | Source Startup | Startup Procedure Followed |
| 11/10/11 | 21:24 | 21:30 | 1 | 20.49 | 20.49 | Kiln Startup | |
| 11/15/11 | 16:18 | 16:36 | 3 | 51.6 | 93.5 | Malfunction | Malfunction Procedure Followed |
| | | | | | | Process Problem - Coal Mill Feeder Issue | |
| 11/16/11 | 19:30 | 19:36 | 1 | 90.62 | 90.62 | Malfunction | Malfunction Procedure Followed |
| 11/16/11 | 21:06 | 21:12 | 1 | 64.12 | 64.12 | Process Problem - ESP Tripped for Safety | |
| 11/19/11 | 2:12 | 2:18 | 1 | 38.59 | 38.59 | Malfunction | Malfunction Procedure Followed |
| 11/19/11 | 15:24 | 15:30 | 1 | 46.77 | 46.77 | Process Problem - ESP Tripped for Safety | |
| 11/19/11 | 15:36 | 15:42 | 1 | 46.18 | 46.18 | | |
| 11/20/11 | 2:00 | 2:06 | 1 | 22.9 | 22.9 | | |
| 11/20/11 | 4:12 | 4:24 | 2 | 26 | 27.88 | | |
| 11/21/11 | 1:36 | 8:06 | 65 | 62 | 83.04 | Source Shutdown | Shutdown Procedure Followed |
| 11/22/11 | 20:54 | 21:06 | 2 | 24.58 | 26.47 | Kiln Taken Off-Line | |
| 12/07/11 | 19:30 | 19:36 | 1 | 30.09 | 30.09 | Source in Shutdown Status | Shutdown Procedure followed |
| 12/07/11 | 19:42 | 19:48 | 1 | 41.97 | 41.97 | | |
| 12/19/11 | 16:00 | 16:06 | 1 | 27.46 | 27.46 | Source in Shutdown Status | Shutdown Procedure followed |
| 12/19/11 | 19:42 | 20:06 | 4 | 24.21 | 34.28 | | |
| 12/28/11 | 10:06 | 10:18 | 2 | 57.54 | 73.39 | Source Startup | Startup Procedure Followed |
| 12/28/11 | 12:18 | 12:24 | 1 | 24.37 | 24.37 | | |
| 12/28/11 | 13:24 | 13:30 | 1 | 21.43 | 21.43 | | |
| 12/28/11 | 13:48 | 13:54 | 1 | 22.77 | 22.77 | | |
| 12/29/11 | 1:30 | 5:06 | 36 | 40.21 | 50.44 | | |
| 12/29/11 | 6:06 | 6:12 | 1 | 20.34 | 20.4 | | |
| 12/29/11 | 9:24 | 9:30 | 1 | 22.17 | 22.17 | | |
| 12/29/11 | 9:36 | 9:54 | 3 | 82.26 | 88.1 | | |

DEC140

Description of any changes since last quarter in COMS, process or controls:

☒ No changes, so no separate description sheet is enclosed.
☐ Changes have been, and are included on a separate sheet [as required by 40 CFR 60.7 (d)].

By signing this report, I certify that, having been duly authorized by Holcim (US) Inc.'s Vice President of Manufacturing, Gian Raffainer, I am a responsible official for the Holcim (US) Inc. – Trident Plant. I further certify, based on reasonable inquiry, that the statements and details enclosed are to the best of my knowledge and belief, true, accurate and complete.

Name:        John Goetz

Signature:

Title:        Plant Manager

Date:        January 30, 2012

DEC141

# Summary Report – Excess Emissions and Monitoring System Performance for Continuous Opacity Monitoring Systems
## 4TH QUARTER 2011

This report is submitted as required by 40 CFR Part 60.7 Section (c). The format is taken from Figure 1.

| | |
|---|---|
| Pollutant: | Opacity |
| Reporting Period Dates: | From 10/01/11 @ 07:00 to 01/01/12 @ 07:00 |
| Company: | Holcim (US) Inc. – Trident Plant |
| Emission Limitation: | 20% |
| Plant Address: | 4070 Trident Road, Three Forks, MT  59752 |
| Monitor Manufacturer and Model No.: | Teledyne Monitor Labs, LightHawk 560 |
| Date of Latest COMS Certification or Audit: | Annual Certification & Audit on February 2, 2011 |
| Process Unit Description: | Wet process cement manufacturing kiln stack |
| Total Source Operating Time in Reporting Period (hours): | 75,504 minutes (1,258.4 hours) |

**Opacity Emission Data Summary[1]**

1. Duration of excess emission in reporting period due to:

| | |
|---|---|
| a. Startup/shutdown | 1,392 minutes |
| b. Control equipment problems | 204 minutes |
| c. Process problems | 0 minutes |
| d. Other known causes | 0 minutes |
| e. Unknown causes | 0 minutes |

2. Total duration of excess emissions: — 1,596 minutes
3. Total duration of excess emissions * (100) / [Total source operating time].[2] — 2.11%

**COMS Performance Summary[1]**

1. COMS downtime in reporting due to:

| | |
|---|---|
| Monitor equipment malfunctions | 0 minutes |
| Non-monitor equipment malfunctions | 0 minutes |
| Quality assurance calibration | 180 minutes |
| Other known causes | 0 minutes |
| Unknown causes | 0 minutes |

2. Total COMS downtime: — 180 minutes
3. [Total COMS downtime] * (100) / [Total source operating time].[2] — 0.24%

1. For opacity, record all times in minutes.  For gases, record all times in hours.
2. For the reporting period:  If the total duration of excess emissions is 1% or greater of the total operating time or the total COMS downtime is 5% or greater of the total operating time, both the summary report form and the excess emission report described in §60.7(c) shall be submitted.


**Opacity Excess Emissions**

The following section individually identifies each period of excess opacity emissions. If no periods of excess emissions occurred, a statement to that effect is included.   As applicable, period(s) occurring during startup, shutdown or malfunction are identified.   Cause(s) of malfunction and corrective action taken or preventative measures adopted are identified.

Please see attached spreadsheet "Excess Opacity Emissions – 2nd Half of 2011".


**Opacity Downtime**

The following section individually identifies each period of time when the COMS was inoperative.  If the COMS has not been inoperative, a statement to that effect is included.  As allowed, automatic zero and upscale check periods are not included as downtime and downtime while the source was not operating is not included.

COMS downtime occurred during the reporting period due to COMS equipment calibration and/or preventative maintenance conducted by instrumentation technicians for a total of 180 minutes (November 9).  For additional detail, please see attached spreadsheet "Excess Opacity Emissions – 2nd Half of 2011".

DEC142

minutes of downtime (September 17). For additional detail, please see attached spreadsheet "Excess Opacity Emissions – 2nd Half of 2011".

Description of any changes since last quarter in COMS, process or controls:
☒ No changes, so no separate description sheet is enclosed.
☐ Changes have been, and are included on a separate sheet [as required by 40 CFR 60.7 (d)].

By signing this report, I certify that, having been duly authorized by Holcim (US) Inc.'s Vice President of Manufacturing, Gian Raffainer, I am a responsible official for the Holcim (US) Inc. – Trident Plant. I further certify, based on reasonable inquiry, that the statements and details enclosed are to the best of my knowledge and belief, true, accurate and complete.

Name:       John Goetz

Signature:

Title:       Plant Manager

Date:       January 30 2012

DEC143



July 30, 2012

RECEIVED

AUG  1 2012

Dept. of Environmental
Quality

MDEQ – Air Resources Bureau
Attn: Vickié Walsh
P.O. Box 200901
Helena, MT 59620-0901


**VIA CERTIFIED US MAIL**

RE:    OPACITY REPORTS – HOLCIM (US) INC. - TRIDENT PLANT
       FIRST AND SECOND QUARTER 2012

Dear Ms. Walsh:

In compliance with reporting requirements (typical of Air Quality Permit #0982-10, Section II.E.9) Holcim (US) Inc. – Trident Plant (Holcim) is submitting Excess Emission Summary Reports for the continuous opacity monitoring systems (COMS) for the first and second quarters of 2012.

With this submittal, Holcim concludes that applicable COMS reporting requirements have been met for this period. If MDEQ does not concur, please notify Holcim immediately.

If you have any questions or comments, please contact me at 406-285-4977.

Sincerely,

Greg Gannon
Environmental Manager


Attachments:    1st & 2nd Quarter Summary Reports
                Excess Opacity Emissions – 1st Half of 2012


cc:    Karen Wilson, MDEQ, 301 W. Alder, Missoula MT 59802


wF

**Summary Report – Excess Emissions and Monitoring System Performance
for Continuous Opacity Monitoring Systems
1ST QUARTER 2012**

This report is submitted as required by 40 CFR Part 60.7 Section (c). The format is taken from Figure 1.

| | |
|---|---|
| Pollutant: | Opacity |
| Reporting Period Dates: | From 01/01/12 @ 07:00 to 04/01/12 @ 07:00 |
| Company: | Holcim (US) Inc. – Trident Plant |
| Emission Limitation: | 20% |
| Plant Address: | 4070 Trident Road, Three Forks, MT  59752 |
| Monitor Manufacturer and Model No.: | Teledyne Monitor Labs, LightHawk 560 |
| Date of Latest COMS Certification or Audit: | On-Stack Calibration on February 9, 2012<br>Certification & Clear Stack Audit on February 2, 2011 |
| Process Unit Description: | Wet process cement manufacturing kiln stack |
| Total Source Operating Time in Reporting Period (hours): | 129,642 minutes (2,160.7 hours) |

**Opacity Emission Data Summary[1]**
1. Duration of excess emission in reporting period due to:

| | |
|---|---|
| a. Startup/shutdown | 6 minutes |
| b. Control equipment problems | 630 minutes |
| c. Process problems | 0 minutes |
| d. Other known causes | 0 minutes |
| e. Unknown causes | 0 minutes |
| 2. Total duration of excess emissions: | 636 minutes |
| 3. Total duration of excess emissions * (100) / [Total source operating time].[2] | 0.49 % |

**COMS Performance Summary[1]**
1. COMS downtime in reporting due to:

| | |
|---|---|
| Monitor equipment malfunctions | 0 minutes |
| Non-monitor equipment malfunctions | 0 minutes |
| Quality assurance calibration | 150 minutes |
| Other known causes | 954 minutes |
| Unknown causes | 0 minutes |
| 2. Total COMS downtime: | 1,104 minutes |
| 3. [Total COMS downtime] * (100) / [Total source operating time].[2] | 0.85 % |

1. For opacity, record all times in minutes.  For gases, record all times in hours.
2. For the reporting period:  If the total duration of excess emissions is 1% or greater of the total operating time or the total COMS downtime is 5% or greater of the total operating time, both the summary report form and the excess emission report described in §60.7(c) shall be submitted.

**Opacity Excess Emissions**
The following section individually identifies each period of excess opacity emissions. If no periods of excess emissions occurred, a statement to that effect is included.   As applicable, period(s) occurring during startup, shutdown or malfunction are identified.   Cause(s) of malfunction and corrective action taken or preventative measures adopted are identified.

Please see attached spreadsheet "Excess Opacity Emissions – 1st Half of 2012".

**Opacity Downtime**
The following section individually identifies each period of time when the COMS was inoperative.  If the COMS has not been inoperative, a statement to that effect is included.  As allowed, automatic zero and upscale check periods are not included as downtime and downtime while the source was not operating is not included.

COMS downtime occurred during the reporting period due to COMS equipment calibration and/or preventative maintenance conducted by instrumentation technicians for a total of 150 minutes (February 9).  PDH system

DEC145

maintenance and/or errors accounted for 954 minutes of downtime for the quarter. For additional detail, please see attached spreadsheet "Excess Opacity Emissions – 1st Half of 2012".

Description of any changes since last quarter in COMS, process or controls:

☒ No changes, so no separate description sheet is enclosed.

☐ Changes have been, and are included on a separate sheet [as required by 40 CFR 60.7 (d)].

By signing this report, I certify that, having been duly authorized by Holcim (US) Inc.'s Vice President of Manufacturing, Gian Raffainer, I am a responsible official for the Holcim (US) Inc. – Trident Plant. I further certify, based on reasonable inquiry, that the statements and details enclosed are to the best of my knowledge and belief, true, accurate, and complete.

Name:       John Goetz

Signature:

Title:      Plant Manager

Date:       July 30, 2012

DEC146

## Summary Report – Excess Emissions and Monitoring System Performance
### for Continuous Opacity Monitoring Systems
### 2ND QUARTER 2012

This report is submitted as required by 40 CFR Part 60.7 Section (c). The format is taken from Figure 1.

| | |
|---|---|
| Pollutant: | Opacity |
| Reporting Period Dates: | From 4/01/12 @ 07:00 to 07/01/12 @ 07:00 |
| Company: | Holcim (US) Inc. – Trident Plant |
| Emission Limitation: | 20% |
| Plant Address: | 4070 Trident Road, Three Forks, MT  59752 |
| Monitor Manufacturer and Model No.: | Teledyne Monitor Labs, LightHawk 560 |
| Date of Latest COMS Certification or Audit: | On-Stack Calibration on May 24, 2012 Certification & Clear Stack Audit on February 2, 2011 |
| Process Unit Description: | Wet process cement manufacturing kiln stack |
| Total Source Operating Time in Reporting Period (hours): | 89,076 minutes (1,484.6 hours) |

**Opacity Emission Data Summary[1]**
1. Duration of excess emission in reporting period due to:

| | |
|---|---|
| a. Startup/shutdown | 240 minutes |
| b. Control equipment problems | 558 minutes |
| c. Process problems | 462 minutes |
| d. Other known causes | 0 minutes |
| e. Unknown causes | 0 minutes |

2. Total duration of excess emissions:    1,260 minutes
3. Total duration of excess emissions * (100) / [Total source operating time].[2]    1.41 %

**COMS Performance Summary[1]**
1. COMS downtime in reporting due to:

| | |
|---|---|
| Monitor equipment malfunctions | 0 minutes |
| Non-monitor equipment malfunctions | 0 minutes |
| Quality assurance calibration | 150 minutes |
| Other known causes | 1,038 minutes |
| Unknown causes | 0 minutes |

2. Total COMS downtime:    1,188 minutes
3. [Total COMS downtime] * (100) / [Total source operating time].[2]    1.33%

1. For opacity, record all times in minutes.  For gases, record all times in hours.
2. For the reporting period:  If the total duration of excess emissions is 1% or greater of the total operating time or the total COMS downtime is 5% or greater of the total operating time, both the summary report form and the excess emission report described in §60.7(c) shall be submitted.

**Opacity Excess Emissions**
The following section individually identifies each period of excess opacity emissions. If no periods of excess emissions occurred, a statement to that effect is included.  As applicable, period(s) occurring during startup, shutdown or malfunction are identified.  Cause(s) of malfunction and corrective action taken or preventative measures adopted are identified.

Please see attached spreadsheet "Excess Opacity Emissions - 1st Half of 2011".  *2012  KW  10/10/12*

**Opacity Downtime**
The following section individually identifies each period of time when the COMS was inoperative.  If the COMS has not been inoperative, a statement to that effect is included.  As allowed, automatic zero and upscale check periods are not included as downtime and downtime while the source was not operating is not included.

COMS downtime occurred during the reporting period due to COMS equipment calibration and/or preventative maintenance conducted by instrumentation technicians for a total of 150 minutes (May 24).  PDH system

DEC147

maintenance and/or errors accounted for 1,038 minutes of downtime for the quarter.  For additional detail, please see attached spreadsheet "Excess Opacity Emissions – 1st Half of 2012".

Description of any changes since last quarter in COMS, process or controls:
☒ No changes, so no separate description sheet is enclosed.
☐ Changes have been, and are included on a separate sheet [as required by 40 CFR 60.7 (d)].


By signing this report, I certify that, having been duly authorized by Holcim (US) Inc.'s Vice President of Manufacturing, Gian Raffainer, I am a responsible official for the Holcim (US) Inc. – Trident Plant.  I further certify, based on reasonable inquiry, that the statements and details enclosed are to the best of my knowledge and belief, true, accurate, and complete.


Name:        John Goetz

Signature:

Title:        Plant Manager

Date:        July 30, 2012

DEC148

Holcim (US) Inc. - Trident Plant

### Excess Opacity Emissions - 1st Half of 2012

| | EXCURSION | | | OPACITY (%) | | CAUSE | CORRECTIVE ACTION |
|---|---|---|---|---|---|---|---|
| DATE | START TIME | END TIME | # - 6 MIN | AVG. | MAX. | | |
| 01/04/12 | 10:48 | 11:00 | 2 | 29.3 | 29.3 | Malfunction | SSM procedures followed |
| 01/09/12 | 12:30 | 12:36 | 1 | 35 | 35 | Process Problem - ESP Tripped for Safety | |
| 01/15/12 | 10:12 | 10:18 | 1 | 23.9 | 23.9 | Source Shutdown | Shutdown Procedure Followed |
| 01/23/12 | 18:42 | 18:48 | 1 | 65.4 | 65.4 | Malfunction | SSM procedures followed |
| 01/23/12 | 18:54 | 19:06 | 2 | 34.7 | 26.6 | Process Problem - ESP Tripped for Safety | |
| 01/23/12 | 19:24 | 19:30 | 1 | 27.5 | 27.5 | | |
| 01/23/12 | 19:36 | 19:42 | 1 | 35.4 | 35.4 | | |
| 01/26/12 | 1:48 | 1:54 | 1 | 36.3 | 36.3 | | |
| 01/25/12 | 7:18 | 7:24 | 1 | - | - | Other Known Cause PDH system reset | System Rest |
| 01/31/12 | 12:00 | 12:06 | 1 | 44.3 | 44.3 | Malfunction | SSM procedures followed |
| 01/31/12 | 12:48 | 13:00 | 2 | 26.9 | 30.9 | Kiln Fan Malfunction | |
| 01/31/12 | 13:48 | 13:54 | 1 | 50.6 | 50.6 | | |
| 01/31/12 | 18:24 | 23:18 | 49 | 67 | 94.4 | | |
| 02/04/12 | 8:18 | 8:24 | 1 | 32.6 | 32.6 | Malfunction Process Problem - ESP Tripped for Safety | SSM procedures followed |
| 2/4/2012-02/05/12 | 21:00 | 12:30 | 155 | - | - | Other Known Cause PDH system reset | System Rest |
| 02/09/12 | 11:00 | 14:30 | 25 | - | - | Other Known Cause Calibration Audit | Audit Completed |
| 02/26/12 | 7:36 | 7:42 | 1 | 40.7 | 40.7 | Malfunction Process Problem - ESP Tripped for Safety | SSM procedures followed |
| 03/01/12 | 15:42 | 16:00 | 3 | - | - | Other Known Cause PDH system reset | System Rest |
| 03/21/12 | 2:36 | 2:42 | 1 | 20.7 | 20.7 | Malfunction | SSM procedures followed |
| 03/21/12 | 2:48 | 2:54 | 1 | 30.9 | 30.9 | Clinker Cooler Malfunction | |
| 03/21/12 | 3:06 | 3:18 | 2 | 37.1 | 53.7 | | |
| 03/21/12 | 3:24 | 3:54 | 5 | 29.5 | 37.5 | | |
| 03/21/12 | 4:00 | 4:06 | 1 | 36.6 | 36.6 | | |
| 03/21/12 | 04:12 | 4:24 | 2 | 30.6 | 30.7 | | |
| 03/21/12 | 04:36 | 4:42 | 1 | 37 | 37 | | |
| 03/21/12 | 06:06 | 8:54 | 28 | 53.6 | 85.9 | | |
| 04/02/12 | 6:30 | 6:36 | 1 | 69.8 | 69.8 | Process Removal of Rings | Shutdown/Startup Procedures followed |
| 04/02/12 | 7:06 | 7:18 | 2 | 22.3 | 23.4 | | |
| 04/02/12 | 7:30 | 7:36 | 1 | 31.4 | 31.4 | | |
| 04/02/12 | 7:48 | 7:54 | 1 | 27.8 | 27.8 | | |
| 04/02/12 | 8:06 | 8:36 | 5 | 28.8 | 38.9 | | |
| 04/02/12 | 8:48 | 9:00 | 2 | 29.9 | 37.6 | | |
| 04/02/12 | 9:12 | 9:24 | 2 | 30.2 | 33.3 | | |
| 04/02/12 | 9:42 | 9:48 | 1 | 27.2 | 27.2 | | |
| 04/02/12 | 10:06 | 10:12 | 1 | 20.1 | 20.1 | | |
| 04/02/12 | 10:18 | 10:24 | 1 | 20.3 | 20.3 | | |
| 04/02/12 | 10:54 | 11:00 | 1 | 24.6 | 24.6 | | |
| 04/02/12 | 11:30 | 11:36 | 1 | 24.4 | 24.4 | | |
| 04/02/12 | 12:36 | 12:42 | 1 | 22 | 22 | | |
| 04/02/12 | 13:24 | 13:30 | 1 | 24.4 | 24.4 | | |
| 04/02/12 | 14:30 | 14:36 | 1 | 30.4 | 30.4 | | |
| 04/02/12 | 14:48 | 14:54 | 1 | 25.7 | 25.7 | | |
| 04/02/12 | 15:06 | 15:12 | 1 | 26.4 | 26.4 | | |
| 04/02/12 | 15:24 | 15:30 | 1 | 22.9 | 22.9 | | |
| 04/02/12 | 15:36 | 17:00 | 14 | 41.8 | 61.2 | | |
| 04/02/12 | 19:06 | 22:51 | 38 | 42.1 | 93.2 | | |
| 04/19/12 | 4:12 | 4:24 | 2 | 29.2 | 37.9 | Source Shutdown | Shutdown Procedure Followed |
| 04/19/12 | 4:36 | 4:48 | 2 | 21.7 | 22 | | |
| 04/19/12 | 5:18 | 7:36 | 23 | 41.5 | 78.1 | | |
| 04/19/12 | 7:54 | 8:00 | 1 | 20.5 | 20.5 | | |
| 04/19/12 | 8:06 | 8:24 | 3 | 22.5 | 24.2 | | |
| 04/20/12 | 11:18 | 11:24 | 1 | 28.6 | 28.6 | | |
| 04/24/12 | 20:24 | 20:36 | 2 | 22.8 | 23.9 | Source Shutdown | Shutdown Procedure Followed |
| 05/11/12 | 12:48 | 13:00 | 2 | 28.1 | 35.1 | Source Shutdown | Shutdown Procedure Followed |
| 05/14/12 | 8:18 | 8:30 | 2 | 90.9 | 93 | | |
| 05/16/12 | 8:24 | 8:30 | 1 | 35 | 35 | Source Startup | Startup Procedure Followed |
| 05/16/12 | 8:36 | 8:42 | 1 | 21.2 | 21.2 | | |
| 05/19/12 | 10:12 | 10:30 | 3 | 67.4 | 93.3 | Malfunction | SSM procedures followed |
| 05/19/12 | 10:36 | 10:54 | 3 | 48.4 | 57.8 | Clinker Cooler Malfunction | |
| 05/19/12 | 11:36 | 14:00 | 24 | 67.8 | 94.8 | | |
| 05/22/12 | 8:42 | 9:00 | 3 | 52.4 | 94.3 | Malfunction Process Problem - ESP Tripped for Safety | SSM procedures followed |
| 05/22/12 | 21:18 | 21:24 | 1 | 22.2 | 22.2 | Source Shutdown | Shutdown Procedure Followed |
| 05/22/12 | 21:42 | 21:48 | 1 | 27.8 | 27.8 | Mechanical Reliability | |
| 05/22/12 | 22:18 | 22:30 | 2 | 23.2 | 25.2 | | |
| 05/23/12 | 17:36 | 17:48 | 2 | 22 | 22 | | |
| 05/23/12 - 05/24/12 | 19:48 | 0:18 | 45 | 62.4 | 94.8 | | |
| 05/24/12 | 10:30 | 13:00 | 25 | - | - | Other Known Cause Calibration Audit | Audit Completed |
| 05/30/12 | 12:36 | 14:54 | 23 | - | - | Other Known Cause PDH system reset | System Rest |
| 06/19/12 | 13:00 | 13:18 | 3 | 53 | 94.9 | Malfunction Process Problem - ESP Tripped for Safety | SSM procedures followed |
| 6/24/2012-06/25/12 | 13:36 | 0:48 | 103 | - | - | Other Known Cause PDH system reset | System Rest |
| 06/25/12 | 8:48 | 13:30 | 47 | - | - | Other Known Cause PDH system reset | System Rest |
| 06/28/12 | 0:06 | 0:36 | 5 | 42.4 | 54 | Malfunction | SSM procedures followed |
| 06/28/12 | 1:06 | 1:12 | 1 | 39 | 39 | Process Problem - ESP Tripped for Safety | |

DEC149



January 30, 2013

MDEQ – Air Resource Management Bureau
Attn: Julie Merkel
P.O. Box 200901
Helena, MT 59620-0901

**VIA CERTIFIED US MAIL**

RE:    OPACITY REPORTS – HOLCIM (US) INC. - TRIDENT PLANT
       THIRD AND FOURTH QUARTER 2012

Dear Ms. Merkel:

In compliance with reporting requirements (typical of Air Quality Permit #0982-10, Section II.E.9) Holcim (US) Inc. – Trident Plant (Holcim) is submitting Excess Emission Summary Reports for the continuous opacity monitoring systems (COMS) for the third and fourth quarters of 2012.

With this submittal, Holcim concludes that applicable COMS reporting requirements have been met for this period. If MDEQ does not concur, please notify Holcim immediately.

If you have any questions or comments, please contact me at 406-285-4977.

Sincerely,

Greg Gannon
Environmental Manager

Attachments:    3rd & 4th Quarter Summary Reports
                Excess Opacity Emissions – 2nd Half of 2012

cc:    Karen Wilson, MDEQ, 301 W. Alder, Missoula MT 59802

RECEIVED

JAN 3 1 2013

Dept. of Environmental
Quality

DEC150

## Summary Report – Excess Emissions and Monitoring System Performance
### for Continuous Opacity Monitoring Systems
### 3RD QUARTER 2012

This report is submitted as required by 40 CFR Part 60.7 Section (c). The format is taken from Figure 1.

| | |
|---|---|
| Pollutant: | Opacity |
| Reporting Period Dates: | From 07/01/12 @ 07:00 to 10/01/12 @ 07:00 |
| Company: | Holcim (US) Inc. – Trident Plant |
| Emission Limitation: | 20% |
| Plant Address: | 4070 Trident Road, Three Forks, MT  59752 |
| Monitor Manufacturer and Model No.: | Teledyne Monitor Labs, LightHawk 560 |
| Date of Latest COMS Certification or Audit: | On-Stack Calibration on July 31, 2012 Certification & Clear Stack Audit on August 8, 2012 |
| Process Unit Description: | Wet process cement manufacturing kiln stack |
| Total Source Operating Time in Reporting Period (hours): | 131,772 minutes (2,196.2 hours) |

**Opacity Emission Data Summary[1]**
1. Duration of excess emission in reporting period due to:

| | |
|---|---|
| a.  Startup/shutdown | 222 minutes |
| b.  Control equipment problems | 66 minutes |
| c.  Process problems | 0 minutes |
| d.  Other known causes | 0 minutes |
| e.  Unknown causes | 0 minutes |

2. Total duration of excess emissions: — 288 minutes
3. Total duration of excess emissions * (100) / [Total source operating time].[2] — 0.22 %

**COMS Performance Summary[1]**
1. COMS downtime in reporting due to:

| | |
|---|---|
| Monitor equipment malfunctions | 0 minutes |
| Non-monitor equipment malfunctions | 0 minutes |
| Quality assurance calibration | 462 minutes |
| Other known causes | 0 minutes |
| Unknown causes | 0 minutes |

2. Total COMS downtime: — 462 minutes
3. [Total COMS downtime] * (100) / [Total source operating time).[2] — 0.35 %

1. For opacity, record all times in minutes.  For gases, record all times in hours.
2. For the reporting period:  If the total duration of excess emissions is 1% or greater of the total operating time or the total COMS downtime is 5% or greater of the total operating time, both the summary report form and the excess emission report described in §60.7(c) shall be submitted.


**Opacity Excess Emissions**
The following section individually identifies each period of excess opacity emissions. If no periods of excess emissions occurred, a statement to that effect is included.   As applicable, period(s) occurring during startup, shutdown or malfunction are identified.   Cause(s) of malfunction and corrective action taken or preventative measures adopted are identified.

Please see attached spreadsheet "Excess Opacity Emissions – 2nd Half of 2012".


**Opacity Downtime**
The following section individually identifies each period of time when the COMS was inoperative.  If the COMS has not been inoperative, a statement to that effect is included.  As allowed, automatic zero and upscale check periods are not included as downtime and downtime while the source was not operating is not included.

COMS downtime occurred during the reporting period due to COMS equipment calibration and/or preventative maintenance conducted by instrumentation technicians for a total of 462 minutes (July 31 and August 8).  For additional detail, please see attached spreadsheet "Excess Opacity Emissions – 2nd Half of 2012".

Description of any changes since last quarter in COMS, process or controls:

☒ No changes, so no separate description sheet is enclosed.
☐ Changes have been, and are included on a separate sheet [as required by 40 CFR 60.7 (d)].

By signing this report, I certify that, having been duly authorized by Holcim (US) Inc.'s Vice President of Manufacturing, Gian Raffainer, I am a responsible official for the Holcim (US) Inc. – Trident Plant.  I further certify, based on reasonable inquiry, that the statements and details enclosed are to the best of my knowledge and belief, true, accurate, and complete.

Name:          John Goetz

Signature:     

Title:          Plant Manager

Date:          January 30, 2013

DEC152

**Summary Report – Excess Emissions and Monitoring System Performance**
**for Continuous Opacity Monitoring Systems**
**4TH QUARTER 2012**

This report is submitted as required by 40 CFR Part 60.7 Section (c). The format is taken from Figure 1.

| | |
|---|---|
| Pollutant: | Opacity |
| Reporting Period Dates: | From 10/01/12 @ 07:00 to 01/01/13 @ 07:00 |
| Company: | Holcim (US) Inc. – Trident Plant |
| Emission Limitation: | 20% |
| Plant Address: | 4070 Trident Road, Three Forks, MT 59752 |
| Monitor Manufacturer and Model No.: | Teledyne Monitor Labs, LightHawk 560 |
| Date of Latest COMS Certification or Audit: | On-Stack Calibration on November 6, 2012 Certification & Clear Stack Audit on August 8, 2012 |
| Process Unit Description: | Wet process cement manufacturing kiln stack |
| Total Source Operating Time in Reporting Period (hours): | 114,150 minutes (1,902.5 hours) |

**Opacity Emission Data Summary[1]**
1. Duration of excess emission in reporting period due to:

| | | |
|---|---|---|
| | a. Startup/shutdown | 1,698 minutes |
| | b. Control equipment problems | 126 minutes |
| | c. Process problems | 42 minutes |
| | d. Other known causes | 0 minutes |
| | e. Unknown causes | 0 minutes |
| 2. | Total duration of excess emissions: | 1,866 minutes |
| 3. | Total duration of excess emissions * (100) / [Total source operating time].[2] | 1.63 % |

**COMS Performance Summary[1]**
1. COMS downtime in reporting due to:

| | |
|---|---|
| Monitor equipment malfunctions | 0 minutes |
| Non-monitor equipment malfunctions | 0 minutes |
| Quality assurance calibration | 144 minutes |
| Other known causes | 168 minutes (PDH issues Oct 29 & Nov 12) |
| Unknown causes | 0 minutes |
| 2. Total COMS downtime: | 312 minutes |
| 3. [Total COMS downtime] * (100) / [Total source operating time].[2] | 0.27 % |

1. For opacity, record all times in minutes.  For gases, record all times in hours.
2. For the reporting period:  If the total duration of excess emissions is 1% or greater of the total operating time or the total COMS downtime is 5% or greater of the total operating time, both the summary report form and the excess emission report described in §60.7(c) shall be submitted.

**Opacity Excess Emissions**
The following section individually identifies each period of excess opacity emissions. If no periods of excess emissions occurred, a statement to that effect is included.   As applicable, period(s) occurring during startup, shutdown or malfunction are identified.   Cause(s) of malfunction and corrective action taken or preventative measures adopted are identified.

Please see attached spreadsheet "Excess Opacity Emissions – 2nd Half of 2012".

**Opacity Downtime**
The following section individually identifies each period of time when the COMS was inoperative. If the COMS has not been inoperative, a statement to that effect is included.  As allowed, automatic zero and upscale check periods are not included as downtime and downtime while the source was not operating is not included.

COMS downtime occurred during the reporting period due to COMS equipment calibration and/or preventative maintenance conducted by instrumentation technicians for a total of 150 minutes (November 6).  PDH system

maintenance and/or errors accounted for 168 minutes of downtime for the quarter. For additional detail, please see attached spreadsheet "Excess Opacity Emissions – 2nd Half of 2012".

Description of any changes since last quarter in COMS, process or controls:
⊠ No changes, so no separate description sheet is enclosed.
☐ Changes have been, and are included on a separate sheet [as required by 40 CFR 60.7 (d)].

By signing this report, I certify that, having been duly authorized by Holcim (US) Inc.'s Vice President of Manufacturing, Gian Raffainer, I am a responsible official for the Holcim (US) Inc. – Trident Plant. I further certify, based on reasonable inquiry, that the statements and details enclosed are to the best of my knowledge and belief, true, accurate, and complete.

Name:    John Goetz

Signature:

Title:    Plant Manager

Date:    January 30, 2013

DEC154

Ashland Steam Plant

**Excess Opacity Emissions - 2nd Half of 2012**

| DATE | EXCURSION START TIME | END TIME | # - 6 MIN | OPACITY (%) AVG. | MAX. | CAUSE | CORRECTIVE ACTION |
|---|---|---|---|---|---|---|---|
| 07/02/12 | 12:42 | 12:48 | 1 | 21.4 | 21.4 | Malfunction Process Problem - ESP Tripped for Safety | SSM Procedures Followed |
| 07/21/12 | 5:54 | 6:24 | 5 | 55.4 | 62.4 | Source Shutdown | Shutdown Procedure Followed |
| 07/21/12 | 6:36 | 6:54 | 3 | 49.2 | 60.1 | | |
| 07/22/12 | 12:36 | 12:42 | 1 | 20.2 | 20.2 | | |
| 07/22/12 | 13:06 | 13:24 | 3 | 35.9 | 50.8 | | |
| 07/22/12 | 13:42 | 14:30 | 8 | 52.2 | 58.4 | | |
| 07/22/12 | 16:30 | 16:36 | 1 | 46.5 | 46.5 | | |
| 07/31/12 | 13:00 | 15:30 | 25 | - | - | Other Known Cause Qtr Calibration Audit | Audit Completed |
| 08/02/13 | 15:48 | 16:00 | 2 | 55.2 | 78.0 | Malfunction Process Problem - ESP Tripped for Safety | SSM Procedures Followed |
| 08/08/12 | 11:30 | 16:42 | 52 | - | - | Other Known Cause Annual Calibration Audit | Audit Completed |
| 08/08/12 | 21:18 | 21:30 | 2 | 29.8 | 30.0 | Source Shutdown | Shutdown Procedure Followed |
| 08/16/12 | 10:36 | 10:42 | 1 | 25.6 | 25.6 | Malfunction Process Problem - ESP Tripped for Safety | SSM Procedures Followed |
| 08/16/12 | 10:54 | 11:00 | 1 | 30.0 | 30.0 | | |
| 08/17/12 | 20:00 | 20:12 | 2 | 55.0 | 61.7 | | |
| 08/28/12 | 23:18 | 23:30 | 2 | 31.3 | 33.5 | Malfunction Process Problem - ESP Tripped for Safety | SSM Procedures Followed |
| 08/29/12 | 0:24 | 0:36 | 2 | 31.4 | 36.2 | | |
| 09/10/12 | 10:00 | 10:12 | 2 | 20.7 | 20.7 | Source Shutdown | Shutdown Procedure Followed |
| 09/10/12 | 10:30 | 10:36 | 1 | 30.9 | 30.9 | | |
| 09/10/12 | 10:48 | 10:54 | 1 | 37.1 | 53.7 | | |
| 09/10/12 | 11:06 | 11:12 | 1 | 28.5 | 37.5 | | |
| 09/10/12 | 11:18 | 12:06 | 8 | 36.6 | 36.6 | | |
| 09/10/12 | 12:12 | 12:18 | 1 | 30.6 | 30.7 | | |
| 10/03/12 | 8:36 | 8:48 | 2 | 21.5 | 21.6 | Malfunction Process Problem - ESP Tripped & Power | SSM Procedures Followed |
| 10/03/12 | 14:24 | 14:30 | 1 | 20.1 | 20.1 | | |
| 10/04/12 | 20:42 | 20:54 | 2 | 28.9 | 32.6 | | |
| 10/06/12 | 12:24 | 12:30 | 1 | 31.5 | 31.5 | | |
| 10/06/12 | 12:42 | 12:54 | 2 | 23.8 | 25.6 | | |
| 10/06/12 | 13:06 | 13:18 | 2 | 25.2 | 27.7 | | |
| 10/06/12 | 13:48 | 13:54 | 1 | 25.1 | 25.1 | | |
| 10/06/12 | 17:30 | 17:48 | 3 | 22.1 | 23.9 | Source Shutdown | Shutdown Procedure Followed |
| 10/06/12 | 18:18 | 18:24 | 1 | 21.7 | 21.7 | | |
| 10/06/12 | 18:30 | 18:36 | 1 | 25.4 | 25.4 | | |
| 10/06/12 | 18:42 | 18:48 | 1 | 25.0 | 25.0 | | |
| 10/06/12 | 19:00 | 19:12 | 2 | 38.3 | 50.7 | | |
| 10/06/12 | 19:18 | 19:36 | 3 | 27.2 | 32.4 | | |
| 10/06/12 | 19:42 | 19:48 | 1 | 37.3 | 37.3 | | |
| 10/06/12 | 20:00 | 20:18 | 3 | 35.8 | 59.9 | | |
| 10/06/12 | 20:42 | 20:48 | 1 | 39.2 | 39.2 | | |
| 10/06/12 | 21:24 | 21:30 | 1 | 27.3 | 27.3 | | |
| 10/06/12 | 21:54 | 22:00 | 1 | 35.6 | 35.6 | | |
| 10/06/12 | 22:54 | 23:00 | 1 | 25.1 | 25.1 | | |
| 10/06/12 | 23:36 | 23:42 | 1 | 22.9 | 22.9 | | |
| 10/07/12 | 0:06 | 1:48 | 17 | 51.2 | 93.4 | | |
| 10/07/12 | 2:06 | 2:18 | 2 | 54.3 | 84.5 | | |
| 10/07/12 | 3:12 | 6:00 | 29 | 60.9 | 75.6 | | |
| 10/07/12 | 7:06 | 7:12 | 1 | 27.0 | 27.0 | | |
| 10/07/12-10/08/12 | 23:54 | 0:00 | 1 | 30.6 | 30.6 | | |
| 10/08/12 | 11:54 | 12:24 | 5 | 57.7 | 75.7 | | |
| 10/12/12 | 5:18 | 5:24 | 1 | 23.4 | 23.4 | Source Startup | Startup Procedure Followed |
| 10/12/12 | 5:30 | 5:48 | 3 | 23.3 | 25.4 | | |
| 10/12/12 | 6:18 | 6:42 | 4 | 23.6 | 25.9 | | |
| 10/12/12 | 6:48 | 6:54 | 1 | 21.0 | 21.0 | | |
| 10/12/12 | 10:18 | 10:24 | 1 | 22.0 | 22.0 | | |
| 10/12/12 | 13:06 | 13:12 | 1 | 30.8 | 30.8 | | |
| 10/13/12 | 2:18 | 2:24 | 1 | 21.5 | 21.5 | | |
| 10/24/12 | 0:24 | 0:54 | 5 | 28.7 | 43.0 | Malfunction Process Problem - Ring Removal | SSM Procedures Followed |
| 10/24/12 | 1:06 | 1:18 | 2 | 26.4 | 26.6 | | |
| 10/29/12 | 11:36 | 11:42 | 1 | 25.6 | 25.6 | Source Shutdown | Shutdown Procedure Followed |
| 10/29/12 | 13:54 | 14:00 | 1 | 22.7 | 22.7 | | |
| 10/29/12 | 14:12 | 14:24 | 2 | 24.8 | 28.6 | | |
| 10/29/12 | 14:24 | 16:30 | 21 | - | - | Other Known Cause PDH error | PDH Communication Error |
| 11/06/12 | 10:24 | 12:48 | 24 | - | - | Other Known Cause Qtr Calibration Audit | Audit Completed |
| 11/12/12 | 7:00 | 7:42 | 7 | - | - | Other Known Cause PDH server maintenance | Maintenance completed |
| 11/11/12 | 15:30 | 15:48 | 3 | 68.2 | 94.6 | Malfunction Process Problem - ESP Tripped & Power | SSM Procedures Followed |
| 11/14/12 | 10:24 | 10:30 | 1 | 20.4 | 20.4 | | |
| 11/16/12 | 10:36 | 10:42 | 1 | 21.7 | 21.7 | | |
| 11/24/12 | 10:06 | 10:12 | 1 | 20.9 | 20.9 | Malfunction Process Problem - ESP Bins | SSM Procedures Followed |
| 11/24/12 | 10:30 | 10:54 | 4 | 26.3 | 33.6 | | |
| 11/26/12 | 5:54 | 8:06 | 22 | 41.9 | 63.3 | Source Shutdown | Shutdown Procedure Followed |
| 11/26/12 | 8:12 | 11:18 | 31 | 32.5 | 38.7 | | |
| 11/26/12 | 11:48 | 12:12 | 4 | 20.2 | 20.5 | | |
| 11/26/12 | 12:24 | 14:18 | 19 | 21.9 | 25.0 | | |
| 11/26/12 | 14:24 | 14:36 | 2 | 20.4 | 20.8 | | |
| 11/26/12 | 14:48 | 14:54 | 1 | 20.0 | 20.0 | | |
| 11/26/12 | 15:54 | 16:00 | 1 | 20.0 | 20.0 | | |
| 11/27/12 | 0:06 | 0:12 | 1 | 23.8 | 23.8 | | |
| 11/27/12 | 0:24 | 0:36 | 2 | 20.7 | 21.1 | | |
| 11/27/12 | 10:42 | 11:00 | 3 | 33.0 | 44.4 | | |
| 11/27/12 | 12:18 | 12:30 | 2 | 23.2 | 25.8 | | |
| 11/29/12 | 23:12 | 23:18 | 1 | 37.9 | 37.9 | | |
| 11/30/12 | 14:54 | 15:00 | 1 | 32.9 | 32.9 | Source Startup | Startup Procedure Followed |
| 12/01/12 | 14:12 | 14:18 | 1 | 38.3 | 38.3 | | |
| 12/01/12 | 14:24 | 14:48 | 4 | 78.1 | 94.1 | | |
| 12/04/12 | 18:42 | 19:00 | 3 | 20.5 | 20.7 | | |
| 12/04/12 | 19:06 | 19:12 | 1 | 20.7 | 20.7 | | |
| 12/04/12 | 19:18 | 19:36 | 3 | 20.2 | 20.5 | | |
| 12/04/12 | 19:42 | 20:12 | 5 | 21.2 | 22.0 | | |
| 12/04/12-12/05/12 | 23:12 | 5:06 | 59 | 50.9 | 92.6 | | |
| 12/26/12 | 14:30 | 14:36 | 1 | 20.44 | 20.4 | Source Shutdown/Startup | SSM Procedures Followed |
| 12/26/12 | 14:54 | 15:00 | 1 | 21.5 | 21.5 | | |
| 12/26/12 | 19:24 | 21:48 | 24 | 34.2 | 86.6 | | |

DEC155

## DECLARATION OF TIM CRAWFORD

1.      I am a member of Montanans Against Toxic Burning and have been since about 2008. I am also a life member of the Sierra Club and have been since 2000.

2.      I live with my wife on my ranch in Bozeman, Montana, which is about 10 miles downwind from Holcim Inc.'s Trident cement plant.

3.      I also own land along the East Gallatin River, just upstream from the Trident plant. I bought it about 20 years ago.

4.      The Trident plant is right at the headwaters of the Missouri River, where three rivers, including the Gallatin, meet. There is a large population of osprey—fish-eating hawks—there. There are also a lot of golden and bald eagles in the Gallatin Valley.

5.      The plant's emissions cause me concern because of their impacts on me physically, as well as on my property and my enjoyment of the activities I undertake there.

6.      I enjoy hunting on my properties in the Gallatin Valley, and I plan to continue hunting there. I hunt ducks, geese, and white-tail deer on my Gallatin River land. I also allow friends to hunt on that land. We usually take about 5-6 deer each year. We eat what we kill. If friends who I've allowed to hunt on my land get a deer, they usually give me a choice cut or some summer sausage as a way of saying thank you, and we eat that.

7.      On my 300-acre ranch, we usually take 12-20 white-tail deer each year for human consumption. We also grow hay and a grain (wheat or barley) for sale locally. My wife has horses on the ranch, and we also have chickens and ~~guinea~~ Pea fowl. We eat their eggs.

8.      I also fish along the Gallatin River. I practice catch and release because I am concerned about maintaining ample and healthy fish populations. I am also aware that mercury accumulates in carnivorous fish, and this contributes to my not eating local fish.

9.    In addition, I enjoy seeing and photographing the birds of prey here in the Gallatin Valley.

10.    Walking and biking in the area around my home are also very important to me.

11.    I am concerned about the Trident plant's emissions of dangerous pollutants like particulate matter and mercury. Because of the geography and weather patterns in the Gallatin Valley, the plant's emissions can get trapped in the valley. The winds come out of the west, but the air must cool when it goes over the Bridger Mountains on the east side of the valley. When it does, there is precipitation, mostly in the eastern part of the valley and in the Bridgers. I am concerned that the mercury from the plant ends up in our ground and surface waters. I am aware from my reading that mercury does not diminish in hazardousness and that it accumulates up the food chain. We drink well water and irrigate using surface waters, and the deer and waterfowl drink the surface water too. A friend of mine who is a biologist working with eagles has told me about the harmful effects of mercury on animals like birds of prey. I am concerned that the mercury and other pollutants from the plant harm the wildlife that I enjoy. Also, when we eat them, whatever mercury they've consumed ends up in us, and this causes me concern.

12.    The fences down on my Gallatin River land and on other lands right by the plant have a bit of a coating of soot. I believe, based on their proximity to the plant, that it came from the Trident plant. I am concerned that the soot from the plant is bad for my lungs.

13.    I am especially concerned about the long-term impacts the Trident plant's pollution has and will have on the water quality and the quality of life in the Gallatin Valley. Once pollutants like mercury get into the land and the water, they are extremely difficult to get out. This has been my home for 20 years. I very much enjoy hunting, fishing, and farming here. I

DEC157

also enjoy seeing and photographing the bald eagles, golden eagles, and osprey in the area. For all my activities to continue, I need clean water and healthy animals.

14.    I am aware that EPA has weakened the standards for hazardous air pollution from cement plants, including the Trident plant, by weakening the particulate matter standard and delaying the date by which cement plants have to comply with all the standards. This causes me great concern. The particulate matter and mercury that the Trident plant emits get into the environment around me. I spend a lot of time outdoors, downwind of the plant. I breathe in the pollutants the plant emits. The more of them, the worse for my lungs, for the water and the land, and for the plants and animals that rely on the water and land, and which I eat. And because mercury is cumulative and persistent, any mercury that comes out of the Trident plant will stay in the environment. If the regulations were stronger and became fully effective sooner, my enjoyment of my activities like hunting would be improved, and I would have greater peace of mind that the water quality and my quality of life here in the Gallatin Valley will be preserved into the future.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _28_ day of March, 2013.

_____

Tim Crawford

3

DEC158

## DECLARATION OF LINDA LOPEZ

I, Linda Lopez, declare as follows:

1.    I am the director of membership and public education at the Natural Resources Defense Council, Inc. ("NRDC").  I have been the director of membership and public education for twenty-five years.

2.    My duties include supervising the preparation of materials that NRDC distributes to members and prospective members.  Those materials describe NRDC and identify its mission.

3.    NRDC is a membership organization incorporated under the laws of the State of New York.  It is recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code.

4.    NRDC's mission statement declares that "The Natural Resources Defense Council's purpose is to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends."  The mission statement goes on to declare that NRDC works "to restore the integrity of the elements that sustain life – air, land, and water – and to defend endangered natural places."

5.    Since its inception in 1970, NRDC has worked on issues relating to clean air in an effort to reduce unhealthy levels of air pollution that some Americans breathe. To that end, NRDC has engaged in legislative advocacy, undertaken public outreach and education, and engaged in both administrative proceedings and litigation relating to air pollution.  In particular, NRDC's Clean Air Project works on, among other things, EPA rules issued under the Clean Air Act.

DEC159

6.     When an individual becomes a member of NRDC, his or her residential address is recorded in NRDC's membership database.  When a member renews his or her membership or otherwise makes a contribution to NRDC, the database entry reflecting the member's residential address is verified or updated.

7.     NRDC currently has approximately 363,000 members.  There are NRDC members residing in each of the fifty United States and in the District of Columbia.

8.     NRDC has many members that live in counties where cement plants operate. NRDC has the following number of members residing in the following counties: 3,457 members in Santa Clara County, California; 379 members in Kern County, California; 4,941 members in King County, Washington; 68 members in Berkeley County, West Virginia; 39 members in Ellis County, Texas.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 5, 2013.

_____
Linda Lopez

2

DEC160

## DECLARATION OF BILL ALMON

I, Bill Almon, declare as follows:

1.      I am a member of the Natural Resources Defense Council ("NRDC") and have

been since 2010.

2.      I reside in Los Altos Hills, Santa Clara County, CA.  I have lived at my current

address for 14 years, and in Santa Clara County for over 20 years.

3.      Lehigh Southwest Cement operates a cement plant and quarry in Cupertino.  The

plant is approximately 1 mile from my home.

4.      I enjoy being outside.  I spend time gardening and walking in my neighborhood.  I

live on one acre of land, and my wife and I spend time walking on our property.

5.      There is almost constantly visible dust in the air around my home.  Though I

would like to limit my outdoor activity on days when the air looks particularly bad, the air is

almost always poor quality, and I cannot spend all of my time in my house with the windows and

doors closed.  The dust is very difficult to wash off of surfaces. I think that is because it is

limestone dust.

6.      I collected a sample of the dust that is in the air around my house and sent it to an

Environmental Protection Agency -- certified lab.  The results indicated that there were a number

of carcinogens in the dust such as lead and arsenic, and I am very concerned about the impact

that these pollutants are having on my health and the health of my community.  Other

organizations in my community have taken these dust samples, and these additional tests have

also made me concerned about the health impact that these pollutants are having on my

community.

2/3

7.    I am aware from published reports that inhaling elevated concentrations of air pollutants such as smog and soot can cause a person pain and impairment, diminish that person's lung function, and increase the person's risk of developing serious illness and even dying prematurely. I am also aware that toxic air pollution from pollutants such as mercury can cause or contribute to cancer, developmental problems in children, and other serious illnesses, as well as increase that person's risk of developing serious and even life-threatening illnesses. I understand that these pollutants are frequently emitted by cement plants like Lehigh. For this reason, I am very concerned about the threat posed to my health and the health of my community by pollution from the Lehigh cement plant.

8.    I want the U.S. EPA to reduce pollution from cement plants. I was very disappointed when EPA delayed new emission levels from taking effect until 2015 rather than 2013. I think that EPA should create the strongest rules possible to regulate pollution from cement plants, and should implement these standards and enforce them as soon as they can.

9.    I support litigation by NRDC to ensure that requirements of the Clean Air Act for controlling air pollution from cement plants generally—and the Lehigh plant, in particular—are fully and expeditiously implemented so as to protect my health and the health of my community.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed on May 5, 2013.



William Almon

3/3

DEC162

### DECLARATION OF ALLIE SHEFFIELD

1.     I have been a member of PenderWatch & Conservancy since 2007. Currently, I am the President of the Board of Directors of PenderWatch and have held that position, first as Acting President, since February 2010. Because PenderWatch does not have paid staff, the President acts as chief executive officer and chief operating officer. As President, I am the primary public spokesperson for PenderWatch, am authorized to act on the organization's behalf, and have knowledge about our membership and activities.

2.     PenderWatch is an all-volunteer, membership-supported organization incorporated under the laws of North Carolina in 1986. It is recognized as a not-for-profit corporation under Section 501(c)(3) of the U.S. Internal Revenue Code.

3.     PenderWatch's mission is to preserve and maintain the natural environment of Pender County by promoting environmentally sound policies and programs.  The organization serves this mission by, among other things: (i) actively working with local officials on land use, zoning, and other regulatory issues; (ii) addressing issues related to utilities, pollution, stormwater runoff, and waste disposal; (iii) promoting conservation of wetlands, forests, and wildlife; (iv) taking action on water quality issues affecting the coast; and (v) educating the public about environmental issues affecting Pender County at schools, fairs, and civic and community organization meetings.

4.     PenderWatch has more than 200 member households, representing more than 450 individuals. More than 95 percent of PenderWatch's members live in New Hanover or Pender County, the two counties that would be most affected by the Portland cement manufacturing facility that Titan America/Carolinas Cement Company  has proposed to construct in Castle Hayne, North Carolina. I am aware that many PenderWatch members, including one of its board

members, live near the Northeast Cape Fear River in the vicinity of Titan's proposed site.

5.    As part of PenderWatch's outreach and environmental protection efforts, the organization has been closely monitoring the cement plant that Titan America has proposed in Castle Hayne, North Carolina, and fighting to stop its construction. The plant would be located in New Hanover County, directly across a small tributary (Island Creek) of the Northeast Cape Fear River from Pender County.  Both counties would be significantly impacted by the project.

6.    I live in Pender County, about 12 miles east of the proposed plant site. My house is straight downwind of the site where the project will have a 500-foot smokestack. I'm closer to the site at least 4 days a week for work. PenderWatch's headquarters are in Hampstead, and I often go to Wilmington for work. Hampstead is about 6 miles from the site. I also regularly visit friends who live about 2 miles from the proposed plant site.

7.    I have enjoyed the Northeast Cape Fear River all of my life. My family roots go back to the pre-Revolutionary War era, when my family lived on the banks of the river near Chinquapin. I grew up fishing in the stretch of river in Duplin County adjacent to Pender County, but do not fish near Titan's proposed site because of existing mercury contamination. I still enjoy exploring the river by boat, as I do at least once a month, and enjoy sharing it with people through my outreach with PenderWatch.

8.    I fish in the local sounds and in the ocean because North Carolina rivers are too contaminated by pollutants. I am concerned that the proposed Titan plant will add more pollutants and more contaminants, like mercury and other heavy metals, that would impede my fishing anywhere near me.

9.    Because of my role with PenderWatch and my personal interest in the Northeast Cape Fear River, I have closely followed Titan's proposed project. I am aware that the project

DEC164

has received an air quality permit from the North Carolina Department of Air Quality and that, if built, Titan's proposed plant would emit, among other things, mercury, particulate matter, benzene, and lead.

10.    I am aware that these air pollutants have numerous environmental and public health effects. Titan's proposed mercury emissions would be deposited in the Northeast Cape Fear River, a river that is already mercury impaired. The State of North Carolina has issued health advisories warning people not to consume fish caught in the river because of this neurotoxin. Titan's emissions would only worsen the existing problem, which keeps me from fishing in the river, as I used to do.

11.    I am aware that these air pollutants have numerous harmful environmental and public health effects. I am aware that particulates and hydrogen chloride, which would be emitted in large quantities from Titan's facility, aggravate asthma and other respiratory illnesses. I suffer from frequent bronchitis and am concerned that additional particulate matter will inflame it and make it really, really hard to breathe. When I have bronchitis, it wipes me out, but I can go outside; if there were worse air pollution, it would be unwise to go outside when I have bronchitis, and I would stay in.

12.    In addition to affecting my and other PenderWatch's members' health, recreational, and aesthetic interests, and our ability to improve environmental quality in Pender County, Titan's proposed facility would impair the organization's educational outreach. PenderWatch has been working with the Pender County Planning Department on the development of Millers Pond Park near the boat ramp in Castle Hayne, just a few miles downstream of Titan's proposed site. If Titan's proposed plant is built without stringent pollution controls, it would interfere with PenderWatch's plans of using this new park to showcase the

natural environment of the Northeast Cape Fear River. PenderWatch also is the lead organization involved in building oyster reefs in the Intracoastal Waterway in Pender County. We build the reefs out of bagged oyster shells, and we bag them at our shell depository in Hampstead, a few miles downwind of the proposed Titan site. All the bagging is done by volunteers. I am deeply concerned that if the Titan plant is allowed to belch forth particulate matter, our oyster-bagging efforts will be harmed because volunteers won't be willing to spend time outdoors at our facility just downwind of Titan's plant. Then, we will have to stop building oyster reefs, harming our organizational interests.

13.    I am aware that in 2010, EPA set standards for new cement plants' emissions of various toxic air pollutants. Then, EPA set the particulate matter standard at 0.01 pounds per ton of clinker. In 2013, EPA changed that standard to 0.02 pounds per ton.

14.    Because of this weakening, new plants, like the proposed Titan plant, will be allowed to emit more particulate matter than they otherwise would. As I described above, increased air pollution, including particulate matter pollution, will harm PenderWatch and its members (like me) by threatening PenderWatch members' health and recreational interests, and by adversely affecting PenderWatch's organizational priorities and activities, such as our efforts to educate the public about the natural resources in the area. If the standard were stronger, there would be less pollution released, which would redress the injuries to PenderWatch and its members. Further, Titan's pollution will blight my enjoyment of the Northeast Cape Fear River.

The more pollution it is allowed to emit, the worse the blight. But if its emissions are subject to stricter standards, my enjoyment will be enhanced.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of May, 2013.

Allie Sheffield

## DECLARATION OF KEMP BURDETTE

1.      I am the RIVERKEEPER® for the Cape Fear River Watch ("CFRW") and have

held that position since January 2010. I served as the organization's Executive Director from

January through October 2010. I work in CFRW's primary place of business in Wilmington,

North Carolina, where I also live. Even though I am now the RIVERKEEPER®, I maintain

many of my Executive Director duties, including directing programs, managing staff, working

with a board of directors, and ensuring that the resources of the CFRW are properly committed

to the execution of our mission.

2.      I am also a member of CFRW.

3.      CFRW is a non-profit organization founded in 1994 whose mission is to protect

and improve the water quality of the Lower Cape Fear River Basin through education, advocacy

and action. CFRW is a member of the Waterkeeper Alliance and supports the work and duties of

the Cape Fear RIVERKEEPER®.

4.      CFRW has more than 600 members, many of whom live, work, and recreate in

the vicinity of the site of Titan America's proposed cement manufacturing facility and quarry.

The majority of CFRW's members live in New Hanover County, including approximately 60

members who live within a few miles of the proposed Titan plant. Many of our members have

joined CFRW because of their concern about the long-term impacts of Titan's proposed plant

and, based on a recent internal survey, the majority of our members believe the plant is the most

pressing issue in our watershed.

5.      To carry out its mission to protect the water quality of the Lower Cape Fear River

Basin, CFRW provides programs and activities for its members. Programs include clean-ups on

local water bodies including Greenfield Lake, Burnt Hill Creek, Smith Creek, Birch Creek, and

DEC168

numerous others. CFRW advocates on environmental issues affecting the Cape Fear River Basin such as environmentally sustainable development, hog lagoon regulations, coal ash regulations, wetland preservation and restoration, vegetative wetland retention, oyster reseeding, and recycling. CFRW has been very involved with fish restoration in the Cape Fear River and has sponsored awareness events including a Striper Tournament to raise the public's awareness of this initiative to install rock weirs around dams to facilitate anadromous fish migration to upstream spawning areas. CFRW also sponsors several education programs including seminars for the public on a wide variety of topics related to the Cape Fear River and presentations to New Hanover and Brunswick County 8th graders on stormwater pollution.

      6.     Titan America's proposal to build a large cement kiln and mining operation on the banks of the Northeast Cape Fear River has the potential to affect water quality for all citizens in North Carolina, but particularly those who live in the Lower Cape Fear River Basin. The area near the Titan plant includes vast wetlands, habitats for threatened species, and prime fishing and recreation areas. The Titan cement kiln and quarry pose a direct and indirect threat to the water quality of the Lower Cape Fear River Basin due to air deposition of pollutants like mercury from the kiln into the Northeast Cape Fear River (a river that is already classified on the North Carolina's 303(d) list as being mercury impaired), destruction of hundreds of acres of critical wetlands and other ecologically sensitive areas, withdrawal of millions of gallons of water from the Castle Hayne aquifer, and the destruction of aquifer recharge areas and the introduction of pollutants to these areas.

      7.     Because of the threat of Titan's proposed facility to the Northeast Cape Fear River and the broader Cape Fear River Basin, CFRW has closely monitored the U.S. Environmental Protection Agency's process in developing standards for conventional and

2

DEC169

hazardous air emissions from the Portland cement manufacturing industry. Because these regulations represent a great opportunity to significantly reduce the amount of pollution emitted by Titan's proposed facility, they are of great concern to CFRW and its members. CFRW has repeatedly commented on the regulations on behalf of its members, encouraging EPA to develop standards that would be protective of public health and the environment. In addition, CFRW members attended a public hearing on the proposed rules in Washington, D.C.

8.      CFRW's long-term goals include restoring the Northeast Cape Fear River system and promoting healthy, sustainable fisheries in the Cape Fear River Basin. I am aware of the potential long-term impacts of Titan's proposed emissions of mercury, hydrogen chloride, and fine and coarse particulates and their impact on the health of our river ecosystem and our members and their recreational and aesthetic interests. Because of my responsibilities with CFRW and my research into Titan's project, I am aware of a report published by the U.S. Geological Survey in 2009 titled "Mercury in Fish, Bed Sediment, and Water from Streams Across the United States, 1998-2005." This report only confirmed what we have observed, that blackwater rivers in the southeastern U.S. are sensitive to mercury contamination. We have experienced that contamination first hand in New Hanover County—fish tissue sampling has shown elevated mercury levels five miles upstream and downstream of Titan's proposed facility, which was the site of an old cement plant until the early 1980s.

9.      Another central role of CFRW is to educate the public about the natural resources in southeastern North Carolina. To this end, the organization leads monthly paddle trips that highlight natural ecosystems in the Cape Fear River Basin, including the Northeast Cape Fear. In 2012, we had approximately 500 paddlers join us, making our monthly paddle trips one of our most popular programs. I am aware that airborne pollutants like particulate matter and hydrogen

DEC170

chloride can aggravate asthma, bronchitis, emphysema, and heart disease among exercising individuals, like paddlers. I am concerned that we will lose interest in our paddling expeditions on the Northeast Cape Fear River if Titan is allowed to build its proposed facility without emission limits that are protective of our environment and health and, therefore, will lose one of our best education tools. We would likely curtail our activities near the proposed plant site if the plant were operating.

10.    CFRW has members who live in the Cape Fear River basin and many more visit, fish, hunt, boat, and otherwise use and enjoy the Lower Cape Fear River Basin in the vicinity of Titan's proposed plant. Many of CFRW's members join the organization and participate in its activities to maintain and improve the health of the Lower Cape Fear River for their own use and enjoyment. As part of my role with CFRW, I interact with our membership regularly. I am aware of many members who are concerned about Titan's proposed emissions and have joined our organization to further our efforts to hold the company to protective regulatory standards.

11.    I enjoy spending time on the Northeast Cape Fear River on a motorboat. My kids are about to be 4 and 6, and I look forward to taking them on motorboat trips exploring the Northeast Cape Fear and its tributaries starting this summer. Last year, I took a group of Girl Scouts on a trip up the river and taught them about the environment and Titan's plant. If the plant is allowed to go forward with lax emission standards, I won't be able to undertake these trips, though I would otherwise like to.

12.    I am aware that in 2010, EPA set standards for new cement plants' emissions of various toxic air pollutants. Then, EPA set the particulate matter standard at 0.01 pounds per ton of clinker. In 2013, EPA changed that standard to 0.02 pounds per ton. Because of this weakening, new plants, like the proposed Titan plant, will be allowed to emit more particulate

4

DEC171

matter than they otherwise would. As I described above, increased air pollution, including

particulate matter pollution, will harm me, CFRW, and CFRW's members by threatening my,

my family's, and other CFRW members' health and recreational interests, and by adversely

affecting CFRW's organizational priorities and activities, like our efforts to clean up the

Northeast Cape Fear River system and to educate the public about the natural resources in the

area through activities like paddle trips. If the standard were stronger, there would be less

pollution released, which would redress the injuries to me, my family, CFRW, and other CFRW

members.


I declare under penalty of perjury that the foregoing is true and correct.


Executed this _30_ day of May, 2013.


Kemp Burdette

5

DEC172

## DECLARATION OF ROBERT PARR

1.    My wife and I are Life Members of Cape Fear River Watch and support its efforts on maintaining the ecological health of the lower Cape Fear River, including the Northeast Cape Fear River. We have been members since at least 2006.

2.    I live in Wilmington, North Carolina, and have lived in Wilmington since 1983. My home on the banks of Howe Creek is approximately 9 miles from the proposed Titan cement plant. I own two adjacent parcels of land on Howe Creek totaling approximately three acres. Howe Creek has been designated an Outstanding Resource Water by the State of North Carolina.

3.    I also own five acres of open land in Pender County, North Carolina, located approximately 15 miles from the proposed Titan Plant. This land is adjacent to Long Creek, which eventually runs into the Northeast Cape Fear River.

4.    My family has regularly fished and eaten our catch from Howe Creek, the nearby Intracoastal Waterway, and the shore waters of the Atlantic Ocean since 1983. We also fish and eat our catch from the fresh waters of the Northeast Cape Fear River, Long Creek, Turkey Creek and the Black River. I am concerned that the Titan Plant's emissions of mercury—a potent neurotoxin that bio accumulates in fish—will make it more dangerous for us to continue to eat fish from these water bodies in the future.

5.    I am a Board Certified Emergency Medicine Physician currently practicing at Medac Urgent Care in New Hanover County. From 1983 to 2006, I practiced Emergency Medicine at Cape Fear Memorial Hospital, New Hanover Regional Medical Center, and Pender Memorial Hospital.

6.    Respiratory illnesses constitute one of the most common and disabling medical conditions that affect my patients in all age ranges, but particularly young children and senior

DEC173

adults who often require emergency care and hospitalization. Cardiovascular illnesses are one of the leading causes of morbidity and premature mortality in my older patients.

7.    My patient population is located primarily in New Hanover and Pender Counties and will be directly affected by the emissions from the Titan cement plant. I have practiced in New Hanover County for 30 years. I am one of the 240 physicians in New Hanover County who have signed a formal petition citing potential health threats from Titan's proposed plant.

8.    Before attending medical school, I earned a masters degree in Biological Oceanography and worked as an oceanographic consultant for an international engineering firm specializing in the environmental effects of heavy industrial development in marine environments. Since 1983, I have been very interested and active in water quality issues.

9.    I am familiar with the proposed Titan plant and am very concerned about the environmental impacts the plant will have on both water and air quality in the Cape Fear River basin. I have been involved in the discussions about the environmental impacts of the proposed plant and spoke at the first public meeting on its draft permit. I have participated in public hearings, provided comments and letters and organized and attended public meetings.

14.    As a doctor interested in the health effects of air pollution, I am aware of numerous studies demonstrating that fine particulate matter ("PM2.5") air pollution can have significant adverse health effects. An article released in the February 2012 edition of the Journal of the American Medical Association confirmed an association between fine particulate matter and an increased risk of myocardial infarction. In addition, in May 2010 the American Heart Association published a Scientific Statement in Circulation that even brief exposure to fine particulate matter can have serious cardiac effects on both healthy and chronically ill populations. Most recently in Circulation (May 2013) it was reaffirmed that exposure to elevated

DEC174

levels of PM2.5 over a few hours to weeks can trigger cardiovascular disease-related mortality and non-fatal cardiac events. I am further aware that levels of PM2.5 presently measured adjacent to the Titan proposed site oftentimes exceed PM2.5 levels considered safe by the medical literature for both short term and long term exposure. Based on my knowledge as a physician, I believe that these levels of PM2.5 are dangerous to my patients living in adjacent areas of Pender and New Hanover County, the children at Holly Shelter Elementary and Middle schools, my wife who stalls and rides her horse in Castle Hayne, and my extended family who fishes on the adjacent Northeast Cape Fear River.

10.    I am aware of the need for stringent regulations to control emissions from cement plants. On a trip to Florida, I visited the Suwannee American cement plant in Branford, Florida. This plant is one of the most modern cement plants in the US. After driving around the plant and the surrounding town, I developed watery eyes and a scratchy, itchy throat which persisted for several hours. My father-in-law and I also visited Titan America's Pennsuco, Florida, plant in 2009. After the visit, we experienced the same watery eyes and itchy throats along with cough and chest discomfort lasting over six hours.

11.    Based on my background as a biological oceanographer, I am concerned that the emissions from Titan's plant will seriously and permanently degrade the estuarine and near-shore marine environment of southeastern North Carolina that I otherwise enjoy through my activities, like fishing. As a citizen who frequently fishes and eats my catch from the Northeast Cape Fear River, I am concerned that my and family's health will be jeopardized from the emissions and discharges from the plant. Finally, as a physician, I am aware of the medical literature that directly links declines in ambient air quality with declines in public health. Therefore, I am

DEC175

concerned that the emissions from Titan's cement plant will seriously and permanently affect my patients' and my family's health.

12.    I am aware that in 2010, EPA set standards for new cement plants' emissions of various toxic air pollutants. Then, EPA set the particulate matter standard at 0.01 pounds per ton of clinker. In 2013, EPA changed that standard to 0.02 pounds per ton. Because of this weakening, new plants, like the proposed Titan plant, will be allowed to emit more particulate matter than they otherwise would.

13.    Strong standards and rules limiting pollution are essential to protecting my health, my property, my recreational and aesthetic interests in the Cape Fear River Basin, and the health of my patients. As I described above, increased air pollution, including particulate matter pollution, will harm my health, property, recreational, aesthetic, and professional interests. If the standards and rules were stronger, there would be less pollution released, which would redress these injuries.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of May, 2013.

Robert Parr

2

DEC176

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of June, 2013, I have served the

foregoing **Proof Brief of Petitioners** on all registered counsel through the Court's

electronic filing system (ECF).


/s/ James S. Pew
James S. Pew