**ORAL ARGUMENT SCHEDULED FOR OCTOBER 24, 2013**

Case Nos. 13-1112 & 10-1371 (and consolidated Case No. 10-1378)

=========================================================

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

SIERRA CLUB, *ET AL.*,

*Petitioners*,

v.

ENVIRONMENTAL PROTECTION AGENCY, *ET AL.*,

*Respondents*,

and

PORTLAND CEMENT ASSOCIATION & HOLCIM (US) INC.,

*Intervenors.*

_____

NATURAL RESOURCES DEFENSE COUNCIL,

*Petitioner*,

v.

ENVIRONMENTAL PROTECTION AGENCY, *ET AL.*,

*Respondents*,

and

PORTLAND CEMENT ASSOCIATION, *ET AL.*,

*Intervenors.*

_____

On Petitions for Review of
Rules of the Environmental Protection Agency

_____

## BRIEF OF INDUSTRY INTERVENORS

_____

<table>
<tr><td>

William M. Bumpers
Debra J. Jezouit
Michael B. Schon
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 639-7700
William.bumpers@bakerbotts.com
*Counsel for Holcim (US) Inc.*

</td><td>

Carter G. Phillips
Roger R. Martella, Jr.
Timothy K. Webster
Ryan C. Morris
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Telephone: (202) 736-8000
cphillips@sidley.com
*Counsel for Portland Cement
Association*

</td></tr>
</table>

*(Additional counsel listed on inside cover)*

Beth S. Ginsberg
Jason T. Morgan
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA  98101
(206) 624-0900
*Counsel for Ash Grove Company*

Deborah E. Jennings
Catherine B. Campbell
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, DC 20004
Telephone:  (202) 799-4357
Deborah.jennings@dlapiper.com
*Counsel for Lehigh Cement Company*

Ashley C. Parrish
Cynthia A.M. Stroman
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone: (202) 737-0500
Email: aparrish@kslaw.com
*Counsel for Riverside Cement Company and
TXI Operations, LP*

Chet M. Thompson
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, DC  20004
Telephone: (202) 624-2500
*Counsel for CEMEX, Inc.*

Richard G. Stoll
FOLEY & LARDNER LLP
3000 K St. NW, Suite 600
Washington DC, 20007-5109
Telephone: (202) 295-4021
*Counsel for Lafarge North America Inc.,
Lafarge Midwest, Inc., and Lafarge Building
Materials Inc.*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), counsel for Intervenors Portland Cement Association *et al.* acknowledge that Petitioners' Brief sets out the parties, rulings, and related cases, with the exception of the SSM Coalition and the Concrete and Masonry Related Associations, both of which are *amici curiae* in support of Respondents.

## CORPORATE DISCLOSURE STATEMENTS

**Portland Cement Association:** The Portland Cement Association ("PCA") is a not-for-profit trade association that represents more than 30 companies in the United States and Canada engaged in the manufacture of portland cement. PCA conducts market development, engineering, research, education, technical assistance, and public affairs programs on behalf of its member companies. Its mission focuses on improving and expanding the quality and uses of cement and concrete, raising the quality of construction, and contributing to a better environment. PCA is a "trade association" within the meaning of Circuit Rule 26.1(b). It has no parent corporation, and no publicly held company owns a 10% or greater interest in PCA.

**Ash Grove Cement Company:** Ash Grove Cement Company is a family controlled American business that owns and operates cement manufacturing facilities, and related businesses, including cement import terminals, ready-mix plants, and aggregates operations. It has no parent corporation, and no corporation owns 10% or more of the stock of Ash Grove Cement Company.

**CEMEX, Inc.:** CEMEX, Inc. is a producer and supplier of portland cement headquartered in Houston, Texas. CEMEX, Inc. is 100% owned by CEMEX, S.A.B. de C.V., a publicly held company traded on the New York Stock Exchange.

**Holcim (US) Inc.:** Holcim (US) Inc., is one of the largest manufacturers and suppliers of cement and mineral components in the United States. Holcim (US) Inc.'s headquarters are in Waltham, Massachusetts, and it serves markets throughout most

of the United States.  Holcim (US) Inc. is a wholly-owned subsidiary of Holcim Ltd.,

of Switzerland, and no other publicly held corporation owns 10% or more of Holcim

(US) Inc.'s stock.

**Lafarge North America Inc., Lafarge Midwest, Inc., and Lafarge Building Materials Inc.:**  Lafarge North America Inc., Lafarge Midwest, Inc., and Lafarge Building Materials Inc. own and operate portland cement manufacturing facilities throughout the United States.  Lafarge S.A., a company publicly traded in France, owns directly or indirectly 100% of the stock of Lafarge North America Inc. Lafarge Midwest, Inc. and Lafarge Building Materials Inc. are each wholly owned subsidiaries of Lafarge North America Inc.

**Lehigh Cement Company:**  Lehigh Cement Company is a cement manufacturer, headquartered in Dallas, Texas, with twelve cement plants in eight states across the United States.  Lehigh Cement Company is a wholly owned, indirect subsidiary of Heidelberg Cement AG, which is traded on various German stock exchanges.  There are no other publicly traded entities in the chain of ownership.

**Riverside Cement Company:**  Riverside Cement Company is a California general partnership that owns and operates cement production facilities in California. There are two general partners in Riverside Cement Company:  TXI California, Inc. (49% interest) and TXI Riverside, Inc. (51% interest), both of which are Delaware corporations.  Each of the general partners is 100% owned by Texas Industries, Inc., a

Delaware corporation that is publicly owned and traded on the New York stock exchange.

**TXI Operations, LP:** TXI Operations, LP is a Delaware limited partnership that owns and operates cement, aggregates, and ready-mix concrete production facilities in Texas and several surrounding states. TXI Operations, LP is owned by a general partner named TXI Operating Trust (1% interest) and a limited partner named Texas Industries Trust (99% interest), both Delaware business trusts. TXI Operating Trust is 100% owned by TXI LLC, a Delaware limited-liability company, which in turn is 100% owned by Texas Industries, Inc. Texas Industries Trust is 100% owned by Texas Industries Holding, LLC, a Delaware limited-liability company, which in turn is 100% owned by Texas, Industries, Inc. Texas Industries, Inc. is a Delaware corporation that is publicly owned and traded on the New York stock exchange.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .................. i

CORPORATE DISCLOSURE STATEMENTS ................................................. ii

TABLE OF AUTHORITIES ................................................................... vii

GLOSSARY ........................................................................................ xi

INTRODUCTION AND SUMMARY OF ARGUMENT ................................... 1

ARGUMENT ....................................................................................... 3

I.      THE PM STANDARDS DO NOT VIOLATE § 112(d)(7) ................................ 3

II.     EPA APPROPRIATELY REFUSED TO SET A BEYOND-THE-
        FLOOR STANDARD FOR PM .............................................................. 10

III.    THE COMPLIANCE DEADLINE FOR EPA'S NEW STANDARDS
        COMPLIES WITH § 112(i)(3)(A) ......................................................... 14

        A.      EPA's Compliance Deadline For Newly Promulgated Standards
                Falls Squarely Within EPA's Authority Under § 112(i)(3)(A) .................. 16

        B.      EPA Has Established A Deadline That Requires Compliance "As
                Expeditiously As Practicable." .................................................... 19

IV.     PETITIONERS' CHALLENGE TO THE MALFUNCTION
        AFFIRMATIVE DEFENSE FAILS ......................................................... 25

        A.      Petitioners Lack Standing To Challenge The Malfunction
                Affirmative Defense. .............................................................. 25

        B.      The Malfunction Affirmative Defense Is Lawful And Reasonable. ........ 29

                1.      The CAA Does Not Foreclose EPA's Malfunction
                        Affirmative Defense. .................................................... 29

                2.      EPA's Malfunction Affirmative Defense Is Reasonable. ............. 33

CONCLUSION .................................................................................... 35

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES[*]

Page

## CASES

*Adams Fruit Co. v. Barrett,*
494 U.S. 638 (1990) ............................................................31

*Almendarez-Torres v. United States,*
523 U.S. 224 (1998) ..............................................................7

*American Textile Mfrs. Inst., Inc. v. Donovan,*
452 U.S. 490 (1981) ............................................................14

*Arteva Specialties S.a.r.l. v. EPA,*
323 F.3d 1088 (D.C. Cir. 2003) ..........................................12

*Ass'n of Battery Recyclers, Inc. v. EPA,*
716 F.3d 667 (D.C. Cir. 2013) ............................................11

*ATK Launch Sys., Inc. v. EPA,*
669 F.3d 330 (D.C. Cir. 2012) ..............................................4

*Biodiversity Legal Found. v. Babbitt,*
146 F.3d 1249 (10th Cir. 1998)............................................22

*Chemical Mfrs. Ass'n v. EPA,*
217 F.3d 861 (D.C. Cir. 2000) ....................................... 22, 23

*Chevron U.S.A. Inc. v. NRDC,*
467 U.S. 837 (1984) ................................10, 14, 31, 32, 33

*City of Arlington v. FCC,*
133 S. Ct. 1863 (2013)................................... 29, 30, 31, 33

*City of Waukesha v. EPA,*
320 F.3d 228 (D.C. Cir. 2003) ............................................19

*Clapper v. Amnesty Int'l USA,*
133 S. Ct. 1138 (2013)........................................................28

_____

[*] Authorities chiefly relied upon are marked with an asterisk.

*Dole v. United Steelworkers of Am.*,
　494 U.S. 26 (1990) ...........................................................................8

*Dow Chem. Co. v. United States*,
　476 U.S. 227 (1986) .......................................................................30

*Fin. Planning Ass'n v. SEC*,
　482 F.3d 481 (D.C. Cir. 2007) .........................................................8

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
　528 U.S. 167 (2000) .......................................................................27

*Great Atl. & Pac. Tea Co. v. FTC*,
　440 U.S. 69 (1979) .........................................................................33

*Gutierrez v. Ada*,
　528 U.S. 250 (2000) .........................................................................8

*Hays v. Sebelius*,
　589 F.3d 1279 (D.C. Cir. 2009) .....................................................11

*Husqvarna AB v. EPA*,
　254 F.3d 195 (D.C. Cir. 2001) .................................................12, 13

*Jama v. ICE*,
　543 U.S. 335 (2005) .........................................................................9

*Lujan v. Defenders of Wildlife*,
　504 U.S. 555 (1992) ...................................................................26, 28

*Luminant Generation Co. v. EPA*,
　714 F.3d 841 (5th Cir. 2013) .........................................................32

*Mossville Envtl. Action Now v. EPA*,
　370 F.3d 1232 (D.C. Cir. 2004) .......................................................5

*Nat'l Wildlife Fed'n v. EPA*,
　286 F.3d 554 (D.C. Cir. 2002), *supplemented sub nom.*
　351 F.3d 1157 (D.C. Cir. 2003) .......................................................4

*NRDC v. EPA*,
　489 F.3d 1364 (D.C. Cir. 2007) .....................................................18

*Portland Cement Ass'n v. EPA*,
    665 F.3d 177 (D.C. Cir. 2011) .........................................................1, 6, 14, 21

*Shays v. FEC*,
    414 F.3d 76 (D.C. Cir. 2005) .........................................................27

*Sierra Club v. EPA*,
    325 F.3d 374 (D.C. Cir. 2003) .........................................................12, 13

*Sierra Club v. EPA*,
    551 F.3d 1019 (D.C. Cir. 2008) .........................................................34

*S. Coast Air Quality Mgmt. Dist. v. EPA*,
    489 F.3d 1245 (D.C. Cir. 2007) .........................................................19

*Steel Co. v. Citizens For Better Env't*,
    523 U.S. 83 (1998) .........................................................26, 27

*Teva Pharm. USA, Inc. v. Sebelius*,
    595 F.3d 1303 (D.C. Cir. 2010) .........................................................29

*Train v. NRDC*,
    421 U.S. 60 (1975) .........................................................20

*United States v. Monsanto*,
    491 U.S. 600 (1989) .........................................................18

*Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*,
    537 U.S. 371 (2003) .........................................................8, 9

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) .........................................................18

## STATUTES AND REGULATIONS

CAA § 110(l), 42 U.S.C. § 7410 .........................................................9

CAA § 112, 42 U.S.C. § 7412 .........................................................2, 7, 8, 9, 11, 12, 14, 16, 17

CAA § 113, 42 U.S.C. § 7413 .........................................................30, 31, 32, 33

CAA § 129(h)(1)-(2), 42 U.S.C. § 7429(h)(1)-(2) .........................................................9

CAA § 172(e), 42 U.S.C. § 7502 .........................................................9

CAA § 193, 42 U.S.C. § 7515 ...................................................................9

CAA § 202(l)(1), 42 U.S.C. § 7521 .........................................................12

CAA § 213(a)(3), 42 U.S.C. § 7547 .........................................................12

CAA § 301(a), 42 U.S.C. § 7601 .........................................................30, 33

CAA § 302(k), 42 U.S.C. § 7602(k) ........................................................33

CAA § 304, 42 U.S.C. § 7604 .............................................................27, 30

CAA § 307(d)(9)(A), 42 U.S.C. § 7607 ................................................6, 19

75 Fed. Reg. 54,970 (Sept. 9, 2010) ........................................................12

76 Fed. Reg. 15,704 (Mar. 21, 2011) .......................................................12

77 Fed. Reg. 42,368 (July 18, 2012) .............................................14, 20, 34

78 Fed. Reg. 10,006 (Feb. 12, 2013) ........................................................
..........................1, 3, 4, 5, 6, 7, 9, 10, 14, 15, 16, 17, 18, 19, 20, 21, 23, 24, 25, 26, 34, 35

OTHER AUTHORITIY

*Black's Law Dictionary* (9th ed. 2009) ...................................................33

# GLOSSARY

| | |
|---|---|
| **Br.** | Petitioners' Brief |
| **CAA** | Clean Air Act |
| **CEMS** | Continuous Emission Monitoring System |
| **CISWI** | Commercial And Industrial Solid Waste Incinerators |
| **CPMS** | Continuous Parametric Monitoring System |
| **EPA** | Environmental Protection Agency |
| **HAP** | Hazardous Air Pollutant |
| **HCl** | Hydrogen Chloride |
| **Industry Intervenors** | PCA and Holcim (US) Inc. |
| **lbs/ton clinker** | Pounds per ton of clinker |
| **NESHAP** | National Emission Standard for Hazardous Air Pollutants |
| **PCA** | Portland Cement Association |
| **PM** | Particulate Matter |
| **THC** | Total Hydrocarbons |

## INTRODUCTION AND SUMMARY OF ARGUMENT

Petitioners' arguments seek to undo the consequences of this Court's remand in *Portland Cement Association v. EPA*, 665 F.3d 177 (D.C. Cir. 2011) (per curiam) ("*PCA*").  In *PCA*, this Court remanded EPA's amendments to the portland cement National Emission Standards for Hazardous Air Pollutants ("NESHAP"), 75 Fed. Reg. 54,970 (Sept. 9, 2010) ("2010 Rule"), because EPA arbitrarily failed to factor in the effect of the mutually exclusive commercial and industrial solid waste incinerators ("CISWI") rule, which it was actively considering at that time.  *PCA*, 665 F.3d at 189. On remand, EPA followed the Court's instruction to recalculate the NESHAP.  78 Fed. Reg. 10,006 (Feb. 12, 2013) ("2013 Rule") (JA___).  EPA promulgated new emission standards and established a new compliance deadline for existing sources of September 9, 2015 (rather than September 9, 2013, under the 2010 Rule) to afford cement kilns the necessary time to design, develop, install, and test "multipollutant control systems" to meet the revised standards.  *Id.* at 10,023/1 (JA___).

Petitioners' challenges to the new standards, the compliance deadline, and an affirmative defense for malfunctions fail.

*First*, EPA's new emission standards for particulate matter ("PM") comply with Clean Air Act ("CAA") § 112(d)(7).[1]  The specific numerical changes that Petitioners challenge did not "weaken" the standards.  And even if they had, § 112(d)(7) does not

---

[1] All citations are to the CAA; the table of authorities provides parallel citations to the U.S. Code.

preclude EPA from issuing an emission standard under § 112(d) that is less stringent than a prior § 112(d) standard.  This provision only forbids EPA from supplanting standards set under *other* CAA provisions with a § 112(d) standard that may be less stringent.

*Second*, EPA properly considered cost in refusing to adopt a more stringent PM standard for existing sources.  Petitioners are wrong that the CAA unambiguously precludes EPA from considering the cost-effectiveness of adopting "beyond-the-floor" standards.  Section 112(d)(2) instructs EPA to "tak[e] into consideration the cost of achieving such emission reduction" and gives EPA discretion on how to do so.

*Third*, EPA's compliance deadline in the 2013 Rule satisfies § 112(i)(3)(A) because this provision specifically authorizes EPA to set a compliance deadline within three years of an emission standard's effective date.  EPA gave portland cement kilns *significantly less* than the authorized three years to comply with the new standards, and it explicitly determined—based on its engineering judgment and a substantial record— that the deadline would ensure compliance "as expeditiously as practicable."

*Finally*, Petitioners lack standing to challenge the affirmative defense to civil penalties in the case of unplanned malfunctions because Petitioners' alleged injury is too speculative and conjectural.  And, their challenge otherwise fails because nothing in the CAA speaks directly to whether EPA can promulgate an affirmative defense to civil penalties, and the affirmative defense is a reasonable exercise of EPA's authority.

**ARGUMENT**

## I.    THE PM STANDARDS DO NOT VIOLATE § 112(d)(7).

Following this Court's remand in *PCA*, EPA rectified the error identified by the Court and recalculated the emission standards, which changed the PM standard's numeric limit for existing sources from 0.04 to 0.05 lbs/ton clinker. 78 Fed. Reg. 10,017/1 (JA__).  EPA also identified "technical issues" with the "reliability" of the 2010 Rule's compliance-monitoring system (known as PM Continuous Emission Monitoring System ("CEMS")), a system that EPA had never before required for cement kilns. *Id.* at 10,017/2 (JA__).  Accordingly, EPA returned the compliance-monitoring method to stack testing and correspondingly changed the compliance-monitoring period.  This necessitated a reformulation of how the existing source PM standard should be expressed.  EPA applied a statistical calculation—the same one it used in the prior rule—that converted the standard from 0.05 to 0.07 lbs/ton.  This conversion did not alter the standard's stringency; it merely accounted for the change in monitoring method and period.  *Id.* at 10,017/1 & n.5 (JA__).  EPA made a similar conversion to the PM standard for new kilns from 0.01 to 0.02 lbs/ton.  *Id.* at 10,017/1, 10,026/2 (JA__, __).

Petitioners do not challenge the change from 0.04 to 0.05 lbs/ton clinker but mistakenly contend that EPA unlawfully "weaken[ed]" the PM standard from 0.05 to 0.07 lbs/ton for existing sources, and from 0.01 to 0.02 lbs/ton for new sources, in

violation of § 112(d)(7).  Petitioners' Br. ("Br.") 27–32.  Their argument is factually and legally wrong.

*First*, Petitioners' argument rests on the incorrect premise that changing the monitoring method reduced the stringency of the PM standards.  Br. 27.  As EPA explained in promulgating the 2013 Rule and again in denying Petitioners' request for an administrative stay, the specific numerical change Petitioners challenge merely accounts for the change in the compliance-monitoring regime (*i.e.*, from PM CEMS to stack testing) and does not alter the stringency of the standard:  "a 30-day average standard of .05 lbs/ton clinker is *equivalent* to a stack test limit … of .07 lbs/ton clinker."  Stay Denial 2 n.1 (JA__) (emphasis added); 78 Fed. Reg. 10,017/1 n.5 (JA__).

Petitioners respond by expressing confusion over EPA's statement and asserting that "[w]hatever EPA meant" the 0.07 lbs/ton value "is less stringent than the 0.05 lb/ton standard."  Br. 32.  Petitioners' empty assertion cannot overcome the "extreme degree of deference" accorded EPA's "technical expertise."  *ATK Launch Sys., Inc. v. EPA*, 669 F.3d 330, 336 (D.C. Cir. 2012) (internal quotation marks omitted); *Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 560 (D.C. Cir. 2002) (per curiam) (giving "particular deference" to EPA regarding "scientific matters in its area of technical expertise."), *supplemented sub nom.* 351 F.3d 1157 (D.C. Cir. 2003).  Petitioners' simple assertion is akin to someone comparing temperatures in Celsius and Fahrenheit and insisting that the former is colder because it is lower.  EPA's

technical conclusion that 0.05 is properly "expressed as 0.07 lb/ton" when converted to the new testing and compliance methodology, 78 Fed. Reg. 10,017/1 n.5 (JA__), is not arbitrary.

Petitioners assert that EPA has weakened the standard because the 0.07 lbs/ton standard "allows plants to emit up to 0.07 lb/ton over any 30-day period" rather than 0.05 lbs/ton. Br. 32. This mixes apples and oranges. The 0.05 lbs/ton version expresses the standard under a PM CEMS-based compliance regime, which averages a plant's emissions over a 30-day period, allowing values higher and lower than the standard to cancel each other out. 78 Fed. Reg. 10,017/1 & n.5 (JA__). The 0.07 lbs/ton version, on the other hand, expresses an absolute limit that cannot be exceeded by an average of three one-hour stack tests. *Id.*; *see Mossville Envtl. Action Now v. EPA*, 370 F.3d 1232, 1241 (D.C. Cir. 2004) (regulators "use a longer averaging time in order to require a lower average limit").

Nor does the 0.07 lbs/ton expression of the standard allow plants to continuously emit PM at that level over a 30-day period. EPA adopted a "parametric monitoring" regime that requires cement plants to establish site-specific operating levels based on the results of the stack testing, not the 0.07 lbs/ton limit. 78 Fed. Reg. 10,014/3–10,015/1 (JA__–__); Establishing an Operating Limit for PM CPMS 1–11 (Dec. 17, 2012) (JA__–__). Parametric monitoring correlates stack-test results with operating parameters within a plant; plants are then required to abide by those operational parameters to help maintain low emission rates. Thus, using its technical

expertise, EPA developed parametric-monitoring requirements that will ensure compliance below the maximum allowable limit of 0.07 lbs/ton. 78 Fed. Reg. 10,014/3–10,015/1 (JA__–__). In sum, EPA acted reasonably. CAA § 307(d)(9)(A).[2]

Ultimately, Petitioners cannot overcome EPA's conclusion that the 0.07 lbs/ton standard does not "weaken" the PM standard. If Petitioners were correct and EPA wrong, then the converse would also be true, and the same statistical calculation would make the conversion from a stack-test to 30-day averaging methodology necessarily more stringent. But this Court rejected precisely such a challenge in *PCA*. The Industry Petitioners argued that the conversion from a stack-test regime to 30-day averaging regime arbitrarily increased the standard's stringency. The Court upheld EPA's approach and rationale. *PCA*, 665 F.3d at 189. Petitioners themselves even adopted EPA's view that the "'effect of the change from a 3-hour averaging time to a 30-day averaging time is to make the standard more lenient,'" the opposite of its position here. Envtl. Intervenors Br. 21, Case No. 10-1359 (D.C. Cir. filed Jul. 22, 2011).

---

[2] Petitioners' effort to contrast the effects of "the change from 0.04 lb/ton to 0.05 lb/ton" with the change from 0.05 to 0.07 lbs/ton, Br. 32 (emphasis omitted), is similarly misguided. A principal reason for the "new compliance measures" permitted by the 0.07 lbs/ton standard, *id.*, is the change to a stack-test compliance regime. *See* 78 Fed. Reg. 10,022/3 (JA__) ("the proposed change in the PM standard made possible different compliance alternatives for all of the *stack emission standards*." (emphasis added)). Petitioners' reference to PCA's prior arguments to EPA are fruitless. Br. 32. If EPA had changed the standard from 0.04 to 0.06–0.08 lbs/ton *and kept the CEMS-based compliance regime*, then the standard would have been weakened. That is not what EPA did.

*Second*, Petitioners are mistaken that § 112(d)(7) is an anti-backsliding provision that bars EPA from issuing a § 112(d) emission standard that is more lenient than a previously issued § 112(d) standard. Br. 27–32. As EPA correctly states, § 112(d)(7)'s plain language prevents EPA from supplanting standards set under *other* CAA provisions with NESHAPs that may be less stringent. EPA Br. 17–18. Section 112(d)(7) provides that no § 112 emission standard "shall … diminish or replace … a more stringent emission limitation or other applicable requirement established pursuant to section 7411 of this title, part C or D of this subchapter, or other authority of this chapter or a standard under State authority." CAA § 112(d)(7). Every reference in this list refers to sections or authorities "other" than § 112.

The structure of § 112(d) and the title of this subsection confirm this conclusion: Subsection (d) is entitled "Emission standards," and subsection (d)(7) is "*Other* requirements preserved." *Id.* (emphasis added); *see Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (explaining that "'the heading of a section'" is a tool in resolving "the meaning of a statute"). EPA correctly concluded that "[o]n its face, the provision indicates that a section 112(d) standard does not supplant more stringent standards issued under some authority other than section 112(d)." 78 Fed. Reg. 10,017/3 (JA__).

Petitioners try to contort the phrase "other authority of this chapter" in § 112(d)(7) to refer back to § 112(d) standards because § 112 is an authority of CAA Chapter 85 not otherwise mentioned in § 112(d)(7). Br. 28–29. They rely on this

7

Court's recognition that the "word 'other' connotes 'existing besides, or distinct from, that already mentioned or implied,'" *Fin. Planning Ass'n v. SEC*, 482 F.3d 481, 489 (D.C. Cir. 2007); Br. 28–29.  But the Court's definition just confirms EPA's plain-text reading because § 112 is something "already mentioned" in § 112(d)(7).  Section 112(d)(7) states that no emission standard "under this section" shall diminish or replace more stringent requirements "established pursuant to … other authority of this chapter."  CAA § 112(d)(7).

Petitioners' reading of the phrase "other authority of this chapter" is also refuted by the familiar interpretive rule that "words and people are known by their companions."  *Gutierrez v. Ada*, 528 U.S. 250, 255 (2000).  General terms or phrases in a list are given a narrower or more definite meaning by looking to the more specific terms or phrases in that list.  *See, e.g.*, *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384–85 (2003) (holding that the phrase "'other legal process' should be understood to be process much like the processes of execution, levy, attachment, and garnishment" listed).  In other words, "words grouped in a list should be given related meaning."  *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990) (internal quotation marks omitted).  Here, the general phrase "other authority of this chapter" appears in a list of authorities, all of which refer to authorities *other* than § 112.  CAA § 112(d)(7) (listing "section 7411," parts "C and D of this subchapter," and "State authority").  Accordingly, the phrase "other authority

of this chapter" likewise should be understood to refer to authorities other than § 112. *Wash. State Dep't*, 537 U.S. at 384–85.

Moreover, Congress has consistently shown that it knows precisely how to make specific requirements applicable to § 112 emission standards. *See* CAA § 112(d)(6) (requiring review and revision of "emission standards promulgated *under this section* no less often than every 8 years" (emphasis added)); *id.* § 112(d)(4) (permitting EPA to consider a health threshold for certain pollutants "when establishing emission standards under this subsection"). But it has not done so here. *See Jama v. ICE*, 543 U.S. 335, 341 (2005). Similarly, when Congress intends to limit EPA's authority to weaken or diminish a previously established requirement, it does so explicitly. *See* CAA § 193 (requiring modifications to "insur[e] equivalent or greater emission reductions of such air pollutant"); *id.* § 172(e) (allowing relaxation of standards, but requiring "controls which are not less stringent than the controls applicable to areas designated nonattainment before such relaxation"); *id.* § 110(*l*) (prohibiting EPA from approving SIP revisions if they would "interfere with any applicable requirement concerning attainment"); *see also* 78 Fed. Reg. 10,017/3 (JA__).[3]

---

[3] Petitioners' reliance on § 129(h), Br. 29, is misguided. That section gives EPA or States the authority to impose more stringent or additional requirements. CAA § 129(h)(1)–(2). Unlike the statutory provisions cited above, the provisions in § 129(h) are not probative of how Congress *limits* EPA's authority to enact less stringent standards than those already promulgated.

*Third*, even if Petitioners' arguments were not foreclosed by the text of § 112(d)(7), they at most make this provision ambiguous, and Petitioners have not shown that EPA's interpretation is unreasonable. *See Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843–44 (1984). EPA explained that its interpretation is reasonable because it allows EPA to amend a standard that is technically deficient or incorrect, 78 Fed. Reg. 10,017/3 (JA__), which is precisely what happened here. *Id.* at 10,017/1–2 (JA__). In response, Petitioners argue only that there are three other ways in which an emission standard could be corrected if it were deficient or incorrect. Br. 31. But the existence of other mechanisms does not render EPA's choice arbitrary or unreasonable. To the extent § 112(d)(7) is ambiguous, EPA's reasonable interpretation prevails.

## II. EPA APPROPRIATELY REFUSED TO SET A BEYOND-THE-FLOOR STANDARD FOR PM.

Petitioners launch a meritless attack on EPA's decision not to set a beyond-the-floor standard for PM. They argue that EPA erred by relying on a cost-effectiveness analysis in refusing to adopt beyond-the-floor standards for PM. Br. 33–37. According to Petitioners, the only cost that EPA can consider under § 112(d) is whether "the standard is too expensive for industry to achieve." Br. 34. Petitioners' argument is unavailing.

Section 112(d)(2) provides that emission standards "shall require the maximum degree of reduction in emissions of" HAPs "that the Administrator, *taking into*

10

*consideration the cost of achieving such emission reduction*, and any non-air quality health and environmental impacts and energy requirements, *determines is achievable*." CAA § 112(d)(2) (emphases added). Nothing in the text of this provision suggests that "Congress made clear *how* it wanted EPA to consider these factors." Br. 34. Rather, Congress granted EPA discretion to determine how "consideration [of] cost" may make a reduction "achievable."

Petitioners' assertion that § 112(d)(2) "requires the maximum degree of reduction that, considering cost and the other listed factors, is *capable* of being achieved," Br. 33 (emphasis added), is not what Congress wrote. *See Hays v. Sebelius*, 589 F.3d 1279, 1283 (D.C. Cir. 2009). Congress required the maximum degree of reduction that EPA "determines is achievable," giving EPA discretion to determine what is achievable based on cost and other factors. CAA § 112(d)(2). Structurally, this makes sense: the baseline "floor" standard reflects the minimum stringency "deemed achievable," *id.* § 112(d)(3), and EPA has discretion after considering cost and other factors to determine what further reductions, if any, are "achievable," *id.* § 112(d)(2). Indeed, while this question of statutory interpretation was not before it, the Court has twice recognized EPA's discretion to evaluate cost-effectiveness when setting beyond-the-floor standards under § 112(d)(2). *See Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 674 (D.C. Cir. 2013) (per curiam) ("EPA reasonably explained that further reductions were unwarranted due to concerns about," *inter alia*, "cost-effectiveness … and petitioners point to no 'clear error of judgment' reflected in this

11

reasoning."); *Arteva Specialties S.a.r.l. v. EPA*, 323 F.3d 1088, 1092 (D.C. Cir. 2003)

(holding that EPA has discretion to aggregate the cost-effectiveness of facility-wide

controls "as long as it is reasonable"); *see also* 75 Fed. Reg. 54,988 (employing cost-

effectiveness analysis to reject beyond-the-floor standard for PM); 76 Fed. Reg.

15,704, 15,732 (Mar. 21, 2011) (same).

　　Moreover, Petitioners' argument ignores that § 112(d)(2) provides only that

EPA must "tak[e cost] into consideration" when determining what is achievable,

without stating how it must do so.  Under similar circumstances, this Court has

explained that EPA's use of cost-effectiveness is "reasonable" when the CAA

mandates consideration of cost but "does not mandate a specific method of cost

analysis."  *Husqvarna AB v. EPA*, 254 F.3d 195, 200 (D.C. Cir. 2001) (addressing CAA

§ 213(a)(3), which states that EPA must promulgate standards that "shall achieve the

greatest degree of emission reduction achievable through the application of

technology which the Administrator determines will be available …, giving

appropriate consideration to the cost of applying such technology"); *see also Sierra Club

v. EPA*, 325 F.3d 374, 377–78 (D.C. Cir. 2003) (addressing CAA § 202(l)(1), which

instructs EPA to develop standards that EPA "'determines reflect the greatest degree

of emission reduction achievable through the application of technology …, taking

into consideration … costs of the technology,'" but which "does not resolve how the

Administrator should weigh all these factors in the process of finding the 'greatest emission reduction achievable'"). So too here.[4]

Petitioners contend that any statements by the Court in *Husqvarna* or *Sierra Club* that would permit a cost-effectiveness analysis are dicta. Br. 36–37. Not so. In *Husqvarna*, the Court explained that EPA had discretion to consider marginal cost-effectiveness, because § 213 "simply directs the EPA to consider cost," and held that "EPA did not deviate from its statutory mandate … by considering cost" and other factors. 254 F.3d at 200. And in *Sierra Club*, the Court explained that "language" similar to what is used in § 112(d)(2) "does not resolve how the Administrator should weigh all these factors in the process of finding the 'greatest emission reduction achievable.'" 325 F.3d at 378. The Court's authoritative reading of the provisions at issue in these cases confirms what is apparent from the face of § 112(d)(2): this provision gives EPA ample discretion to consider cost-effectiveness.

Petitioners contend that the Supreme Court's decision in *American Textile Manufacturers Institute, Inc. v. Donovan*, 452 U.S. 490 (1981), supports their argument that the plain language of § 112(d)(2) forbids EPA from considering cost-effectiveness. Br. 35. But unlike § 112(d)(2), the statutory provision at issue in *American Textile* said nothing about considering cost, and provided only that the agency must "'set the

---

[4] In fact, cost-effectiveness is a more rational metric than absolute cost because it permits EPA to make comparative assessments of different technologies on an apples-to-apples (*i.e.*, cost per unit of pollution reduced) basis.

13

standard which most adequately assures, *to the extent feasible*, on the basis of the best available evidence, that no employee will suffer material impairment of health.'" 452 U.S. at 508 (quoting 29 U.S.C. § 655(b)(5)). Section 112(d)(2), on the other hand, specifically directs EPA to "conside[r] the cost" and leaves to its discretion the appropriate way of doing so.

Because § 112(d)(2) does not unambiguously preclude EPA from considering cost-effectiveness in determining what is achievable, the question is only whether EPA's construction of the CAA is reasonable. *Chevron,* 467 U.S. at 845. However, Petitioners do not challenge the reasonableness of EPA's long-standing interpretation, nor do they attack EPA's cost-effectiveness analysis. EPA properly refused to adopt a beyond-the-floor limit for PM.

## III. THE COMPLIANCE DEADLINE FOR EPA'S NEW STANDARDS COMPLIES WITH § 112(i)(3)(A).

Petitioners' challenge to EPA's compliance deadline for the newly promulgated emission standards also fails. After this Court remanded EPA's prior portland cement NESHAP, *see PCA*, 665 F.3d at 182, 189, EPA complied with the Court's instruction to recalculate the emission floors. 78 Fed. Reg. 10,007/3–10,008/1 (JA__–__); 77 Fed. Reg. 42,368, 42,370/1–2 (July 18, 2012) (JA__). This produced a revised PM limit for new and existing sources, but the same limit for total hydrocarbons ("THC") and hydrogen chloride ("HCl"). 78 Fed. Reg. 10,010/1–3 (JA__). EPA promulgated the same emission limit for mercury, but did so as a beyond-the-floor standard rather

14

than a floor standard, and issued a revised standard for the organic HAP alternative to the THC standard. *Id.*

In promulgating these new emission standards, EPA set a "compliance date of September 9, 2015 for existing source standards for PM, mercury, HCl and THC." *Id.* at 10,008/2 (JA__). EPA explained that the new PM standard—and in particular the change to the PM compliance regime—provided companies with "different compliance alternatives" that "could legitimately take two years from the original compliance date to implement." *Id.* at 10,022/3 (JA__). This is due in part to the "interrelatedness of the standards: the mercury, THC and HCl standards all typically involve some element of PM generation and capture and so the controls must be integrated with PM control strategies." *Id.* Based on EPA's "engineering judgment" and expertise, its long-standing analysis of the timing for "multipollutant control systems," and the substantial record, EPA concluded that the most expeditious date by which cement kilns could comply with the emission standards would be September 9, 2015. *Id.* at 10,022/3–10,024/3 (JA__–__). EPA explained that numerous cement kilns had taken steps toward compliance with the 2010 Rule but concluded that "the remaining work" to comply with the 2013 Rule "would legitimately stretch through the summer of 2015." *Id.* at 10,023/3–10,024/1 (JA__–__). The "preliminary work could only go so far when there was uncertainty about the final standard and uncertainty around which standard would determine their final control strategy." *Id.*

15

Petitioners launch two attacks on the compliance deadline:  they contend that EPA lacks authority under CAA § 112(i)(3)(A) to "extend" the compliance deadline in the 2010 Rule by revising the standards, Br. 41–47, and that EPA, under the same subsection, failed to require compliance "as expeditiously as practicable," Br. 37–41. Neither has merit.

## A. EPA's Compliance Deadline For Newly Promulgated Standards Falls Squarely Within EPA's Authority Under § 112(i)(3)(A).

Contrary to Petitioners' assertions, EPA had ample authority to set the September 9, 2015 compliance deadline for existing-source standards.  Section 112(i)(3)(A) provides that "[a]fter the effective date of any emission standard … promulgated under" § 112, no source may operate in violation of the standard; but for existing sources, EPA "shall establish a compliance date …, which shall provide for compliance as expeditiously as practicable, but in no event later than 3 years after the effective date of such standard."  CAA § 112(i)(3)(A).  Thus, the effective date of the emission standard triggers the compliance-deadline clock for existing sources.  Here, the effective date was February 12, 2013, 78 Fed. Reg. 10,006/1 (JA__), and the September 9, 2015 deadline is significantly shorter than the three-year limit.

Petitioners contend that § 112(i)(3)(A) does not allow EPA to "extend" a compliance deadline by "weakening" an emission standard.  Br. 41–42.  But EPA did not extend the compliance deadline for the standards established by the 2010 Rule; it set a new deadline for the new emission standards promulgated in the 2013 Rule,

16

explaining that any prior "standard no longer exists. It has been amended." 78 Fed. Reg. 10,024/3 (JA__). Because EPA issued new emission standards, it had authority to set a corresponding compliance deadline for those new standards.[5]

As for Petitioners' contention that EPA cannot establish a new compliance deadline by "weakening" an emission standard, Br. 42, EPA did not, as an initial matter, "weaken" the standard by converting it from 0.05 to 0.07 lbs/ton. EPA necessarily issued a new PM standard in response to this Court's remand. The final expression of the standard, which Petitioners challenge, reflects a statistical conversion, not a weakening. *See supra*, 4–6. Nonetheless, Petitioners cannot point to any textual limitation tied to the type of emission standard promulgated that would restrain EPA's authority to establish a compliance deadline. There is none. Section 112(i)(3)(A) permits EPA to establish a compliance deadline up to three-years from the effective date of a newly promulgated emission standard. The only limitation is that the deadline ensure compliance "as expeditiously as practicable." CAA § 112(i)(3)(A). Here, EPA relied on its expertise and engineering judgment to conclude based on extensive record evidence that cement kilns would need until September 9, 2015, to comply and that this deadline would ensure compliance "as expeditiously as practicable." 78 Fed. Reg. 10,022/3–10,024/3 (JA__–__). Contrary

---

[5] Petitioners make much of EPA's occasional characterization of the compliance deadline as an "extension." Br. 41 & n.7. Such a shorthand characterization cannot alter the fact that EPA established a compliance deadline based on the promulgation of new emission standards.

to Petitioners' assertion, EPA did not create "a new agency-created exception," Br.

42; it followed the text of § 112(i)(3)(A) by setting the compliance deadline according

to the effective date of newly promulgated standards.

In *NRDC v. EPA*, 489 F.3d 1364 (D.C. Cir. 2007), this Court specifically

instructed that the promulgation of an emission standard is "the trigger for the three-

year compliance period." *Id.* at 1373. "Congress made clear that only the effective

date of Section 112 emissions standards matters when determining the maximum

compliance date." *Id.* Petitioners contend that EPA was wrong to rely on *NRDC*

because that case did not address the specific situation here. Br. 43. But the logic and

reasoning of *NRDC* fully support EPA's textual reading of this subsection that EPA

"may reset the compliance date when the EPA amends the actual standard, as here."

78 Fed. Reg. 10,024/2 (JA__) (citing *NRDC*).[6]

Equally unavailing is Petitioners' argument that EPA's compliance deadline

"creates a loophole" in the CAA and defeats Congress's intent. Br. 42. The best

evidence of congressional intent is the statutory language, *United States v. Monsanto*, 491

U.S. 600, 609 (1989), and EPA's deadline is fully consistent with that intent.

Accordingly, Petitioners' reliance on *Whitman v. American Trucking Associations*, 531 U.S.

---

[6] As EPA explained, "[i]f the statute provided an absolute bar on the EPA extending an effective date," then "there was no reason for the court [in *NRDC*] to distinguish the situation where the EPA amends some ancillary feature of the rule from the situation where the EPA amends the actual standard." 78 Fed. Reg. 10,024/2 (JA__).

457, 485 (2001), and *South Coast Air Quality Management District v. EPA*, 489 F.3d 1245, 1248 (D.C. Cir. 2007), is misguided. *See* Br. 42–43. Unlike those cases, EPA is not nullifying statutory deadlines. And unlike those cases, EPA is not relying on any statutory ambiguity as a basis for action; it is following the clear text of § 112(i)(3)(A). EPA issued amended standards in response to this Court's remand in *PCA*, and § 112(i)(3)(A) gives EPA authority to set a compliance deadline for its newly promulgated emission standards.

### B. EPA Has Established A Deadline That Requires Compliance "As Expeditiously As Practicable."

Petitioners contend that, even if EPA's interpretation of § 112(i)(3)(A) is correct, EPA still violated the requirement to make sources comply with standards "as expeditiously as practicable." Br. 38. But nowhere do they even attempt to carry their heavy burden of challenging EPA's particular engineering determinations as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." CAA § 307(d)(9)(A); *see City of Waukesha v. EPA*, 320 F.3d 228, 247 (D.C. Cir. 2003) (per curiam) ("we will give an extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise." (internal quotation marks omitted)).[7]

---

[7] EPA made specific findings—based on a substantial record, and EPA's "engineering judgment" and experience—that cement kilns would need until September 2015 to comply. *See* 78 Fed. Reg. 10,022/3–10,023/3 (JA__–__); PCA Comments 6–23 (Aug. 17, 2012) (JA__–__).

Instead, Petitioners attempt a sleight-of-hand: they contend that because it was practicable for cement kilns to satisfy the 2010 Rule's standards, it is equally "practicable" for them to comply with the "weaker standards" in the 2013 Rule by using the "same control strategies" they planned to use under the 2010 Rule. Br. 38. That logic would turn the *PCA* decision into a dead letter because industry would be required to comply on the original timeline with a rule the Court remanded as arbitrary.

Section 112(i)(3)(A) provides that sources must comply with the "standard" actually promulgated, not some other standard that is without effect. Here, EPA promulgated new emission standards to revise the unlawful standards remanded in *PCA* and specifically found that cement kilns cannot be required to comply with these standards any sooner than September 9, 2015. Petitioners' approach, on the other hand, would require cement kilns to install the only PM control technology that could theoretically meet the 2010 Rule's PM standard, *compare* 77 Fed. Reg. 42,386/1 (explaining that the 2010 Rule's PM standard "requires the most advanced fabric filters, membrane bags"), *with* 78 Fed. Reg. 10,022/3 (JA__) (recognizing "new compliance strategies"), and ignore how that technology would affect or be affected by control technologies for other HAPs, *id.* at 10,022/3 (JA__) (addressing interrelatedness of control technologies and need for other "controls [to] be integrated with PM control strategies"). Section 112(i)(3)(A) does not compel such a result. *Cf. Train v. NRDC*, 421 U.S. 60, 97 (1975) ("the statute requires only

attainment as expeditiously as practicable, not attainment as expeditiously as was *thought* practicable when the initial implementation plan was devised.").  The 2010 Rule's standards "no longer exist[ and have] been amended."  78 Fed. Reg. 10,024/3 (JA__).

Petitioners say that § 112(i)(3)(A) compels cement kilns to install the "same control strategies" they were going to use "to meet the 2010 Rule" because the phrase "as expeditiously as practicable" mandates that EPA "require sources to comply as soon as they can comply."  Br. 38.  But the premise of Petitioners' argument—that if cement kilns had worked toward compliance under the 2010 Rule, they should be able to meet that Rule's September 2013 compliance deadline—is erroneous.  As EPA explained, numerous cement kilns have "taken preliminary steps toward compliance" under the 2010 Rule, but these kilns nonetheless "made the evident point that this preliminary work could only go so far when there was uncertainty about the final standard and uncertainty around which standard would determine their final control strategy."  78 Fed. Reg. 10,023/3–10,024/1 (JA__–__); *see* PCA Comments 15–16 (JA__–__).

Nor can Petitioners credibly contend that cement kilns should have installed controls despite the uncertainty regarding the final emission standards.  This Court specifically stated that "industry should not have to" comply with standards that "could likely change substantially" until those standards are "finally determined." *PCA*, 665 F.3d at 189.

Even on its own terms, Petitioners' argument fails. As the Court explained in *Chemical Manufacturers Association v. EPA*, 217 F.3d 861 (D.C. Cir. 2000), the question is not simply whether § 112(i)(3)(A) requires expeditious compliance, but whether Congress has spoken directly to the issue of how that expeditious compliance would be achieved. In that case, EPA and environmental groups argued that because the "method of compliance" at issue—ceasing to burn hazardous waste—"can be achieved well before the three-year compliance date," that method "is required by section 112(i)(3)(A)'s 'compliance as expeditiously as practicable' mandate." *Id.* at 864, 866–67. This Court rejected that argument, explaining that the phrase "as expeditiously as practicable" is "'silent or ambiguous with respect to the specific issue'" of whether the statute "requires early cessation." *Id.* at 866. Turning to the second step in the *Chevron* analysis, the Court found EPA's interpretation of this phrase "as requiring [EPA] to impose costly obligations on regulated entities without regard to the Clean Air Act's purpose" unreasonable. *Id.* at 866–67.

Thus, contrary to Petitioners' suggestion, neither § 112(i)(3)(A), nor the phrase "as expeditiously as practicable," compels EPA to require cement kilns to over-comply with emission standards by installing unnecessary and costly controls to meet an earlier deadline. *See also Biodiversity Legal Found. v. Babbitt*, 146 F.3d 1249, 1254 (10th Cir. 1998) (the phrase "maximum extent practicable" "speaks in general terms of the greatest extent feasible or possible, [but] the phrase remains ambiguous because neither the statutory language nor its ordinary meaning specifies the circumstances").

Because § 112(i)(3)(A) is "'silent or ambiguous with respect to the specific issue,'" the question is only whether EPA's reading of the phrase is reasonable, *Chem. Mfrs. Ass'n*, 217 F.3d at 866, and it is.

EPA required existing cement kilns to comply with the newly promulgated standards at the earliest date that EPA determined in its engineering judgment could be met, given the interrelatedness of all the pollution controls and the engineering requirements of designing, installing, and testing "multipollutant control systems." 78 Fed. Reg. 10,023/1–3 (JA__). Moreover, EPA concluded that cement kilns needed sufficient time to install the Continuous Parametric Monitoring System ("CPMS") newly required to monitor PM emissions. *Id.* at 10,024/1 (JA__); *id.* at 10,019–20 (JA__–__); *see supra*, 3, 5–6. These systems are necessary, according to EPA, because the technical problems EPA identified with the CEMS-based PM standard in the 2010 Rule precluded any assumption that the prior standard would actually achieve "the full range of emission reductions." 78 Fed. Reg. 10,027/1 (JA__). Thus, EPA appropriately read § 112(i)(3)(A) to require cement kilns to comply as soon as possible while also implementing control strategies that will provide reliable means of ensuring that they will achieve the necessary emission reductions. *See id.* at 10,026/3 (JA__).

Finally, Petitioners contend that EPA's reading of the phrase "as expeditiously as practicable" is unreasonable because EPA's view of practicability supposedly relies on an improper cost-benefit analysis. Br. 39–40. To the contrary, EPA's determination of the appropriate compliance deadline rests on "EPA's engineering

23

determinations as to the time needed for cement kilns to implement a different multi-HAP control strategy," 78 Fed. Reg. 10,023/1 (JA__), not a cost-benefit analysis. EPA explained that "[b]ased on the facts of this record for this source category, the type, size and aggressiveness of the controls for these HAP, as well as the PM controls, are not only interdependent but can all change as a result of the amended PM standard." *Id.* at 10,022/3–10,023/1 (JA__–__). As a result of the technical challenges, EPA concluded that existing cement kilns needed until September 2015 to design, construct, implement, and test the necessary multipollutant control systems. Moreover, existing cement kilns required time to install the newly required CPMS to monitor compliance. *Id.* at 10,023/3–10,024/1 (JA__–__).

Furthermore, adopting Petitioners' artificial compliance deadline, which will have expired over a month before the Court hears oral argument in this case, would cause widespread turmoil and harm. Because many, if not most, portland cement plants cannot meet the accelerated September 2013 deadline, this deadline would render many companies out of compliance with the CAA, subjecting them to possible penalties as high as $37,500 per day, per violation. *See, e.g.*, Br. of *Amici Curiae* SSM Coalition & Concrete And Masonry Related Associations 22–30. Such a result could be devastating to not only portland cement companies, but also the national economy. *Id.*

24

## IV.   PETITIONERS' CHALLENGE TO THE MALFUNCTION AFFIRMATIVE DEFENSE FAILS.

The Court should dismiss or deny Petitioners' challenge to EPA's affirmative defense to civil penalties in the case of unplanned malfunctions.  In conjunction with the emission standards promulgated in the 2013 Rule, EPA adopted an "affirmative defense to civil penalties for violations of emission standards that are caused by malfunctions."  78 Fed. Reg. 10,013/2–3 (JA__).  The defense requires a cement kiln to "prove by a preponderance of the evidence that it has met" nine stringent elements, which are "designed in part to ensure that the affirmative defense is available only where the event that causes a violation of the emission standard meets the narrow definition of malfunction"—namely, a "'sudden, infrequent,'" and unavoidable event "not caused by poor maintenance or careless operation."  *Id.* at 10,013/3 (JA__).  These elements also include a showing that "[r]epairs were made as expeditiously as possible."  *Id.* at 10,039 (JA__).

Petitioners contend that this affirmative defense exceeds EPA's authority and violates the CAA because it limits "federal courts' authority to impose penalties and citizens' right to obtain penalties" for CAA violations.  Br. 47.  Petitioners' challenge fails because they lack standing and their arguments are otherwise meritless.

### A.    Petitioners Lack Standing To Challenge The Malfunction Affirmative Defense.

Petitioners cannot establish the necessary standing requirements, most notably a concrete and particularized injury to a legally protected interest that is actual or

imminent and not merely conjectural or hypothetical. *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 560–61 (1992). Petitioners contend that they have suffered an injury in fact

because, when the affirmative defense's criteria are met, the defense "restrict[s] their

statutory right to have penalties imposed on companies … whenever a district court

finds penalties appropriate under § 113." Br. 24. Petitioners' supposed injury is too

speculative to support standing.

*First*, Petitioners likely could not seek civil penalties for any violations that fit

the terms of the affirmative defense. The malfunction affirmative defense is available

only when (1) the violation was "caused by a sudden, infrequent, and unavoidable

failure"—*i.e.*, not a systematic or ongoing problem; (2) the events causing the

violation were "not part of a recurring pattern indicative of inadequate design,

operation, or maintenance"—*i.e.*, they were discrete events; and (3) "[r]epairs were

made as expeditiously as possible"—*i.e.*, the cause of the violation has been corrected,

thereby eliminating (or at least reducing) the possibility that it could occur again. 78

Fed. Reg. 10,039/2 (JA__). In *Steel Co. v. Citizens For Better Environment*, 523 U.S. 83

(1998), the Supreme Court held that citizens lack standing to seek civil penalties for

past violations when those penalties "are payable to the United States Treasury." *Id.*

at 106.[8] And that would be the case here: Petitioners would be seeking penalties for

wholly past malfunctions, and "[p]enalties received under" the citizen-suit provision

---

[8] *Steel Co.* held that standing must be determined before analyzing whether the
statute itself even permits civil penalties for wholly past violations. 523 U.S. at 88–92.

invoked by Petitioners "shall be deposited in a special fund in the United States Treasury," CAA § 304(g). The "psychic satisfaction" of ensuring that the Treasury gets paid, that wrongdoers are punished, or that the environmental laws are enforced cannot give Petitioners standing to pursue civil penalties. *Steel Co.*, 523 U.S. at 107.

Petitioners suggest that in *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167 (2000), the Supreme Court recognized their right to seek civil penalties in situations that now may be covered by the affirmative defense. Br. 23. *Laidlaw*, however, only permitted citizens to seek civil penalties when they "are injured or threatened with injury as a consequence of *ongoing* unlawful conduct." 528 U.S. at 186 (emphasis added). The Court recognized that under *Steel Co.*, private citizens "may not sue to assess penalties for wholly past violations." *Id.* at 188.[9]

*Second*, even if Petitioners did have a right to seek civil penalties, they still lack standing because any injury is too speculative and conjectural to satisfy Article III. The Supreme Court recently reiterated "that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are

---

[9] Because Petitioners likely would have no substantive right to civil penalties in the circumstances covered by the affirmative defense, they cannot claim a procedural injury that would give them standing. *See* Br. 25. To have a procedural injury, the procedure must cause a distinct risk to the party's particularized interest. *Shays v. FEC*, 414 F.3d 76, 91 (D.C. Cir. 2005). Petitioners have no particularized interest in civil penalties under the circumstances covered by the affirmative defense, nor can they point to a risk to interests in "mitigating excess toxic emissions" or "deterring future violations." Br. 26. Civil penalties of the sort here do not remediate these interests, *Steel Co.*, 523 U.S. at 106, and thus procedures affecting penalties present no risk to these interests.

not sufficient." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (alteration in original). But Petitioners fail to show that their threatened injury of losing the right to civil penalties in the case of particular malfunctions is "certainly impending." Rather, they contend that Petitioners are likely to seek civil penalties in some future lawsuit against a cement company, and that if the criteria for the defense are met, and a district court would otherwise award such penalties, they will have been deprived of those penalties. *See* Br. 24. Such a "chain of possibilities" does not satisfy the requirement that the threatened injury be "certainly impending." *Clapper*, 133 S. Ct. at 1148. Petitioners' injury is especially speculative because, as explained to EPA, the nine criteria of the defense will be exceptionally difficult to satisfy. PCA Comments 67 (JA__).

Petitioners also try a different tack, claiming that the additional costs of litigating the affirmative defense injures them. Br. 25. This too is a purely speculative injury. Petitioners provide nothing more than the bare assertion that cement kilns will at some point raise this affirmative defense, and that Petitioners will face a "strong likelihood of incurring" additional litigation costs. *Id.* "Such 'some day'" possibilities—"without any description of concrete plans, or indeed even any specification of *when* that some day will be—do not support a finding of the 'actual or imminent' injury that [the Court's] cases require." *Defenders of Wildlife*, 504 U.S. at 564. Petitioners merely assume that cement kilns will invoke the affirmative defense, but the defense has stringent requirements that will be difficult to meet. Nor have they

shown that they will in fact face increased costs.  Cement companies—not Petitioners or EPA—bear the burden of proving the affirmative defense, and Petitioners have done nothing to show that the type of discovery relevant to the defense would differ materially from the other types of discovery that already occurs in enforcement actions.  Unlike *Teva Pharmaceuticals USA, Inc. v. Sebelius*, 595 F.3d 1303 (D.C. Cir. 2010), upon which they rely, Petitioners have not shown that the "prospect of impending harm [is] effectively certain."  *Id.* at 1314.

### B.  The Malfunction Affirmative Defense Is Lawful And Reasonable.

Even if Petitioners have standing, the Court should deny their petition because the malfunction affirmative defense is not foreclosed by the language of the CAA and is a reasonable exercise of EPA's authority.

### 1.  The CAA Does Not Foreclose EPA's Malfunction Affirmative Defense.

Contrary to Petitioners' contentions, the CAA has not "'directly spoken to the precise question at issue'" of EPA's authority to promulgate the malfunction affirmative defense for civil penalties, and, therefore, EPA has authority to adopt the defense.  *City of Arlington v. FCC*, 133 S. Ct. 1863, 1868, 1874 (2013) (quoting *Chevron*, 467 U.S. at 842).

Petitioners argue that CAA § 304(a) unambiguously precludes EPA from promulgating an affirmative defense to civil penalties.  Br. 48.  But § 304(a) merely gives district courts jurisdiction to hear citizen suits, to enforce emission standards,

and "to apply any appropriate civil penalties."  CAA § 304(a).  Nothing in this section

purports to circumscribe EPA's authority to promulgate an affirmative defense to civil

penalties for malfunctions.  Petitioners' argument presumes that EPA has no

enforcement role, but that is demonstrably incorrect.  "Congress has vested in EPA

certain investigatory and enforcement authority, without spelling out precisely how

this authority was to be exercised in all the myriad circumstances that might arise in

monitoring matters related to clean air … standards."  *Dow Chem. Co. v. United States*,

476 U.S. 227, 233 (1986).  "When Congress invests an agency with enforcement and

investigatory authority, it is not necessary to identify explicitly each and every

technique that may be used …."  *Id.*  Given EPA's enforcement authority, *see, e.g.*,

CAA §§ 113(b), (d), (e)(1), 304(c)(2), nothing in § 304(a) is sufficient to deprive EPA

of the authority under § 301 "to prescribe such regulations as are necessary to carry

out [EPA's] functions."  *Id.* § 301(a); *see City of Arlington*, 133 S. Ct. at 1874 (explaining

that the "preconditions to deference under *Chevron* are satisfied because Congress has

unambiguously vested the FCC with general authority to administer the

Communications Act through rulemaking and adjudication, and the agency

interpretation at issue was promulgated in the exercise of that authority").

Petitioners are mistaken that § 304(a)'s grant of jurisdiction to district courts to

issue civil penalties precludes EPA's authority to promulgate regulations concerning

civil penalties.  Br. 48.  First, § 304(a) is not an unconditional grant of authority to

district courts to issue civil penalties.  Rather, Congress provided that district courts

30

may issue "*appropriate* civil penalties," a facially ambiguous mandate that leaves EPA discretion to promulgate rules defining when civil penalties are appropriate. *Chevron*, 467 U.S. at 843.

Second, Petitioners' argument rests on taking a statement from *City of Arlington* out of context. Br. 48. In footnote 3, the *City of Arlington* Court did not address district court authority to issue civil penalties, or even whether an agency can promulgate an affirmative defense to civil penalties for violations of the standards it promulgates. Rather, the Court sought to distinguish the lack of deference given to an agency interpretation that sought to eliminate a private right of action completely when Congress had "established an enforcement scheme independent of the Executive and provided aggrieved farmworkers with direct recourse to federal court where their rights under the statute are violated." *Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650 (1990); *City of Arlington*, 133 S. Ct. at 1871 n.3. The Court merely recognized that deference is inappropriate when an agency attempts to eliminate a private right of action that Congress has vested exclusively in the judiciary. 133 S. Ct. at 1871 n.3.[10] The Court meant nothing more when it stated that "the Judiciary, not any executive agency, determines 'the scope'—including the available remedies—'of judicial power vested by' statutes establishing private rights of action." *Id.* It did not forbid agencies from promulgating affirmative defenses. By giving district courts jurisdiction to apply

---

[10] Unlike the situation in *Adams Fruit Co.*, here Congress has not vested an exclusive enforcement scheme in the judiciary. *See, e.g.*, CAA § 113(a), (b), (d).

"appropriate" civil penalties, Congress did not speak directly to whether EPA has

authority to promulgate the malfunction affirmative defense, much less foreclose

EPA's authority to do so.

Petitioners also claim that Congress has spoken directly to the precise issue

here in CAA § 113(e) and foreclosed EPA's authority to promulgate the defense to

civil penalties. Br. 48–50. Again, they are mistaken. Section 113(e) sets forth the

factors that "the Administrator or the court" must consider "[i]n determining the

amount of any penalty." CAA § 113(e). As the Fifth Circuit recently recognized,

§ 113 does not speak directly to whether EPA has authority to adopt an affirmative

defense against civil penalties for malfunctions. *Luminant Generation Co. v. EPA*, 714

F.3d 841, 852 (5th Cir. 2013) (upholding EPA's approval of an affirmative defense in

a state implementation plan). This provision provides the factors that EPA and the

courts must consider in setting the amount of civil penalties, but it says nothing about

affirmative defenses to those penalties. Petitioners admit as much, Br. 50 (noting

"Section 113(e)'s silence on affirmative defenses against civil penalties in cases of

malfunction"), which is more than sufficient to move to the second step of the

*Chevron* analysis. 467 U.S. at 842–43.

Petitioners retort that § 113(e) does speak to EPA's authority to promulgate an

affirmative defense to penalties because that defense would make "the amount of civil

penalties to be assessed … zero" and zero "is an amount." Br. 54. An affirmative

defense, however, does not simply reduce an award to zero; it "defeat[s] the plaintiff's

or prosecution's claim." *Black's Law Dictionary* 482 (9th ed. 2009). No one says that a statute of limitations defense reduced a defendant's liability to zero. They say that the defendant "cannot be held liable." *Great Atl. & Pac. Tea Co. v. FTC*, 440 U.S. 69, 78 (1979). Section 113(e)'s phrase "determining the amount of any penalty" does not speak directly to whether EPA has authority to promulgate the malfunction affirmative defense for civil penalties.

Petitioners also complain that "EPA identifies neither textual support for the affirmative defense nor any ambiguous language that … might accommodate it." Br. 51. EPA explained, however, that the defense stems from its authority to establish emission standards under § 112, which include "any requirement relating to the operation or maintenance of a source to assure continuous emission reduction." CAA § 302(k) (defining emission standard); *see* Br. of *Amici Curiae* SSM Coalition & Concrete And Masonry Related Associations 9–11 & n.11. And, in any event, EPA bears no such burden. *See City of Arlington*, 133 S. Ct. at 1874; *see* CAA § 301(a).

## 2.     EPA's Malfunction Affirmative Defense Is Reasonable.

Because Congress has not spoken directly to the precise issue here, the only remaining question is whether EPA's affirmative defense "is a reasonable policy choice for the agency to make." *Chevron*, 467 U.S. at 845. It is. EPA explained that the defense "appropriately resolves an underlying tension inherent in many types of air regulation, to ensure continuous compliance while simultaneously recognizing that

despite the most diligent of efforts, emission limits may be exceeded under circumstances beyond the control of the source." 78 Fed. Reg. 10,014/1 (JA__).

Petitioners contend (Br. 56) that the affirmative defense is unreasonable because it effectively "[c]ircumvents" this Court's decision in *Sierra Club v. EPA*, 551 F.3d 1019 (D.C. Cir. 2008), which vacated EPA's *exemption* from emission standards for periods of startup, shutdown, and malfunction, holding that this exemption "violate[d] the CAA's requirement that some section 112 standard apply continuously." *Id.* at 1021. But the affirmative defense does nothing to circumvent the Court's ruling; rather, it upholds the "continuous compliance" requirement while not excessively penalizing cement companies for events completely out of their control. Because injunctive relief remains available, an enforceable emission standard applies continuously.

Petitioners next contend that EPA's choice is irrational because EPA acknowledged that intervening case law and CAA amendments have "'undermine[d]'" the relevance of cases it has relied upon in explaining the inherent tension in the CAA's treatment of malfunctions. Br. 52 n.12, 58 (alteration in original). EPA merely recognized, however, that the Court's interpretation of CAA amendments precluded it from adopting an *exemption* for startup, shutdown, and malfunction. EPA explained that the cases remained relevant to the tension inherent in many types of air regulation. 77 Fed. Reg. 42,379/2 (JA__).

Finally, Petitioners' attempt to prove that EPA's rationale for the defense is "internally inconsistent," Br. 59, also fails.  There is nothing inconsistent with EPA's statement that the criteria necessary to obtain the defense are designed to prevent future malfunctions, and the fact that the defense operates only when the events were not reasonably preventable.  One criterion for the defense is that the cement kiln prepare an analysis to identify the cause of the malfunction and help understand what can be done to prevent future malfunctions.  78 Fed. Reg. 10,039/2 (JA__).  Understanding a malfunction to help prevent future malfunctions is not inconsistent with the fact that the past malfunction was at that time unpreventable.  EPA reasonably exercised its discretion in adopting the malfunction affirmative defense.

## CONCLUSION

For the foregoing reasons, the Court should dismiss in part and deny Petitioners' petitions for review.

Respectfully submitted,

| | |
|---|---|
| /s/ William M. Bumpers | /s/ Carter G. Phillips |
| William M. Bumpers | Carter G. Phillips |
| Debra J. Jezouit | Roger R. Martella, Jr. |
| Michael B. Schon | Timothy K. Webster |
| BAKER BOTTS L.L.P. | Ryan C. Morris |
| 1299 Pennsylvania Avenue, N.W. | SIDLEY AUSTIN LLP |
| Washington, D.C. 20004 | 1501 K Street, N.W. |
| (202) 639-7700 | Washington, D.C. 20005 |
| William.bumpers@bakerbotts.com | Telephone: (202) 736-8000 |
| *Counsel for Holcim (US) Inc.* | *Counsel for Portland Cement Association* |

/s/ Beth S. Ginsberg
Beth S. Ginsberg
Jason T. Morgan
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
(206) 624-0900
*Counsel for Ash Grove Company*

/s/ Ashley C. Parrish
Ashley C. Parrish
Cynthia A.M. Stroman
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 737-0500
Email: aparrish@kslaw.com
*Counsel for Riverside Cement Company*
*and TXI Operations, LP*

/s/ Richard G. Stoll
Richard G. Stoll
FOLEY & LARDNER LLP
3000 K St. NW, Suite 600
Washington DC, 20007-5109
Telephone: (202) 295-4021
*Counsel for Lafarge North America Inc.,*
*Lafarge Midwest, Inc., and Lafarge*
*Building Materials Inc.*

/s/ Deborah E. Jennings
Deborah E. Jennings
Catherine B. Campbell
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, DC 20004
Telephone: (202) 799-4357
Deborah.jennings@dlapiper.com
*Counsel for Lehigh Cement Company*

/s/ Chet M. Thompson
Chet M. Thompson
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, DC 20004
Telephone: (202) 624-2500
*Counsel for CEMEX, Inc.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,672 words (as determined by the Microsoft Word 2007 word-processing system used to prepare the brief), excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using the Microsoft Word 2007 word-processing system in 14-point Garamond font.

/s/ Carter G. Phillips
Carter G. Phillips
*Counsel for Portland Cement Association*

## CERTIFICATE OF FILING AND SERVICE

I certify that on this 5th day of August, 2013, I caused the foregoing Brief of Industry Intervenors to be filed via the Court's CM/ECF System; all of the parties listed on the attorney service preference report have been served, via the Court's CM/ECF system or by first-class mail.

I further certify that the undersigned will cause 5 copies of the foregoing Brief of Industry Intervenors to be delivered within two business days to the Clerk of the United States Court of Appeals for the District of Columbia Circuit.

/s/ Carter G. Phillips
Carter G. Phillips
*Counsel for Portland Cement Association*